1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

YOUNGEVITY INTERNATIONAL CORP., a Delaware corporation,

              Plaintiff,

   v.

TODD SMITH, an individual and Utah resident; WILLIAM ANDREOLI, an individual and New Hampshire resident; WAKAYA PERFECTION, a Utah corporation; TOTAL NUTRITION TEAM D/B/A TNT, a Utah corporation; BLAKE GRAHAM, an individual and Utah resident; ANDRE VAUGHN, an individual and Maryland resident; DAVE PITCOCK, an individual and Kansas resident; PATTI GARDNER, an individual and Utah resident; BRYTT CLOWARD an individual and Utah resident; and DOES 1–10, inclusive.

              Defendants.

Case No.  **'16CV0704 W    JLB**

**VERIFIED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**

1. Intentional Interference with Prospective Economic Advantage;
2. Intentional Interference with Contract/Inducing Breach of Contract;
3. Civil Conspiracy;
4. Breach of Contract;
5. Misappropriation of Trade Secrets (Cal. Civ. Code § 3426);
6. Misappropriation of Likeness (Cal. Civ. Code § 3344)
7. Lanham Act (15 U.S.C. 1125);
8. Breach of Fiduciary Duty; and
9. Unfair Competition (Cal. B & P Code § 17200)

<u>JURY TRIAL DEMANDED</u>

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1.      Plaintiff Youngevity International Corp. ("YGYI" or "Youngevity"), by counsel, files this Complaint for Damages and Injunctive Relief against the above-named Defendants.  This is an action for intentional interference with business relations, inducement of breach of contract, civil conspiracy, breach of contract, misappropriation of trade secrets, unfair competition, breach of fiduciary duty, and misrepresentation.  For at least the past year, the Defendants have conspired and acted in concert to interfere with Youngevity business operations, Youngevity contractual relations, and Youngevity distributor relations in order to convert business opportunities meant for Youngevity to their own competing multi-level marketing startup, doing so maliciously and in breach of fiduciary duties, while for much of that time serving as either top executives of or top level distributors in Youngevity.

2.      The Defendants have used their unique positions of trust and confidence within the company in an effort to reduce and destroy the company through a campaign, conducted in secret until the first quarter of 2016, whereby they have diverted Youngevity resources and business opportunities to their own competing venture and induced formerly loyal Youngevity distributors and Youngevity employees to breach their contracts with Youngevity and assist them in building that competing enterprise, Wakaya Perfection, LLC, a Utah-based multi-level marketing company operated by them ("Wakaya").  The Defendants took unlawful actions from within Youngevity, preying on the trust, confidence, and prominence they had within Youngevity and using confidential and trade secret information to which they had unique access to induce those breaches of contract and to convert business opportunities intended for Youngevity to Wakaya.

3.      The Defendants have thus built their competing business unlawfully at Youngevity's expense rather than legitimately without interference with Youngevity business and breach of Youngevity contracts.  Acting with malice and

1
2
3
4

with the intent to cause permanent and lasting injury to Youngevity, the Defendants have employed tactics of tortious interference, misappropriation, inducement to breach contract, breach of contract, breach of fiduciary duty, and unfair competition.

5

6

## I.   PARTIES

7

**The Plaintiff:**

8   4.   Plaintiff Youngevity International Corp. ("Youngevity") is a
9   corporation organized in 1997 and operates under the laws of Delaware with its
10   principal place of business in Chula Vista, California.  Youngevity develops and
11   distributes a wide range of consumer products through a global network of
12   independent, direct-sellers known as "distributors."  Youngevity is a successful,
13   nineteen year-old, publicly traded, "direct selling company " (DSC) company that
14   operates through direct selling networks worldwide, as well as wholly owned
15   subsidiaries, including, e.g., AL Global Corporation; CLR Roasters, LLC;
16   Financial Destinations, Inc.; and FDI Management, Inc.

17   5.   Originally a domestic company that sold specialty liquid based
18   vitamin and mineral formulas created by Dr. Joel D. Wallach, DVM, ND,
19   Youngevity has fulfilled Dr. Wallach's vision of becoming a global enterprise,
20   selling a wide range of consumer and lifestyle products, including, but not limited
21   to, health, food, gourmet coffee, wellness, beauty, cosmetic, high-end clothing,
22   photo organization and ancestry, and jewelry products to consumers globally
23   through its distributor network.  Distributors generally sell through peer-to-peer
24   relationships, e-commerce, and social marketing.  Youngevity's distributors market
25   products through corporate-backed marketing channels, including internet
26   websites, the airwaves, trade shows, lectures, community events, local shops, and
27   home meetings.  Youngevity invests more than seventy million dollars annually on
28   sales, incentives, and marketing efforts to support its distributor networks.

Youngevity now sells in excess of 1000 products, including, but not limited to, nutritional products, sports and energy drinks, health and wellness-related services, lifestyle products, gourmet coffees, and cosmetics.

6.     Through its charity, Youngevity Be the Change Foundation, Youngevity directs hundreds of thousands of dollars and a large volume of clothing and consumer goods to those in need around the world and to other charities that serve veterans and the needy.

7.     Youngevity's subsidiary owns a 1000-acre Coffee Plantation in Nicaragua.  The Plantation holds the unique distinction of being Fair Trade, Organic, Rain Forest Alliance and Bird Friendly certified.  Through its own foundation and from its Fair Trade Certification, Youngevity has invested hundreds of thousands of dollars to provide modern housing and a hydroelectric plant for the one hundred and eighty families who live and work on the plantation. Additionally, Youngevity has opened a school on the plantation to provide Kindergarten through 8th grade education for the children of the families residing there.

8.     Youngevity is a publicly traded corporation trading under the symbol: YGYI.

**The Defendants:**

9.     Defendant Wakaya Perfection ("Wakaya") is a limited liability company formed and operating under the laws of the State of Utah.  Wakaya was founded largely in secrecy in October 2015 by Todd Smith, who remained until March of 2016, a top level Youngevity distributor.  Wakaya is a multi-level marketing company that competes directly against Youngevity.  Through improper and unlawful means, and trade on the trust and confidence of their prominent Youngevity positions afforded them in dealing with Youngevity distributors, Wakaya's founding Youngevity owners, operators, and promoters (all of whom were affiliated with Youngevity as officers, employees, or distributors) have

interfered with and injured Youngevity's business interests by, *inter alia*: unlawfully inducing Youngevity employees and distributors to violate Youngevity contractual agreements trading in no small measure on their positions of trust and confidence within Youngevity; intentionally converting business opportunities intended for Youngevity to Wakaya by falsely representing that they had authority to make acquisition decisions for Youngevity and diverting those opportunities to Wakaya; disseminating false information concerning Youngevity's business and financial health to induce distributors to subscribe to the false view that Youngevity was failing in order to induce them to affiliate with Wakaya; aiding and facilitating the unauthorized use of Youngevity's intellectual property to divert business opportunities and commissions from Youngevity to Wakaya; and committing other acts of unfair competition through marketing, promotional, or advertising claims (performance and comparative claims).

10.    Todd Smith is an individual, resident of the state of Utah, and co-founder of Wakaya Perfection, LLC.  Smith recently served as a trusted, top-level distributor in Youngevity, and had ownership interests in entities that distributed Youngevity products.  While a top-level distributor for Youngevity, yet acting as an undisclosed agent for Wakaya, and serving the interests of Wakaya, Smith intentionally converted Youngevity business opportunities through misrepresentation, subterfuge, and deceit.  Smith has facilitated, aided, or abetted the violation of Youngevity contractual agreements in an effort to induce Youngevity distributors to breach their contracts with Youngevity and to cause business opportunities meant for Youngevity to be diverted to Wakaya.  Smith has encouraged or solicited Youngevity distributors to take actions that violate their contractual agreements with Youngevity.  He has disseminated false and misleading information concerning Youngevity's finances and financial standing in an effort to disparage Youngevity and thereby draw distributors and business away from Youngevity and to Wakaya.  He has falsely represented himself to be

authorized by Youngevity to negotiate and consummate acquisition contracts for Youngevity acquisitions, only to conceal and divert at least one offer meant for Youngevity to Wakaya.  Smith resides in the state of Utah.

11.     William "Bill" Andreoli is an individual and resident of the state of New Hampshire.  Andreoli has undisclosed personal financial interests in Wakaya Perfection.  Through November of 2015, Andreoli served as President of Youngevity, received a seven figure salary of pay, stock, and benefits, and received commissions as a Youngevity distributor.  While acting as an undisclosed agent for Wakaya, and serving the interests of Wakaya, Andreoli breached his contractual agreements with Youngevity for the purpose of helping create and advance the interests of Wakaya.  Andreoli acted to injure Youngevity while serving as Youngevity's President, aiding and abetting the unlawful poaching of Youngevity business opportunities and inducing Youngevity employees and distributors to breach their contracts with Youngevity to work for, and assist in the promotion of, Wakaya.  Andreoli also violated his fiduciary duty to Youngevity by placing his family and friends in profitable positions within Youngevity's marketing chain without approval from Youngevity.

12.     Andre Vaughn is an individual and resident of the state of Maryland.  Vaughn served as a top-level distributor in Youngevity until March of 2016.  A confidant of Andreoli, Vaughn is now a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants, while still a Youngevity distributor, Vaughn induced breach of Youngevity contractual agreements in an effort to secure business opportunities for Wakaya from Youngevity distributors.  Vaughn has encouraged or solicited Youngevity distributors to violate their contractual agreements with Youngevity.  As part of his effort to induce such breaches, Vaughn has falsely disparaged the company, claiming it to be financially bereft and teetering on the brink of dissolution or bankruptcy.

13.     Dave Pitcock is an individual and resident of the state of Kansas. Pitcock served as a top-level distributor in Youngevity until March of 2016, and held ownership interests in the Livinity Corporation, which Youngevity purchased from Pitcock in 2012.  As part of that agreement, Pitcock entered into a consulting agreement with Youngevity containing non-compete and nondisclosure clauses. While still a Youngevity distributor and subject to the consulting agreement, Pitcock became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants while still a Youngevity distributor, Pitcock has induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Pitcock has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  As part of his effort to induce such breaches, Pitcock has falsely disparaged the company, claiming it to be financially bereft and teetering on the brink of dissolution or bankruptcy.

14.     Total Nutrition, Inc., d/b/a "TNT," is a corporation organized and operated under the laws of Utah since 1996 and, until March of 2016, a Youngevity distributor.  Originally founded by Todd Smith and Blake Graham, TNT distributed Youngevity nutritional products and information.

15.     Blake Graham is an individual and resident of the state of Utah.  Until March of 2016, Graham served as a top-level distributor in Youngevity, and, together with Smith, held ownership interests in TNT.  Acting individually and in concert with other Defendants, while still a Youngevity distributor, Graham has facilitated, aided, or abetted violations of Youngevity contractual agreements in aid of efforts to secure business opportunities for Wakaya.  For example, in December 2015, Graham lied to Youngevity to conceal Smith's involvement in Wakaya. Further, under his control, TNT employed Wakaya distributors and assisted Wakaya in developing promotional materials used in soliciting Youngevity

distributors to breach their contracts with the company.  Graham helped support a false narrative that the Defendants' defection from Youngevity was acceptable to Youngevity management by dispatching, in the first quarter of 2016 shortly after Smith's public announcement of his establishment of Wakaya, an unauthorized email and text message to all Youngevity distributors which thanked Smith for his service to Youngevity and wished him well in his new endeavor, materially omitting the fact that Smith's actions were in violation of Youngevity contractual requirements and unapproved by Youngevity.  Graham orchestrated a campaign of deception, whereby he represented to Youngevity and its distributors that he was a loyal Youngevity distributor despite having direct knowledge of actions taken by Smith to injure Youngevity and divert its business opportunities and distributors to Wakaya.  He concealed from Youngevity facts and circumstances detrimental to its business operations, distributor relations, and business dealings with third parties.

16.    Patti Gardner is an individual and resident of Utah.  Patti Gardner served as the President of Heritage Makers, Inc.  In August 2013, Youngevity acquired Heritage Makers and entered into an Asset Purchase Agreement with Heritage Makers that included a non-compete clause.  Gardner then became Youngevity's vice president of sales.  While still employed by Youngevity, Gardner became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants, while still employed at Youngevity, Gardner induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Gardner has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  Gardner violated the Asset Purchase Agreement containing the non-compete clause which she signed on behalf of Heritage Makers.

17.    Brytt Cloward is an individual and resident of Utah.  Brytt Cloward served as the President of Heritage Makers, Inc.  In August 2013, Youngevity

acquired Heritage Makers and entered into an Asset Purchase Agreement with Heritage Makers, which included a non-compete clause.  Cloward signed that agreement on behalf of himself.  Cloward then became Youngevity's vice president of marketing.  While still employed by Youngevity, Cloward became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants while still employed at Youngevity, Cloward induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Cloward has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  Cloward violated the Asset Purchase Agreement containing the non-compete clause which he signed on behalf of himself.

18.     Defendants DOES 1-10 are presently unidentified or unknown individuals and/or entities who have or that have facilitated and participated or cooperated in the unlawful activities described herein.  The nature and identity of those defendants will become known through discovery.

## II.   JURISDICTION AND VENUE

19.     This Court has original subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff Youngevity is domiciled in California, while no other named Defendant resides in California.  The matter in controversy yields damages of millions of dollars and, thus, substantially exceeds $75,000.

20.     This Court has personal jurisdiction over all Defendants and venue is proper in this District because Youngevity maintains its principal place of business in this District and all Defendants have sufficient minimum contacts with California.  All Defendants knowingly injured Youngevity with knowledge that Youngevity is located in this District and that the damages would be incurred by Youngevity in this District.

21.     Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Youngevity's claims herein occurred in this District.  Youngevity is a California Corporation with its principal place of business located in San Diego, California.

## III.     ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

22.     Wakaya is a limited liability company recently founded in 2015.  The vast majority of MLM startups ultimately fail or remain unprofitable.  To survive, Wakaya needed to create, coincidental with the public announcement of the company's start of operations, extensive marketing appeal with a strong direct-selling network of distributors who could move consumer goods.  Wakaya has attempted to build that network by unlawfully converting to its own use Youngevity's business opportunities, employees, intellectual property, distributors and distributor networks.  Wakaya has attempted to accomplish those unlawful acts by encouraging, facilitating, aiding, or abetting individuals within the Youngevity by interfering with Youngevity's relations with its distributors, inducing Youngevity distributors to violate their contractual agreements with Youngevity, and converting business opportunities intended for Youngevity to Wakaya.

23.     Youngevity is a direct selling company that depends on the integrity of its direct-selling network of distributors to operate a profitable business.  Youngevity's distributors are deemed independent contractors, but sales and commissions earned by each distributor are shared with other Youngevity members according to the well-defined corporate structure.

24.     Youngevity distributors are encouraged to enroll additional distributors, thus increasing Youngevity's sales force and expanding the company's ability to provide Youngevity products at the consumer level to people worldwide.  New distributors who enroll under an existing distributor are said to fall within that enrolling distributor's "downline."  Those enrolling distributors fall

within the new distributor's "upline."  The relationships of distributors are all mapped through a Youngevity distributor "genealogy."

25.     Each upline distributor receives commissions for the sales by those distributors in the downline.  That compensation package encourages enrolling distributors to actively assist their downlines, train them, and support them in product promotions and sales.  The success of any Youngevity genealogy is commensurate with teamwork, effort, and resources available to those in the genealogy.

26.     Because upline distributors have a direct financial interest in their downlines (or genealogy generally), Youngevity requires all distributors to adopt, execute, and follow the Youngevity Policies & Procedures Agreement (hereinafter "Procedures").  *See* Youngevity Policies and Procedures, attached as Exhibit A. Those Procedures govern all aspects of distributor relations, from dispute resolution to advertising practices.

27.     All Youngevity distributors are bound by the Procedures.  All distributors must submit an Application/Agreement Form to become a distributor. Almost all Applications/Agreements are now submitted through Youngevity's website.  When accepting the submission of applications to become a distributor electronically, the Youngevity website requires all distributors and prospective distributors to affirmatively agree to the Procedures.  Once an individual becomes a Youngevity distributor, he or she must accept the Procedures each time before successfully logging into and accessing his or her back office.  In addition, each time the Procedures are updated, the Youngevity website provides the update to distributors, and requires the distributors to affirmatively agree to the updates.

28.     The integrity of Youngevity genealogies is essential for the successful operation of Youngevity's business.  Like most direct selling companies, Youngevity's Procedures therefore impose strict prohibitions against activities like

"cross-recruiting" among the various Youngevity genealogies.  For example, Section E12 of the Youngevity Procedures states:

> Distributors are strictly forbidden from Cross-Recruiting, and shall not sell, recruit, propose, or in any other way induce or attempt to induce any other Distributor to purchase any product or service, or to participate in any other income opportunity, investment, venture, or commit any other activity deemed, at the full discretion of the Company, as cross-recruiting.  This includes any such activities across any divisions of the Company, should any separate divisions with different compensation plans or hierarchy structures exist, unless, and as specifically stated otherwise.  The integrity of the hierarchy and the relationships therein is of paramount importance to every Distributor as well as to the Company.  Any Distributor violating this provision may be subject to immediate termination for cause, forfeiting any and all commissions due him or her.

*See* Exh. A at 8, § E12.

29.    Section E7 of those Procedures similarly prohibits the use of Youngevity's proprietary information to cross-recruit.  *Id.* at 7 (including the use of "[d]istributor lists, including downline sales organization information," which is "proprietary and confidential to the Company").  Section E7 states:

> Without limiting the generality of the foregoing, no such information may be used in cross-recruiting or with the intent to entice Company Distributors into other network marketing organizations

*Id.*

30.    Wakaya is founded, in part, by disgruntled former Youngevity distributor Todd Smith who, once loyal to the company, came to resent it as the growth of the company brought in more distributors with status equal to his own and income exceeding his.  Smith joined with the above-named Defendants—all former Youngevity employees, distributors, or executives—to build a competing network marketing company by disparaging Youngevity, inducing Youngevity

distributors to break their contracts with Youngevity and work for Wakaya, converting Youngevity business opportunities intended for Youngevity to Wakaya, and unlawfully converting Youngevity resources to promote Wakaya.

31.     Smith had enjoyed a long period of success within Youngevity, had achieved prominence in the company, and garnered the trust and confidence of the company's distributors.  He developed a reliable income stream through Youngevity's system and helped grow the business.  Youngevity supported Smith and assisted in his business development for nineteen years.

32.     Smith grew dissatisfied with Youngevity management, his dissatisfaction reaching a pinnacle when he received corporate reprimands for unlawfully entering the international market of Mexico without Youngevity authorization or Mexican legal approvals, and engaging in unlawful sales of product in Mexico, exposing the company to potential liability for foreign advertising claims and sales.  Smith translated his dissatisfaction with those reprimands and his increasing immersion in a sea of up and coming new Youngevity leaders into a design to induce Youngevity distributors to defect from the company, to divert business opportunities intended for the company, and to redirect resources of the company to facilitate the creation of a competing direct sales company: Wakaya.

33.     Smith and the other Defendants first tested whether they could induce a mass exodus of Youngevity distributors from the company to their fledgling start-up while on a Youngevity expenses-paid cruise for distributors in January 2015.  On that cruise, a top level Youngevity distributor, Tom Chenault, called a meeting to help organize and assist Youngevity distributors.  At that meeting, co-conspirators Dave Pitcock (a top-level Youngevity distributor), his wife Barb Pitcock (a top-level Youngevity distributor), Andre Vaughn (a top-level Youngevity distributor), Bill Andreoli (President of Youngevity), and Todd Smith (a top-level Youngevity distributor), all publicly expressed dissatisfaction with

Youngevity and condemned company officers.  Inviting dissent rather than defending Youngevity interests, Andreoli stated that if anyone in attendance left Youngevity, he would leave with them.

34.     After that cruise, Smith worked with his co-conspirators to lay the foundation for a new competing MLM.  Wakaya Perfection was acquired on October 22, 2015, in the State of Utah.  Smith identifies himself as a co-founder.

35.     While Smith was a top-level Youngevity distributor, he arranged meetings ostensibly as a Youngevity representative with outside businesses seeking to contract with Youngevity.  Unbeknownst to those entities, Smith used his position in Youngevity to redirect business opportunities intended for Youngevity to Wakaya, all the while concealing the opportunities from Youngevity.

36.     In 2015, a member of Smith's Youngevity "downline" introduced Todd Smith to David Smith, the owner of the Great American Clay Company based in Austin, Texas (hereinafter "GAC").[1]  GAC expressed interest in contracting with Youngevity to provide bentonite clay products, which are helpful detoxifying agents.  GAC also indicated its willingness to work with Youngevity's founder, Dr. Joel Wallach, on a book publishing project related to Youngevity's business.

37.     Todd Smith met with GAC as a representative of Youngevity.  He led GAC owner David Smith to understand that he, Todd Smith—and he alone—was the contact for Youngevity.  GAC had been scheduled to meet with Youngevity's Dr. Wallach in October of 2015 in North Carolina.  Todd Smith asked GAC to cancel that meeting with Wallach, stating that he (Smith) was already working on the account and had been given Youngevity's authority to develop new products himself.  Those representations were false.

---

[1] David Smith and Todd Smith are unrelated and have no familial connections.

38.     Todd Smith asked GAC not to disclose the reasons for cancelling GAC's meeting with Wallach and Youngevity's representatives.  Meanwhile, Todd Smith continued his negotiations with GAC for the development and formulation of four GAC products all the while still purporting to do so on Youngevity's behalf.

39.     Todd Smith then prepared a contract for GAC which named as contracting parties not Youngevity and GAC but instead Wakaya Perfection and GAC.  This led GAC's owner to engage in email correspondence expressing confusion as to why Wakaya and not Youngevity was the named contracting party. Given further assurances by Todd Smith, GAC then contracted with Wakaya to prepare its four clay products developed at Todd Smith's request for the exclusive marketing of Wakaya.  At no point did Todd Smith inform Youngevity that GAC had been seeking to contract with Youngevity.  In fact, Todd Smith requested that GAC's owner keep his negotiations with Smith confidential.

40.     Todd Smith falsely represented that he had authority to contract for Youngevity, used his color of title within Youngevity to secure business meetings allegedly on Youngevity's behalf, concealed those meetings from Youngevity, discouraged prospective businesses from contracting with Youngevity, and then converted those Youngevity business opportunities to his new Wakaya venture. That conduct was unquestionably tortious, unlawful, and deceitful.

41.     GAC now provides products exclusively for sale through Wakaya, and continues to develop products at Wakaya's direction.  The Wakaya-GAC products include nutritional supplements or products that now compete directly with Youngevity nutritional products.

42.     Smith intended to (and did) induce Youngevity distributors to break their contracts with Youngevity and become Wakaya participants, investors, and distributors.

43.     Many of the first people to endorse Wakaya's social media publications were Youngevity distributors or former Youngevity distributors recruited by Todd Smith or at Todd Smith's request.

44.     To promote Wakaya, Wakaya employees and distributors conducted conference calls.  During those calls, Wakaya has used Youngevity distributors, including Pitcock and Vaughn as primary presenters, which calls, text messages, and related social media posts are then communicated to a broad audience of Youngevity distributors, derived from Youngevity's confidential distributor lists.

45.     Smith manipulated relationships with Youngevity distributors to secure economic advantages for Wakaya, thus attempting to dismantle Youngevity business networks from within the Youngevity corporation.  To preserve his prior income stream from Youngevity business, Smith purported to convey his interests in Youngevity distributorships to his long-time personal friend, partner, and fellow Youngevity distributor, Blake Graham.  Smith conveyed those interests through a strawman transaction wherein no valuable consideration was exchanged and Smith continued to derive income and resources from Graham and TNT despite conspiring with Graham to convince Youngevity that Graham had not defected from Youngevity and should thus be entitled to receive all distributorships and commissions previously divided by Graham and Smith.  On information and belief, Graham and Smith maintained financial ties and enabled commissions and resources to be available to and used by Smith in support of Wakaya.

46.     Graham continued operation of TNT purportedly without Smith as a named partner, but in fact permitted the direct recruiting and cross-recruiting of TNT distributors and the diversion of business opportunities by Wakaya.  Graham maintained TNT as a Youngevity front that aided and abetted Smith's tortious conduct.  Both Graham and Smith profited at Youngevity's expense while Graham permitted Smith to drive Youngevity business, resources, and opportunities away from Youngevity to Wakaya.  Both Graham and Smith were aware of the

Youngevity agreements executed to prevent business losses through that type of conduct.

47.     Graham retains control over Youngevity websites that drive commerce to TNT based on the unauthorized use of the Youngevity founder's name and likeness, those of Dr. Joel Wallach.  Dr. Wallach has exclusively licensed his name, likeness, and image to Youngevity.  Youngevity has not granted to TNT, Graham, or Smith approval to use Dr. Wallach's name, likeness, or identity and has in fact demanded that Smith, Graham, and TNT cease all use of the unauthorized marks.

48.     For example, TNT and Graham retain control over the website: www.wallachonline.com.  That webpage captures prospective Youngevity purchasers and traffic.  The website ranks within the top pages when individuals search for Dr. Wallach online.  The phone number for TNT is 1-800-925-5224 (or 1-800-WALLACH), thus further trading off of Dr. Wallach's name without authorization.

49.     Aware of Todd Smith's actions to form a competing company that would cross-recruit Youngevity distributors, Graham withheld that information from Youngevity for months, until after Smith recently made a public announcement of his formation of Wakaya.   Youngevity commissions were paid to distributorships owned by Smith, Graham, and both of them, during that time and from which they drew income, and some of those funds were diverted to help establish and further the business interests of Wakaya.  In addition, Graham purported to receive, at or before the start of 2016, a transfer, assignment, or purchase of all Youngevity distributorships in which Todd Smith held an interest or received income, but the alleged transfer was a sham without complying with company rules that required authorization from Youngevity before so doing. Graham attempted to mislead Youngevity into believing Smith was no longer involved in or receiving income from any Youngevity distributorship when in fact

Smith remained involved in and received income from Youngevity distributorships.   He did so in an effort to have all distributorships previously held jointly or from which funds were divvied up between the two restructured to be in Graham's name only but with no restrictions as to Graham's dispensation of the funds, including payment back to the defecting Todd Smith or to Wakaya.  Graham falsely informed Youngevity that TNT, a Youngevity distributor, had been assigned to him exclusively and that it had nothing to do with Smith or Smith's company Wakaya.

50.     On February 22, 2016, Graham sent an email and text letter to all Youngevity distributors using Youngevity's confidential distributor list without Youngevity authorization. Graham's unauthorized correspondence, issued while under suspension, complimented Todd Smith on his departure and wished him well in the new venture, as if written with Youngevity's blessing when it was not. *See* Graham e-mail, attached as Exhibit B.  The content was contrary to Youngevity's position on the departure of Todd Smith.  A top level distributor, Graham used the email and text communication and the confidential distributor list to convey the false impression that Youngevity had no issues with Todd's departure or formation of a competing MLM, thus implying that further moves by Youngevity distributors to become Wakaya distributors would likewise not offend the company.

51.     Graham has admitted that certain individuals employed by TNT are in fact also employed by Wakaya Perfection and are also distributors for Wakaya Perfection, thereby causing a Youngevity distributor, TNT, to condone, aid, and support Wakaya Perfection's recruitment efforts, including Wakaya Perfection's efforts at cross-recruitment of Youngevity distributors and creation of certain Wakaya promotional materials.  Those promotional materials have been used by Wakaya distributors to induce Youngevity distributors to breach their contracts with Youngevity.

52.     While still employed by or serving as distributors for Youngevity, Defendants encouraged high ranking Youngevity distributors and Youngevity employees to work for or enroll in Wakaya.  All of those individuals were advised and encouraged to maintain secrecy about their dealings with Wakaya Perfection until after public announcement of the company by Smith.  Most continued working for Youngevity at a superficial level, while concurrently gathering Youngevity information and using Youngevity relationships to lay the foundation for and promotion of Wakaya.

53.     Bill Andreoli had owned Financial Destination, Inc., FDI Management, Inc., FDI Realty, LLC, and MoneyTRAX, LLC (collectively, "FDI").  FDI was not a successful company, was experiencing a severe decline in its finances, and had just lost a major contract for one of its services when, on or about August 13, 2011, Andreoli contracted Youngevity concerning the sale of FDI to Youngevity.  Youngevity agreed to allow Andreoli, as an accommodation, to maintain and staff an office in New Hampshire.  As part of the transaction, Andreoli and Youngevity entered into an Employment Agreement which included non-circumvent and non-disclosure clauses.  *See* Andreoli Employment Agreement, attached as Exhibit C.  That agreement contains the following relevant terms:

- Andreoli must "devote his full working time, attention, and energy to [Youngevity …] and shall not … be engaged in any other business activity if pursued for gain, profit, or other pecuniary advantage without [Youngevity's] prior written consent …."  *Id.* at § 7.

- Andreoli cannot disclose any confidential information, including customer information, to any third party.  *Id.* at § 9(a)

- Andreoli cannot use any of Youngevity's trade secrets to compete with Youngevity.  *Id.* at § 9(b).

- Andreoli was required to promptly disclose any new discoveries or improvements that he developed to Youngevity.  *Id.* at §10.

54.     Over a period of approximately four years, Andreoli in his capacity as President of Youngevity, caused in excess of a dozen "forced qualifications" or automatic rank advancements to be bestowed upon individuals and entities who did not earn those advancements through increased product sales volumes, as required by Youngevity rules. Through those forced qualifications, Andreoli breached his fiduciary duty to Youngevity.  The effect was to cause the company to pay those individuals and entities higher than justified commissions, bonuses, and car bonuses.  Among those given these forced qualifications were Andreoli's parents, his wife and children, Andre Vaughn, and Monique Vaughn.  For example, as a result of Andreoli's forced qualification of Andre Vaughn, Youngevity paid Vaughn $40,000.00 in car bonuses and in excess of $600,000.00 in commissions and other bonuses over a four year period.

55.     Andre Vaughn and Monique Vaughn are married, share their assets, and co-mingle their funds.  Andre was a top distributor for Youngevity.  While both Andre and Monique maintained Youngevity distributor accounts, Andre was by far the more active in Youngevity business.  Monique claims that she has not accessed her Youngevity back office in over three years, and, upon information and belief, Monique has never been to a YGYI distributor meeting.

56.     Andre Vaughn is now a participant, promoter, and distributor for the Wakaya venture.  Andre uses his contacts at Youngevity to induce Youngevity distributors to enroll in his downline at Wakaya.

57.     Andre has unlawfully promoted Wakaya by making false and misleading claims.  For example, Andre has represented that Wakaya distributors can earn a free cruise in only 12 hours.

58.     Andreoli participated in, and helped facilitate, the Wakaya venture while serving as President of Youngevity and while under contractual obligations

to refrain from such participation and facilitation.  Andreoli's contractual agreements with Youngevity expressly precluded and prohibited his involvement with other network marketing companies.

59.     Nonetheless, while serving as Youngevity's President in August 2015, Andreoli acted to encourage widespread dissention from Youngevity management during key distributor meetings and on occasional visits to other Youngevity offices.

60.     In October 2015, again while under contract with Youngevity and while serving as Youngevity's President, Andreoli contacted other Youngevity distributors in an effort to induce contract breaches by causing them to become distributors for Wakaya Perfection.  Andreoli made additional contacts with distributors in November 2015, again soliciting their involvement in the Wakaya venture.  Andreoli hosted Wakaya corporate events at his New Hampshire facilities.  Andreoli was unquestionably a participant in and promoter for the Wakaya venture.  Andreoli took those actions despite contractual provisions that expressly and directly forbad him from so doing.

61.     Also in October 2015, Andreoli, while serving as Youngevity's President, contacted world renowned oncologist and immunologist Dr. Charles B. Simone, who had been in talks with Youngevity concerning possible licensing of a Simone health product to Youngevity.  Andreoli informed Simone that Andreoli was involved in a new MLM venture and urged Simone to join Andreoli in consummating a deal with that venture.  The offer to Simone was not made known to Youngevity's CEO or other officers or directors, and Simone declined to accept the offer.

62.     Effective December 30, 2015 in accordance with its lease agreement Youngevity closed its New Hampshire office.  A Youngevity employee, John Taylor, flew to New Hampshire to pack up the office equipment, including computers and data contained within same.  That office employed Mike Randolph,

a Youngevity Executive Vice President and "consiglieri" to Andreoli. Youngevity also employed Mike Randolph. When John Taylor attempted to obtain the computer used by Mike Randolph's son, Taylor discovered that the computer was missing and had been replaced by an older computer. Taylor was unable to recover the contents of the computer, which had included proprietary Youngevity information. In addition, at Andreoli's request, Taylor did not remove approximately $40,000 worth of office furniture to which Youngevity was entitled.

63.     Youngevity also employed Jimmy Hyun, Andreoli's brother-in-law, at the New Hampshire office. Hyun refused to supply Youngevity with passwords essential to updating Youngevity's distributor information sections on Youngevity's website. Youngevity was therefore required to expend employee hours to rebuild and replace that part of their website.

64.     On or about August 7, 2013, Youngevity purchased Heritage Makers, Inc. Patti Gardner signed that Agreement (the "HM Agreement") on behalf of Heritage Makers, and Brytt Cloward signed that Agreement on behalf of himself. *See* Heritage Makers Agreement, attached as Exhibit D. Article XI of that agreement contains confidentiality and non-competition clauses. *See id.* at p. 33. Under that article, neither Gardner nor Cloward may use, for their or Wakaya's benefit, customer lists or other information that HM transferred to Youngevity. *Id.* Further, those individuals cannot engage in a business or enterprise that qualifies as a "competing business" until at least August, 2017, or solicit or attempt to solicit sales or licenses of any competing businesses, interfere with, disrupt, or attempt to disrupt the relationship between HM, Youngevity and their customers, suppliers, agents, consultants, officers or employees relating to the Heritage Makers' products sold to Youngevity. *Id.*

65.     In August, 2015, Andreoli, acting as President of Youngevity, had Youngevity's key employees, its marketing team, comprised of Mike Casperson, Brytt Cloward, and Patti Gardner, fly to Andreoli's Youngevity office in New

Hampshire purportedly to work on Youngevity's marketing.  On information and belief, however, Andreoli had those three Youngevity employees travel to New Hampshire to discuss in secret Wakaya and their prospective employment by that company.  While at Youngevity, Cloward reported directly to Andreoli.

66.     Patti Gardner was employed by Youngevity as Vice President of Sales.  Gardner was in charge of making Youngevity's travel reservations and making reservations for Youngevity's events.  Gardner has a "travel agent number" which allows her to receive commissions on such reservations.  While in Youngevity's employ, Gardner was required to forward all commissions she earned from making reservations for Youngevity back to Youngevity.  Gardner currently owes Youngevity in excess of $20,000.00 from such commissions.

67.     While at Youngevity, Gardner reported directly to Andreoli and became close with Andreoli.  When Gardner left Youngevity, she failed to return several binders of information to Youngevity, which included contact information for Youngevity's distributors.   Gardner is now the Vice President of Sales at Wakaya.  While at Youngevity, Marin Barney reported directly to Cloward. Casperson, Cloward, and Barney all resigned from Youngevity, *at the same time as Andreoli*, in October 2015 to "pursue some other options" and "work on some new projects."

68.     Youngevity maintained valid and enforceable Nondisclosure agreements with Casperson, Cloward, Barney, and Gardner.  *See* Nondisclosure Agreements, attached as Exhibit E.

69.     As part of their resignation, Casperson, Cloward, and Barney all asked to keep their Youngevity work computers.  Youngevity refused to release those work computers, and sent an employee to the Utah office to retrieve the computers where Casperson, Cloward, and Barney worked.  That employee discovered each computer's hard drive and memory to be completely erased of content so that Youngevity could not retrieve any of its confidential information contained therein

and any of Casperson's, Cloward's, or Barney's work product.  Those laptop computers had contained sensitive and proprietary Youngevity data and work product.  The laptops also included Youngevity marketing materials, graphics, and data belonging exclusively to Youngevity.

70.     Barney is now the Senior Creative Director, Corporate Visual Branding, at Wakaya.  Mike Casperson and Brytt Cloward are also employed at Wakaya in different capacities.  New publications and promotional content published by Wakaya have adopted the format and content developed on those computers by these same employees for Youngevity during the times Barney, Cloward, and Gardner were employed at Youngevity.  On information and belief, Wakaya or its agents facilitated, aided, abetted, and orchestrated the departure of Youngevity employees and the conversion to Wakaya's use of sensitive and proprietary Youngevity data and work product.  Wakaya benefitted from that departure, and has used Youngevity proprietary information gleaned from those departing employees to its economic advantage and to Youngevity's economic disadvantage.

71.     Brytt Cloward and Patti Gardner violated their obligations under the Heritage Makers Agreement.  By working for Wakaya, they are engaging in a business venture that directly competes with Youngevity, in violation of the HM Agreement.  Cloward and Gardner further violated the HM Agreement by using Youngevity's proprietary information, including Youngevity's customer and distributor lists, to develop work product for and to solicit and attempt to solicit sales for Wakaya at Youngevity's expense.

72.     In October 2015, Youngevity began to experience injury from Wakaya's campaign to induce Youngevity employees and distributors to break their contracts with Youngevity.  As discussed *supra*, several Youngevity executives and employees suspiciously departed within the same two week window, including:  Brytt Cloward (Youngevity Vice President of Marketing);

Patti Gardner (President of Youngevity's Heritage Makers); Marin Barney (Youngevity Senior Creative Director); Mike Randolph; Mike Casperson; and President, Bill Andreoli.  Those individuals departed Youngevity abruptly, declining to identify their new positions or business plans.  Marin Barney indicated on social media that she was "starting a new project [in] November 2015" and that she had left Youngevity to "fill new Creative Management Position at a new corporation, launching 2016."

73.    All of those individuals have become executives in, employees of, or distributors for Wakaya Perfection.

74.    Those employees abruptly departed Youngevity in unison under suspicious circumstances that reflect a conspiracy—a uniform effort or agreement to participate in Wakaya and disadvantage Youngevity long before discontinuing their service to or within Youngevity.  Those employees were in constant and direct contact with Defendants, including Youngevity's former President, Andreoli.  Those employees, executives, and distributors were bound by various non-compete agreements and non-disclosure agreements that would have prevented their involvement with Wakaya, and would have particularly prevented their cross-recruiting of Youngevity distributors and their disclosure of Youngevity proprietary business information to and conversion of Youngevity work product to Wakaya.

75.    Dave Pitcock was the owner of Livinity, Inc.  On or about July 10, 2012, Pitcock sold Livinity, Inc.'s assets to Youngevity.  As part of that transaction, Livinity and Youngevity entered into a Consulting Agreement with valid non-disclosure and non-circumvent clauses, wherein Pitcock agreed to serve as a Consultant for Youngevity.  *See* Livinity Consulting Agreement, attached as Exhibit F.

76.    That agreement prohibited Livinity and Pitcock from disclosing any confidential information and from using confidential information, including

business contacts, information regarding distributors/vendors/supplies and other business associates of Youngevity, for the purpose of circumventing Youngevity's business operations. *Id.* at §§ 4(c)–(d). Furthermore, Livinity was required, at all times, to refer to Youngevity in terms that further Youngevity's business objectives and not refer to Youngevity in a manner that damages Youngevity's position in the marketplace. *Id.* at § 6. The Livinity Consulting Agreement provides for extensive relief to Youngevity, including an "injunction, monetary damages, punitive damages, and specific liquidated damages in the amount of the prior year's earnings for disclosure of Confidential Information and/or use of such information to solicit Youngevity's customers." *Id.* at § 4(e).

77.     Dave Pitcock and his wife, Barb Pitcock, are now distributors for the Wakaya venture. They were the joint owners of Youngevity distributor accounts and co-mingled their funds.

78.     The documentary and testimonial evidence demonstrates that Wakaya founders, investors, distributors, executives, and participants operated an unlawful scheme to prey upon Youngevity's distributor networks, business interests, accounts, sales, commissions, and goodwill. Wakaya, through its agents, has interfered with Youngevity business operations, has interfered with Youngevity distributor relationships, and has induced Youngevity employees and distributors to violate their contracts with the company. Wakaya unlawfully benefitted (or sought to benefit) from Youngevity's proprietary and confidential business information, in part, by using that information to recruit participants in Wakaya.

79.     Wakaya, through its agents, facilitated and encouraged the breach of Youngevity employment contracts. Those actions were taken by individuals—like Smith, Vaughn, Pitcock, Graham, Cloward, Gardner, Casperson, and Andreoli— who had knowledge of Youngevity's contractual relationships, and who were aware that their conduct was in violation of same (or would result in violation of same). Indeed, the Defendants, specifically former Youngevity leaders Smith and

Graham, and former Youngevity President Andreoli, were the same people responsible for enforcing or causing distributors to uphold Youngevity's Procedures—including Youngevity's prohibition against cross-recruiting.  They held positions of prominence in Youngevity that caused Youngevity distributors to view them with trust and confidence.  Thus, the Defendants' solicitation to join Wakaya conveyed implicit as well as explicit false connotations that doing so would not offend Youngevity, would be legally protected, and would be accepted by Youngevity without further recourse.

80.     Wakaya, through its agents, intentionally converted Youngevity business opportunities through misrepresentation, deceit, and trickery.  Wakaya met with potential Youngevity acquisitions while holding its agents out as Youngevity representatives, only to direct those accounts to Wakaya through subterfuge, concealment, and misrepresentation.

81.     Wakaya's agents, including its co-founder Smith, displayed a consciousness of potential liability.  He repeatedly coerced or encouraged individuals to maintain secrecy surrounding his unlawful and anti-competitive activities.  Through misrepresentation, he solicited the secrecy of distributors and potential Youngevity clients.

82.     The intentional targeting of Youngevity resources, and the manipulation of Youngevity's business from within—all for the economic advantage of Wakaya—violated business ethics and constituted actionable tortious conduct.  Youngevity distributors, employees, and executives are free to work outside of Youngevity during or after their time with Youngevity.  They are not, however, free to work directly for competing ventures to Youngevity's detriment and use Youngevity resources, confidential information, contacts, and opportunities against Youngevity while purporting to hold interests with Youngevity.  That latter conduct is unlawful, and is the subject of this lawsuit.  All Defendants were aware of the contractual obligations prohibiting the conduct

alleged herein and maliciously violated those obligations, fiduciary duties, and trust.

83.    Wakaya and the Defendants have made unauthorized use of Youngevity's distributor lists to facilitate interference with Youngevity contractual relations and induce breach of contract by Youngevity distributors.  They have used Youngevity's name and intellectual properties to cross-recruit.

84.    The individual Defendants used their well-known identities within Youngevity as President, in the case of Andreoli, and as corporate employees or as prominent top level distributors, in the case of the other individual named Defendants, to mislead Youngevity distributors into believing that they could become Wakaya distributors and recruit additional Youngevity distributors into Wakaya without loss of their Youngevity distributorships and commissions, thus causing those distributors wittingly or unwittingly to breach their Youngevity contracts as a result of the Defendants' exercise of artifice, guile, misrepresentation, and deceit.

85.    The Defendants, specifically Andreoli, Smith, and Graham, held prominent positions within Youngevity or its distributor hierarchy which enabled them to enjoy distributor trust and confidence, which trust and confidence they manipulated to induce distributors to breach their Youngevity contracts in the mistaken belief that Youngevity would not take any adverse action as a result of those breaches.

86.    Wakaya's conduct is unfair competition.  Wakaya has also manipulated commercial markets through false or deceptive advertising and promotional claims.  Wakaya has lured distributors into its venture through the promise of unreasonable income generation.   Acting through its agents, Wakaya has published or disseminated demonstrably false information concerning Youngevity's business.  Wakaya's dissemination of false information was intended to disparage Youngevity.  In an effort to secure more business from Youngevity

directly, Wakaya has attempted to cast Youngevity as a financially bereft corporation on the brink of bankruptcy when in fact it is financially robust and profitable, having experienced considerable success and growth.

87.     Wakaya's conduct includes false and misleading claims.  Wakaya has represented that Wakaya distributors can earn large incomes.  In fact, to date no Wakaya distributors are earning large commission-generated incomes and the substantial majority of Wakaya distributors will not earn the amount of income Wakaya has represented they will earn; indeed, most will not even recoup their investments in the company.  Todd Smith and Dave Pitcock, among others, have made such illegal income claims.

88.     Wakaya is a company formed almost entirely from a select few disgruntled Youngevity employees, distributors, and executives who came to believe that a competing direct network MLM venture would bring greater fortune than possible through Youngevity alone, despite their high salaries and large volume commissions from Youngevity.  Rather than expanding their fledgling venture through traditional means, however, the Defendants have relied substantially on business stolen or converted from Youngevity's operations.  The Defendants have attempted to secure business opportunities through unlawful means.

## COUNT ONE

### Intentional Interference with Prospective Economic Advantage

89.     The allegations of paragraphs 1 through 88 are incorporated herein by reference.

90.     Defendants Smith and Wakaya interfered with Youngevity's prospective economic relationship with Mr. David Smith, the owner of GAC.

91.     Youngevity had an economic relationship with GAC when Smith, as a purported Youngevity representative, met with GAC, and that relationship had the probability of conferring future economic benefit on Youngevity.

92.     At all times relevant herein, Defendants Smith and Wakaya were aware of the relationship between GAC and Youngevity.

93.     Defendants Smith and Wakaya engaged in intentional acts to disrupt Youngevity's relationship with GAC.  For example, Smith met with GAC falsely as a representative of Youngevity, told GAC to cancel its meeting with Youngevity's Dr. Joel Wallach without Youngevity authorization, concealed his meetings with GAC from Youngevity, and used his position within Youngevity to mislead GAC into consummating a contract with Wakaya.

94.     As a result of Smith's and Wakaya's action, GAC now provides products for sale exclusively through Wakaya, and continues to develop products at Wakaya's direction.

95.     Defendants Smith and Wakaya caused Youngevity harm because, but-for Smith's and Wakaya's interference with GAC and Youngevity's relationship, GAC would be producing products for sale through Youngevity and at Youngevity's direction and all profits to Wakaya from the sale of GAC products would instead flow to Youngevity.

96.     All defendants have interfered with Youngevity business opportunities by unlawfully diverting potential profits and sales away from Youngevity into the Wakaya enterprise.  Defendants accomplished that diversion by encouraging the breach of Youngevity agreements, and through exploitation of Youngevity's proprietary and confidential information.

## **COUNT TWO**

**Intentional Interference with Contract/Inducing Breach of Contract**

97.     The allegations of paragraphs 1 through 96 are incorporated herein by reference.

98.     All Defendants interfered with contracts Youngevity had with third parties, and induced those parties to breach their contracts with Youngevity.

99.     Youngevity maintains valid and enforceable contracts with all of its distributors.  Exh. A.  Youngevity also maintained valid non-disclosure agreements with Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney, Exh. E, and a valid asset purchase contract with Gardner and Cloward through Youngevity's purchase of Heritage Makers, Inc.  Exh. D.

100.   At all times relevant herein, all Defendants were aware that Youngevity maintained valid and enforceable contracts with all of its distributors. Further, at all relevant times herein, Wakaya and Andreoli were aware that Youngevity maintained valid non-disclosure agreements with Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney, and were aware that Youngevity maintained a valid contract with Gardner and Cloward through Youngevity's purchase of Heritage Makers, Inc.

101.   All Defendants intentionally induced Youngevity distributors to breach their contracts with Youngevity.  The Defendants contacted Youngevity distributors directly to tell them about Wakaya and recruit them to join Wakaya. For example, Defendant Graham sent an unauthorized e-mail and text to all Youngevity distributors, acting as though Youngevity endorsed the e-mail, and explained that Todd Smith is engaging in a new enterprise.  Exh. B.  That e-mail had the effect of encouraging Youngevity distributors to be aware of Wakaya and to comprehend joining Wakaya to be an option acceptable to Youngevity, when it was in fact a contractual breach damaging to Youngevity and its distributor networks.  Cross-recruiting is prohibited under Youngevity's Contract with

distributors.   Exh. A.  Defendants Wakaya and Andreoli induced Casperson, Gardner, Cloward, and Barney to violate their agreements with Youngevity by, *inter alia*, engaging in enterprises intended to compete with Youngevity, to wit, Wakaya, and by using Youngevity's confidential information, including customer lists, to obtain economic advantage for Wakaya.

102.   The actions of Defendants Smith, Andreoli, Wakaya, TNT, Graham, Vaughn, and Pitcock caused Youngevity distributors to breach their Youngevity contracts, inter alia, by cross-recruiting for Wakaya.  The action of Defendants Andreoli and Wakaya caused Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney to breach their contracts with Youngevity by, inter alia, using Youngevity's proprietary information and resources to benefit Wakaya.

103.   Youngevity has suffered damages and continues to suffer damages as a result of those distributors and employees' violations of their contracts with Youngevity and inducement of others to violate their contracts with Youngevity.

## COUNT THREE

### Conspiracy

104.   The allegations of paragraphs 1 through 103 are incorporated herein by reference.

105.   All Defendants formed and operated a conspiracy to illegally harm Youngevity for their own benefit.  For example, the Defendants conspired misappropriate and use Youngevity's trade secrets, including distributor and customer lists and Youngevity work product, for the purpose of obtaining economic advantage for Wakaya.  In particular, all Defendants had an agreement amongst themselves to illegally misappropriate and use Youngevity's customer lists, work product, and other proprietary information for the purpose of soliciting Youngevity's customers and distributors away from Youngevity and to Wakaya.  Similarly, the Defendants conspired, *inter alia*, to induce Youngevity distributors

to breach Youngevity's Procedures and conspired to misappropriate Dr. Joel Wallach's name, likeness, and identity.

106.   Defendants Smith, Andreoli, Pitcock, Graham, and Vaughn were the ringleaders in this conspiracy, formulating the goals and methods of the scheme and enticing and recruiting others to take part in in it, even while employed by and affiliated with Youngevity.  In this manner, they recruited and enticed, for example, GAC, Mike Randolph, Defendant Gardner, Bernadette Trafton, Mike Casperson, Defendant Cloward, and Marin Barney to affiliate with Wakaya.

107.   The Defendants enticed those they recruited to use proprietary information, including Youngevity customer and distributor contact information, to recruit others to join the conspiracy.

108.   The Defendants had knowledge of the unlawful objectives of the conspiracy and intended to achieve those objectives, as evidenced by the affirmative action they took to convert to Wakaya the business opportunity presented by GAC for Youngevity, to interfere with Youngevity contractual relations, and to cross-recruit Youngevity distributors.

109.   The conspiracy was successful in that it resulted in the formation of Wakaya, a direct competitor to Youngevity, and produced and continues to cause damages to Youngevity.

110.   As a direct and proximate result of the conspiracy, Youngevity has suffered and will continue to suffer loss of profits and loss of market share.  In perpetrating the above stated acts, Defendants acted willfully and maliciously, and in blatant disregard of their fiduciary duties to Youngevity and of Youngevity's rights.

## COUNT FOUR

### Breach of Contract

111.   The allegations of paragraphs 1 through 110 are incorporated herein by reference.

112.   Defendants Smith, Andreoli, Graham, Vaughn, Pitcock, Gardner, and Cloward have all entered into valid contracts with Youngevity.  Exhs. A, C–F.

113.   Youngevity has performed all obligations required under those contracts.

114.   Defendants Smith, Andreoli, Graham, Vaughn, Pitcock, Gardner, and Cloward have all breached their contracts with Youngevity.  All of those Defendants were Youngevity distributors and violated the Youngevity Procedures by cross-recruiting and using proprietary Youngevity information, such as customer lists, to cross-recruit.  All of those defendants also breached the implied covenant of good faith and fair dealing present in every contract.  Further, Defendant Andreoli breached his employment contract with Youngevity by, for example, failing to devote all of his working time and attention to Youngevity, disclosing confidential customer information and using Youngevity's trade secrets to compete with Youngevity, attempting to divert business opportunities of Youngevity to Wakaya, and failing to promptly notify Youngevity about those business opportunities.  Pitcock violated his consulting agreement with Youngevity by using confidential information, including business contacts, information regarding distributors/vendors/supplies and other business associates of Youngevity, for the purpose of circumventing Youngevity's business operations and by referring to Youngevity in terms that do not further Youngevity's business objectives.  Gardner and Cloward violated the HM Agreement by, for example, working for Wakaya, a business that competes directly with Wakaya, and by using Youngevity's confidential information, including customer and distributor lists, to solicit business for Wakaya at Youngevity's expense.

115.   As a direct, proximate, and legal result of the breaches by Defendants Smith, Andreoli, Graham, Vaughn, Pitcock, Gardner, and Cloward, Youngevity has been damaged in an amount to be proven at trial.

## COUNT FIVE

### Misappropriation of Trade Secrets

### (Cal. Civ. Code § 3426)

116.   The allegations of paragraphs 1 through 115 are incorporated herein by reference.

117.   Defendants misappropriated Youngevity's trade secrets, including distributor and customer lists, and Youngevity marketing and business information to benefit Wakaya at the expense of Youngevity.

118.   All Defendants aggressively solicited Youngevity's employees and distributors to leave Youngevity and work for and/or become distributors for Wakaya.  By virtue of their experience and positions within Youngevity, Defendants are well aware of the contractual restrictions placed on Youngevity's distributors and employees, in particular the obligation to refrain from using or divulging Youngevity's customer lists and distributor lists.

119.   The proprietary information, including customer and distributor lists, is, and at all relevant times has been, the subject of Youngevity's reasonable efforts under the circumstances to maintain its secrecy.  Youngevity has taken reasonable measures to prevent the unauthorized disclosure or use of its proprietary customer and distributor lists.

120.   The Defendants' actions constitute misappropriation of trade secrets in violation of Cal. Civil Code sections 3426.1 and 3246.2 because Defendants knew or had reason to know that Youngevity's trade secrets were acquired or were accomplished under circumstances that gave rise to a duty to maintain the secrecy of Youngevity's customer and distributor lists.  Moreover, every time the

Defendants' accessed their Distributor back door office, they were required to acknowledge and agree that the information was confidential and not to be used to Youngevity's detriment.  Defendants were well aware of the numerous policies Youngevity has about the nature and protection of its confidential, proprietary information.

121.   Defendants misappropriated Youngevity's trade secrets by, among other things, retaining or utilizing Youngevity's distributor and customer information and confidential Youngevity work product for the purpose of soliciting, directing or advising Youngevity's customers and distributors to switch their business away from Youngevity and to Wakaya's competing business.  For example, Defendant Graham used Youngevity's distributor lists to support the resignation of Defendant Smith, reveal Wakaya as a competing MLM business opportunity, and mislead Youngevity distributors into believing that Smith's resignation and new venture were not objected to by Youngevity.

122.   As a direct and proximate result of Defendants' misappropriation of Youngevity's trade secrets, Youngevity has suffered and will continue to suffer damage.  Furthermore, Defendants have been unjustly enriched by their misappropriation and use of Youngevity's trade secrets and confidential information.

123.   Defendants' conduct was done and continues to be done willfully and maliciously.  Youngevity is therefore entitled to exemplary damages pursuant to Civil Code section 3426.3, subdivision (c), and reasonable attorneys' fees pursuant to Civil Code section 3426.4.

## COUNT SIX

### Misappropriation of Likeness

### (Cal. Civ. Code § 3344)

124.   The allegations of paragraphs 1 through 123 are incorporated herein by reference.

125.   Defendants TNT, Graham, and Smith have used and continue to use Dr. Joel Wallach's name, likeness, or identity without his permission.  Dr. Wallach granted Youngevity an exclusive license to use of his name, likeness, and identity.

126.   Those Defendants have gained a commercial benefit and advantage by using Dr. Wallach's name, likeness, or identity in commerce.

127.   Youngevity and its founder, Dr. Joel Wallach, have been harmed by the unlawful and improper misappropriation and use of his name, likeness, or identity.

128.   The Defendants' conduct was a substantial factor in causing that harm.

129.   Dr. Wallach's privacy interests, including the right to limit use of commercial trading on his name, outweigh any public interest served by the Defendants' improper use of Dr. Wallach's name, likeness, and identity.

## COUNT SEVEN

### Lanham Act False or Misleading Advertising

### 15 U.S.C. § 1125

130.   The allegations of paragraphs 1 through 129 are incorporated herein by reference.

131.   Defendants have made false statements of fact in commercial advertisements about allegedly superior commercial opportunities available to Wakaya distributors, by claiming, for example, that Wakaya distributors would be able to earn $100,000.00 per month ("income claims").  Those statements by

Wakaya are false on their face or by necessary implication, inaccurate, and/or the statements are likely to mislead or confuse a substantial portion of their intended audience.

132.   The Defendants' unsubstantiated income claims actually deceived or have the potential to deceive a substantial segment of the intended audience, to induce Youngevity distributors to breach their contracts and enroll in Wakaya, and to mislead the audience into believing that they can and will in fact earn $100,000.00 per month working as a distributor for Wakaya, which representation is utterly false.

133.   The Defendants' unsubstantiated income claims are material and are likely to influence the willingness of the audience to become Wakaya distributors by purchasing that business opportunity.

134.   The Defendants' caused their false statements to enter interstate commerce by publishing those statements on the internet.

135.   Youngevity is or is likely to be injured as a result of the Defendants' false income claims by direct diversion of distributors to and sales of competing products by Wakaya.

## COUNT EIGHT
### Breach of Fiduciary Duty

136.   The allegations of paragraphs 1 through 135 are incorporated herein by reference.

137.   Bill Andreoli, as President of Youngevity, owed fiduciary duties to Youngevity.  Those duties included notifying Youngevity and obtaining authorization from Youngevity before force qualifying any individuals or entities. Those duties also obligated actions from Andreoli that served the interests of Youngevity over competing ventures.  Those duties also required Andreoli to exercise reasonable care and to maintain his loyalty to Youngevity.

138.   Andreoli breached his fiduciary duties to Youngevity, in part, by force qualifying his friends and family without obtaining authorization from Youngevity. He breached his fiduciary duties by encouraging the infliction of financial loss to Youngevity's business by other Youngevity distributors and employees.

139.   Andreoli's breach of his fiduciary duties to Youngevity proximately caused Youngevity damages.  Youngevity then paid those individuals and entities higher than justified commissions and bonuses over the course of four years, at the direct and substantial expense of Youngevity.

## COUNT NINE

### Unfair Competition

### Cal. Bus. & Prof. Code § 17200

140.   The allegations of paragraphs 1 through 139 are incorporated herein by reference.

141.   The Defendants' conduct, as alleged above, constitutes unlawful, unfair, and/or fraudulent business practices, as defined in the California Business and Professions Code § 17200 *et seq.*  California Business and Professions Code § 17200 *et seq.* borrows violations from other statutes and laws and makes them unlawful to engage in as a business practice.  Plaintiff's California Business and Professions Code § 17200 allegations are tethered to the following violations:

142.   Defendant Smith's and Wakaya's interference with Youngevity's prospective economic relationship with Mr. David Smith, the owner of GAC, constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

143.   Defendants' interference with contracts Youngevity had with third parties, and inducement to those parties to breach their contracts with Youngevity, constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

144.   Defendants' formation and operation of a conspiracy to illegally misappropriate and use Youngevity's trade secrets and confidential work product, including distributor and customer lists, for the purpose of obtaining economic advantage for Wakaya, constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

145.   Defendant Smith's, Andreoli's, Graham's, Vaughn's, Pitcock's, Cloward's, and Gardner's breaches of contracts with Youngevity constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

146.   Defendants' misappropriation of Youngevity's trade secrets, including distributor and customer lists, to benefit Wakaya at the expense of Youngevity, constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

147.   Defendant TNT's, Graham's, and Smith's use of Dr. Joel Wallach's name, likeness, or identity without his permission constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

148.   Defendants' violation of the Lanham Act by making false income claims constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

149.   Defendant Andreoli's breach of fiduciary duty to Youngevity constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

150.   As a result of Defendants' wrongful conduct, Youngevity has suffered and will continue to suffer damages and injuries according to proof at trial.

1

**PRAYER FOR RELIEF:**

WHEREFORE, Youngevity prays for judgment in its favor and against Defendants and requests that this Court award NIC the following:

A.      An award of exemplary or punitive damages under Cal. Civ. Code § 3294, 15 U.S.C. § 1117, and other applicable laws and statutes for Defendants' conduct undertaken with intent to injure Plaintiff, or with a willful and conscious disregard of Youngevity's rights.  This is an exceptional case that involves a Company's top officers, employees, and distributors conspiring together, while employed at Youngevity, to create a business in direct competition with Youngevity.  An award of punitive damages sufficient to deter and prevent that misconduct in future is appropriate in this case;

B.      A permanent injunction enjoining the Defendants, their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, subsidiaries, affiliated companies or entities, all those in privity with same, and all those in active concert or participation who receive actual notice of the judgment: (1) from using any of Youngevity's proprietary and confidential information in any manner not expressly authorized by Youngevity; (2) from profiting from any of their illegal activities, including profits made from Wakaya employees and/or distributors who were employed by and/or distributors for Youngevity; (3) from recruiting any additional Youngevity employees or distributors; and (4) from maintaining distributorships with those recruited from Youngevity through unlawful means, including through cross-recruiting;

C.      An Order requiring the Defendants to file with this Court a compliance plan under oath describing the method and manner in which Defendants intend to comply with the injunction(s), including a description of any new operating procedures and policies, to be filed within 30 days after service of an injunction;

D.     Order that defendants specifically perform contractual provisions binding on Defendants Smith, Andreoli, Graham, Pitcock, Gardner, and Vaughn that require those defendants to return all proprietary and confidential information to Youngevity;

E.     An award to Plaintiff Youngevity of costs and reasonable attorney fees and expenses incurred by Youngevity in connection with this action;

F.     An award to Plaintiff Youngevity of all of Defendants' profits and incomes since October, 2015;

G.     An award to Plaintiff Youngevity of all damages suffered by Youngevity as a result of Defendants' unlawful acts;

H.     An award to Plaintiff Youngevity of all damages allowed under the contracts and agreements between Youngevity and defendants Smith, Andreoli, Graham, Vaughn, Pitcock, Cloward, and Gardner;

I.     An award to Plaintiff Youngevity of all Wakaya sales receipts and proceeds from the sale of GAC products exclusively licensed to Wakaya;

J.     An accounting of all Defendants' profits, revenues, accounts, and proceeds received or obtained, directly or indirectly, since the date Wakaya was founded.

K.     Pre-judgment and post-judgment interest on the above damage awards;

L.     An order adjudging all Defendants jointly and severally liable, as the law allows, under each cause of action asserted by Youngevity and for all damages awarded against any Defendant;

M.     Such other and further relief as this Court deems just.

1

2   DATED:  March 23, 2016

3                                          Respectfully submitted,

4

5                                          YOUNGEVITY INTERNATIONAL,
                                           CORP.
6

7                              By:      _/s/ Peter A. Arhangelsky_____

8                                      Peter A. Arhangelsky, Esq. (SBN 291325)
                                       *Attorney for Plaintiff Youngevity*
9                                      E-mail: parhangelsky@emord.com
                                       Emord & Associates, P.C.
10                                     3210 S. Gilbert Road, Suite 4
                                       Chandler, AZ 85286
11                                     Phone: (602) 388-8899
                                       Fax: (602) 393-4361
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VERIFICATION

I, Steve Wallach, am the Chief Executive Officer of Youngevity International Corp., the Plaintiff in the above-entitled action. I have read the foregoing complaint and know the contents thereof. The allegations in the Complaint are true to the best of my own knowledge, except as to those matters which are therein stated on information and belief, and, as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Date: 3-23-16

Steve Wallach

# TABLE OF CONTENTS

**Document**                                                                 **Page Nos.**

Youngevity's Policies and Procedures …………………………………pp. 46–84

Graham E-mail………………………………………………………pp. 85–88

William Andreoli Employment Agreement..…………………………..pp. 89–99

Heritage Makers Agreement……………………………..................pp. 100–187

Nondisclosure Agreements…………………………………………..pp. 188–192

Livinity Consulting Agreement…………...............…………………pp. 193–199

# EXHIBIT A



# Policies and Procedures

**AMENDED SEPTEMBER 2014**



# Table of Contents

A. Introduction ................................................................................................ 3

B. Distributor Compensation And Definitions ................................................. 3

C. Distributor Authorization ............................................................................ 5

D. Distributor Practices .................................................................................. 8

E. Prohibited Practices ................................................................................... 9

F. Placement .................................................................................................. 11

G. Transfer Of Placement Distributorship ...................................................... 11

H. Ordering And Shipping Procedures ............................................................ 12

I. Advertising, Use Of Company Names, Protected Materials ......................... 16

J. Judicial Procedures .................................................................................... 23

K. Amendments .............................................................................................. 26

L. General Business Ethics ............................................................................. 27

M. Product Return Policy ............................................................................... 28

N. Heritage Makers Terms and Conditions and Purchase ............................. 29

How to Reach Us .......................................................................................... 38

## A  |  INTRODUCTION

The success of your independent network marketing business is directly related to relationships—relationships with customers, other Distributors, and the Company.

Tied closely to your success is the method by which the Company will compensate you for your participation in the Company's program as you conduct your business.

Experience has shown that a clear set of policies and procedures promotes harmony in vital relationships. By understanding well-defined compensation provisions, you can plan your efforts for maximum return and effectiveness. In addition, establishing proper policies ensures that equality of opportunity and fairness are available to all Distributor participants.

As you understand the Company's Policies and Procedures, you will want to follow "the spirit as well as the letter" of those policies. Your success is directly related to the service provided to others. You will find that following these policies will lead to greater success and rewards.

It is with great anticipation of your success that we present to you these policies and urge you to follow them closely and completely.

## B  |  DISTRIBUTOR COMPENSATION AND DEFINITIONS

All Distributors will better understand the policies of the Company by understanding the Distributor Compensation Plan and Definitions of a number of basic terms. These terms are commonly used to explain policies and programs in Company literature and in discussions between Distributors.

**B 1**  Company: The term "Company" as it is used throughout these policies and procedures, along with other literature, is to be considered synonymous, and can be used interchangeably with, Youngevity, or any of its subordinate and or contemporaneous companies or product lines; These companies and product lines include, but are not limited to any and all product brands, divisions, and or strategic alliances affiliated with or a part of Youngevity and or its parent company, AL International.  This list is dynamic and will change from time to time.  The current and complete list can be found by visiting www.youngevity.com.

**B 2**  Product: Any commissionable item, program, or service that the Company makes available for Distributors to market.

**B 3**  Distributor: A person or legal entity currently authorized to purchase products from the Company and to participate in the Distributor Compensation Plan. Distributor is a general term referring to all authorized Distributors as individuals and as a group regardless of the level or position attained in the program, including, but not limited to analogous terms such as associates, representatives, consultants, marketing directors, and entrepreneurs, among others.

**B 4**  Enroller or Enrolling Distributor: A distributor who officially enrolls another Distributor in the Company's income opportunity.  The Enrolling Distributor has the option to place the new Distributor into any position within his/her downline organization, or to retain the new Distributor on his/her front line and maintain the role of Placement Distributor.  The Enrolling Distributor retains a vested interest in bonus commissions, as bonus commissions primarily follow the lines of enrollment, irrespective of placement within a given organization.

**B 5**  Placement Distributor: A Distributor under which a new Distributor is placed, either by him/herself or by another Distributor in the Placement Distributor's direct Upline organization.  The Placement Distributor is generally responsible for supervision and training of the placed Distributor.  The Placement Distributor retains a vested

interest in residual commissions, GBV, and GQV, as these primarily follow the lines of placement, irrespective of enrollment within a given organization.

**B 6**    Upline: All Placement Distributor's above a particular Distributor in lines of placement up to the Company. The entire Upline consists of all Placement Distributor's and Enrolling Distributor's that link or are between any particular Distributor and the Company.

**B 7**    Downline: All Distributors via lines of enrollment or placement by any other Distributor below or emanating from a particular Distributor.

**B 8**    Suggested Retail Price (SRP): The Company's recommended price for selling a particular product to retail customers.  It is the intent that the Suggested Retail Price is the price that is charged for any and all product(s) that are sold to anyone that is not either an active Distributor or Preferred Customer of the Company. Prices are subject to change without notice.  Please see current Price List for details.

**B 9**    Wholesale Price (W/S): The maximum discounted price paid to the Company by Distributors for product.  Also, the minimum price to be charged for selling product(s) to anyone that is not either an active Distributor or Preferred Customer of the Company.  Prices are subject to change without notice.  Please see current Price List for details.

**B 10**    Bonus Volume (BV): A value amount assigned to individual products. This is the amount, singly and cumulatively, from which a distributor's Bonus and Residual Commissions are calculated.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 11**    Personal Bonus Volume (PBV): Is the BV value of a Distributor's personal purchases/retail sales (all sales running through the Distributors personal I.D. Number) during a calendar month.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 12**    Group Bonus Volume (GBV): The Bonus Volume (BV) purchased/sold by a Distributor's downline organization. The number of levels that are added cumulatively are dependent upon the specific parameters of the bonus in question.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 13**    Qualifying Volume (QV): A value amount assigned to individual products.  This is the amount, singly and or cumulatively, from which rank qualifications are calculated.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 14**    Personal Qualifying Volume (PQV):  The QV value of a Distributor's personal purchases/retail sales (all sales running through the Distributors personal I.D. Number) during a calendar month.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 15**    Group Qualifying Volume (GQV): The total QV purchased/sold by a Distributor's downline organization.  Different qualifying criteria may recognize different calculations – such as a certain number of downline levels, or cut-off's or percentages based upon downline rank complexion.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 16**    Consumer:  Any purchaser of a Company Product or Service that in turn consumes or utilizes said product or service.  Consumers may be Retail Customers, Preferred Customers, Distributors, or unaffiliated with the Company in any way.

**B 17**    Preferred Customer (PC):  A product purchaser that enrolls with the Company as a Preferred Customer through a

Distributor and purchases product at the wholesale price through their own I.D. Number.  Preferred Customers do not participate in, or benefit from the Company's Compensation System.

**B 18**   Retail Customer: A product purchaser that is not enrolled as an active Distributor or Preferred Customer with the Company, and that purchases product, either directly from a Distributor, or through the Distributor's online shopping cart. Retail Customers do not participate in the Company's Compensation System.

**B 19**   Retail Sale: A retail sale is a sale to an ultimate consumer of Company product. Included are:

   **❶** Sales to Retail customers by the Distributor.

   **❷** Purchases by a Distributor who is purchasing for personal or family use in reasonable quantities and is not purchasing for the mere purpose of qualifying for bonuses, overrides, or advancement in the marketing program.

**B 20**   Retail Profit: The amount a Distributor makes (gross) by purchasing an item at wholesale price and selling it at retail to a customer, or the difference between the wholesale price and retail price for items purchased directly through the Distributor's retail shopping cart.  Retail sales for items purchased directly through the Distributor's retail shopping cart are subject to a surcharge of 5% of the retail profit amount, which is automatically levied in the net retail commission.  Please see the Youngevity Distributor Training Manual for details on the Youngevity Compensation Plan.

**B 21**   Compensation: Compensation refers to commissions paid to Distributors for product sales to consumers.  See the Youngevity Distributor Training Manual for details and definitions relating to Distributor Compensation System.

**B 22**   Titles or Ranks: Represents certain milestones of growth and production for a Distributor and his/her downline organization.  Details of ranks, titles, and qualifications are detailed in the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide.  Ranks and the corresponding titles are shown two ways:  Lifetime Rank – which is the highest rank achieved within the Compensation system, and Paid as Rank – represents the current qualification within a given calendar month.  Some aspects of the Compensation Plan pay in concert with either a Representative's Lifetime Rank or Paid as Rank.  See the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details and definitions relating to Distributor Compensation System.

**B 23**   Commissions: Commissions are a percentage (%) of the Bonus Volume of the products purchased/sold from the Company by Distributors. Commissions on downline activity are calculated and paid on both weekly and monthly cycles.  Please see the Youngevity Distributor Training Manual and the Youngevity Compensation Plan Guide for details on the Youngevity Compensation Plan.

**B 24**   70% Rule: A rule which provides that Distributors may only purchase Company products for resale to consumers, for personal consumption, or to provide prompt product delivery to downline Distributors in their own personal group. Distributors may not stockpile or acquire excessive inventories. Prior to reordering any product, Distributors must certify that they have sold a minimum of 70% of all previous orders.

## C  |  DISTRIBUTOR AUTHORIZATION

The following are rules related to initiating and maintaining Distributor authorization in the Company's program. In addition to the warehouse policies, all aspects of these Policies and Procedures apply to Youngevity warehouses.

**C 1**   New Distributors enroll in the program by purchasing the Company's current Business Kit and submitting an Application/ Agreement Form to become a Distributor, which, upon acceptance by the Company, is part of the contract between the

Distributor and the Company. This can be done using the paper application or electronically on-line through a replicated Distributor website.  The Distributor Agreement is to be completed and endorsed by the person or entity applying to become a Distributor. This document contains important information which a prospective Distributor should read and understand before endorsing or otherwise applying for a Distributor Position. The Company reserves the right to reject, at its sole discretion, any application deemed unacceptable. Purchase of a Business Kit may be optional in some geographic areas. No purchase of Company products is required to become a Distributor.

**C 2**   When an application for Distributor authorization is other than an individual or a husband and wife, the application must be signed by one or more legal representatives who have the power to bind the applying entity. A list of all principals, directors, officers, shareholders, or others with any beneficial interest must be submitted to the Company, complete with current names, addresses, phone numbers, and a detailed accounting of percentages and conditions of interest. While partnerships, corporations, and trusts may be accepted as Company Distributors, an individual may not have a beneficial interest or be listed in more than one Distributor Position without the prior written authorization of the Company. Every Distributor must have a numerical identification number ("ID number"). If the Distributor Position includes more than one person, the Social Security Number of the first applicant on the Distributor Agreement becomes the official Federal Tax ID Number. Any bonus check paid to a Distributor will be issued in the name of the first two applicants listed on the Distributor Agreement, if applicable.

Applicants and Distributors shall not submit any inaccurate or false information on a Distributor Agreement. Furthermore, a Distributor is responsible for informing the Company of any changes affecting the accuracy of the Distributor Agreement/Application. The Company reserves the right to immediately terminate a Distributor if the Company determines that false or inaccurate information has been provided. All proposed changes to a Distributor Position must be submitted to the Company in writing, along with a new Distributor Application/Agreement form with the word "Amendment" written across the top, or electronically with proper login and password by editing information through the Representative's replicated website and back office system.

**C 3**   Authorization as a Distributor includes the right to sell products of the Company and to participate in the Company's Distributor Compensation Plan. No geographic territory in which the Company is operational shall be exclusive to any one or group of Distributors.

**C 4**   Distributor applicants must be of the age of majority in the state or province in which they reside.

**C 5**   Upon the death of the Distributor, his/her rights to bonuses and marketing position, together with Distributor responsibilities, shall pass to his/her successors in interest upon written application and approval by the Company. Written application must be received by the Company within ninety (90) days of the date of death. If the Company does not receive appropriate instruction within ninety (90) days of the death of a Distributor, the Distributor Position will be terminated or reassigned. The successor Distributor must fulfill all responsibilities of the Distributor.

**C 6**   When a decision is made to terminate a Distributor, the Company will inform the Distributor in writing. The termination notice will be sent by certified mail, or other verifiable means requiring a recipient signature, to the Distributor's address on file with the Company. If deemed necessary by the Company, Distributors may be terminated by the Company for cause. The Company has the right to take quick and decisive action in limiting or terminating a Distributor who is found in violation of these Policies and Procedures, the Distributor Agreement, rules governing the Compensation Plan, or any state, provincial, or federal laws, statutes, and/or regulations deemed as pertinent by and at the sole discretion of the Company. Such disciplinary action may include oral and written warnings, suspension, forfeiture of bonus checks, or termination. In extreme cases of violations by a Distributor, the Company also reserves the right to pursue reasonable legal recourse, as well as reimbursement by a Distributor for any expenses, including attorney's fees and legal fees, generated from a violation. The issuance

of bad checks, attempts to persuade Distributors to change Placement Distributors, cross recruiting, fraudulent misrepresentation of the Company, and the commission of illegal or deceptive acts all constitute reasonable cause for termination, together with any other material breach or violation as noted above.

**C 7**   An individual may terminate their Distributor Position at any time by providing written notice to the Company. Notice must be sent via certified mail, or other verifiable means, which may include FedEx, UPS, and or Electronic Mail with return receipt and delivery verification.

**C 8**   Whether a Distributor is terminated through voluntary resignation or through termination by the Company, that Distributor is no longer entitled to sell Company products or to enroll other Distributors. In addition, said Distributor shall lose all rights to their existing downline and shall no longer be entitled to receive sales commissions, overrides, bonuses, awards, or any compensation whatsoever from the Company, nor shall they be entitled to any rights to their former downline genealogies or Distributor lists.

**C 9**   Buy-back: Any Distributor who wishes to terminate through the Buy-Back policy must notify the Company of their intention in writing to the Company. The termination letter must list all the items to be returned, the quantities of each item, and the sales order number(s) under which each of the items was most recently purchased. The letter must be signed by all parties listed on the Distributor Agreement and must acknowledge the fact that the individual(s) listed on the Agreement may never again become a Distributor.

If the Distributor has purchased products for inventory purposes or unopened sales aids while the Distributor Agreement was in effect, all unopened products in a resalable condition then in possession of the Distributor, which have been purchased within one year of cancellation, shall be repurchased by the Company at a price ninety percent (90%) of the original net cost to the Distributor returning such goods, taking into account any sales made by or through Distributor prior to notification to the Company of the election to terminate.  For Montana Distributors only: A Montana Distributor who cancels within 15 days, is entitled to a 100% refund of any consideration given to participate.

The Company will not issue any refunds on products previously certified as sold under the 70% rule.

1   For purpose of this policy, products shall not be considered "resalable condition" if returned for repurchase after the products' commercially reasonable, usable, or shelf-life period has passed; nor shall products be considered if the Company clearly discloses to Distributors, prior to purchase, that the products are seasonal, discontinued, or special promotional products.

2   If bonuses were paid to a terminating Distributor's Upline on volume represented by returned products, commissions related to such volume will be debited from all Upline Distributor accounts. A "clawback" transaction will appear in the personal purchases section of the Upline's next "adjustment summary" with the name of the terminated Distributor in the description. Once the Buy-Back letter has been received by the Company, the Distributor will be contacted and provided with a Return Authorization Number, as well as the address to which the merchandise should be shipped. This Return Authorization Number must be clearly marked on the outside of each and every box which is being returned. Distributors are encouraged to use a traceable means of transport as the Company is not responsible for items lost in transit. Merchandise that is returned without this Return Authorization Number will be refused by the Company. Any merchandise being returned to the Company must be sent prepaid. Once the shipment has been verified, a credit will be issued and a check sent by the 15th of the following month, or a credit will be issued on the credit card originally used for the purchase. The Distributor will then be permanently terminated.

## D | DISTRIBUTOR PRACTICES

**D 1**   Distributors are independent contractors and are not: franchisees, partners, joint venturers, employees or agents of the Company or their Placement Distributors or Enrollers. Distributors must not imply or represent employment or agency relationships in any manner, including oral representations, printed material, or deceptive actions.

**D 2**   Distributors are responsible for all taxes on income received from the Company on sales made by them, and for all and any other taxes, licenses, and fees, unless the Company has established specific written procedures which specify otherwise. The Company will collect and remit sales taxes when applicable on products at the federal, state, and provincial level. Distributors are responsible for any other taxes at any lower jurisdictional levels. The Company is not responsible for any expenses relating to a Distributor's business.

**D 3**   Because Distributors are independent contractors, the Company does not dictate selling methods, specific hours, or effort levels, other than those required in Distributor/Company interactions and except as stated herein.  Distributors must at all times adhere to Youngevity compliance guidelines and acceptable marketing and business practices.

**D 4**   Personal product purchasers (retail or preferred customers) are not required to enroll as a Distributor.

**D 5**   No Distributor will be compensated solely or merely for enrolling Distributors or Customers.  Ultimately all compensation is based upon the selling of product to Consumers, which is the core of the Company's business. This fact must be emphasized in all recruiting presentations.

**D 6**   Written sales receipts, which include information regarding the products sold, price, and Distributor's name, address, and telephone number must be given to every retail customer.

**D 7**   Income paid to Distributors on sales for which the Company has given a refund, may, at the Company's option, be charged back to those Distributors.

**D 8**   In the conduct of his/her business, the Distributor shall safeguard and promote the reputation of the Company and its products. The Distributor shall hold harmless, defend and indemnify the Company, its shareholders, officers, directors, employees, attorneys, accountants, agents, assigns, and successors in interest against any and all claims, lawsuits (civil or otherwise), losses and expenses of any kind, arising out of or relating to any claims or alleged connections with that Distributor's activities of any kind that violate any local, state, provincial, or federal laws or regulations.

**D 9**   All Youngevity Distributor Applications, AutoShip Order Forms, and or any other official forms submitted to Youngevity must be endorsed by the party named on the respective form – Paper forms must contain an original signature and be mailed directly to Youngevity, and electronic forms must be viewed by, agreed to, and electronically endorsed by the appropriate party as stated within the particular form online. In the case of business entity, the endorser must be that of the legal registrant of the business name. At no time is a Distributor allowed to submit a Youngevity Distributor Application, AutoShip Order, or any other documentation that does not contain the endorsement of the named party in the manner stated above. At no time is a Youngevity Distributor allowed to submit a Youngevity Distributor Application, AutoShip Order Form, or any other documentation on which he/she has entered a signature of the named party regardless of permissions implied or received, as Youngevity does not and will not accept a "Power of Attorney" signature on any of its forms.

**D 10**   From time to time, at Company events or other functions or occurrences, solely for the purposes of promoting the Products, the Company, or combination thereof, the Company may take photos, record audio and or video of events, testimonials, sessions, or interviews and the like.  Said photos, video, and or audio may include the image, likeness, and or voice of any and or all attendees of the event, function, or occurrence.  Attendees may include,

Complaint
Exh. A
Page 54

but are not limited to Distributors, Customers, and or prospective Distributors or Customers and or Guests of same (Hereinafter for the purposes of this section, will be inclusively referred to as "Subject").  Distributor agrees and understands that it is his/her responsibility to disclose this policy to any guest that he/she invites to any Company event, function, or other occurrence.  Any such photography, videography, and or voice recording will be obvious and or clearly disclosed to the Subject.  Company will use its best and reasonable efforts to ensure that no photos, videos, and or audio recordings will be gathered against the expressed wishes of the Subject.  However, continued attendance by Subject at any event, function, or occurrence where photos, video, and or audio is being captured will, in all cases, be construed as agreement and acceptance of the following:  Subject grants permission to the rights of his/her image, likeness and sound of his/her voice as recorded on audio or video without payment or any other consideration.  Subject understands that his/her image may be edited, copied, exhibited, published or distributed and summarily waives the right to inspect or approve the finished product wherein his/her likeness appears.  Additionally, Subject waives any right to royalties or other compensation arising from or related to the use of his/her image or recording.  Subject also understands that these images and or recordings may be used in diverse educational, commercial or promotional settings within an unrestricted geographic area.  As well, there is no time limit on the validity of this understanding and subsequent release, nor is there any geographic limitation on where these materials may be distributed.

## E  |  PROHIBITED PRACTICES

**E 1**     Distributors shall not produce, promote, or use any copyrighted or otherwise proprietary materials containing the Company's names, programs, products, or logos, except those that are pre-approved and obtained directly from the Company.  Any materials used that are not provided by Company, must be approved in advance by submitting said material in concert with the Youngevity Advertising Approval Application.  Details of who may submit, and what can and cannot, and what will and will not be approved is detailed in the application, which can be obtained by contacting customer service.

**E 2**     Distributors shall not misrepresent product attributes and qualities to customers. Unauthorized, unwarranted, and unjustified product claims shall not be made.

**E 3**     Distributors shall not repackage or re-label any Company product. Nor shall the product be removed from its original packaging and resold in any way.

**E 4**     Distributors shall not misrepresent the Company's Compensation Plan for Distributors. No misleading or deceptive statements about the Plan shall be made. No opportunity or income exaggerations are to be given. If actual income examples, extrapolations, or geometric progressions are used, actual typical incomes of Company's Distributors at all levels must also be disclosed. Examples used to illustrate how the Plan works are allowed if they are specified as "examples only" and any relevance to anticipated success is disclaimed.

**E 5**     There are no franchises or exclusive territories as a part of the Company's Distributor Compensation Plan. No Distributor may represent that any such territory or franchise exists or can be sold as part of the Distributor program.

**E 6**     All Distributors are Independent Contractors; the Company imposes no restrictions on any Distributor's participation or sales activities in other businesses or programs other than Youngevity except as said activities or programs would cause or create a violation of any provision of Distributor's agreement with the Company or any of these policies and procedures.

**E 7**     Distributor lists, including downline sales organization information, is proprietary and confidential to the Company,

Complaint
Exh. A
Page 55

with the exception of first level, personally enrolled Distributors. The Company may forward genealogical information at a nominal cost to Distributors, in strict and complete confidence, to help them manage their downline sales organization and for no other purpose.

Every Distributor who is provided with such information shall treat it as confidential and take care to maintain its secrecy as well as refrain from making any use thereof for any purpose other than the management of his/her downline sales organization. Without limiting the generality of the foregoing, no such information may be used in cross-recruiting or with the intent to entice Company Distributors into other network marketing organizations.

Any violation of this policy by a Distributor will result in the immediate suspension and/or termination of the offending Distributor. Furthermore, the offending Distributor could be subject to legal action for injunctive relief and/or damages.

**E 8**  Distributors shall not cause any Company product or name to be sold or displayed in any retail establishment of any kind, including, but not limited to, civilian, military, internet based or otherwise, except those establishments and or virtual locations specifically authorized and licensed in writing by the Company. As a general rule, the Company discourages distributors from using any website for promotion other than those replicating websites provided by the Company to its distributors. Distributors using weblogs ('blogs'), online forums, video-streaming websites, chat rooms, social networking sites or systems, auction sites, or any other internet based systems are subject to the guidelines of the Company Policies and Procedures. Any violation of the terms of service of any of the aforementioned systems may subsequently be considered a violation of Youngevity Policies and Procedures. The Company reserves the right to investigate reported infractions and to enforce its Policies and Procedures.

**E 9**  Distributors shall not engage in any unlawful practices.

**E 10**  All purchases of Youngevity products, literature, and promotional material must be purchased from Youngevity in accordance with the stated Policies & Procedures. Youngevity Distributors and/or Preferred Customers are not allowed to purchase Youngevity products, literature, and promotional material from a Youngevity supplier. At the request of the Youngevity suppliers, Youngevity Distributors and Preferred Customers are not allowed to contact any Youngevity suppliers for any reason. Contact is described as, but not limited to, telephone calls, recorded voice messages (voicemail), facsimile transmission (fax), written communication, or electronic correspondence (e-mail). Any violation of this policy can, depending on severity, result in the termination of Distributors or Preferred Customer status.

**E 11**  Distributors, whether active or otherwise, shall not re-sell any product(s) in any form or combination with any other product unless it is complete, factory sealed, and in its original packaging with all required labels intact.  Pricing for said product(s) is strongly recommended to be equal to the Suggested Retail Price, but under no circumstances shall be less than the current wholesale price for same item as published by the Company. Distributors are prohibited from using any advertisement or commercial enticement that is not provided directly by the Company. Prohibited enticements include, but are not limited to, less than "wholesale plus sales tax" pricing, free shipping, quantity discounts, or any and all other perks and or incentives offered in conjunction with the purchase of any Company product or service.

**E 12**  Distributors are strictly forbidden from Cross-Recruiting, and shall not sell, recruit, propose, or in any other way induce or attempt to induce any other Distributor to purchase any product or service, or to participate in any other income opportunity, investment, venture, or commit any other activity deemed, at the full discretion of the Company, as cross-recruiting.  This includes any such activities across any divisions of the Company, should any separate divisions with different compensation plans and or hierarchy structures exist, unless, and as specifically stated otherwise.  The integrity of the hierarchy and the relationships therein is of paramount importance to

every Distributor as well as to the Company.  Any Distributor violating this provision may be subject to immediate termination for cause, forfeiting any and all commissions due him or her.

## F | PLACEMENT

**F 1**   All Distributors in good standing may enroll and place other Distributors in their Downline organization within the Company's Distributor program.  Said placement must be finalized on or prior to the 60th day of enrollment. Placement cannot be changed after 60 days of enrollment.

**F 2**   Enrollers and Placement Distributors must offer general support, information, and assistance as well as bona fide supervisory, marketing, selling, and training support to Distributors they enroll and or override, or otherwise benefit from through the compensation system.

**F 3**   Enrollers and Placement Distributors shall exercise their best efforts to ensure that all Downline Distributors understand and comply with the most current terms and conditions of the Distributor Agreement, the Policies & Procedures and Compensation Plan, as well as all applicable federal, state, provincial, and local laws, ordinances and regulations that pertain to the business of the Company.

**F 4**   Enrolling and Placement Distributors should always use their best efforts to settle disputes between a Retail Customer, a Preferred Customer, and or any Downline Distributor in an attempt to resolve such disputes promptly and amicably.

## G | TRANSFER OF PLACEMENT DISTRIBUTORSHIP

**G 1**   A Distributor may change enrollers and Placement Distributors by one of two methods.

Method one is through resignation of current Distributorship, followed by re-enrollment of a new Distributorship in the desired position of enrollment and or placement.  Such action will result in the termination of current Distributorship, along with all rights and benefits of said Distributorship, including commissions, as well as the subsequent loss of any downline Distributors and or Customers.  This must be followed by a mandatory Six (6) month period of inactivity as a Distributor prior to the submission of a new Distributor Application.

Method two is through the approved movement of current Distributorship from one line of Enrollment and or Placement to another.  This method not only requires the approval of the Company, but it additionally requires the approval of 6 levels of Upline Enrollers, using the Enroller/Placement change application.  All Upline Enrollers must actively approve any move in writing, as verbal approvals or 3rd party approvals are invalid.  Further, any lack of response by an Enroller within 10 days of notification will be construed as non-approval, and the Distributorship move will be summarily denied.  This method of Distributorship movement within the hierarchy is valid for a single Distributorship only, and does not provide for the movement of any downline Enrollees or placed distributors.  It does, however, provide for the movement of Preferred and Retail Customers that are personally enrolled by the Distributor requesting the move.

The only exception to this rule is, at the discretion of a Customer Service Manager, executive, or officer of the Company, if it is determined that a Distributor has been enrolled inappropriately or incorrectly, and only with the expressed permission of the Enroller and Distributor, said Distributor may be moved to a different Enroller/ Placement Distributor within 7 days of initial enrollment.  No Enroller/Placement Distributor changes made under this "7 day rule" will be unreasonably made or withheld.

**G 2**     A Distributor may not sell, assign or otherwise transfer his or her Distributor Position, marketing position, or other Distributor rights without written application and approval by the Company which may not be unreasonably withheld.  Use the Distributorship Transfer Application to apply for such a sale or transfer.  Sale or transfer of a Distributorship will be automatically denied if said transfer would cause a violation of any other portion of these Policies and Procedures.  Any Distributor who sells his or her Distributor Position shall not be eligible to reenroll as a Distributor for a period of at least six (6) months after the sale. The Company, after a review of the terms of the sale, reserves the right to approve or disapprove, in its sole discretion, of a proposed purchaser's qualifications and intention to manage and develop the Distributor Position.

**G 3**     No two adults in the same household shall hold Distributorships in more than one line of Enrollment or Placement.

## H  |  ORDERING AND SHIPPING PROCEDURES

**H 1**     Who May Order: The Company will accept orders for products only after a valid Distributor Agreement certified by their Placement Distributor is on file with the Company. Distributors are then authorized to submit orders.

**H 2**     All orders for product and other items will be processed for shipment upon clearance of payment. Shipment is made by common carrier and delivery should be expected within 7-14 days, unless special shipping arrangements are made at the time of order. If an ordered item is on backorder, consignee will be notified via telephone or electronic communication as to the status.  As a standard, Youngevity does not ship partial orders or hold backorders in the system for extended periods of time.  If backorder delay is relatively short, entire order will be held back and shipped in its entirety upon availability of backordered item.  If backorder delay is extended, then backordered item will be cancelled from order, the price of that item returned to Customer/Distributor, and the balance of the order, if any, will be processed and shipped.  All ordered item(s) will be shipped as soon as items are available and usually within fourteen (14) days of the date the original order and payment was received.

**H 3**     Upon receipt, Distributors should immediately inspect shipments to determine whether orders are complete and in good condition. Any damaged or missing contents should be noted on the delivery receipt. If items have been damaged in shipping, Distributor should request, from the shipper, the process for filing a claim for damaged or missing materials. Items that are missing from shipment should be brought to the attention of the Company within 1 business day of receipt to ensure proper handling of refund and or product reshipment.

**H 4**     If a shipment does not arrive within the expected timeframe, before assuming any shipment has been lost or stolen; a Distributor should wait at least fifteen (15) working days from the placement of mail orders, and ten (10) working days from the placement of telephone or internet orders. Lost shipments, if later found and/or delivered, must be reported to the Company's Distributor Services within seven (7) days of delivery. Any extra product received in any shipment must also be reported.  Duplicate orders or replaced shipments that do arrive can be either returned to the Company, or purchased by Distributor, at the Distributors discretion.

A Distributor who signs a delivery release with a common carrier, authorizing the carrier to leave an order at an unsecured location, without a signature, releases the Company from responsibility for such delivery. Distributors who are absent at the time of delivery may be required to retrieve their packages from the shipping office or have them delivered to a more suitable alternate location.

**H 5**     **Sales Aids:** Sales aids (Business Kits, Business Tools, Marketing Materials, etc.) are not items that carry a discount or a bonus volume credit. Placement Distributors developing their networks should have a supply of these materials on hand to serve their downline growth needs.

Complaint
Exh. A
Page 58

**H 6**   **Order Forms:** When submitting written orders to the Company, Distributors must use unaltered official Company order forms, or have all orders placed through the appropriate online shopping cart / back office interface.

**H 7**   **Submitting Orders:** Products are ordered at Wholesale prices. The overall success of the Company and its Distributors depends upon retail sales of the products to consumers. A "retail sale" is defined as the sale to an ultimate consumer who is purchasing the product for his/her own use.

  1. Distributors may not themselves order, or ask their Downline Distributors to order inventory for the sole purpose of participating in the Compensation Plan or "qualifying" themselves or others to earn commissions or bonuses (This practice is frequently referred to as "inventory loading").

  2. Distributors may only purchase Company products for resale to consumers, for personal consumption, or to provide prompt product delivery to downline Distributors in their own personal group. Distributors may not stockpile or acquire excessive inventories. Prior to reordering any product, Distributors must certify that they have sold a minimum of 70% of all previous orders (The "70% Rule").

  3. Distributors are required to carefully document all retail sales. The Company may, at any time, require a Distributor to produce all completed retail sales receipts for the previous thirty (30) days and a list of five (5) or more persons to whom the Distributor has made retail sales of the products during the previous thirty (30) days.

  4. Distributors may not advertise or promote product for more than the current established retail price or for less than the current established wholesale price as published by the Company.  See current product price list for details on Wholesale and Retail prices.

**H 8**   The Product Order Form is required for all mail orders of products and must be fully completed and submitted to the Company. Two or more Distributors may not combine orders on the same order form.

  1. Incomplete orders will not be processed by the Company. Such orders will be returned to the Distributor by mail and any consequences arising out of an incomplete order shall be the responsibility of the Distributor who attempted to place the order.

  2. In placing an order by mail, the Distributor certifies, acknowledges, and warrants that the order was made by the Distributor and that a minimum of 70% of all previous orders of Company products have been sold.

**H 9**   **Qualifying Order Policy:** The Company may not accept any qualifying order from Distributor Warehouses after the twenty-fifth (25th) of any calendar month for the current volume month.

A qualifying order is defined as an order for the Company products in which the Distributor placing the order is using the bonus volume from that order to qualify for commissions and/or rank advancement.

All qualifying orders submitted by any warehouse must be clearly marked "Qualifying Order" with the volume month and year marked underneath. These markings must be placed on the Product Order Form in the box in the upper right hand corner labeled "Do Not Ship." The date of the order must also be placed on the qualifying order and a copy of the qualifying order given to the Distributor placing the qualifying order.

Any qualifying order submitted after the twenty-fifth (25th) of any calendar month for the current volume month must be submitted to the Company directly via telephone or facsimile transmission. To insure priority handling of a qualifying order, the Distributor should inform the Company's Customer Service Distributor the order being placed is a qualifying order. If the qualifying order is transmitted to the Company via facsimile then the order should be clearly marked as a qualifying order and indicate the volume month for which the order is to be applied.

Any qualifying order received from a warehouse after the twenty-fifth (25th) of the calendar month for the current volume month will be applied towards the following volume month. In the event that an order is received from a warehouse and also submitted to the Company directly via telephone or facsimile transmission will be treated as two orders: One qualifying order for the current volume month and one qualifying order for the following volume month. If an order is canceled or refused, commissions for either of the volume months may be affected.

It is not the responsibility of the Company to inform a Distributor of an improper submission of a qualifying order. The Distributor must place qualifying orders properly in order to participate in rank advancement and/or the earning of commissions.

Any Distributor who, in good faith, placed a qualifying order in accordance with these policies and is denied commissions and/or rank advancement because a Warehouse is found to be in violation of these policies will receive commissions in accordance with the "Recalculation of Commissions Policy."

A Warehouse may institute its own individual policy regarding the acceptance of qualifying orders from a Distributor in order to ensure submission to the Company on or before the twenty-fifth (25th) of the calendar month. Any Warehouse found to be in violation of these policies resulting in the Company being required to recalculate commissions in accordance with the "Recalculation of Commissions Policy" may, at the Company's sole discretion, be required to forfeit commissions in the amount equal to the commissions of the Distributor(s) who were negatively affected. Serious and/or repeated abuses of this policy will result in the revocation of a Distributor's Warehouse status.

In the event that a Distributor willfully disregards this policy, neither the Company nor the Warehouse will be held responsible.

**H 10    Policies and Procedures for AutoShip:**

1. Youngevity will use its best efforts to ship all AutoShip orders on the specific day of the month specified by the Customer or Distributor at the time the AutoShip order was setup.  In cases where that day lands on a weekend, holiday, or any other day that the Youngevity warehouse is closed for shipping, said AutoShip order will be fulfilled on a day chosen by Youngevity, as close as possible to the chosen day.  Should there be a need to permanently change an AutoShip date, Customer or Distributor will be notified of same and provided with revised schedule and or other Autoship day options.

2. All new AutoShip requests must be received electronically or physically by the Company by the last business day on or before the 28th of the month to be processed for the following month.

3. Youngevity is not responsible for delays in the delivery of an AutoShip request caused by the U.S. Postal Service, or any other courier service, public or private.

4. All AutoShip requests must be received electronically or on an official Company AutoShip Order form. The order form must be filled out completely. Any omissions of information will render the AutoShip request invalid and must be resubmitted.

5. Youngevity can receive faxed, photocopied, internet, and original AutoShip forms. AutoShip requests will be accepted with appropriate endorsement. Youngevity cannot receive a request for AutoShip via the telephone.

6. All AutoShip requests must be paid with a credit card, ProPay or credit on account, which will be billed monthly.

Complaint
Exh. A
Page 60

7. All AutoShip requests must be sent to the billing address of the credit card (this information will be verified with the credit card company).

8. An AutoShip order may be of any size. Qualifying Volume for AutoShip orders will be applied automatically, however, having an active AutoShip order on file, in itself, does not automatically constitute Commissions or Rank Qualification for any Representative. It is the responsibility of the individual Distributor to qualify for commissions with the required Personal Qualifying and or Group Qualifying Volume.

9. Any and all changes to an existing AutoShip are treated as a new AutoShip Request and are subject to the same requirements. Any and all changes to an existing AutoShip must be clearly identified as a change to avoid a duplicate AutoShip order being created.

10. The Company is not responsible for any incorrect information supplied by any financial institution.

11. The Company is not responsible for credit cards not authorized for payment of an AutoShip order. Any order not authorized for payment via a credit card will be cancelled for that month. Any order not authorized for payment via a credit card for two (2) months in any twelve (12) month period will be rendered void and will be required to be resubmitted with another credit card number as payment. If the new credit card is not authorized for payment during the twelve (12) month period, the Distributor will not be allowed to participate in the AutoShip program and will instead need to place orders using another payment method.

12. The Company will cancel any AutoShip that is subject to a consumer credit card chargeback.

13. Unauthorized duplication of an AutoShip Order Form is prohibited. Written permission from the Company is required before the duplication of any form is permitted.

14. Any AutoShip that is refused delivery will be immediately canceled. Additional charges will be levied if a second shipment is requested. An AutoShip canceled for refused delivery will not be eligible for renewal.

15. The Company processing fees will be deducted from refunds issued for AutoShip orders.

16. As outlined in section D9, all Youngevity Distributor Applications and AutoShip Order Forms must be properly and legally endorsed. Violation of this policy is considered fraud and is a violation of these Policies & Procedures.

**H 11     Policies and Procedures for Duplication of Distributor Application, Order Form & AutoShip Form:**

1. The word "form" refers to the Youngevity Distributor Application, Product Order Form, and AutoShip Order Form, whether in print on paper or electronic via any Youngevity website.

2. The word "original" refers to the source material provided by the Company for reproduction.

3. These forms must be "duplicated" from the original supplied from the Company and not "recreated", ie: all forms must be exact reproductions of the original without changes or deletions.  Any and all duplication of forms must also adhere to all other applicable provisions to these Policies & Procedures.

4. An original Company form will be made available in the following formats for reproduction:

   **a)** A laser print

   **b)** A computer image available in PDF format.

5. All paper forms must be reproduced in the following Pantone colors:

   **a)** Distributor Application - PMS 527 (Purple)

Complaint
Exh. A
Page 61

**b)** Order Form - PMS 355 (Green)

**c)** AutoShip Order Form - PMS 485 (Red)

**6** Any paper forms reproduced in other colors and submitted to the Company for processing will be returned for correction and resubmission.

**7** All forms reproducible will contain a box labeled "Presented By" or "Presented by the Company's following Distributor." A Distributor wishing to do so, may place his/her name, company name, telephone number, special offer, or advertisement within the borders of this box and not covering the above mentioned label inside the box. The nature of the contents inside the box is governed by the Policies & Procedures and must be submitted to the Company for approval prior to reproduction.

**8** Any and all forms reproduced without prior written consent from the Company may be found to be in violation of the Policies & Procedures and may not be accepted for processing.

**9** These forms and policies are designed to give the Company's Distributor the opportunity to personalize the service he/she offers their downline and to ensure that uniformity is maintained to aid the speedy and accurate processing of all the Company orders and applications.

**H 12   Drop Ship Policy**

For the purposes of these Policies & Procedures, a Drop Ship is defined as an order placed by a Distributor using their credit card and having that order delivered to a place or party other than the Distributor or Distributor's address.

Youngevity will Drop Ship your order so long as it is paid for with your credit card.  Youngevity will not Drop Ship any C.O.D. or payment due orders.

**1** Distributors placing a Drop Ship order will assume all responsibility for packages lost or stolen after delivery to the address specified.

**2** Distributors placing Drop Ship orders must be named on the credit card used for the order.

**3** A Distributor may not pay for an order using another person's credit card, regardless of the delivery destination.

**4** The billing address of the credit card to be used for a Drop Ship must be provided at the time of the order. Youngevity will, without notice, verify the billing address, telephone number, and name or card holder. If this information is found to be different than that submitted to Youngevity, further Drop Ships will not be permitted.

**5** Any Drop Ship refused delivery will not be eligible for a full refund. Shipping and handling charges will be deducted from any refund issued. These charges may exceed seven (7%) percent of the sales price.

**6** Youngevity may, at its sole option, suspend any Distributor who instigates a consumer chargeback related to a Drop Ship paid for via credit card. Payment plus additional administrative fees must be made prior to the removal of a Distributor's suspended status.

**7** Failure to abide by the Drop Ship Policy will result in the termination of the Drop Ship Agreement.

**I   |   ADVERTISING, USE OF COMPANY NAMES, AND PROTECTED MATERIALS**

**I 1**      No Distributor shall produce, promote, or use copyrighted, trademarked, service marked, or proprietary materials

Complaint
Exh. A
Page 62

of any kind describing the Company's names, products, or logos, if said materials are not obtained from, or approved by, the Company in advance in writing, prior to their production or use. Distributors shall not use or appear on television, radio, including Internet blogs, internet radio, podcasts, or any other media to promote or discuss the Company or its programs without prior written permission from the Company. All media inquiries shall be referred directly to the Company.  Distributors may use the Youngevity Advertising Approval form to submit for approval any such media promotions.

In addition, Distributor shall not misuse or misrepresent him/herself or any of the Company's products through the use of any other person's name, company name, trademark, or any other personal or copyrighted information, symbols, logos, or trade names without the express written permission of both the other party and the Company.

1 2    In addition to these Company Policies and Procedures, Federal law prohibits deceptive advertising, which includes any and all false and or unsubstantiated advertising. Distributors must not use false or misleading statements or material omissions of information that may be construed to deceive the public in any advertising, whether in print, written, electronic, verbal, or any other form or media considered advertising. The Company is including these regulations to comply with those of the Federal Trade Commission, Federal Drug Administration, as well as other various Federal, State, and Local agencies. The Company takes these regulations seriously, and always abides by them when creating any and all Company generated advertising.

1 3    Whereas the Company may also consider approval of distributor generated advertising (as outlined in our Advertising Approval Application), it is mandatory that all distributors use only Company generated and pre-approved advertising in the promotion of the Youngevity® income opportunity or any Youngevity® products.  The Company is not required to, nor will it defend or hold harmless any Distributor using non-approved advertising, in any form, that is found to be in violation of any Local, State, or Federal statutes.  Please read these regulations carefully. Complete compliance with them is not only expected, it is necessary to avoid violation of federal law. Under federal law, the Company is obliged to take all reasonable action possible to prevent and or halt deceptive advertising by its distributors. Once aware of deceptive promotions by a Distributor, The Company must and will act accordingly.

The following are examples of prohibited content applicable to all advertising and promotion of The Company products (whether on the web, in person, or via media of mass communication):

a)   No distributor may use any recording, book, pamphlet, or transcript to promote the sale of a Company product if that recording, book, pamphlet, or transcript associates any nutrient found in a Company product with any effect on a disease or any health benefit unless the precise claim in question has been pre-approved for such use by the Company.

b)   No distributor may place upon his or her website used to promote or sell Company products any link to another website containing information that associates a nutrient contained in any Company product or any Company product with an effect on a disease or any health benefit unless that specific link has been pre-approved by the Company.

c)   You may not inform a potential purchaser of a Company product that the product or any of its ingredients can treat, cure, or prevent a disease or cause a health benefit unless the specific claim has been pre-approved by the Company.

d)   You may not advertise in any medium of mass communication (including via the internet, direct mail, print media, broadcast media, or cable media) that the product or any of its ingredients can treat, cure, or prevent a disease or cause a health benefit unless the specific claim has been pre-approved by the Company.

e)   You may not represent that a The Company product has any effect upon a body structure or function unless the

specific claim has been pre-approved by the Company.

By contrast with the preceding examples, you may use any claim approved by The Company so long as it is used consistently with the approval given and within the same context approved for use. Company literature, websites, and other electronic media do contain approved health claims, in context. These have been approved or allowed by the Food and Drug Administration and are consequently approved for use by Company distributors, provided that FDA's conditions on use of the individual claims are satisfied. These claims must be used in their entirety and within the limits prescribed by FDA.

**I 4      Default Rule of Advertising Use**

By default, any advertising, including, but not limited to, brochures, pamphlets, recordings, videos, E-Mail content, Websites, Blogs, Newsletters, Scripts, Articles, Banners, Presentations, and displays that are not produced and made available directly by the Company are deemed a non-approved, non-compliant advertising, and must not be used to promote any aspect of the Youngevity® income opportunity or products.

**I 5      Esoteric, Non-Intuitive Content**

The laws regulating the use of advertising, claims, and information made available regarding nutritional products, network marketing, income opportunities, and health and or income claims are vast, containing many esoteric indications and rationale that are not always intuitive or obvious, especially to the layperson.  The Company goes to a great deal of time, energy, and expense to make sure that Distributors have professional advertising materials available to them, that said advertising is up to date, compliant, and will not place the Distributor in a situation where he/she violates company policies or Federal, State, and or Local statutes.  For obvious reasons, Youngevity is reticent to approve any Distributor generated advertising.  Even in such cases where Distributor generated advertising is approved, the Company reserves the right to deny or rescind approval on any advertising for any reason at any time, with no liability or recourse for expenses incurred by Distributor to create, distribute, or repeal said advertising.  Once notified of same, Distributor must discontinue use of said unapproved advertising immediately.

**I 6**      Distributors may place classified ads in newspapers if they do not use Company names or trademarks.

**I 7**      Distributor's use of the Company is restricted as to protect the Company's proprietary rights, ensuring that Company protected names will not be lost or compromised by unauthorized use.

**I 8**      Other rules relating to the use of the Company name are as follows:

**a)**  All stationery (letterhead, envelopes, and business cards) bearing the Company name or logo must be printed using the correct wording as indicated by the Company.

**b)**  All promotional items such as clothing, personal use items, and any items of any other nature which bear the Company's name or logo must be purchased/sold only from the Company or its authorized Distributors. The only exceptions are imprinted gift items such as: pens, key chains, letter openers, buttons, and calendars. These kinds of items must not include the Company's logo, but must be inscribed as follows:

Compliments of "Youngevity"

(Name)

Independent Distributor

(optional address and phone number)

Complaint
Exh. A
Page 64

c)  All Distributors may list themselves in the telephone directory under their own name, followed by the words "Independent Distributor of Youngevity."

d)  No Distributor is allowed to place phone directory display ads using the Company's name or logo.  No Distributor shall list their business name, caller ID, or directory listing as Youngevity or any other Company trademark, salesmark, or product name.

e)  Use of the Company's name or logo on buildings, vehicles, etc., must be approved in writing in advance by the Company. Such usage must always carry the phrase "Youngevity Independent Distributor" immediately following the Distributor's name. Such usage must be according to Company instructions and using Company formats and/or materials. Items bearing the Company name(s) must be kept in visually attractive condition.

f)  A Distributor may not refer to themselves as "Youngevity" alone when answering the telephone. The Distributor's name must be given. Always refer to yourself or your business as an "Independent Youngevity Distributor."

g)  It is not permitted for anyone to possess a business name or bank account using the name Youngevity.

19  **Distributor Website and Social Media Policy**

This amendment to the Youngevity Policy & Procedures refers to the creation and use of Internet websites created by Youngevity Distributors for the purpose of promoting themselves as a Youngevity Distributor and the Youngevity products or Dr. Joel Wallach. A website is defined as any use of a computer, the Internet, and the World Wide Web to display, comment on, or otherwise transmit information in graphic, text, or audio form. As with any advertisement or promotion, the Policies & Procedures of Youngevity prevail and should be followed in addition to the following amendment.

a)  The name Youngevity is a registered trademark, as are the other Company and Product names owned by the Company. The name Youngevity or any trademark or salesmark of the Company, in its entirety, in part, or hyphenated may not be used in any domain name, URL, or email address.

b)  The name Dr. Joel Wallach is part of the intellectual property of Dr. Joel Wallach and may not be used in its entirety, in part or hyphenated, in any domain name, URL, or email address.

c)  All logos, slogans, and trademarks of the Company are the sole property of Youngevity and may be used with written permission only. Permission to use Youngevity logos, slogans, and trademarks may be revoked without notice or reason and solely at the discretion of Youngevity.

d)  All use of Youngevity logos, slogans, and trademarks must state permissions given on the front, index, home, or main page of any website.

e)  All Youngevity logos, slogans, and trademarks must be used in their respective entirety. All colors in any Youngevity logo or trademark must be reproduced accurately. No partial logos or "artistic license" may be used.

f)  Youngevity logos, slogans, and trademarks in graphic form may not be sold or traded by anyone.

g)  The name and Distributor Identification Number of any and all Youngevity Distributors responsible for content of a website must be displayed on the front, index, home, or main page of the website.

h)  No Distributor of Youngevity may state or imply that their website is official, sanctioned, authorized, or licensed by Youngevity, Dr. Joel Wallach, or any board member, advisor, consultant, or affiliate of same. Any and all Representative owned websites must be identified as owned and controlled by the individual entity

Complaint
Exh. A
Page 65

or person to whom the site belongs, followed by "independent distributor for Youngevity."  Only websites owned, controlled, and designated by the Company as such can be considered as an "official website" or any iteration thereof.  These websites include, but are not limited to www.youngevity.com, www.90forlife.com, and many other micro sites, and subordinate sites.  Only representatives in good standing may have access to the Company replicated sites, including, but not limited to www.my90forlife.com, www.youngevityonline.com, as well as access to the tools, programs, back office access, and other areas contained therein.

i)  Any and all sources of content and permissions for use of a Youngevity Distributor's website must be documented and stated on the website. This includes but is not limited to the use of graphics, quotes, and excerpts.

j)  Written approval for all quotes or excerpts from Dr. Wallach's lectures, books, radio shows, audio, or visual productions must be stated and documented. Note: Copyrights from various radio shows, audio, and visual productions may be held by persons or entities other than Youngevity. People or entities holding copyrights of this type are not obligated to grant permission for use of these materials.

k)  The signature of, or likeness of Dr. Joel Wallach, board member, advisor, or any current employee or affiliate of the Company is not allowed to be used on any website.

l)  No Distributor of Youngevity may make any claims of income or income potential by becoming a Youngevity Distributor.

m)  No Distributor of Youngevity may make any claims of health benefits or betterment by consuming or applying Youngevity products.

n)  Only the Distributor's personal testimonial about the benefits or results stemming from the use of Youngevity products may be used on a Distributor's website. A Distributor's website must not contain the testimonials of others in the content of their website.

o)  No banners or other methods of advertisement may be used or included in the content of any Youngevity Distributor's website.

p)  No hyperlinks to other websites promoting competing products may be used on any Youngevity Distributor's website.

q)  No products other than Youngevity products may be mentioned or sold on any Youngevity Distributor's website. This includes but is not limited to product comparisons.

r)  Any use of the internet to promote the Youngevity Compensation Plan internationally is prohibited until such time as Youngevity authorizes promotion of the Compensation Plan, after being designed and approved for a particular country.

s)  Distributors using a website for order fulfillment must transact business using a secure server to protect the personal information of the customer. Email orders are not to be encouraged or accepted for transacting Youngevity business.

t)  Each individual Youngevity Distributor is responsible for abiding by all local, state, and federal laws concerning all aspects of using the Internet to promote or sell Youngevity products and business opportunities.

u)  Youngevity reserves the right to edit content of and require immediate modifications to any Distributor's website at the sole discretion of Youngevity.

v)  Electronic mail (email) advertising is subject to Youngevity Policies & Procedures and as such must be

submitted and approved prior to transmission. All email advertising is subject to editing by Youngevity prior to approval to transmit.

w)  All email advertising must be in compliance with all prevailing local, state, and federal laws concerning unwanted, unsolicited email also known as spam. Spamming is illegal and will not be tolerated by Youngevity.

x)  It is strictly forbidden for any Distributor to represent him/herself or any products, product packages, or affiliations through direct or indirect inference through any website, advertisement, email, or any other means as other than is actually true and as outlined herein.  Any represented affiliation with any person, persons, groups, or organization(s) that is against the wishes of, or unknown to said affiliate, will be viewed upon as fraudulent and in violation of Distributor's agreement.

*Existing websites (sites that were constructed prior to, and that have been in continuous operation since October of 2002) using a form of Youngevity or Dr. Joel Wallach in their URL or domain name only (RE: provisions a and b of this section) are granted permission to continue to operate as long as all other policies are followed (sections c through x inclusively). The email addresses are still subject to the policy. Websites granted these permissions must contain a hyperlink to the www.Youngevity.com corporate website on the front, index, or main "page" and should be labeled as "The Youngevity Corporate Website may be found here." The Company's network of Independent Distributors can therefore protect each Distributor's individual business image, as well as the Company's overall image.

y)  Social Media Community Guidelines

In addition to the Distributor website specific guidelines, there are additional stipulations regarding Social Media and similar online communities.  The Company's Social Media Community Guidelines are maintained separately as a part of these Policies and Procedures.  As Social Media is a dynamic and rapidly changing environment, it may be necessary to update said guidelines more frequently than that of this document.  As a result, the most current guidelines may or may not coincide with what is listed herein.  The most current guidelines are appropriately posted in/on the official Company Social Media sites by the administrator(s) of said sites.  Any violation of the Social Media Community Guidelines will be considered a violation of these Policies and Procedures, and will be subject to the remedies as stated herein.

The Company welcomes the use of the Internet and on-line communities to promote the Company, its products, services, and income opportunity. However, just as with any written or spoken advertising, any and all Social Media postings including, but not limited to chats, blogs, fan pages, broadcasts, videos, tweets, text messages, and etc. must be compliant with the entirety of these Policies and Procedures.  This also includes a Distributor's personal Social Media pages, if said pages are used to promote the Company, its products, or income opportunity.  If it is unclear whether any information to be posted may be compliant, submit said information to the Company via mail, facsimile, or electronic mail to compliance@youngevity.com for review prior to posting.

The Company audits and monitors web activity for unapproved and/or unauthorized advertising on a continuing basis. Should any non-compliant activity be discovered, notification will be sent to the offender requesting the immediate removal of the non-compliant information, links, or other media.  All notices and requests will be made as stated herein. In addition to the Company's monitoring, it is expected that all Distributors actively police their Social Media site(s) for compliance violations, take steps to correct these, and report any violations as outlined herein.  The Company greatly appreciates the cooperation of all Distributors and other members of the various Social Media groups for assisting in upholding the spirit of our on line community by providing an open, safe, and compliant environment.

### Fan Pages

Distributors and other members of Company sponsored social media communities (for the purposes of this section, referred to solely as "Member") may not attempt to, or appear to, represent the Company in any way on Facebook, Twitter, LinkedIn or other social media platforms. Further, no attempt to represent or appear to represent any individual person, either affiliated or not affiliated with the Company is strictly prohibited. All accounts, fan pages, and personally created websites and blogs must be personal and obviously appear as such.

For example, you may not create a fan page entitled "Youngevity" or "FDI Business Opportunity" or "Youngevity Nutrition" because this would appear to represent the Company. You may create a personal fan page, such as "Youngevity Personal Health Coach" with a picture of yourself, so long as you follow the other guidelines as stated herein.

### Blogs

You may create a personal blog in which you discuss the Company products and business opportunity, but you may not use the Company name(s) in your domain or claim to represent the Company in anyway, and you must follow the health and income claim guidelines as stated herein with all your marketing efforts.

### Personal Facebook Profiles

You may not include the Company name anywhere in your personal Facebook profile name. Facebook profiles must be your real name; to do otherwise is a violation of both these Policies and Procedures as well as Facebook terms of service and will likely result in the deletion or suspension of your Facebook account.  It is strongly discouraged that you use any Company logo or product images as your personal profile picture. To do so, will likely result as your account being designated as spam, which will hinder your relationship building efforts. An exception to this may be if the company posts or sets up "pic badges" or other uniform branding that can be added to your personal profile picture.

### Marketing to Facebook Members

The Company Facebook pages and groups provide a forum for discussion, but they should not be used for marketing products or services, recommending affiliate products, or self-promotion. Anyone found to be misusing, abusing, or defaming the Company or any Distributor or Customer thereof on any and all company Facebook pages, will have all posts removed, be "unfriended" and flagged as "inappropriate" and, or "spammer" within Facebook.

### Links to Competing Companies

Posting information from, or links to, competing companies is not allowed. Such activity will be viewed as cross-recruiting and is a direct violation of your representative / distributor agreement.

### Spam

The Company maintains a zero tolerance policy with regard to SPAM within Social Media Communities.  Common examples of SPAM include, but are not limited to:

- Unsolicited links and information sent to inboxes of those who do not wish to receive it, or without some sort of request for information.

- Posts of unsolicited links in Facebook groups or other Facebook pages not related to the Company without some request for information.

- Tags of people in any Company-related Facebook photos if they are not involved/have expressed interest in the Company, its products, or business opportunity or who have specifically requested not to be tagged.

- Invitations or additions of individuals to the Company Corporate Group who are not involved/have expressed interest in the Company, its products or business opportunity.

- Frequent status updates promoting specific URL hyperlinks or other links.

**I 10**   Violators of any of these Policies & Procedures relating to advertising, Company name(s), and logo(s) may be required by the Company, at the Company's option, to correct the violations in whatever manner the Company deems necessary. Correction measures are not limited to, but may include disconnecting phone numbers without a referral, removing signs, canceling advertising, and destroying noncompliant literature. Distributor authorization may also be terminated, and offending Distributors will be liable for any damages sustained by the Company, as well as any other penalties imposed through legal action.

**I 11**   **Compliance**

The Company actively seeks out to discover the use of non-approved, non-compliant advertising.  Said discovery may be made by active web searches, anonymous monitoring of public conference calls and or meetings, or by reports of potential violations by other Distributors or Customers, or by various other non-intrusive methods.  At no time will the Company's compliance audit process violate the Company's privacy policy or that of any Local, State, or Federal Statute. Any distributor found in violation of these regulations will receive a warning letter via electronic mail at their last known E-Mail address. The letter will demand full compliance within 7 days of its date of issuance.  Follow-up will then be conducted by The Company on the 7 day anniversary of the date of warning letter issuance to determine whether all changes necessary to achieve full compliance have been made.  Where compliance is not achieved or not achieved completely, The Company will suspend the Distributorship in question, whereby all benefits of the Distributorship, including commissions, will also be suspended.  Full compliance will have to be achieved within an additional 7 days of Distributorship suspension or The Company will terminate the Distributorship in question, and all Distributor benefits, including commissions, will be forfeit.  In addition, the Company reserves the right to refer deceptive advertising cases to the FTC, if deemed necessary to protect the interests of the Company or consumers at large.

All Distributors are obligated to report any and all violations of these regulations regarding deceptive advertising.  Any such complaint will be promptly investigated, and appropriate action taken.  The identity of anyone reporting such violations will be protected and the best interests of the Company as well as the reporting Distributor will be considered at all times during and after said investigation.

## J  |  JUDICIAL PROCEDURES

**J 1**   Most violations of the Policies & Procedures occur through lack of awareness or understanding on the part of the violating Distributor. Distributors observing a Policy violation should immediately point out the violation directly to the violating Distributor.

**J 2**   Distributors who observe continued violations by another Distributor following the personal contact outlined in J1, should report the violation in writing to the Company. Details such as dates, number of occurrences, and evidence, along with any supporting testimony, should be included in the report.

**J 3**   Any violation, large or small, of the Advertising, Use of Company Name(s), and other Section I Policies must be referred directly to the Company for resolution.

**J 4**   The Company will address all violations according to set procedures including using Distributor network input and

Complaint
Exh. A
Page 69

giving the accused Distributor adequate opportunity to respond to any violation charged.

**J 5**     It is the obligation of every Distributor to maintain the integrity of the Policies & Procedures to ensure fairness and equal Compensation Plan opportunities to all Distributors.

**J 6**     Failure of the Company to enforce any of these Policies & Procedures with one Distributor does not waive the right of the Company to enforce any such provision(s) against that same Distributor or any other Distributor.

**J 7**     The original of a document faxed to the Company must be received by the Company before the document is considered "received" by the Company.

**J 8**     To the fullest extent permitted by law, Youngevity shall not be liable for, and Distributor releases the Company from, and waives all claims for, any loss of profits, indirect, direct, special, or consequential damages or any other loss incurred or suffered by Distributor as a result of:

**a)** the breach by the Distributor of the Agreement and/or the terms and conditions of the Policies & Procedures,

**b)** the operation of Distributor's business,

**c)** any incorrect or wrong data or information provided by the Distributor, or

**d)** the failure to provide any information or data necessary for the Company to operate its business, including without limitation, the enrollment and acceptance of a Distributor into the Compensation Plan or the payment of commissions and bonuses.

**J 9**     In the event of a dispute with the Company, Distributor and the Company agree to participate in mediation in an earnest attempt to resolve the dispute prior to submitting it to binding arbitration pursuant to the Commercial Arbitration Rules then in effect of the American Arbitration Association, provided, however, that injunctive relief sought by the Company against any party shall be excluded from this clause. Such Arbitration shall occur in San Diego, California.  Louisiana Distributors, however, may arbitrate in New Orleans, Louisiana.

**J 10**    **Distributor Website Policy**

This amendment to the Youngevity Policy & Procedures refers to the creation and use of Internet websites created by Youngevity Distributors for the purpose of promoting themselves as a Youngevity Distributor and the Youngevity products or Dr. Joel Wallach. A website is defined as any use of a computer, the Internet, and the World Wide Web to display, comment on, or otherwise transmit information in graphic, text, or audio form. As with any advertisement or promotion, the Policies & Procedures of Youngevity prevail and should be followed in addition to the following amendment.

**a)** The name Youngevity is a registered trademark, as are the other Company and Product names owned by the Company. The name Youngevity or any trademark or salesmark of the Company, in its entirety, in part, or hyphenated may not be used in any domain name, URL, or email address.*

**b)** The name Dr. Joel Wallach is part of the intellectual property of Dr. Joel Wallach and may not be used in its entirety, in part or hyphenated, in any domain name, URL, or email address.*

**c)**  All logos, slogans, and trademarks of the Company are the sole property of Youngevity and may be used with written permission only. Permission to use Youngevity logos, slogans, and trademarks may be revoked without notice or reason and solely at the discretion of Youngevity.

**d)** All use of Youngevity logos, slogans, and trademarks must state permissions given on the front, index, home, or

Complaint
Exh. A
Page 70

main page of any website.

e) All Youngevity logos, slogans, and trademarks must be used in their respective entirety. All colors in any Youngevity logo or trademark must be reproduced accurately. No partial logos or "artistic license" may be used.

f) Youngevity logos, slogans, and trademarks in graphic form may not be sold or traded by anyone.

g) The name and Distributor Identification Number of any and all Youngevity Distributors responsible for content of a website must be displayed on the front, index, home, or main page of the website.

h) No Distributor of Youngevity may state or imply that their website is official, sanctioned, authorized, or licensed by Youngevity, Dr. Joel Wallach, or any board member, advisor, consultant, or affiliate of same. Any and all Representative owned websites must be identified as owned and controlled by the individual entity or person to whom the site belongs, followed by "independent distributor for Youngevity."  Only websites owned, controlled, and designated by the Company as such can be considered as an "official website" or any iteration thereof.  These websites include, but are not limited to www.youngevity.com, www.90forlife.com, and many other micro sites, and subordinate sites.  Only representatives in good standing may have access to the Company replicated sites, including, but not limited to www.my90forlife.com, www.youngevityonline.com, as well as access to the tools, programs, back office access, and other areas contained therein.

i)  Any and all sources of content and permissions for use of a Youngevity Distributor's website must be documented and stated on the website. This includes but is not limited to the use of graphics, quotes, and excerpts.

j) Written approval for all quotes or excerpts from Dr. Wallach's lectures, books, radio shows, audio, or visual productions must be stated and documented. Note: Copyrights from various radio shows, audio, and visual productions may be held by persons or entities other than Youngevity. People or entities holding copyrights of this type are not obligated to grant permission for use of these materials.

k) The signature of, or likeness of Dr. Joel Wallach, board member, advisor, or any current employee or affiliate of the Company is not allowed to be used on any website.

l)  No Distributor of Youngevity may make any claims of income or income potential by becoming a Youngevity Distributor.

m) No Distributor of Youngevity may make any claims of health benefits or betterment by consuming or applying Youngevity products.

n)  Only the Distributor's personal testimonial about the benefits or results stemming from the use of Youngevity products may be used on a Distributor's website. A Distributor's website must not contain the testimonials of others in the content of their website.

o) No banners or other methods of advertisement may be used or included in the content of any Youngevity Distributor's website.

p) No hyperlinks to other websites promoting competing products may be used on any Youngevity Distributor's website.

q) No products other than Youngevity products may be mentioned or sold on any Youngevity Distributor's website. This includes but is not limited to product comparisons.

r) Any use of the internet to promote the Youngevity Compensation Plan internationally is prohibited until such time as Youngevity authorizes promotion of the Compensation Plan, after being designed and approved for a particular country.

Complaint
Exh. A
Page 71

**s)** Distributors using a website for order fulfillment must transact business using a secure server to protect the personal information of the customer. Email orders are not to be encouraged or accepted for transacting Youngevity business.

**t)** Each individual Youngevity Distributor is responsible for abiding by all local, state, and federal laws concerning all aspects of using the Internet to promote or sell Youngevity products and business opportunities.

**u)** Youngevity reserves the right to edit content of and require immediate modifications to any Distributor's website at the sole discretion of Youngevity.

**v)** Electronic mail (email) advertising is subject to Youngevity Policies & Procedures and as such must be submitted and approved prior to transmission. All email advertising is subject to editing by Youngevity prior to approval to transmit.

**w)** All email advertising must be in compliance with all prevailing local, state, and federal laws concerning unwanted, unsolicited email also known as spam. Spamming is illegal and will not be tolerated by Youngevity.

**x)** It is strictly forbidden for any Distributor to represent him/herself or any products, product packages, or affiliations through direct or indirect inference through any website, advertisement, email, or any other means as other than is actually true and as outlined herein.  Any represented affiliation with any person, persons, groups, or organization(s) that is against the wishes of, or unknown to said affiliate, will be viewed upon as fraudulent and in violation of Distributor's agreement.

*Existing websites (sites that were constructed prior to, and that have been in continuous operation since October of 2002) using a form of Youngevity or Dr. Joel Wallach in their URL or domain name only (RE: provisions a and b of this section) are granted permission to continue to operate as long as all other policies are followed (sections c through x inclusively). The email addresses are still subject to the policy. Websites granted these permissions must contain a hyperlink to the www.Youngevity.com corporate website on the front, index, or main "page" and should be labeled as "The Youngevity Corporate Website may be found here." The Company's network of Independent Distributors can therefore protect each Distributor's individual business image, as well as the Company's overall image.

**J 11** Any distributor found in violation of these regulations will receive a warning letter via electronic mail at their last known E-Mail address. The letter will demand full compliance within 7 days of its date of issuance.  Follow-up will then be conducted by The Company on the 7 day anniversary of the date of warning letter issuance to determine whether all changes necessary to achieve full compliance have been made.  Where compliance is not achieved or not achieved completely, The Company will suspend the Distributorship in question, whereby all benefits of the Distributorship, including commissions, will also be suspended.  Full compliance will have to be achieved within an additional 7 days of Distributorship suspension or The Company will terminate the Distributorship in question, and all Distributor benefits, including commissions, will be forfeit.  In addition, the Company reserves the right to take further actions, including, but not limited to, seeking injunctive relief and or punitive damages and reformations, or referral to local, State, or Federal agencies if deemed necessary to protect the interests of the Company or consumers at large.

## K | AMENDMENTS

**K 1** The Company shall have the right to amend rules, the Policies & Procedures, and the Compensation Plan and bonus structure under the following conditions:

Complaint
Exh. A
Page 72

1. Changes in the business environment: Changes which are detrimental to the Company's or Distributor's financial health or changes which require new policies due to new markets or strategies. For example, the evolution and popularity of eBay as an online storefront used by Distributors may require new policies and procedures for this new marketing strategy. In the absence of specific language, the Company will use its sole discretion to determine whether or not any "new" or "unique" marketing method is in violation of the spirit of these Policies and Procedures. Should any Distributor be seen as violating the spirit of these Policies and Procedures, said Distributor will be deemed as in violation of same, whether or not specific language yet exists to address the circumstances. If deemed necessary to amend these Policies and Procedures, the Company will do so in a timely basis once the need is recognized, however, the lack of such language will not preclude the Company from acting upon violation of same.

2. Operational: Unanticipated operational expenses or to streamline procedures at the request of Distributors.

3. Unsustainable Compensation Plan.

   a) May be altered only if management discovers that the percentage of payout is detrimental to the long-term sustainability, profitability, or longevity of the Company than initially anticipated.

   b) If the Company transitions to direct/retail sales, the Company will continue to pay Distributors on their current group volume up to that point under the same guidelines and terms of compensation.

   c) To enhance the compensation payout to the benefit of the majority of Distributors.

4. Legal Reasons: The Policies & Procedures may be modified due to new or modified federal, state, or local laws or legal action. All such modifications need to be commensurate with the specific need that has arisen, and no disguised, extraneous alterations may be inserted at this time to the determent of the Distributors, creating additional breakage for the Company. In such instances, the Company is obligated to give notice and state such modifications to the Policies & Procedures in a companywide communication. When essential modifications are made, there will be no retroactive effect of said changes.

**K 2**   Changes and amendments to these rules will go into effect immediately upon publication in an official Company bulletin, newsletter, magazine, or Company website. Amendments so announced will be binding on all Distributors.

**K 3**   The Company shall have the right to change pricing for products and sales materials at any time without consultation and for any reason the Company deems necessary.

## L | GENERAL BUSINESS ETHICS

By application to the Company, each Distributor agrees to conduct his/her business according to the following General Business Ethics. This code ensures high standards of integrity and professionalism throughout the Company's network of independent Distributors and protects each Distributor's individual business image, as well as the Company's overall image.

I promise and agree to conduct my business according to the following principles:

**L 1**   I will use the Golden Rule "treating others as I wish to be treated..." as the primary measuring stick in conducting all business.

**L 2**   I will be honest in all business dealings.

**L 3**   I will give the highest quality of service by treating customers fairly and showing courtesy and helpfulness in explaining the Company products.

**L 4**   I will represent the Company's Compensation Plan completely and without exaggeration to all potential Distributors.

**L 5**   I will fulfill all obligations stated herein with regards to Enrollment and Placement of other Distributors including training, motivation, and support.

**L 6**   I will work in harmony with all of the Company's Distributors to help further the success of the overall Company programs and the success of all Distributors recognizing that this supports my own business.

**L 7**   I will conduct my business professionally, keeping commitments I have made to others and portraying a positive image to all contacts.

**L 8**   I will always remember that success is the result of honest effort. I will work for personal success as well as encourage others to reap the rewards of diligent effort.

**L 9**   I will endeavor to observe the spirit as well as the letter in all of the Company's rules and policies, knowing they are for my benefit and the benefit of all Distributors.

**L 10**   I will make no claim for any Company product that is not contained in official Company literature, nor will I misrepresent the income potential of the Compensation Plan.

## M  |  PRODUCT RETURN POLICY

Distributors, Preferred, and Retail Customers of Youngevity that need to return product for any reason, will be required to follow the procedures as outlined in this policy. Anyone failing to follow the procedures as described will not be entitled to a refund from Youngevity. Please read the following policy carefully.

**M 1**   In accordance with previously stated policy, no refunds are given or offered after thirty (30) days from the date product is received by the customer.

**M 2**   All requests for an RMA (Returned Merchandise Authorization) must be received by telephone to Youngevity. Request for an RMA via facsimile or letter will not receive a response from Youngevity.

**M 3**   Food is not returnable. All items returned for credit or refund must be disclosed at the time an RMA is issued. Any items returned to Youngevity that were not disclosed at the time the RMA was issued are not eligible for a credit or refund.

**M 4**   Only one RMA will be issued per invoice.

**M 5**   At the time a RMA is requested, a RMA number will be issued. The customer will be required to write the RMA number in black on the outside of the packaging material used to return product. It is advised that the customer retain the RMA number issued for their records.

**M 6**   At the time a RMA is requested a "Product Due Date" will be issued. The Product Due Date will be approximately ten business days from the date an RMA is initiated. Youngevity must receive the product on or before the issued Product Due Date to be eligible for any credit or refund issued. It is the responsibility of the customer to ensure that products are returned on or before the Product Due Date. Youngevity is not responsible for delays in the delivery of product returned caused by the United States Postal Service, or any other courier service, public or private. If after receipt of an RMA it is determined that product was received after the Product Due Date, a credit

will not be issued.

**M 7**   It is advised that when product is returned to Youngevity, the customer use a carrier that will provide proof of delivery to the customer. Youngevity is not liable for packages lost in transit or not received.

**M 8**   Perishable (chocolate) shipments must abide by the following requirements in addition to all other policies as stated in Section M.

   **a)**  Must be returned in original packaging

   **b)**  Must be shipped overnight by UPS or Fed Ex

   **c)**  Return must be accompanied with RMA (Returned Merchandise Authorization.)

**M 9**   Packages sent to Youngevity without an RMA clearly visible on the outside of the package will be refused by Youngevity. It is advised that the customer use a thick black marker when writing the RMA number on the outside of the package. Ball point pen can be removed during the shipping process. Youngevity is not responsible for any RMA numbers removed during the delivery of product caused by the United States Postal Service, or any other courier service public or private. Any package refused by Youngevity will not be eligible for return or refund.

**M 10**   Instances of packages received without an RMA number that have been received by Youngevity from the United States Postal Service without a return receipt required will be held by Youngevity unopened for ten days after which they will be destroyed and disposed of. Any customer wanting their merchandise back must arrange to have said merchandise picked up by the carrier of their choice. Youngevity is not responsible for incorrect pickups in these instances.

**M 11**   All returned merchandise is subject to an 8% restocking fee.

**M 12**   Youngevity will not accept packages sent to Youngevity "Postage Due" or "Freight Collect."

**M 13**   After Youngevity receives returned merchandise, a credit will be issued within 7-14 business days.

**M 14**   Credits will be issued for product amount only (minus 8% restocking fee). Credits will not be issued for shipping and handling.

## N | HERITAGE MAKERS TERMS AND CONDITIONS AND PURCHASE

Youngevity dba Heritage Makers Terms and conditions and terms of service and purchase.

By entering and using the Heritage Makers website ("Site") or service you indicate that you accept these Terms and that you agree to be bound by them. Your use of the Site and its services (together, the "Service") is entirely conditioned on and subject to your compliance with these Terms. If you do not agree with these Terms, do not access or use the Service.

Acceptance of these Terms creates a binding contract between you and Heritage Makers that you will use the Service only in a manner consistent with these Terms. If you have questions about these Terms, please contact support@ heritagemakers.com.

**I.**   **General Terms of Membership**

   **a)**  Heritage Makers membership ("Membership") is available to you if you are at least 18 years of age and reside in the United States or Canada. Membership is available to you if you submit certain requested information to Heritage Makers, including your name and correct email address. When you register as a Member, you must provide Heritage Makers with true, accurate, current, and complete information about yourself.

   **b)**  A condition of Membership is your "Active Participation" in the Service. Active Participation is defined as placing an

Complaint
Exh. A
Page 75

order through the Heritage Makers website at least once during every 18-month period, or as having publishing points in your account. If your Membership is inactive for more than 18 months, Heritage Makers may terminate your Membership (or any part thereof) and your use of the Service, and may remove and discard all information, albums, image files, creative material, and other content (collectively "Content") uploaded by you or otherwise made available by you within the Service.

**II.     Your Use of the Service**

Subject to and conditioned upon your compliance with these Terms, and solely for so long as you are permitted by Heritage Makers to access the Service, we grant to you a non-exclusive, non-transferable, non-sub-licensable, limited right and license to access the Service, including any images, text, graphics, data, files, links and other materials incorporated into the Service (other than your Submissions), solely as made available by us, solely as necessary to access the Service and solely for your own personal, non-commercial, home purposes, provided that you keep intact all copyright and other proprietary notices. The Service, including all such materials and all intellectual property rights therein, remain the property of Heritage Makers or its licensors or suppliers. Except as expressly authorized by these Terms, you may not use, reproduce, distribute, modify, transmit, perform, display or create derivative works of any portion of the Service without the written consent of Heritage Makers. Nothing herein grants any rights to commercially exploit any portion of the Service or any content therein. All rights not expressly granted hereunder are expressly reserved.

**III.    Digital Image Storage**

**a)** A benefit of Membership is the ability to store photos ("Content") in your online account. A condition of your storage of photos is your "Active Participation" in the Service. Your data storage allowance depends on the Membership plan you subscribe to and Heritage Makers' current photo storage policy.

**b)** You should always preserve your original Content, or make back-up copies of such Content, on your personal system. You should not use the Service as the only repository for your Content.

**IV.    Photo Storage Policy**

**a)** Depending on your membership type, your account will be allotted a certain amount of free photo storage. Please check the pricing page for more information.

**b)** If your account meets or exceeds its photo storage limits, additional photos will not be able to be uploaded until you obtain more storage space by taking action such as purchasing additional storage space, upgrading your membership subscription, or clearing storage space in your account through photo deletion.

**c)** Heritage Makers reserves the right to purge your account of sufficient image files to bring your account into compliance with the photo storage policy. This will only be done after attempts have been made by Heritage Makers to notify you of your account's overages and requesting your attention to the matter.

**d)** You can check your photo storage allowances and usage in the "my photos" or "my account" areas of the Heritage Makers website.

**V.     Member Conduct**

**a)** Heritage Makers is committed to ensuring that the Service remains a fun and safe place to process photographs. To that end, the Service allows Members to be creative with their Content. Users of the Service may not use the Service to process Prohibited Content. Generally, Prohibited Content includes Content or other material that Heritage Makers believes:

❶ Is abusive, deceptive, pornographic, obscene, defamatory, slanderous, offensive, or otherwise inappropriate;

Complaint
Exh. A
Page 76

② Comprises copyrighted material used without the express permission of the owner;

③ Comprises photos, images or materials traced or derived from images you do not own the copyright to (such as images found on the Internet, images scanned from books or magazines, other artist's work, etc);

④ Comprises photos, images or materials containing embedded copyright notices, personal signatures or watermarks.

⑤ Violates or otherwise encroaches on the rights of others;

⑥ Contains viruses, worms, corrupt files, Trojan horses or other forms of corruptive code, or any other content which may compromise the Service (collectively "Corruptive Code");

⑦ Advocates illegal activity;

⑧ Hacks, destabilizes or adapts the Service, or alters another website to falsely imply it is affiliated with the Service;

⑨ Uses any high volume automated means (including robots, spiders or scripts) to access the Service;

⑩ Broadcasts or sends any form of advertising, mass communication or solicitation to Heritage Makers users;

⑪ Harms anyone, including minors; or,

⑫ Provides a link to any of the above.

**b)** Heritage Makers has the sole discretion to determine whether Content is Prohibited Content, and any Content submitted to the Service may be subject to examination from time to time. Although Heritage Makers does not and will not examine or otherwise review all Content submitted or transmitted to the Service, Heritage Makers may delete, move, and edit Content for any reason, at any time, without notice.

**c)** All Content (whether private or shared) that is processed on the Site is the sole responsibility of the person who submitted it. Thus, you are responsible for your Content.

**d)** By viewing the Site, you may be exposed to Content that you consider offensive. You take sole responsibility for such exposure.

**e)** Heritage Makers in no way guarantees the accuracy, quality, or appropriateness of Content available through the Service. In no event shall Heritage Makers (including its officers, directors, employees, affiliates, suppliers and agents) be liable for claims of any nature, whether direct or indirect, arising from or related to any Content made available on or through the Services, including (without limitation) errors or omissions in such Content, and loss or damages incurred as a result of use of such content.

**f)** You agree that you shall not interfere with or disrupt (or attempt to interfere with or disrupt) this service or servers or networks connected to this website, or to disobey any requirements, procedures, policies or regulations of networks connected to this service; or, provide any information to Heritage Makers that is false or misleading, that attempts to hide your identity, or that you do not have the right to disclose. Heritage Makers does not endorse any content placed on the website by third parties, or any opinions or advice, contained in such content.

**VI.    Copyrights**

Heritage Makers is, unless otherwise stated, the owner of all copyright and data rights in the Service and its contents. Individuals who have posted works to this service are either the copyright owners of the component parts of that work, or are posting the work under license from a copyright owner or his or her agent, or otherwise as permitted by law. You may not reproduce, distribute, publicly display or perform, or prepare derivative works

based on any of the content, including any such works without the express, written consent of Heritage Makers, or the appropriate owner of copyright in such works. Heritage Makers does not claim ownership rights in your works or other materials posted by you to this service ("Content").

While Heritage Makers has an inspection process that helps flag potential copyright issues, this process may, or may not, be applied to your Content at Heritage Makers' sole discretion. Ultimately, you are responsible for your Content. As such, it is very important that you take the time to research the images and materials that you submit, and ensure that you keep any reference material on hand in case of a dispute regarding the ownership of your images and materials. If you are not sure about the legality of reference material you did not create, please contact Heritage Makers.

**VII.    Reporting Copyright Violations**

Heritage Makers respects the intellectual property rights of others and expects you to do the same. At Heritage Makers' discretion, and in appropriate circumstances, Heritage Makers may remove Your Content submitted to this service, terminate your account and/or prevent access to this service, if Heritage Makers believes you may have infringed on the intellectual property rights of others. If you believe the copyright in your work, or in the work for which you act as an agent, has been infringed through this service, please contact Heritage Makers' Customer Support. Please provide substantially the following information, which Heritage Makers may then forward to the alleged infringer (see 17 U.S.C. 512 (c)(3) for further details):

**a)** A physical or electronic signature of a person authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**b)** Identification of the copyrighted work claimed to have been infringed, or, if multiple copyrighted works at a single online site are covered by a single notification, a representative list of such works at that site.

**c)** Identification of the material that is claimed to be infringing or to be the subject of infringing activity and that is to be removed or access to which is to be disabled, and information reasonably sufficient to permit the service provider to locate the material.

**d)** Information reasonably sufficient to permit the service provider to contact the complaining party, such as an address, telephone number, and, if available, an electronic mail address at which the complaining party may be contacted.

**e)** A statement that the complaining party has a good faith belief that use of the material in the manner complained of is not authorized by the copyright owner.

**f)** A statement that the information in the notification is accurate, and under penalty of perjury, that the complaining party is authorized to act on behalf of the owner of an exclusive right that is allegedly infringed.

**VIII.    Trademark**

All brand, product and service names used in this service which identify Heritage Makers, or third parties, and their products and services are proprietary marks of Heritage Makers and/or the relevant third parties. Nothing in this service shall be deemed to confer on any person, any license or right on the part of Heritage Makers, or any third party with respect to any such image, logo or name.

**IX.    Privacy**

Heritage Makers has a firm commitment to safeguarding your privacy. Please review Heritage Makers' Privacy Policy. The terms of Heritage Makers' Privacy Policy are incorporated into, and form a part of, this Agreement.

Complaint
Exh. A
Page 78

**X.    International Considerations**

Recognizing the global nature of the Internet, you agree to comply with all local rules regarding online conduct and acceptable Content. Such includes, but is not limited to, complying with all applicable laws regarding the transmission of technical data exported from the United States, or the country in which you reside, and decency laws in the locality in which you reside.

**XI.    Termination**

You agree that Heritage Makers, in its sole discretion, may terminate your account, and remove and discard any content, for any reason, including and without limitation, the lack of Active Participation; or, if Heritage Makers believes that you have violated, or acted inconsistently, with the Agreement. Heritage Makers may also, in its sole discretion and at any time, discontinue providing the service, or any part thereof, with or without notice. You agree that any termination of your access to the service under any provision of this Agreement may be effected without prior notice, and acknowledge and agree that Heritage Makers may immediately deactivate, or delete, your content and all related information and files. Heritage Makers reserves the right to bar any further access to such files or the service. You agree that Heritage Makers shall not be liable to you, or any third-party, for any termination of your access to the service. Paid accounts that are terminated will not be refunded.

**XII.    Indemnity**

You agree to indemnify and hold Heritage Makers, and its subsidiaries, affiliates, officers, agents, co-branders or other partners, and employees, harmless from any alleged claim or demand. This includes reasonable attorney fees, made by any third party due to or arising out of your content, your use of the service, your connection to the service, your violation of this Agreement, or your violation of any rights of another. You are solely responsible for your actions when using this service, including, but not limited to, costs incurred for Internet access.

**XIII.    Availability**

This service is provided by Heritage Makers on an "AS IS" and "AS AVAILABLE" basis, and Heritage Makers reserves the right to modify, suspend, or discontinue the service, in its sole discretion, at any time, and without notice. You agree that Heritage Makers is not, and will not be, liable to you for any modification, suspension or discontinuance of the service.

**XIV.    External Links**

This service, or relevant third parties, may provide links to other websites or resources. Because Heritage Makers has no control over such sites and resources, you acknowledge and agree that Heritage Makers is not responsible for the availability of such external sites or resources, and does not endorse and is not responsible, or liable, for any content, advertising, products, or other materials on, or available from, such sites or resources. You further acknowledge, and agree, that Heritage Makers shall not be responsible, or liable, directly or indirectly, for any damage or loss caused, or alleged to be caused by, or in connection with, use of or reliance on any such content, goods or services available on, or through, any such site or resource.

**XV.    Third Party Software**

As a convenience, we may make third-party software available through the service. To use the third-party software, you must agree to the terms and conditions imposed by the third party provider. The agreement to use such software will be solely between you and the third-party provider. By downloading third-party software, you acknowledge, and agree, that the software is provided on an "AS IS" basis without warranty of any kind. In no event shall Heritage Makers be liable for claims, or damages of any nature, whether direct, or indirect, arising from or related to any third-party software downloaded through the service.

**XVI.    Disclaimer of Warranty and Limitation of Liability**

HERITAGE MAKERS MAKES NO REPRESENTATIONS, OR WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, AS TO THE OPERATION OF THE SERVICE, OR THE CONTENT OR PRODUCTS PROVIDED THROUGH THE SERVICE. YOU EXPRESSLY AGREE THAT YOUR USE OF THE SERVICE IS AT YOUR SOLE RISK. HERITAGE MAKERS DISCLAIMS ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NON-INFRINGEMENT TO THE FULLEST EXTENT PERMITTED BY LAW. HERITAGE MAKERS MAKES NO WARRANTY AS TO THE SECURITY, RELIABILITY, TIMELINESS, AND PERFORMANCE OF THIS SERVICE. YOU SPECIFICALLY ACKNOWLEDGE THAT HERITAGE MAKERS IS NOT LIABLE FOR YOUR DEFAMATORY, OFFENSIVE, OR ILLEGAL CONDUCT, OR SUCH CONDUCT BY THIRD PARTIES, AND YOU EXPRESSLY ASSUME ALL RISKS AND RESPONSIBILITY FOR DAMAGES AND LOSSES ARISING FROM SUCH CONDUCT. EXCEPT FOR THE EXPRESS, LIMITED REMEDIES PROVIDED HEREIN, AND TO THE FULLEST EXTENT ALLOWED BY LAW, HERITAGE MAKERS SHALL NOT BE LIABLE FOR ANY DAMAGES OF ANY KIND ARISING FROM USE OF THE SERVICE, INCLUDING BUT NOT LIMITED TO, DIRECT, INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, EXEMPLARY, OR PUNITIVE DAMAGES, EVEN IF HERITAGE MAKERS HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING DISCLAIMERS, WAIVERS AND LIMITATIONS SHALL APPLY NOTWITHSTANDING ANY FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OF, OR LIMITATIONS ON, CERTAIN WARRANTIES OR DAMAGES. THEREFORE, SOME OF THE ABOVE EXCLUSIONS, OR LIMITATIONS, MAY NOT APPLY TO YOU. IN NO EVENT SHALL HERITAGE MAKERS 'S AGGREGATE LIABILITY TO YOU EXCEED THE AMOUNTS PAID BY YOU TO HERITAGE MAKERS PURSUANT TO THIS.

**XVII.    General Legal Terms**

The Agreement constitutes the whole legal agreement between you and Heritage Makers and governs your use of this service, and completely replaces any prior agreements between you and Heritage Makers in relation to this service. You agree that if Heritage Makers does not exercise, or enforce, any legal right, or remedy, which is contained in the Agreement (or which Heritage Makers has the benefit of under any applicable law), this will not be taken to be a formal waiver of Heritage Makers' rights. Those rights, or remedies, will still be available to Heritage Makers. If any court of law, having the jurisdiction to decide on this matter, rules that any provision of the Agreement is invalid, then that provision will be removed from the Agreement without affecting the rest of the Agreement. The remaining provisions of the Agreement will continue to be valid and enforceable. The Agreement and your relationship with Heritage Makers under the Agreement shall be governed by the laws of the State of Utah without regard to its conflict of laws provisions. You and Heritage Makers agree to submit to the exclusive jurisdiction of the courts located within the county of Utah County, Utah, to resolve any legal matter arising from the Agreement. Notwithstanding this, you agree that Heritage Makers shall still be allowed to apply for injunctive remedies (or an equivalent type of urgent legal relief) in any jurisdiction. Further, by using this service, you agree that Heritage Makers, at its sole discretion, may require you to submit any disputes arising from the use of the service, or this Agreement, concerning or, including disputes arising from, or concerning their interpretation, violation, nullity, invalidity, non-performance or termination, as well as disputes about filling gaps in this contract, or its adaptation to, newly arisen circumstances, to final and binding arbitration under the International Rules of Arbitration of the American Arbitration Association, by one or more arbitrators appointed in accordance with the said Rules. Notwithstanding these rules, however, such proceeding shall be governed by the laws of the state as set forth above.

**Terms of Purchase**

Heritage Studio is an Internet service (the "Service") owned and operated by Heritage Makers, Inc. ("we", "our" or "us"). "You" or "your" means an adult user of the Service for yourself and you as parent or guardian for any minor who you allow to access the Service, for whom you will be held strictly responsible. Your failure to cancel this purchase within 3 days (10 days in Canada), or by your activating or using the Service, you designate that you agree with the service terms and conditions. If you do not agree with any of these terms and conditions,

Complaint
Exh. A
Page 80

cancel your purchase and do not use the Service. We may alter or amend this Agreement at our discretion and your continued use after any change, or your failure to notify us of your unwillingness to accept such changes indicates your acceptance of that change. If you don't want to be bound by a change, notify Heritage Makers and discontinue use of the Service.

**1** **Activation and Security.** You have a right to cancel your purchase with Heritage Makers. Your failure to cancel this purchase within 3 days (10 days in Canada) is your acceptance of the terms of this contract. You must first activate your account to use the Service. As part of the activation process, you will select a password. You must provide Heritage Makers Inc. with accurate, complete, and up-to-date registration information. Failure to do so will constitute a breach of this Agreement. During activation you must agree to the terms and conditions of using the Service. Registration as a user of or subscriber to any of the Sites or services provided on them results in your customer information being stored and processed in the United States, and you, in registering or subscribing, specifically consent to that storage and processing.

**2** **Terms and Conditions.** Your failure to cancel this purchase within 3 days (10 days in Canada), or by your activating or using the Service, you designate that you agree with the service terms and conditions. Terms and conditions are viewable online under the "terms and conditions link." and are specifically adopted and incorporated into this agreement.

**3** **Publishing Points and the Heritage Studio Service.** You may purchase points for publishing service associated with the Heritage Studio Service through a consultant. The Service may be used for photo upload, photo storage, digital editing, use of artistic templates, and custom publishing. Publishing Points expire 12 months from the original date of purchase. Terms related to the Heritage Studio Account and ongoing storage of photos and projects following the expiration of Service are available online at www.heritagemakers.com.

**4** **Heritage Makers offers two membership programs:** 1) Premier Access, and 2) Club HM Membership (Bronze Level, Silver Level, or Gold Level). Your subscription to either of these programs will be automatically renewed through the payment option you selected based on the subscription program (annual, semi annual or monthly) you have chosen. Billing will be charged to the same credit card used on the original order; however, you may change the credit card on file by contacting customer service. Billing will be processed within 24 hours from the time your order is entered online (either by you or your consultant). Publishing points and access to Premier Art will be available to the account shortly thereafter. Premier memberships are paid in advance and end the last day of the 30-day period. Club HM memberships can be cancelled online at any time. Club HM memberships are charged on the 5th and the 20th of the month after the first purchase. If a billing problem occurs (for example a credit card transaction is denied) access to the account will be unavailable until the problem is resolved.

**5** **Cancellations.** An initial subscription comes with the option to cancel within the first 3 business days after purchase and receive a full refund (10 days in Canada). The business day period begins on the day your order form for the subscription service is received by your consultant. If you subscribe to the service following a free or other trial period, that trial period takes the place of the 3 business day cancellation period. Cancellations during the 3 business day period must be made by providing the same information that you provided when you subscribed. Subscription may be modified or cancelled online or by calling Heritage Makers customer support. Cancellation of subscription after 3 business days from the original date of purchase stops billing of future payments, however no refund will be made on the original payment after 3 business days (10 days in Canada).

**6** **Communications.** Heritage Makers will send electronic mail to you, for the purpose of informing you of changes or additions to the Service or of any Heritage Makers related products and services. It is your responsibility to provide Heritage Makers with your current email address. You may opt out of this notification service by replying to the electronic mail.

**7** **Termination.** Should you breach this Agreement we will revoke your license to use the Service and suspend your right of access. In such a case, no portion of your subscription payment will be refunded.

**8** **Modifications.** Heritage Makers, Inc. has the right, at its sole discretion, to modify this Agreement or the Service, including the Content of the Service, at any time. Changes in Service will be posted on Heritage Makers website under "Terms and Conditions." You may cancel your subscription by calling Customer Services at Heritage Makers, Inc. (See section 5 regarding cancellation of subscription.) Your continued use of the Service following notice of any changes in this Agreement, or passage of one year without use of the Service following notice of any changes in this Agreement, (notice is given on your account) means that you have accepted and are bound by any changes in this Agreement.

**9** **Privacy.** Your purchase of a Heritage Studio account and your use of the Service are subject to Heritage Makers Privacy Policy. See www.heritagemakers.com for details.

**10** **Choice of Law.** This Agreement shall be construed, interpreted and performed exclusively according to the laws of the State of Delaware without giving effect to any principles of conflicts of law, and, as applicable, federal law.

**11** **Limitation of Liability.** IN THE EVENT THAT WE ARE FOUND LIABLE TO YOU, YOU SHALL ONLY BE ENTITLED TO RECOVER ACTUAL AND DIRECT DAMAGES. BOTH YOU AND WE SPECIFICALLY AGREE AND CONSENT THAT IN THE EVENT OF ANY SUIT, ACTION, OR PROCEEDING ARISING UNDER OR RELATED TO THE AGREEMENT OR THE SERVICE THAT EACH PARTY'S DAMAGES SHALL BE LIMITED TO THE CONTRACT AMOUNT AND THAT NEITHER PARTY WILL SEEK ANY DAMAGES IN EXCESS OF SAID CONTRACT AMOUNT. WE SHALL HAVE NO LIABILITY FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES (INCLUDING WITHOUT LIMITATION LOSS OF PROFIT, REVENUE AND USE) ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT OR THE SERVICE, WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING NEGLIGENCE, WHETHER ACTIVE, PASSIVE OR IMPUTED), PRODUCT LIABILITY, STRICT LIABILITY OR OTHER THEORY, EVEN IF WE OR OUR AUTHORIZED REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. IN NO EVENT SHALL WE HAVE ANY LIABILITY FOR UNAUTHORIZED ACCESS TO THE SERVICE THROUGH ACCIDENT, MISUSE, OR FRAUDULENT MEANS OR DEVICES BY YOU OR ANY THIRD PARTY, OR AS A RESULT OF ANY DELAY OR MISTAKE RESULTING FROM ANY CIRCUMSTANCES BEYOND OUR CONTROL.

**12** **Arbitration Provision.** PLEASE READ THIS SECTION CAREFULLY. IT AFFECTS RIGHTS THAT YOU MAY OTHERWISE HAVE. IT PROVIDES FOR RESOLUTION OF DISPUTES THROUGH ARBITRATION INSTEAD OF COURT TRIALS AND CLASS ACTIONS. YOU WILL NOT BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION IN COURT, NOR WILL YOU BE ABLE TO BRING ANY CLAIM IN ARBITRATION AS A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. YOU WILL NOT BE ABLE TO BE PART OF ANY CLASS ACTION OR OTHER REPRESENTATIVE ACTION BROUGHT BY ANYONE ELSE, OR BE REPRESENTED IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION. ARBITRATION IS FINAL AND BINDING AND SUBJECT TO ONLY VERY LIMITED REVIEW BY A COURT. THIS ARBITRATION CLAUSE SHALL SURVIVE TERMINATION OF THIS AGREEMENT.

YOU HEREBY AGREE THAT ANY DISPUTE, CLAIM OR CONTROVERSY ARISING NOW OR IN THE FUTURE UNDER OR RELATING IN ANY WAY TO THIS AGREEMENT, OR TO THE SERVICE, REGARDLESS OF THE NATURE OF THE CAUSE(S) OF ACTION ASSERTED (INCLUDING CLAIMS FOR INJUNCTIVE, DECLARATORY, OR EQUITABLE RELIEF), SHALL BE RESOLVED BY BINDING ARBITRATION. CLAIMS SUBJECT TO ARBITRATION INCLUDE CLAIMS THAT ARE MADE AS COUNTERCLAIMS, CROSS CLAIMS, THIRD PARTY CLAIMS, INTERPLEADERS, OR OTHERWISE.

ARBITRATION REPLACES THE RIGHT TO GO TO COURT, AND YOU THEREFORE AGREE TO WAIVE ANY RIGHT THAT YOU OR WE MIGHT OTHERWISE HAVE HAD TO A JURY TRIAL OR THE OPPORTUNITY TO LITIGATE ANY CLAIMS IN COURT BEFORE EITHER A JUDGE OR JURY. NEITHER YOU NOR WE WILL BE ABLE TO BRING A CLASS ACTION OR OTHER REPRESENTATIVE ACTION (SUCH AS AN ACTION IN THE FORM OF A PRIVATE ATTORNEY GENERAL) TO LITIGATE ANY CLAIMS IN COURT BEFORE EITHER A JUDGE OR JURY; NEITHER YOU NOR WE WILL WE BE ABLE TO PARTICIPATE

Complaint
Exh. A
Page 82

AS A CLASS MEMBER IN A CLASS ACTION OR OTHER REPRESENTATIVE ACTION TO LITIGATE ANY CLAIMS IN COURT BEFORE EITHER A JUDGE OR JURY; YOU AND WE FURTHER AGREE TO WAIVE ANY RIGHT TO ARBITRATION ON A CLASS OR REPRESENTATIVE BASIS, AND THE ARBITRATOR SHALL HAVE NO AUTHORITY TO PROCEED ON THAT BASIS. THIS MEANS THAT EVEN IF A CLASS ACTION LAWSUIT OR OTHER REPRESENTATIVE ACTION, SUCH AS THAT IN FORM OF A PRIVATE ATTORNEY GENERAL ACTION, IS FILED, ANY CLAIM BETWEEN US RELATED TO THE ISSUES RAISED IN SUCH LAWSUITS WILL BE SUBJECT TO AN INDIVIDUAL ARBITRATION CLAIM IF EITHER YOU OR WE SO ELECT.

You and we agree that this binding arbitration provision is made pursuant to a transaction involving interstate commerce, and shall be governed by and enforceable under the Federal Arbitration Act, 9 U.S.C. Â§1-16, as it may be amended.

This binding arbitration provision applies to any and all claims that you have against us, our parent, subsidiaries, affiliates, licensees, predecessors, successors, assigns, and against all of their respective employees, agents, or assigns, or that we have against you; it also includes any and all claims regarding the applicability of this arbitration clause or the validity of the Agreement, in whole or in part.

The party filing a claim(s) in arbitration must file its claim(s) before the American Arbitration Association under the rules of such arbitration administrator in effect at the time the claim(s) was filed. Rules and forms may be obtained and claims may be filed at the American Arbitration Association, 335 Madison Avenue, Floor 10, New York, NY 10017-4605, 800-778-7879, www.adr.org.

All administrative fees and expenses of an arbitration will be divided equally between you and us, except that for claims of less than $1,000, you will be obligated to pay $25 and we will pay all other administrative costs and fees. In all arbitrations, each party will bear the expense of its own counsel, experts, witnesses and preparation and presentation of evidence at the arbitration.

Any dispute you have arising from this Agreement or the Service shall be submitted to arbitration in Delaware, conducted in accordance with the commercial arbitration rules of the American Arbitration Association by a single arbitrator to be chosen in accordance with said rules. The arbitrator, applying Delaware law, without reference to its rules regarding choice of law, shall have the authority to grant any remedy that a court hearing the same case would have the authority to grant. The award or decision rendered by the arbitrator will be final and binding on you and any judgment may be entered thereon in any court having jurisdiction.

Any arbitration shall be confidential, and neither you nor we may disclose the existence, content or results of any arbitration, except as may be required by law or for purposes of enforcement of the arbitration award. If any portion of this arbitration clause is determined by a court to be inapplicable or invalid, then the remainder shall still be given full force and effect.

*These terms of purchase are for your purchase of the Heritage Studio Service and associated Project Points only. Your use of the service is subject to additional terms of service located at www.heritagemakers.com. You will be required to separately agree to the Terms of Service in order to use the Service.

**Right to Cancel**

You may CANCEL this transaction, without any penalty or obligation, within THREE (3) BUSINESS DAYS (IN CANADA, TEN (10) BUSINESS DAYS) from the date listed on the front of this receipt. If you cancel, any property traded in, any payments made by you under the contract of sale and any negotiable instrument executed by you will be returned within TEN (10) BUSINESS DAYS following receipt by the seller of your cancellation notice, and any security interest arising out of the transaction will be cancelled.

If you cancel, you must make available to the seller at your residence, in substantially as good condition as when received, any goods delivered to you under this contract of sale; or you may, if you wish, comply with the

instructions of the seller regarding the return shipment of goods at the seller's expense and risk.

If you do make the goods available to the seller and the seller does not pick them up within twenty (20) days of the seller's receipt date of your Notice of Cancellation, you may retain or dispose of the goods without any further obligation. If you fail to make the goods available to the seller or if you agree to return the goods to the seller and fail to do so, then you remain liable for performance of all obligations of this contract. To cancel this transaction, mail or deliver a signed and dated copy of this Cancellation Notice or any other written notice to the consultant listed on the front of this receipt.

## HOW TO REACH US

**FOR ORDERS & SIGN-UP:**

(800) 982-3197 toll free

**CUSTOMER SERVICE:**

(800) 982-3189 toll free

**24-HOUR FAX LINE FOR ORDERS & SIGN-UP:**

(619) 934-3205

**OUTSIDE USA:**

(619) 934-3980

**WEBSITES:**

www.Youngevity.com or www.90forLIFE.com

**EMAIL:**

support@youngevity.com

**ADDRESS:**

2400 Boswell Road
Chula Vista, CA 91914

# EXHIBIT B

CONFIDENTIAL FINANCIAL INFORMATION REDACTED

CONFIDENTIAL FINANCIAL INFORMATION REDACTED

From: Blake Graham <japanblake@hotmail.com<mailto:japanblake@hotmail.com>>
Date: February 22, 2016 at 6:13:18 PM PST
To: Blake Graham <japanblake@hotmail.com<mailto:japanblake@hotmail.com>>
Subject: Youngevity saying goodbye to Todd Smith

Dear Youngevity Family,

I had wanted to reach out to you individually before you heard about it from someone or somewhere else, but unfortunately each day I find that I can only talk to so many people before time runs out and so I am resorting to a group email so that I don't get any further behind.  After you read this email, you are welcome to reach back out to me on the phone, text or email and I will answer as many as I can.

I am sad to inform you that we are saying goodbye in Youngevity to Todd Smith, my sponsor and partner of 19 years.  As many of you know, for more than a year, Todd has stepped back from Youngevity to devote more time to the new restaurant franchise.  And a couple of months ago he was presented with an opportunity to take an established company and turn it MLM.  While it is not my place to tell you the details of this, suffice it to say that Todd has re-hired some of the former Youngevity corporate staff, and is working in the new business with a couple of leaders who were dis-engaged with Youngevity.

As his partner, I have known about his decision for a couple of months -- though I have not looked forward to the time when I had to tell anyone else.
I know that Todd's decision to move on has a lot to do with his desire to work on the new company.  Although he isn't working with us, he has told me that he still believes in the need for the 90 Essential Nutrients and doesn't regret the 2 decades that he spent in building Dr. Wallach's Crusade.  I deeply appreciate him for introducing me to Dr. Wallach and Youngevity many years ago and for all he has contributed to the Crusade during the last 2 decades, and I wish him well in his new adventure.

As Rich Stocks says...

The best company may not be the RIGHT company for you, but the RIGHT company will always be the BEST company for you.

This past weekend before the training in Portland Oregon, I sat down and spoke in person with Steve and Michelle Wallach about Todd's decision.
There Michelle Wallach asked me, "Why aren't YOU going with your friend?"
The answer is because I'm all in with the Crusade.  I not only believe in Dr. Wallach's message, this is where I feel that I belong.  Some people -- even good people -- come and go.  And I appreciate all that they contribute while they are here.  We have seen that many of them come back and I hope that someday all of them will come back.  Todd has made the decision to leave and I wish him the best in doing something that he is putting his whole heart into.  But even if others leave, as long as Youngevity will have me, I would like to stay and continue to promote and advance the Crusade.

There are times when the Crusade and life can be hard.  Right now is one of those times for me.

It's hard to see good people you care about move on, especially when they have been your partner for 19 years.  It can be hard to see some people no longer carry on the torch of Dr. Wallach's Crusade, and still wish them the best.  And it's hard for me to feel like I'm "in the dog house" with Dr.
Wallach, Steve & Michelle Wallach, and even many of the other Youngevity leaders, because I've known about

Complaint
Exh. B
Page 86

Todd's decision but haven't said anything to anyone out of my respect and my relationship with him.

It's hard... but it doesn't make it a Crusade because it's easy.

Scott Fardulis, in a talk in New Zealand, spoke of our slogan in America, one repeated in the US National Anthem, "The Land of the Free and the Home of the Brave."

Sometimes being BRAVE is the PRICE for FREEDOM.

Bravery isn't the absence of fear.  Bravery is doing what needs to be done even in the face of fear, in the face of opposition, in the face of being misunderstood or even being criticized when you're doing your best.  I hope that each and everyone of you know that I'm trying to do my best to contribute to and to advance the Crusade.  I am here because I feel that this is where I am supposed to be.

The need for Dr. Wallach's message hasn't decreased even though sometimes good people leave.  And though we are sad that we will not be working together, we do wish them the best.  I would hope that everyone who has come across our Crusade, though they do something else for work, that they will continue to use the 90 for Life and be healthy.  And as they come across people who also are in dire need of Youngevity's products, that they will at least refer them to someone who can help them.

For those of you who feel the same, who want to continue to contribute to our Crusade, I invite you to not only stay, but to increase your activity.

In critical times like this, we show our support for Dr. Wallach, Steve & Michelle, Dave Briskie, Dr. Ma Lan, and all of Youngevity corporate and our teams by INCREASING what we do -- by sharing the message with more people, by bringing more people with us to events and meetings, by being positive and cheerful and making more of a difference in the lives of others, by being good people and building a bigger and better business.
More and more people need this message and as much as ever it is up to US to share it.

There is no message greater than Dead Doctors Don't Lie.  As all of you that are personally seeing results and have loved ones and team members seeing results, our opportunity is more than a comp plan, more than a product, even more than a company  -- it is a Crusade and to me a calling.
I am here because I feel that I need to be here, and I am excited and honored to work with all those that feel that way too!

We have many events coming up.  Let's show our support by attending these events and bringing people with us.


  *   March 1 thru 5 -- Meetings in Utah with Dr. Wallach
  *   March 11 & 12 -- SLC Corporate Tour and Training with Steve &
Michelle
Wallach, Alex Theis, Richard Renton, and Scott Fardulis
  *   April 14-16 -- Leadership Summit in Anaheim
  *   May 5-7 -- Week of Youngevity in SLC (VP & above meeting, Product
Showcases, Opportunity Meeting, and Bootcamp with Barb Pitcock)
  *   Sept 8-10 -- Youngevity Convention in SLC (Mine Tour on Sept 7)

And more to come.

In addition, please feel free to reach out to me for all of you that would like to talk.  You can reach me by email, by text or call (text can come through even when I cannot talk) on my cell at 801-376-2110.  I also invite you to reach out to Steve & Michelle, to Dr. Wallach, and without saying anything bad about any good people who may have left, to reaffirm your commitment and excitement for Youngevity, for our opportunity, for international expansion, for our Crusade.

For all that have contributed to this Crusade over the years -- THANK YOU!

And for all that will CONTINUE to contribute to this Crusade -- THANK YOU and I LOOK FORWARD TO ACHIEVING EVEN GREATER HEIGHTS TOGETHER IN 2016!

May God bless and watch over you and your families always!

Sincerely,

Blake Graham
Diamond Chairman
90 for Life Crusader

# EXHIBIT C

## EMPLOYMENT AGREEMENT

This Employment Agreement ("**Agreement**") is made and entered into on 10/25, 2011 by and between AL International, Inc., a Delaware corporation, doing business as Youngevity ("**Company**") and William J. Andreoli ("**Employee**").  Capitalized terms used in this Agreement and not otherwise defined herein shall have the meaning set forth in the Purchase Agreement.

R E C I T A L S :

**WHEREAS**, entering into this Agreement is a condition of closing under that certain Equity Purchase Agreement of the date hereof (the "**Purchase Agreement**"), pursuant to which the Company is purchasing one hundred percent (100%) of the issued and outstanding shares of capital stock and membership interests of each of Financial Destination, Inc. ("**FDI**"), FDI Management Co., Inc. ("**FDIM**"), FDI Realty, LLC ("**FDIR**") and MoneyTRAX, LLC ("**MoneyTRAX**" and, together with FDI, FDIM and FDIR, the "**FDI Entities**");

**WHEREAS**, Company wishes to procure Employee's employment with Company and Employee wishes to accept such employment, upon the terms and conditions hereinafter set forth; and

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, receipt of which is hereby acknowledged, the parties hereto agree as follows:

A G R E E M E N T :

1.    Duties and Term.

(a)    Company hereby employs Employee to serve as President of the Company, to perform such duties as may be determined by the Board of Directors of Company and which are consistent with the duties that Employee performed for the FDI Entities prior to the date hereof.  Employee shall perform his duties in accordance with and subject to such policies, guidelines and directions as are consistent herewith and established by the Board of Directors of Company from time to time.

(b)    Employee acknowledges that as an executive performing services for a subsidiary of a publicly held company, he will need to conform with certain policies and procedures that will be established by Company and that may not previously have been incorporated in the policies and procedures of the FDI Entities.

(c)    Employee shall devote his full working time, effort, skill, and attention to the affairs of Company and shall faithfully perform his duties hereunder to promote Company's interests and observe and perform his agreements contained herein.

(d)    The term of this Agreement shall commence as of the Closing Date (which is excepted to occur on or about August 31, 2011 and shall continue for a term of ten (10) years ("**Initial Term**").  At the end of the Initial Term, this Agreement may be extended by mutual written agreement of the parties (said term, as the same may be extended by written agreement, referred to as the "**Term**").  Unless so extended, Employee's employment thereafter shall be considered to be "at will" and not part of the Term.  Prior

to any such extension, Employee's employment with the Company shall *not* be considered to be "at will".

2.      <u>Compensation</u>.

(a)      *Salary*:  Subject to Section 2(b), during the Term of this Agreement, Company shall pay to Employee as compensation a salary of $170,000 per annum ("**Salary**"), in accordance with the standard payroll practices of Company.  In addition, Company may, in its discretion, elect to award Employee an annual bonus.  Employee's salary level shall be reviewed by the Board of Directors on an annual basis and Employee shall be entitled to an increase in salary if specified objectives are satisfied.

(b)      *Adjustment to Salary:*  In the event that the amount of any payment of Contingent Consideration is reduced as a result of Annual DP Gross Revenue being less than Target DO Gross Revenue pursuant to Section 1.3(d) of the Purchase Agreement, Employee's Salary shall be reduced by the same percentage as the reduction in the payment of Contingent Consideration pursuant to the Purchase Agreement.

(c)      *Initial Executive Team Goals Bonus*:  Employee shall receive stock options in the amount of one hundred and twenty-five thousand (125,000) shares, at the strike price equal to the last closing price of the Company's common stock on the date of such grant, if Company reaches Fifty Million dollars ($50,000,000) in Gross Revenue for any calendar year ("Threshold").  The stock options shall be granted to Employee at the first Board meeting held following achievement of the Threshold, or, if no such Board meeting is scheduled to be held within thirty (30) days following the achievement of the Threshold, by unanimous written consent of the Board on or prior to such date.  The stock options shall provide that Employee can exercise them by means of a cashless exercise.

(d)      *Future Bonuses*: Future annual bonus and/or spot bonuses can be made available to Employee based upon the achievement of mutually-agreeable objectives set forth by Employee and Company.  The bonus shall be payable in either cash or stock, or some combination of the two, depending upon the Company's cash flow position and at the sole discretion of Company.

3.      <u>Expenses</u>.   Company will reimburse Employee for all reasonably necessary expenses incurred by him in carrying out his duties under this Agreement, including reimbursement of all reasonable travel and entertainment expenses incurred by Employee.  With respect to any particular expense exceeding $100.00 or any series of expenses exceeding $250.00 in any thirty (30) day period, Employee shall present to Company an itemized account of such expenses in such form as may be reasonably required by Company.  Company may impose reasonable limitations on the amount of expenses Employee may incur on behalf of Company.

4.      <u>Employee Benefit Plans</u>.   Employee shall be entitled to participate in any employee benefit plans that Company from time to time offers to its employees generally or are offered generally by Company to employees of its subsidiaries to the extent Employee is eligible to participate in such plans, and under the same terms as provided to other key executive employees of Company.

5.     Paid Time Off.  Employee shall be entitled to paid time off ("**PTO**") during each calendar year of the Term in accordance with Company's policies.  Such PTO shall be taken at times consistent with the proper performance by Employee of his duties and responsibilities. PTO is to be taken in the calendar year in which it accrues, any unused PTO days will be administered in accordance with Company's standard policies with respect to rollovers and accruals.

6.     No Hindrances.  Employee represents and warrants to Company that he is free to accept employment with Company hereunder, and that he has no prior other obligations or commitments of any kind to anyone that would in any way materially hinder or interfere with his acceptance of and performance of such employment with Company.

7.     Other Business.  Employee shall devote his full working time, attention, and energy to the business of Company and corporations affiliated with Company, including the FDI Entities, and shall not during the term of this Agreement be engaged in any other business activity if pursued for gain, profit, or other pecuniary advantage without Company's prior written consent, which consent shall not be unreasonably withheld.  The Company's acknowledges and agrees that Employee is, and the Company expressly permits Employee to remain, the owner and operator of restaurants in the New Hampshire area.

8.     Termination.  Subject to the provisions of this Paragraph 8, either Company or Employee may terminate this Agreement prior to the expiration of the Term, as provided for herein:

(a)     Company shall have the right to terminate this Agreement for Cause (as hereinafter defined).

(b)     Company may terminate this Agreement for other than Cause, provided that in such circumstances, Company shall be obligated to:

(i)     pay to Employee all accrued but unpaid Salary amounts payable hereunder with respect to the period prior to the date of termination (including, without limitation, unused PTO pay to the extent accrued prior to termination); and

(ii)     continue to pay to Employee his Salary until six months after the date of termination (the "**Severance Period**").  The payments required to be paid under this Paragraph 8(b)(ii) are referred to herein as the "**Severance Payments**."  The Severance Payments will be made in equal installments during the Severance Period pursuant to the Company's regular payroll schedule and practices, and subject to the provisions of this Section 8. The making or acceptance of any Severance Payment shall not negate, reduce or modify any other other payment(s) that Purchaser may owe to Seller under the Equity Purchase Agreement.

Employee agrees to provide Company with prior written notice of his resignation from Company at least thirty (30) days prior to such resignation.

(c)     If Company terminates this Agreement for Cause; or if Employee

terminates this Agreement, then Company's sole liability shall be to pay to Employee all accrued but unpaid Salary amounts payable hereunder with respect to the period ending on the date of termination, together with reimbursement of any approved expenses previously incurred and unused PTO pay to the extent accrued prior to termination) any other amounts or rights of Employee hereunder shall be automatically forfeited.

    (d)    For purposes of this Agreement, "**Cause**" shall mean:

    (i)    Employee (A) is convicted of or pleads guilty or nolo contendere to criminal conduct involving a felony or embezzlement of corporate funds or property, or (B) fails to comply in all material respects with the general written policies of Company, including without limitation, trading in securities on non-public information or otherwise in violation of Company's insider trading policies; or

    (ii)    refusal to obey lawful instructions given in writing by the Board of Directors of Company as to the performance of Employee's duties under this Agreement; provided, however, that such instructions are consistent with the duties that Employee performed for Company prior to the date hereof, which refusal is (A) not remedied within ten (10) days after receipt by Employee of written notice from the Board of Directors of Company identifying such refusal, or (B) subsequently repeated; or

    (iii)    repeatedly and materially performs below expectations of the Board of Directors of Company as communicated in writing to Employee and such performance is not remedied during the six (6) month period in which Company communicates in writing such performance deficiencies with Employee; or

    (iv)    Employee acts in a grossly negligent or intentional manner which results in substantial harm to Company, its affiliates, or their respective business, prospects or oprations; or

    (v)    an intentional and material breach by Employee of his duties and responsibilities hereunder which is (A) not remedied within ten (10) days after receipt by Employee of written notice from the Board of Directors with respect to such breach, or (B) is subsequently repeated within six (6) months.

    (e)    Employee acknowledges and agrees that the Severance Pay is the full amount of severance payable to Employee pursuant to the terms of this Agreement if Employee is terminated by Company without Cause.  Employee further acknowledges that the Severance Pay is not payable if Employee is terminated for Cause, or if Employee voluntarily resigns or if employment is terminated as a result of death or disability.  For purposes of this Agreement, "disability" shall mean the cessation of the Employee's ability to perform his duties as described in Section 1, with or without reasonable accommodation, due to a mental or physical illness, incapacity or disability for an aggregate period of more than thirteen (13) weeks during any twelve (12) month

period.

Employee acknowledges and agrees that a change of control of Company in which Employee is offered continued employment is not an event requiring payment of Severance Pay provided that continued employment is on substantially the same terms and conditions as prior to a change of control (i.e., substantially the same responsibilities, salary and benefits). Employee further acknowledges that during the Severance Period, Employee shall not be entitled to participate in any employee benefit plans, except to the extent that Employee elects COBRA coverage which shall be at Employee's expense.

(f)     The Severance Payments do not constitute non-qualified deferred compensation subject to Section 409A of the Internal Revenue Code of 1986, as amended (the "**Code**") pursuant to Treas. Reg. §1.409A-1(b)(9)(iii) in that the Severance Payments are payable only upon an involuntary separation of service. If the Severance Payments are deemed to constitute non-qualified deferred compensation subject to Section 409A of the Code, the following interpretations apply to the Severance Payments: (i) any termination of Employee's employment triggering payment of the Severance Payments must constitute a "separation from service" under Section 409A(a)(2)(A)(i) of the Code and Treas. Reg. §1.409A-1(h) before distribution of such benefits can commence. To the extent that the termination of Employee's employment does not constitute a separation of service under Section 409A(a)(2)(A)(i) of the Code and Treas. Reg. §1.409A-1(h) (as the result of further services that are reasonably anticipated to be provided by him to Company at the time his employment terminates), the Severance Payments shall be delayed until after the date of a subsequent event constituting a separation of service under Section 409A(a)(2)(A)(i) of the Code and Treas. Reg. §1.409A-1(h). For purposes of clarification, this Section 8(g) shall not cause any forfeiture of benefits on the Employee's part, but shall only act as a delay until such time as a separation from service occurs; (ii) if Employee is a "specified employee" (as that term is used in Section 409A of the Code and regulations and other guidance issued thereunder), any installment of the Severance Payments that constitute non-qualified deferred compensation subject to Section 409A shall be delayed until the earlier of (A) one business day following the six-month anniversary of the date his separation from service becomes effective, and (B) the date of Employee's death, but only to the extent necessary to avoid such penalties under Section 409A of the Code. On the earlier of (A) one business day following the six-month anniversary of the date his separation from service becomes effective, and (B) his death, Company shall pay Employee in a lump sum the aggregate value of the non-qualified deferred compensation that Company otherwise would have paid him prior to that date under Section 8(b)(ii) of this Agreement and thereafter shall pay Employee the amounts payable to him in accordance with the schedule of fixed payments set forth in Section 8(b)(ii), as applicable; (iii) it is intended that each installment of the payments and benefits provided under Section 8(b)(ii) of this Agreement shall be treated as a separate "payment" for purposes of Section 409A of the Code; and (iv) neither Company nor Employee shall have the right to accelerate or defer the delivery of any such payments or benefits except to the extent specifically permitted or required by Section 409A of the Code.

(g)     Company's obligation under this Paragraph 8 to pay the Severance

Payments shall be subject to (i) the execution (without revocation) and delivery by Employee of a release of claims, in customary form reasonably satisfactory to Company, of claims against the Company and its affiliates (including the FDI Entities), arising out of this Agreement and Employee's employment relationship with Company (the "Release"), and (ii) the Release becoming effective and irrevocable prior to the sixtieth (60th) day following the effective date of the termination of the Employee's employment.

(h)     In the event that Employee breaches his obligations under Paragraphs 9 through 11 below, then, without limiting the other rights and remedies available to Company under Paragraph 12, Company shall be entitled to immediately terminate making any further Severance Payments to Employee.

(i)     Except as set forth in the Purchase Agreement, nothing in this Agreement shall relieve, waive, reduce or modify Company's obligation to make any and all payments set forth in the Purchase Agreement (whether obligatory or contingent), including but not limited to any and all payments set forth in Sections 1.2 and 1.3 of the Purchase Agreement.

9.     <u>Confidentiality and Covenant Not to Disclose.</u>

(a)     Employee agrees that, by virtue of the performance of the normal duties of his position with Company and by virtue of the relationship of trust and confidence between Employee and Company, he possesses certain data and knowledge of operations of Company which are proprietary in nature and confidential.  Employee covenants and agrees that he will not, at any time, whether before or after the termination of this Agreement, reveal, divulge or make known to any person (other than Company or its affiliates) or use for his own account, or for the benefit of any other person or entity other than Company or its affiliates, any confidential or proprietary records, data, trade secrets, technology, customer information, pricing policy, bid strategy, rate structure, personnel policy, method or practice of obtaining or doing business by Company or its affiliates, or any other confidential or proprietary information of Company or its affiliates, or of its customers, suppliers or other third parties that Employee gained access to through his employment by Company (the "**Confidential Information**"), whether or not obtained with the knowledge and permission of Company or its affiliates and whether or not developed, devised or otherwise created in whole or in part by the efforts of Employee. Employee further covenants and agrees that he shall retain all such knowledge and information which he shall acquire or develop respecting such Confidential Information for the sole benefit of Company and its affiliates and their successors and assigns. Notwithstanding the foregoing, Confidential Information shall not include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure to Employee by Company or its affiliates; (ii) becomes publicly known and made generally available after disclosure to Employee by Company or its affiliates through no action or inaction of Employee; (iii) was already in the possession of Employee in writing before its receipt from the Company; (iv) was obtained from a third party who is free to divulge the same; and (v) which is required by law or other competent authorities to be disclosed.

(b)     Employee acknowledges and agrees that he will not knowingly use any trade secrets of Company to contact or solicit any person, including without limitation,

Company's employees, suppliers and customers, or otherwise use such Company trade secrets to unfairly compete with Company.

(c)     Employee acknowledges and agrees that all computer programs and disks, manuals, drawings, blueprints, letters, notes, notebooks, reports, books, procedures, forms, documents, records or papers, or copies thereof, pertaining to the operations or business of Company or its affiliates made or received by Employee or made known to him in any way in connection with his employment and any other Confidential Information are and will be the exclusive property of Company or its affiliates. Employee agrees not to copy or remove any of the above from the premises and custody of Company or its affiliates, or disclose the contents thereof to any other person or entity, or make use thereof for his own purposes or for the benefit of any other person or entity, except as specifically authorized in writing by the Board of Directors of Company or in connection with the performance of his duties under this Agreement.   Employee acknowledges that all such computer programs and disks, papers and other materials will at all times be subject to the control of Company, and Employee agrees to surrender and return the same to Company upon request of Company, and in any event will surrender and return such no later than the termination of Employee's employment hereunder, whether voluntary or involuntary.  Company may notify anyone employing Employee at any time of this provision of this Agreement.

(d)     The obligations of this Paragraph 9 shall apply to any and all employment relationship between Company and Employee, whether under this Agreement, at will or otherwise, and shall survive the termination of this Agreement.

(e)     Notwithstanding any other provision of this Paragraph 9, Employee may disclose Confidential Information in response to a subpoena or valid order of a court or other governmental agency, provided that Employee first provides notice to the Company and reasonably cooperates, at Company's sole expense,  with the Company to obtain a protective order requiring such Confidential Information be disclosed only for the limited purposes for which the order was issued.

10.     Inventions and Discoveries.  Employee hereby assigns, transfers and conveys to Company all of Employee's right, title and interest to, and shall promptly disclose to the Board of Directors of Company, all ideas, inventions, discoveries, or improvements (whether or not patentable) conceived or developed solely, or jointly with others, by Employee during his Term of employment, (a) that relate directly or indirectly to the business of Company or its affiliates as conducted at any time during his Term of employment, (b) which relate to the actual or anticipated research or development activities of Company or its affiliates, (c) which result from any work performed by Employee for Company or its affiliates; or (d) for which Confidential Information of Company or its affiliates was used.  Upon the request of Company and at the Company's sole cost, Employee shall execute and deliver to Company any and all instruments, documents and papers, give evidence and do any and all other acts which Company deems necessary or desirable to document such assignment, transfer and conveyance, or to enable Company or its affiliates to file and prosecute applications for, and to acquire, maintain and enforce, any and all patents, trademark registrations or copyrights under United States or foreign law with respect to any such discoveries, or to obtain any extension, validation, reissue, continuance or renewal of any such patent, trademark or copyright.  Company will be responsible for the preparation and cost of any such instruments, document and papers and shall

reimburse Employee for all reasonable expenses incurred by him in complying with the provisions of this Paragraph 10; provided, Employee shall not be entitled to any further compensation or consideration for performance of his obligations under this Paragraph 10.  The obligations of Employee under this Paragraph 10 shall apply to any and all employment relationship between Company and Employee, whether under this Agreement, at will or otherwise, and shall survive the termination of this Agreement.

11.     <u>Business Materials and Property of Company</u>.  All written materials, records and documents (whether hard copies or in electronic media) made by Employee or coming into his possession concerning the business or affairs of Company or its affiliates shall be the sole property of Company or its affiliates and, upon termination of his employment with Company, Employee shall deliver the same to Company and shall retain no copies.  Employee shall also return to Company all other property in his possession owned by Company or its affiliates upon termination of his employment.  The obligations of Employee under this Paragraph 11 shall apply to any and all employment relationship between Company and Employee, whether under this Agreement, at will or otherwise, and shall survive the termination of this Agreement.

12.     <u>Breach by Employee</u>.  It is expressly understood, acknowledged and agreed by Employee that (i) the restrictions contained in Paragraphs 9 through 11 of this Agreement are given in consideration of Company's agreements contained herein, and represent reasonable and necessary protections of the legitimate interest of Company and its affiliates and that Employee's failure to observe and comply with the covenants and agreements in those Paragraphs may cause irreparable harm to Company and/or its affiliates; (ii) it is and will continue to be difficult to ascertain the nature, scope and extent of the harm; and (iii) a remedy at law for such failure by Employee will be inadequate.  Accordingly, it is the intention of the parties that, in addition to any other rights and remedies which Company and its affiliates may have in the event of any breach of those paragraphs, Company and its affiliates may each be entitled, and each is expressly and irrevocably authorized by Employee, to demand and obtain specific performance; including without limitation, temporary and permanent injunctive relief, and all other appropriate equitable relief against Employee, in order to enforce against Employee, or in order to prevent any breach or any threatened breach by Employee, of the covenants and agreements contained in those paragraphs.

13.     <u>Indemnification.</u> To the fullest extent provided by law, the Company will indemnify Employee against and hold him harmless from liabilities of whatsoever kind and nature which may be imposed on, incurred by or asserted against him at any time related to actions taken or omitted on behalf of the Company in his capacity as an executive officer of the Company (irrespective of whether Employee is employed by the Company).  The Company shall also cover Employee under any by-law indemnity as well as directors' and officers' liability insurance that will continue in effect both during the Agreement Term and, while potential liability exists, thereafter.  The obligations of the Company under this Paragraph 13 shall apply to any and all employment relationship between Company and Employee, whether under this Agreement, at will or otherwise, and shall survive the termination or expiration of this Agreement.

14.     <u>Miscellaneous.</u>

(a)     <u>Entire Agreement</u>.  This Agreement sets forth the entire agreement and understanding of the parties concerning the employment of Employee by Company.  This

Agreement is intended to supplement the provisions of the Purchase Agreement. The provisions of Paragraphs 9 through 11 of this Agreement are in addition to, and not in substitution for, any agreements regarding confidentiality, non-solicitation, work made for hire or the like previously or in the future executed and delivered by Employee for the benefit of Company.

(b)     Inconsistency in Agreements. In the event of a conflict or inconsistency between this Agreement and the Purchase Agreement, the terms and provisions of the Purchase Agreement shall control. In the event of a conflict or inconsistency between this Agreement and the Non-Competition, Non-Solicitation, No-Disclosure and Intellectual Property Agreement, the terms and provisions of this Agreement shall control.

(c)     No Additional Promises. No representation, promise, inducement, or statement of intention has been made by or on behalf of either party hereto which is not set forth in this Agreement.

(d)     Amendments. This Agreement may not be amended or modified except by written instrument executed by the parties hereto.

(e)     Notices. Any notice, request, demand or other communication required or permitted to be given under this Agreement shall be in writing and delivered in person, by overnight delivery by nationally recognized carrier, or sent by certified mail to Employee and to Company as specified hereafter, or to such other address as either party shall designate by written notice to the other:

If to Company:

> AL International, Inc.
> 2400 Boswell Rd.
> Chula Vista, CA 91914
> Facsimile: 619-934-5009
> Attention: Steve Wallach

If to Employee:

> William J. Andreoli
> 81 Heritage Hill Rd.
> Windham, N.H. 03087

(f)     Assignment. The terms and provisions of this Agreement shall inure to the benefit of Employee, Company and its affiliates, and their respective subsidiaries, affiliates, heirs, legal representatives, successors and assigns.

(g)     No Waivers. The failure of any party to this Agreement at any time or from time to time to require performance of any other party's obligations under this Agreement shall in no manner affect such party's right to enforce any provision of this Agreement at a subsequent time and shall not constitute a waiver by such party of any right arising out of any subsequent breach.

(h)     Governing Law.  This Agreement shall be subject to and governed by the laws of the State of California without giving effect to its conflicts-of-laws principles.

(i)     Severability.  In the event that any court of competent jurisdiction shall finally determine that any provision, or any portion thereof, contained in this Agreement shall be void or unenforceable in any respect, then such provision shall be deemed limited to the extent that such court determines it enforceable, and as so limited shall remain in full force and effect.  In the event that such court shall determine any such provision, or portion thereof wholly unenforceable, the remaining provisions of this Agreement shall nevertheless remain in full force and effect, provided that the severing of such provision or portion thereof will not materially change the substance of this Agreement.

(j)     Incorporation of Recitals.  The parties agree that the preamble and recitals are true and correct and that the preamble and recitals, as well as the definitions set forth therein, are hereby incorporated into this Agreement by reference.

(k)     Counterparts.  This Agreement may be executed by the parties hereto in separate counterparts and by facsimile or Portable Document Format ("pdf"), each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year first above written to be effective for the period described therein.

COMPANY:

AL International, Inc.

By: _____
Name:   STEVE WALLACH
Title:   CEO

EMPLOYEE:

_____
William J. Andreoli

5454895v.8

# EXHIBIT D

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**YOUNGEVITY INTERNATIONAL, INC.**

**HERITAGE MAKERS, INC.**

**HM-3, LLC**

**CHRISTOPHER LEE**

**DOUG CLOWARD**

**SHARON MURDOCH**

**JUSTIN BIGGS**

**AND**

**BRYTT CLOWARD**

**Dated August 7, 2013**

## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT**, dated August 7, 2013 (this "**Agreement**"), is entered into by and among Youngevity International, Inc., a Delaware corporation ("**YGYI**"), with an address at 2400 Boswell Road, Chula Vista, California 91914, Heritage Makers, Inc., a Delaware corporation ("**HM**") with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, HM-3, LLC, a Utah limited liability company ("**HM-3**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, Christopher Lee ("**Lee**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, Doug Cloward ("**D. Cloward**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, Sharon Murdoch ("**Murdoch**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, Justin Biggs ("**Biggs**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538, and Brytt Cloward ("**B. Cloward**"), with an address at 1837 South East Bay, Suite 201, Provo Utah 84606-5538. HM-3, Lee, D. Cloward, Murdoch, Biggs, and B. Cloward are collectively referred to herein as the "**Representing Parties**".

**WHEREAS**, HM owns and desires to sell and assign to YGYI substantially all of its Assets (as more specifically defined herein) and YGYI desires to purchase and acquire such Assets from HM and, thereafter, to use, market, license, sublicense, develop, maintain, collect and otherwise deal with the Assets without restriction.

**NOW, THEREFORE**, in consideration of the foregoing premises and the respective representations, warranties, covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the parties agree as follows:

## ARTICLE I

## DEFINED TERMS

In addition to terms defined elsewhere in this Agreement, the following terms shall have the meanings assigned to them herein, unless the context otherwise indicates, both for purposes of this Agreement and all Exhibits and Schedules referenced herein:

"**Action**" means any action, complaint, summons, citation, notice, directive, order, suit, proceeding, actual claim, arbitration, litigation, audit, judgment, letter, inquiry, investigation or other communication from any Person or Governmental Entity.

"**Affiliate**" means, as to a Person, any other Person controlling, controlled by or under common control with such first Person. As used in this definition, the term "control" shall mean the power, directly or indirectly, to vote more than 50% of the outstanding voting equity of an entity or the right, directly or indirectly, to designate a majority of the directors of a Person (in the case of a corporation) or the Persons exercising similar functions (in the case of an unincorporated Person).

"**Ancillary Document**" means any writing, certificate, exhibit, schedule, transfer document, statement, list, report, instrument, agreement or other document furnished or delivered in connection with this Agreement.

"**Assets**" means all of the properties, assets, rights, claims, leasehold interests, contracts and goodwill used in the Business or owned by HM, of every kind and character, wherever located, whether real or personal, tangible or intangible, including, but not limited to, the Contracts, Inventory, Intellectual Property, Proprietary Rights and Real Property and the name Heritage Makers, Inc. For the avoidance of doubt, the "Assets" shall not include the distributorship owned by HM-3, which is identified as "1003" in HM's distributor genealogy.

"**Assumed Liabilities**" means the liabilities set forth on <u>Schedule A</u> hereto.

"**Balance Sheet**" is defined in the definition of "Financial Statements".

"**Benefit Plan**" means any employee benefit plan including (i) any (a) nonqualified deferred compensation or retirement plan or arrangement or superannuation plan; (b) qualified defined contribution retirement plan or arrangement; or (c) qualified defined benefit retirement plan or arrangement, which is an "employee pension benefit plan"; (ii) any "employee welfare benefit plan" or material fringe benefit plan or program; or (iii) any stock purchase, stock option, profit sharing, deferred compensation, welfare, pension, retirement, severance pay, employment, change-in-control, vacation pay, company awards, salary continuation, sick leave, excess benefit, bonus or other incentive compensation, life insurance, or other employee benefit plan, contract, program, policy or other arrangement.

"**Business**" means the current business of HM relating to, among other things, on-demand photo publishing and the sale of "points" to exchange for products through a network of distributors and sales consultants.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which federally chartered commercial banks in Chula Vista, California are authorized by Law to close.

"**Capital Stock**" means (i) in the case of a corporation, its shares of capital stock; (ii) in the case of a partnership or limited liability company, its partnership or membership interests or units (whether general or limited); and (iii) any other interest that confers on a Person the right to receive a share of the profits and losses or distribution of assets of the issuing entity.

"**Charter Documents**" means, with respect to any entity, the certificate of incorporation, articles of incorporation, by-laws, constitution, articles of organization or other similar organizational documents of such entity (in each case, as amended).

"**Closing Date**" means the date which is three (3) days after all of the conditions set forth in <u>Article VI</u> have been satisfied or waived or such other date mutually agreed to by the parties.

"**Consents**" is defined in <u>Section 5.4(a)</u>.

"**Consultant**" means each of HM's independent representatives who market and sell any HM's Products or services.

"**Contract**" means any agreement, contract, license, lease, commitment, arrangement or understanding, written or oral.

"**Disclosure Schedules**" means the YGYI Disclosure Schedule and the HM Disclosure Schedule.

"**Employees**" means those Persons employed by HM immediately prior to the Closing.

"**Environment**" means all indoor or outdoor air, water including surface water, groundwater, drinking water and wetlands, surface or subsurface land, and all natural resources including all forests and marine resources, minerals, oil, gas, fish, wildlife and biota.

"**Environmental Action**" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, proceeding, judgment, letter or other communication from or threatened from any Governmental Entity (whether United States or foreign) or any other Person involving a Release from or on the Real Property or any violation of any order, permit or Environmental Law.

"**Environmental Laws**" means any and all applicable Laws relating to the Environment, human health, worker health and safety, preservation or reclamation of natural resources, climate change or the management, handling, use, generation, treatment, storage, transportation, disposal, manufacture, distribution, formulation, packaging, labeling, Release or threatened Release of or exposure to Hazardous Materials, whether now existing or subsequently amended or enacted, including but not limited to: the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. Section 9601 et seq. ("**CERCLA**"); the Federal Water Pollution Control Act, 33 U.S.C. Section 1251 et seq.; the Clean Air Act, 42 U.S.C. Section 7401 et seq.; the Toxic

Substances Control Act, 15 U.S.C. Section 2601 et seq.; the Occupational Safety and Health Act, 29 U.S.C. Section 651 et seq.; the Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. Section 11001 et seq.; the Safe Drinking Water Act, 42 U.S.C. Section 300(f) et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801 et seq.; the Federal Insecticide, Fungicide and Rodenticide Act 7 U.S.C. Section 136 et seq.; the Resource Conservation and Recovery Act of 1976, 42 U.S.C. Section 6901 et seq.; the Oil Pollution Act of 1990, 33 U.S.C. Section 2701 et seq.; any similar or implementing federal, state or local Law or non-U.S. Law and regulation and all amendments or regulations promulgated thereunder; and any common law doctrine, including but not limited to, negligence, nuisance (including related to noise, dust or vibration), trespass, personal injury or property damage related to or arising out of the presence, Release or exposure to Hazardous Materials.

"**Equity Securities**" means (i) Capital Stock and (ii) options, warrants, purchase rights, subscription rights, conversion rights, exchange rights or other Contracts that, directly or indirectly, could require the issuer thereof to issue, sell or otherwise cause to become outstanding Capital Stock.

"**Financial Statements**" means the HM's financial statements consisting of the balance sheet as of December 31, 2012 and the related statement of income for the period then ended and the balance sheet as of June 30, 2013 (the "**Balance Sheet**") and the related statement of income for the period then ended.

"**Governmental Entity**" means any domestic or foreign governmental or regulatory authority, agency, commission, body, court or other legislative, executive or judicial governmental entity.

"**Hazardous Materials**" means any substance: (i) the presence of which requires investigation or remediation under any Environmental Law or Environmental Action; (ii) which is or becomes defined as a hazardous waste, hazardous substance, toxic substance, pollutant, or contaminant or noxious or dangerous or is regulated in any manner under any Environmental Law or Environmental Action; or (iii) which contains gasoline, diesel fuel, other petroleum hydrocarbons, PCBs, asbestos, lead-based paint, or radon gas.

"**HM Benefit Plan**" is defined in Section 5.19(a).

"**HM Contracts**" shall mean the Contracts listed on Schedule 5.17(a) hereto.

"**Indebtedness**" means any of the following: (i) any indebtedness, including accrued interest, for borrowed money; (ii) any inter-company debt; (iii) any obligations evidenced by bonds, debentures, notes or other similar instruments; (iv) any obligations to pay the deferred purchase price of property or services, except trade accounts payable and other current liabilities arising in the ordinary course of business (other than inter-company debt); (v) any obligations as lessee under capitalized leases; (vi) any indebtedness created or arising under any conditional sale or other title retention agreement with respect to acquired property; (vii) any obligations, contingent or otherwise, under acceptance credit, letters of credit or similar facilities; (viii) obligations relating to interest rate protection, swap agreements and collar agreements, and obligations arising from the extinguishment of indebtedness (e.g. prepayment penalties); and (ix) any guaranty of any of the foregoing.

"**Intellectual Property**" means: (i) trademarks and service marks (whether or not registered), trade names, logos, trade dress and other proprietary indicia and all goodwill associated therewith; (ii) documentation, advertising copy, marketing materials, web-sites, specifications, mask works, drawings, graphics, databases, recordings and other works of authorship, whether or not protected by copyright law; (iii) computer programs, including HM's Internal Points Management Software, any and all software implementations of algorithms, models and methodologies, whether in source code or object code, design documents, flow-charts, user manuals and training materials relating thereto and any translations thereof; and (iv) all forms of legal rights and protections that may be obtained for, or may pertain to, the Intellectual Property set forth in clauses (i) through (iii) in any country of the world, including all letters patent, patent applications, provisional patents, design patents, PCT filings, invention disclosures and other rights to inventions or designs, all registered and unregistered copyrights in both published and unpublished works, all trademarks, service marks and other proprietary indicia (whether or not registered), trade secret rights, moral rights or other literary property or author's rights, and all applications, registrations, issuances, divisions, continuations, renewals, reissuances and extensions of the foregoing.

"**Inventory**" means all personal property or goods held for sale or lease in the ordinary course of business or to be furnished under contracts of service and all materials, supplies, parts, work-in-process, finished goods, packaging and other inventories of materials and personal property used or consumed in the operation of the Business.

"**Law**" or "**Laws**" means any and all applicable statutes, laws, ordinances, proclamations, regulations, published requirements, orders, decrees, authorizations, licenses, permits and rules of any foreign, federal, state or local government, political subdivision or governmental or regulatory authority, agency, board, bureau, commission, instrumentality or court or quasi-governmental authority, including, without limitation, those covering environmental, tax, energy, safety, health, transportation, bribery, record keeping, zoning, discrimination, antitrust and wage and hour matters, and in each case as amended and in effect from time to time.

"**Lien**" means with respect to any property or asset, any lien, pledge, claim, charge, security interest, mortgage, adverse claim or other encumbrance of any nature whatsoever.

"**Losses**" means losses, damages, liabilities, deficiencies, debts, obligations, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder.

"**Material Adverse Effect**" means a material adverse effect on the assets, liabilities, business, operations, or condition (financial or otherwise) of HM.

"**Party**" means any a party to this Agreement as set forth in the first paragraph of this Agreement.

"**Permitted Liens**" means (i) Liens securing the payment of current real or personal property, taxes, assessments or other governmental charges or levies which are not yet delinquent, or which are being contested in good faith and as to which adequate reserves have been established; (ii) materialmen's, mechanics', carriers', workmen's, repairmen's or other like Liens incurred in the ordinary course of business securing obligations or payments not yet due and that do not impact the conduct of HM or the present proposed use of affected property; (iii) zoning restrictions, easements, licenses, restrictions on the use of Real Property or minor irregularities in title thereto, which do not materially impair, alone or in the aggregate, the use of the property affected thereby in the operation of the Business or the value of such property for the purpose of the Business; and (iv) workers' compensation and unemployment compensation liens for amounts not yet due.

"**Person**" means a corporation, an association, a partnership, a limited liability company, an organization, a business, any other entity, an individual, a government or political subdivision thereof or a government agency.

"**Products**" is defined in Section 5.23(a).

"**Proprietary Information**" means inventions (whether or not patentable), trade secrets, technical data, databases, customer lists, designs, tools, methods, processes, technology, ideas, formulas, know-how, source codes, product road maps and other proprietary information and materials.

"**Real Property**" means all real property, buildings and fixtures owned, leased or used by HM.

"**Release**" means any releasing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, disposing or dumping of Hazardous Substances into the Environment.

"**Representatives**" means with respect to a Person, such Person's directors, managers, officers, employees, investment bankers, attorneys, accountants, financial advisors, consultants and other advisors or representatives.

"**Sale Transaction**" means (i) any consolidation or merger of a Person with or into any other corporation or other entity or person, or any other corporate reorganization or acquisition of such Person, other than any such consolidation, merger, reorganization or acquisition in which the equity holders of such Person immediately prior to such consolidation, merger, reorganization or acquisition, continue to hold, as a result of the securities of such

Person held by such holders prior to such transaction, at least a majority of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; (ii) any transaction or series of related transactions to which a Person or any of its equity holders is a party or is subject in which a majority of such Person's voting power is transferred; or (iii) a sale, lease, exchange or other transfer (in one transaction or a series of transactions) of all or substantially all of the assets of a Person, unless, in each case, such Person's equity holders as constituted immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for such Person's acquisition or sale or otherwise) hold at least a majority of the voting power of the surviving, continuing or purchasing entity.

"**Subsidiaries**" means, with respect to any specified Person, any other Person of which: (i) more than 50% of the outstanding Capital Stock is held, directly or indirectly, by such specified Person or (ii) over which the specified Person has the power, directly or indirectly, to designate a majority of the directors thereof (if such other Person is a corporation) or the individuals exercising similar functions (if such other Person is unincorporated).

"**Tax**" or "**Taxes**" means any and all federal, state, local or foreign net or gross income, gross receipts, net proceeds, sales, use, ad valorem, value added, franchise, withholding, payroll, employment, excise, property, deed, stamp, alternative or add-on minimum, environmental, profits, windfall profits, transaction, license, lease, service, service use, occupation, severance, energy, unemployment compensation, social security, workers' compensation, capital, premium and other taxes, assessments, customs, duties, fees, levies or other governmental charges of any nature whatever, whether disputed or not, together with any interest, penalties, fines, additions to tax or additional amounts with respect thereto.

"**Tax Authority**" means any Governmental Entity having jurisdiction with respect to any Tax.

"**Tax Returns**" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto and any amendment thereof.

"**Transactions**" means the transactions contemplated in this Agreement.

## ARTICLE II

## SALE AND PURCHASE OF ASSETS; ASSUMPTION OF ASSUMED LIABILITIES

2.1    Sale and Purchase. Subject to the terms and conditions contained herein, HM agrees to sell, transfer, assign, convey and deliver to YGYI or its designee, and YGYI agrees to purchase from HM, all of HM's right, title and interest in and to, the Assets free and clear of any liens, pledges, security interests, claims or encumbrances of any kind, except as set forth on the HM Disclosure Schedule.

2.2    Liabilities Assumed. YGYI shall assume on the Closing Date HM's obligations under the Assumed Liabilities, as set forth on Schedule A. It is expressly agreed and understood that YGYI shall not assume, pay or discharge or in any respect be liable for any liability, obligation, commitment or expense of HM other than those expressly set forth on Schedule A. Without limitation of the foregoing and notwithstanding anything in this Agreement to the contrary (other than YGYI's assumption of the liabilities set forth on Schedule A) YGYI shall not assume, pay or discharge, and shall not be liable for, and HM and the Representing Party, jointly and severally, shall discharge, indemnify and hold YGYI and each of its Affiliates (and their respective officers and directors) harmless, in accordance with the provisions of Article IX hereof, from and against, any liability (actual or contingent), loss, commitment, obligation or expense of HM or the Representing Parties:

(a)    incident to, or arising out of, the negotiation and preparation of, or the performance of HM or the Representing Parties under this Agreement;

(b)    incident to, or arising out of, any claims, actions, suits, proceedings, liabilities, fines, penalties, deficiencies or judgments existing on the Closing Date that are not set forth on Schedule A or arising at any time thereafter as a result of or in connection with the conduct of the business of HM, including, without limitation, the ownership or use of the Assets by HM or the Representing Parties and HM's and the Representing Parties' conduct of HM's business up to and including the Closing Date;

(c)      incident to, or arising out of, any tax liabilities (or penalties or interest thereon), of any nature whatsoever of HM's whether on account of this Agreement or otherwise, including, without limitation, (i) any which may arise as a result of the sale of the Assets as contemplated by this Agreement or (ii) relating to the operations of HM prior to the Closing Date;

(d)      incident to, or arising out of, any liabilities (other than those assumed by YGYI, as set forth on Schedule A) with respect to the conduct of the business of HM up to and including the Closing Date, including any liability for "points" exchangeable for future points in excess of the amounts and expiration dates set forth in HM's Disclosure Schedules; and

(e)      incident to, or arising out of, any liabilities of HM not reflected on Schedule A, in the Balance Sheet or HM's Disclosure Schedules.

2.3      The Purchase Price. CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED
ONFIDENTIAL INFORMATION REDACTED

## ARTICLE III

### THE CLOSING TRANSACTIONS AND OTHER RIGHTS

3.1     Transfer of HM Assets. At the Closing: (i) HM will transfer the Assets to YGYI or its designee and (ii) YGYI will pay to HM by certified check or wire transfer, the Cash Payment.

3.2     Disclosure Schedules. As of the date of this Agreement, YGYI has delivered to HM and HM has delivered to YGYI, contemporaneously with the execution of this Agreement, the YGYI Disclosure Schedule and the HM Disclosure Schedule, respectively.

3.3     The Closing.

(a)  The Closing shall take place remotely via the exchange of documents and signatures at 10:00 A.M. on August 14, 2013, or at such other time and place as the Parties agree (the date of the Closing, the "Closing Date").

(b)  No action actually taken at the Closing with respect to the consummation of the Transactions shall be deemed to have been taken until such time as the last of the actions actually taken at the Closing is completed.

(c)  At the Closing, each Party shall execute, deliver and file each document, agreement and instrument required of such Party by this Agreement to be so executed, delivered and filed in connection with the Transactions as set forth in Sections 3.4 and 3.5 and which have not been theretofore accomplished.

(d)  Each Party shall, from time to time after the Closing Date at the reasonable request of another Party and without further consideration, execute and deliver or cause to be executed and delivered to the other such further instruments of transfer, assignment, conveyance and assumption, and shall take or cause to be taken such other action as reasonably requested by the other Party, as may be necessary to effectively implement and carry into effect the Transactions.

3.4     <u>YGYI's Deliveries</u>. At the Closing, YGYI shall deliver to HM, as applicable:

(a)     An executed Assignment, Bill of Sale and Assumption Agreement with respect to the Assets and the Assumed Liabilities in substantially the form of <u>Exhibit A</u> annexed hereto; and

(b)     Such other documents, instruments or certificates that may be reasonably required to carry out the provisions of this Agreement and consummate the Transactions.

3.5     <u>HM's Deliveries</u>. At the Closing, HM shall deliver:

(a)     An executed Assignment, Bill of Sale and Assumption Agreement with respect to the Assets and the Assumed Liabilities in substantially the form of <u>Exhibit A</u> annexed hereto;

(b)     An officer's certificate as set forth in <u>Section 6.2(c)</u>;

(c)     Resolutions adopted by the board of directors and stockholders of HM dated at or about the Closing Date authorizing it to execute and deliver this Agreement and to perform its obligations hereunder and authorizing the Transactions certified by the Secretary of HM and approving the change of name of HM to a name not including the words "Heritage" or "Maker";

(d)     An assignment of any property leases to be transferred to YGYI including the consent of all third parties;

(e)     An assignment of all permits and licenses to be transferred to YGYI in respect of operating the Business;

(f)      A release or discharge of any liens over the Assets;

(g)     A copy of all books and records of HM including originals of all Contracts, Tax Returns and other information and documentation related to HM and the operations of the Business as currently conducted or intended to be conducted and all other documents, instruments or certificates as may reasonably be required to carry out the provisions of this Agreement and consummate the Transactions;

(h)     All documents, instruments, certificates, consents, authorizations, orders or approvals required in order to execute and deliver this Agreement and to effectuate the Transactions contemplated hereby in form, scope and substance reasonably satisfactory to YGYI; and

(k)     All approvals, consents, permits and waivers of Governmental Authorities and any Person necessary for the consummation of the Transactions contemplated by this Agreement and no such approval, consent, permit or waiver of any Governmental Authority or such other third party shall contain any term or condition that each of YGYI in its reasonable discretions determines to be unduly burdensome.

**ARTICLE IV**

**REPRESENTATIONS OF YGYI**

YGYI represents and warrants to HM that each statement contained in this <u>Article IV</u> is true and correct, and will be true and correct as of the Closing Date, except as set forth in the disclosure schedule dated and delivered as of the date hereof by YGYI to HM (the **"YGYI Disclosure Schedule"**), which is attached to this Agreement. The

YGYI Disclosure Schedule shall be arranged in sections corresponding to each section and subsection of this <u>Article IV</u>.

4.1     <u>Organization and Good Standing</u>. YGYI is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware has all requisite corporate power to own, lease and operate its properties and to carry on the Business as now being conducted.

4.2     <u>Authority and Enforceability</u>. YGYI has, and will have on the Closing Date, the requisite power and authority to enter into this Agreement and to consummate the Transactions. The execution and delivery by YGYI of this Agreement and/or the Ancillary Documents to which it is a party and the consummation by YGYI of the Transactions have been duly authorized by all necessary corporate action on the part of YGYI. This Agreement and/or the Ancillary Documents to which it is a party have each been duly executed and delivered by YGYI and, assuming due authorization, execution and delivery by HM and the Representing Parties, constitute the valid and binding obligation of YGYI, enforceable against it in accordance with their terms, except as such enforceability may be limited by: (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (ii) the availability of injunctive relief and other equitable remedies.

4.3     <u>No Conflicts; Authorizations</u>.

(a)     The execution and delivery by YGYI of this Agreement and/or the Ancillary Documents do not, and the consummation by each of YGYI of the Transactions will not: (i) violate the provisions of any of the Charter Documents of YGYI; (ii) violate any Contract to which YGYI is a party; (iii) violate any Law of any Governmental Entity applicable to YGYI on the Closing Date; or (iv) result in the creation of any Liens upon any of the assets owned or used by YGYI except in each such case where such violation or Lien would not reasonably be expected to impair materially the ability of YGYI to perform its obligations under this Agreement or consummate the Transactions.

(b)     No authorization or order of, registration, declaration or filing with, or notice to, any Governmental Entity or any other Person is required by or with respect to YGYI in connection with the execution and delivery of this Agreement and the consummation of the Transactions, except for such authorizations, orders, registrations, declarations, filings and notices the failure to obtain or make which would not reasonably be expected to impair materially the ability of YGYI to perform its obligations under this Agreement or consummate the Transactions.

4.4     <u>Litigation; Compliance with Law</u>. There is no Action pending or, to YGYI's knowledge, threatened, against YGYI that reasonably could be expected to materially adversely affect YGYI's ability to consummate the Transactions.

4.5     <u>Ability to Perform Agreement</u>. To YGYI's knowledge, there is no occurrence, event or condition with respect to it that would prevent it from performing this Agreement in all material respects. No solvency proceeding of any character, including bankruptcy, receivership, reorganization, composition or arrangement with creditors (including any assignment for the benefit of creditors), voluntary or involuntary, affecting the business of YGYI (other than as a creditor) is pending or is currently being contemplated by YGYI or is being threatened against YGYI by any other Person. YGYI has not made any assignment for the benefit of creditors or taken any action in contemplation of, or which would constitute the basis for, the institution of any such insolvency proceedings.

4.6     <u>Brokers or Finders</u>. Except as disclosed on <u>Schedule 4.6</u> of the YGYI Disclosure Schedule, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions contemplated by this Agreement based upon arrangements made by or on behalf of YGYI or any of its Affiliates.

**ARTICLE V**

**<u>HM AND REPRESENTING PARTIES REPRESENTATIONS</u>**

HM represents and warrants to YGYI that the statements contained in this <u>Article V</u> are true and correct, except as may be set forth in the disclosure schedule dated and delivered as of the Closing Date by HM to YGYI (the "<u>HM Disclosure Schedule</u>"), which is attached to this Agreement. The HM Disclosure Schedule shall be arranged in sections corresponding to each section and subsection of this <u>Article V</u>.

5.1     <u>Organization and Good Standing</u>.

(a)  HM is a corporation duly organized, validly existing and in good standing under the applicable Laws of Delaware. HM has all requisite power to own, lease and operate its properties and to carry on the Business as currently conducted. HM is duly authorized, qualified and licensed to do business and is in good standing as a foreign corporation in each jurisdiction in which it owns or leases property or conducts any business so as to require such qualification. <u>Schedule 5.1</u> contains a true and complete list of each jurisdiction in which HM is qualified to do business and each jurisdiction in which it has Assets, employees, consultants or conducts the Business.

(b)  HM previously has delivered to YGYI true and complete copies of the Charter Documents of HM as presently in effect. HM is not in default under, or in violation of, any provision of its Charter Documents.

5.2     <u>Capitalization</u>. Attached hereto as <u>Schedule 5.2</u> is a complete and accurate list of (i) the HM stockholders and each holder of options and warrants to purchase any shares of Capital Stock of HM, and (ii) the number and class of issued and outstanding HM shares and HM options and warrants. All of the Capital Stock of HM is owned by HM-3, LLC, and there are no options or warrants outstanding.

5.3     <u>Authority and Enforceability</u>. HM and the Representing Parties have the requisite power and authority to enter into this Agreement and the Ancillary Documents and to consummate the Transactions. Each of the Representing Parties has the full capacity, power and authority to enter into this Agreement and the other agreements contemplated hereby to which each is a party and to consummate the Transactions contemplated hereby and thereby and to comply with the terms, conditions and provisions hereof and hereof. The execution and delivery by HM and the Representing Parties of this Agreement and the Ancillary Documents and the consummation of the Transactions have been duly authorized by all necessary corporate action on the part of HM and the Representing Parties and no further authorization or approval, whether of the stockholders or directors of HM or of governmental bodies or otherwise is necessary to fully authorize the execution, delivery and performance of this Agreement by HM and the Representing Parties. This Agreement and the Ancillary Documents have been duly executed and delivered by HM and the Representing Parties and constitute the valid and binding obligations of HM and the Representing Parties, respectively, enforceable against each of them in accordance with their respective terms, except as such enforceability may be limited by: (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (ii) the availability of injunctive relief and other equitable remedies.

5.4     <u>No Conflicts; Authorizations</u>.

(a)  The execution and delivery of this Agreement and the Ancillary Documents by HM and the Representing Parties does not, and the performance by HM and the Representing Parties of their respective obligations hereunder and thereunder, and the consummation by HM and the Representing Parties of the Transaction (in each case, with or without the giving of notice or lapse of time, or both) will not, directly or indirectly: (i) violate the provisions of any of the Charter Documents of HM; (ii) violate or constitute a default, an event of default or an event creating rights of acceleration, termination, cancellation, imposition of additional obligations or loss of rights or require a consent to assignment or change of control, under any Contract (A) to which HM or any of the Representing Parties is a party; (B) of which HM or any of the Representing Parties is a beneficiary; or (C) by which HM or the Representing Parties, or any of their respective Assets is bound; (iii) violate or conflict with any Law applicable to HM or the Representing Parties, or any of their respective Assets, or give any Governmental Entity or other Person the lawful right to challenge any of the Transactions or to exercise any remedy or obtain any relief under, or revoke, cancel, terminate or otherwise modify any rights held under, any such Law; or (iv) result in the creation of any Liens upon any of the Assets owned or used by HM. <u>Schedule 5.4</u> sets forth and enumerates all notices, authorizations, consents, licenses, permits, waivers, assignments and other approvals and actions that are necessary or advisable in connection with the execution and delivery by HM and the Representing Parties of this

Agreement and the consummation by HM and the Representing Parties of the Transactions , under any Law or Contract to which HM or either of the Representing Parties is a party or to which their Assets are subject (collectively, "<u>Consents</u>") and the consummation of the Business after the consummation of the Transactions.

(b) No authorization, consent, registration, declaration or filing with, or notice to, any Governmental Entity or other Person is required by or with respect to HM or either of the Representing Parties in connection with the execution and delivery by HM or either of the Representing Parties of this Agreement or the consummation by HM or either of the Representing Parties of the Transactions.

5.5     <u>Financial Statements/Internal Accounting Controls</u>.

(a) <u>Schedule 5.5</u> includes true, correct and complete copies of the Financial Statements. The Financial Statements are true, correct and complete and have been prepared in accordance with U.S. GAAP applied on a consistent basis throughout the periods involved. The Financial Statements are based on the books and records of HM and fairly present the financial condition of HM as of the respective dates they were prepared and the results of the operations of HM for the periods indicated therein. The Financial Statements have not been rendered untrue, incomplete or unfair as representations of the financial condition or results of operations of HM by the subsequent discovery of events or occurrences which should have been reflected in such Financial Statements.

(b) HM maintains a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations and (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with U.S. GAAP and to maintain asset accountability. HM has established disclosure controls and procedures for HM and designed such disclosure controls and procedures to ensure that material information relating to HM is made known to their officers by others. The officers of HM have evaluated the effectiveness of HM's controls and procedures. Since the date of the Balance Sheet, there have been no changes in HM's internal controls or other factors that could significantly affect HM's internal controls.

(c) Except as set forth in <u>Schedule 5.5</u>, the Financial Statements reflect all debts, liabilities, obligations or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured of HM. All reserves shown or incorporated in the Financial Statements are reasonable to provide for losses thereby contemplated. Except as set forth in the Financial Statements, neither the Business nor the Assets are liable upon or with respect to, subject to or obligated in any other way to provide funds in respect of or to guarantee or assume in any manner, any debt, liability or obligation of any other Person and there is no basis for the assertion of any such claim or liability.

5.6     <u>Title to Assets</u>.

(a) HM has good and marketable title to all of the Assets.

(b) Except as set forth on <u>Schedule 5.6</u>, none of such Assets, or the use thereof: (i) is subject to any easements or restrictions or to any mortgages, liens, pledges, charges, encumbrances or encroachments, or to any rights of others of any kind of nature whatsoever, (ii) encroaches or infringes on the property or rights of another, or (iii) contravenes any applicable law or ordinance or any other administrative regulation or violates any restrictive covenant or any provision of law. There are no agreements or arrangements between HM or the Representing Parties, and any third person which have any adverse effect upon HM's title to or other rights respecting the Assets. Further, and not in limitation of any of the foregoing provisions of this <u>Section 5.6</u>, except as described in <u>Schedule 5.6</u>:

(i) HM has the sole and exclusive right to produce and market its products and conduct its business as heretofore conducted and has the full right and power to transfer the Assets;

(ii) HM has the exclusive right to bring actions for the infringement of, and HM has taken all actions and made all applicable applications and filings pursuant to relevant federal, state and local law required to perfect and protect their interest and proprietary rights in, all of the Assets;

(iii) HM has no present or future obligation or requirement to compensate any person with respect to any of the Assets, whether by the payment of royalties or not, or whether by reason of the ownership, use, license, lease, sale or any commercial use or any disposition whatsoever of any of the Assets;

(iv) the ownership, production, marketing, license, lease, use or other disposition of any product or service presently being licensed or leased by HM to any person does not and will not violate any license or agreement of HM with any person or infringe any right of any other person;

(v) there are no express or implied warranties outstanding with respect to any products or services provided by HM, except as may be provided by law;

(vi) none of the present or former employees of HM own directly or indirectly, or has any other right or interest in, in whole or in part, any of the Assets; and

(vii) the Assets constitute all such rights necessary for HM to conduct its business as now conducted.

5.7     <u>Inventory and Current Products</u>. All Inventory of HM is of a quality, quantity and condition useable or saleable in the ordinary course of business, except as reserved in accordance with U.S. GAAP consistent with past practices. Except as reserved in accordance with U.S. GAAP consistent with past practices or as set forth on <u>Schedule 5.7</u>, none of such Inventory is obsolete and no write-down of such Inventory has been made or should have been made in the period since the date of the Balance Sheet. The quantities of Inventory are not excessive and are reasonable in the present circumstances of HM. All work-in-process and finished goods Inventory is free of any defect or other deficiency. All of such Inventory is located at the facilities of HM and no inventory is held on a consignment basis. HM owns its Inventory free and clear of all Liens other than Permitted Liens. <u>Schedule 5.7</u> sets forth a list of all Products being developed, manufactured, marketed or sold by HM as of the Closing Date.

5.8     <u>Accounts Receivable</u>. The accounts receivable of HM as of the Closing Date are: (i) valid and genuine and have arisen solely out of bona fide sales and deliveries of goods, performance of services and other business transactions in the ordinary course of business consistent with past practice; (ii) not subject to valid defenses, set-offs or counterclaims; and (iii) collectible after billing at the full recorded amount thereof in each case as reserved in accordance with U.S. GAAP consistent with past practices and are owned by HM free and clear of all Liens other than Permitted Liens.

5.9     <u>Taxes</u>.

(a)  All Tax Returns required to have been filed by or with respect to HM have been duly and timely filed with the appropriate Tax Authority, and each such Tax Return correctly and completely reflects liability for Taxes and all other information required to be reported thereon. All Tax Returns have been properly and accurately compiled and completed in all material respects, fairly present the information purported to be shown therein, and reflect in all material respects all liabilities for the applicable Taxes for the periods covered by such Tax Returns. All Taxes owed by HM (whether or not shown on any Tax Return) have been timely paid in full on or before their due date. HM has adequately provided for, in its books of account and related records, liability for all unpaid Taxes, including, but not limited to, current Taxes not yet due and payable.

(b)  There is no Action currently proposed, threatened or pending against, or with respect to, HM or the Assets in respect of any Taxes or Tax Return. No material issue has been raised in writing in any Tax examination with respect to HM which could result in liability for Taxes for HM for any period. HM is not the beneficiary of any extension of time within which to file any Tax Return, nor has HM made (or caused to be made on its behalf) any requests for such extensions. No claim is pending or, to the knowledge of HM or the Representing Parties, threatened by a Governmental Entity in a jurisdiction where HM does not file Tax Returns that HM is or may be subject to taxation by such jurisdiction or that HM must file Tax Returns. Except as set forth in <u>Schedule 5.9</u>, HM has not conducted business in any country other than the U.S. to the extent that HM is obligated to pay

Taxes in such country. There are no Liens encumbering any of the Assets of any HM with respect to Taxes (except where such Lien arises as a matter of Law prior to the due date for paying the related Taxes).

(c)   HM has withheld and timely paid all Taxes required to have been withheld and paid and has complied with all information reporting and backup withholding requirements, including maintenance of required records with respect thereto.

(d)   HM has delivered to YGYI correct and complete copies of all Tax Returns, examination reports and statements of deficiencies assessed against or agreed to by HM since year 2009. HM has not waived (or is subject to a waiver of) any statute of limitations in respect of Taxes or has agreed to (or is subject to) any extension of time with respect to a Tax assessment or deficiency.

(e)   HM has not received (and is not subject to) any ruling from any Tax Authority or has entered into (or is subject to) any agreement with a Tax Authority, except as set forth on Schedule 5.9.

(e)   HM is not a party to any Tax allocation or sharing agreement, or other agreement relating to the allocation or sharing of, or liability or indemnification for, Taxes between HM and any other Person. HM does not have liability for the Taxes of any other Person. HM is not a party to any joint venture, partnership or other arrangement that is, or could be, treated as a partnership for federal income tax purposes.

5.10   Compliance with Law.

(a)   HM has complied in all material respects with every, and is not in violation of any, applicable Law to which HM or the Business or Assets are or have been subject. No event has occurred and no circumstances exist that (with or without the passage of time or the giving of notice, or both) may result in a violation, conflict with or the failure on the part of HM to comply with, any applicable Law. Neither HM nor the Representing Parties has received notice regarding any violation of, conflict with or failure to comply with any applicable Law by, or which may have a Material Adverse Effect on, HM, the Business or Assets. No investigation or review by any Governmental Entity with respect to HM is pending or, to the knowledge of HM or the Representing Parties, threatened.

(b)   Neither HM or, to the knowledge of HM or the Representing Parties, any director, officer, agent, employee or other person acting on behalf of HM has, in the course of its, his or her actions for, or on behalf of, HM (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity or (ii) made any direct or indirect unlawful payment to any foreign or domestic government official or employee or Governmental Entity from corporate funds. HM carries on and conducts, and has carried on and conducted at all times, the Business in compliance with all Laws governing international business activities HM's Assets have not been, are not, and will not be derived from or commingled with proceeds of any activities that are proscribed by the Foreign Corrupt Practices Act and other Laws relating to bribery or corruption, and were not procured or obtained through any payments to or for the benefit of officials of any Governmental Entity or to any other Person, regardless of the form, whether in money, property or services, to obtain favorable treatment in obtaining, retaining or directing business or to obtain special concessions or to pay for favorable treatment for business secured or for special concessions already obtained. HM is not currently nor has it been within the past five years, the target of any inquiry, investigation, settlement, plea agreement or enforcement Action by any Governmental Entity involving an alleged or suspected violation of any Laws governing international business activities, including export control laws, trade and economic sanctions.

(c)   No "fair price," "moratorium," "control share acquisition," "interested stockholder," "business combination" or other similar anti-takeover statute or regulation enacted in Delaware is applicable to HM, or the Transactions.

(d)   HM has complied and is in compliance in all material respects with all anti-pyramid scheme Laws, and neither HM nor the Representing Parties has received any written notice from any Governmental Entity or written communications from any Person alleging that the Business of HM has been or is being conducted or maintained in violation of any anti-pyramid scheme Law.

5.11     Licenses and Permits.

(a)  HM owns, holds or lawfully uses in the operation of the Business all licenses, permits, consents and authorizations (international, federal, state and local) which are necessary for it to conduct the Business as currently conducted or for the ownership and use of the Assets owned or used by HM in the conduct of the Business, free and clear of all Liens, other than Permitted Liens. No Person owns or has any proprietary, financial or other interest (direct or indirect) in any such licenses, permits, consents and authorizations (international, federal, state and local). All such licenses, permits, consents and authorizations (international, federal, state and local) are valid and in full force and effect, are listed on Schedule 5.11, and none will be terminated or impaired or become terminable or impaired as a result of the Transactions.

(b)  No event has occurred and to the knowledge of HM and the Representing Parties no circumstances exist that (with or without the passage of time or the giving of notice, or both) may result in a violation of, conflict with, failure on the part of HM to comply with the terms of, or the revocation, withdrawal, termination, cancellation, suspension or modification of, any license, permit, consent or authorization (international, federal, state and local). HM is not in default or violation of, and neither HM nor either of the Representing Parties has received notice regarding any claim of default or violation of, conflict with, failure to comply with the terms of, or any revocation, withdrawal, termination, cancellation, suspension or modification of, any license, permit, consent or authorization (international, federal, state and local).

5.12     Title to Personal Properties.

(a)  Schedule 5.12 sets forth a true and complete list of all the personal property, and assets owned, leased or used by HM as of the Closing Date with a current book value in excess of $10,000, specifying whether and by whom each such Asset is owned or leased and, in the case of leased Assets, indicating the parties to, execution dates of, and annual payments under, such lease.

(b)  With respect to personal property Assets that are owned, including all Assets reflected as owned on the Balance Sheet (other than inventory sold in the ordinary course of business since the date thereof), HM has good and valid title to all such Assets, free and clear of all Liens other than Permitted Liens.

(c)  With respect to personal property Assets that are leased, HM has a valid leasehold interest in such leased Assets and all such leases are in full force and effect and constitute valid, binding and enforceable obligations of the parties thereto, except as may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting or relating to creditors' rights generally and (ii) the availability of injunctive relief and other equitable remedies. HM is not in breach of any of the terms of any such lease except as otherwise would not have a Material Adverse Effect on HM.

(d)  Other than holders of Permitted Liens (solely to the extent of such Permitted Liens) and lessors of leased Assets (solely to the extent of their interest in such leased Assets), no Person has any interest in any equipment or other tangible Assets used in the Business.

5.13     Condition and Sufficiency of Assets. All buildings, plants, leasehold improvements, structures, facilities, equipment and other items of tangible property and Assets which are owned, leased or used by HM have been properly maintained and serviced, are in good operating condition and repair (subject to normal wear and tear given the use and age of such Assets), are usable in the ordinary course of business and conform in all material respects to all Laws relating to their construction, use and operation. The tangible and intangible Assets owned by HM constitute all the Assets and properties necessary to permit YGYI, from and after the Closing, to conduct the Business in the same manner as HM conducted such Business in the past or as currently contemplated.

5.14     Real Property.

(a)  Schedule 5.14 contains a list of all Real Property and interests in Real Property currently leased or owned by HM and includes all interests in Real Property used in or necessary for the conduct of the Business and operations of HM as currently conducted.

(b)  With respect to the leased Real Property, the Representing Parties have delivered to YGYI true and complete copies of all leases and subleases pursuant to which HM is a party or by which it is bound, and no party is in default or received notice of default under such leases or subleases. With respect to the Real Property owned by HM, HM has good and marketable title to the Real Property, free and clear of all Liens. The Representing Parties have delivered to YGYI true and complete copies of the following: (i) all deeds pursuant to which HM acquired title and (ii) all owner's policies of title insurance, together with copies of listed exceptions to title, covering such Real Property. Except as set forth to the contrary in any Leases, HM has peaceful, undisturbed and exclusive possession of the Real Property. Neither HM nor the Representing Parties have received notice of any outstanding claims under any expired leases or subleases to which HM is or was a party.

(c)  The uses for which the buildings, facilities and other improvements located on the Real Property are zoned do not restrict or impair the use of the Real Property for purposes of the Business of HM.

(d)  No Governmental Entity having the power of eminent domain over the Real Property has commenced or to the knowledge of HM or the Representing Parties threatened to exercise the power of eminent domain or a similar power with respect to all or any part of the Real Property. Neither HM nor the Representing Parties have received notice of any pending or threatened condemnation, fire, health, safety, building, zoning or other land use regulatory proceedings, lawsuits or administrative Actions relating to any portion of the Real Property or any other matters which materially adversely affect the current use, occupancy or value thereof. Neither HM nor the Representing Parties have received notice of any pending or threatened special assessment proceedings affecting any portion of the Real Property.

(e)  The Real Property and all present uses and operations of the Real Property comply with all Laws, covenants, conditions, restrictions, easements, disposition agreements and similar matters affecting the Real Property. The Real Property and the continued use, occupancy and operation as used, occupied and operated in the conduct of the Business, do not constitute nonconforming uses and are not the subject of any special use permit under any Law.

(f)  The Real Property is in suitable condition for HM's Business as currently conducted and as currently contemplated. HM has good and valid rights of ingress and egress to and from all Real Property from and to the public street systems for all usual street, road and utility purposes.

(g)  Except as otherwise set forth in leases to the contrary, no Person, is in possession of any of the Real Property or any portion thereof, and there are no leases, subleases, licenses, concessions or other agreements, written or oral, granting to any Person, the right of use or occupancy of the Real Property or any portion thereof. No easement, utility transmission line or water main located on the Real Property adversely affects the use of the Real Property or any improvement on the Real Property.

(h)  All water, sewer, gas, electric, telephone, internet and drainage facilities, and all other utilities required by any Law or by the use and operation of the Real Property in the conduct of the Business are installed to the property lines of the Real Property, are connected pursuant to valid permits to municipal or public utility services or proper drainage facilities, are fully operable and are adequate to service the Real Property in the operation of the Business and to permit compliance with the requirements of all Laws in the operation thereof. No fact or condition exists which could result in the termination or reduction of the current access from the Real Property to existing roads or to sewer or other utility services presently serving the Real Property.

5.15    Intellectual Property.

(a)  Other than the domain names listed on Schedule 5.15(a) hereto, HM neither owns nor licenses any Intellectual Property that is used in or necessary for the Business as it is currently conducted (except for software that is commercially available at retail to consumers on nondiscriminatory pricing terms and is subject to "shrink-wrap" or "click-through" license agreements). HM owns the entire right, title and interest in and to all its Intellectual Property, free and clear of all Liens other than Permitted Liens.

(b)   Except with respect to software licenses that are commercially available at retail to consumers on nondiscriminatory pricing terms and is subject to "shrink-wrap" or "click-through" license agreements, Schedule 5.15(b) lists all licenses, sublicenses and other agreements pursuant to which a third party authorizes HM to use, practice any rights under, or grant sublicenses with respect to, any Intellectual Property owned by such third party, including the incorporation of any such Intellectual Property into the Products of HM and, with respect to each license, whether the license is exclusive or non-exclusive and its term.

(c)   Schedule 5.15(c) lists all licenses, sublicenses and other agreements pursuant to which HM authorizes a third party to use, practice any rights under, or grant sublicenses with respect to, any of its Intellectual Property or pursuant to which HM grants rights to use or practice any rights under any Intellectual Property owned by a third party and, with respect to each license, whether the license is exclusive or non-exclusive and its term.

(d)   The Intellectual Property of HM constitutes all the Intellectual Property used in or necessary for the operation of the Business as currently conducted.

(e)   All registration, maintenance and renewal fees related to HM's Intellectual Property and any other certifications, filings or registrations that are included in its Intellectual Property that are currently due have been paid and all documents and certificates related to such Intellectual Property have been filed with the relevant Governmental Entity for the purposes of maintaining such Intellectual Property.

(f)   HM owns or has legal right to use all of its Intellectual Property, free and clear of all Liens, except for Permitted Liens. There are no challenges, oppositions or cancellation or interference proceedings (or any basis therefor) with respect to the validity or enforceability of HM's Intellectual Property. Schedule 5.15(f) lists all trademark filings, if any, made or registered by HM before any Governmental Entity and the status of any Actions before the United States Patent and Trademark Office or any other Governmental Entity anywhere in the world related to HM's Intellectual Property, including the due date for any outstanding response by HM in such Actions. Neither HM nor either the Representing Parties has taken any action or failed to take any action that could reasonably be expected to result in the abandonment, cancellation, forfeiture, relinquishment, invalidation, waiver or unenforceability of HM's Intellectual Property.

(g)   To the knowledge of HM and the Representing Parties none of the Products or services currently or formerly developed, manufactured, sold, distributed, provided, shipped or licensed by HM, or which are currently under development, has infringed or infringes upon, or otherwise unlawfully used or uses, the Intellectual Property rights of any third party. HM's Intellectual Property has not infringed or infringes upon, or otherwise unlawfully used or uses, any Intellectual Property of a third party. Neither HM nor the Representing Parties has received any communication alleging that HM or any of its Products, services, activities or operations infringe upon or otherwise unlawfully uses any Intellectual Property of a third party nor is there any basis for any claim of infringement or unlawful use. No Action has been instituted or threatened relating to any Intellectual Property formerly or currently used by HM. No Person has infringed or is infringing any Intellectual Property rights of HM or has otherwise misappropriated or is otherwise misappropriating or unlawfully using HM's Intellectual Property.

(h)   With respect to HM's Proprietary Information, the documentation relating thereto is current, accurate and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the special knowledge or memory of others. HM has taken commercially reasonable steps to protect and preserve the confidentiality of all Proprietary Information owned by HM. Without limiting the generality of the foregoing, the Proprietary Information of HM is not part of the public knowledge and has not been used or divulged for the benefit of any Person. Any receipt or use by, or disclosure to, a third party of Proprietary Information owned by or pertaining to HM has been pursuant to the terms of a binding written confidentiality agreement. True and complete copies of all confidentiality agreements and any amendments thereto have been delivered to YGYI. HM is, and, to HM's and the Representing Parties' knowledge, all other parties thereto are, in compliance with the provisions of the confidentiality agreements. HM is in compliance with the terms of all Contracts pursuant to which a third party has disclosed to, or authorized HM to use, Proprietary Information owned by such third party.

(i)   All current and former employees, consultants and contractors of HM have executed and delivered, and are in compliance with, enforceable agreements regarding the protection of HM's Intellectual Property and have provided valid written current assignments of all Intellectual Property conceived or developed by

such employees, consultants or contractors in connection with their services for HM. True and complete copies of all such agreements have been delivered to YGYI. No such current or former employee, consultant or contractor or any other Person has any right, claim or interest in or to HM's Intellectual Property.

(j)   All Intellectual Property that has been distributed, sold or licensed to a third party by HM that is covered by a representation or warranty conformed to or conforms to, and performed or performs in accordance with, the representations and warranties provided with respect to such Intellectual Property by or on behalf of HM for the time period during which such representations and warranties apply.

(k)   The execution and delivery by HM and the Representing Parties of this Agreement does not, and the consummation by HM and the Representing Parties of the Transactions (in each case, with or without the giving of notice or lapse of time, or both), will not, directly or indirectly, result in the loss or impairment of HM's Intellectual Property, or give rise to any right of any party to terminate or reprise or otherwise renegotiate HM's rights to own any of its Intellectual Property or its rights under any license, nor require the consent of any Governmental Entity or other third party in respect of any such Intellectual Property.

5.16   <u>Absence of Certain Changes or Events</u>. Except as otherwise set forth on the <u>Schedule 5.16</u>, since the date of the Balance Sheet:

(a)   There has been no event, occurrence, or fact, or any series of events, occurrences, or facts that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)   HM has not amended or changed its Charter Documents;

(c)   HM has not declared, set aside or paid any dividend or other distribution (whether in cash, stock or property) with respect to any Equity Securities or any other security;

(d)   HM has not split, combined or reclassified any Equity Securities or other security, or issued, or authorized for issuance, any Equity Securities or other security;

(e)   HM has not altered any term of any outstanding Equity Securities or other security;

(f)   HM has not (i) increased or modified the compensation, including salary, bonuses, royalty, commissions or deferred compensation or benefits payable or to become payable by HM to any of its current or former directors, managers, employees, contractors or consultants; (ii) increased or modified any Benefit Plan, payment or arrangement made to, for or with any current or former directors, managers, employees, contractors or consultants of HM; (iii) entered into any employment, severance or termination agreement; or (iv) entered into any agreement or arrangement with any of its current or former directors, managers, employees, contractors or consultants providing any form of signing or stay on bonus or compensation;

(g)   Other than the sale of inventory in the ordinary course of business, HM has not sold, leased, transferred or assigned any of its Assets;

(h)   HM has not incurred, assumed or guaranteed any Indebtedness;

(i)   HM has not created or assumed any Lien on any Asset, except for Permitted Liens;

(j)   HM has not made any loan, advance or capital contribution to, or investment in, any Person;

(k)   HM has not entered into any Contract other than in the ordinary course of business;

(l)   Other than in the ordinary course of business (i) no Contract has been terminated or cancelled; (ii) no rights under any Contract have been waived or accelerated; and (iii) no Contract that would be required to be listed as a Contract pursuant to <u>Section 5.17</u> if such Contract were in effect on the Closing Date, has been terminated or cancelled;

(m)  HM has not sold, transferred, pledged or assigned, and there has been no reduction in the value of, any of its Intellectual Property;

(n)  There has not been any labor dispute or any activity or proceeding by a labor union or representative thereof to organize any employees of HM;

(o)  There has not been any violation of or conflict with any Law to which the Business or Assets of HM are subject;

(p)  Neither HM nor either of the Representing Parties has agreed or entered into any arrangement to take any action which will result in any representation or warranty set forth in this <u>Article V</u> being untrue or incorrect on the Closing Date;

(q)  There has not been any damage, destruction or loss with respect to the Assets of HM, whether or not covered by insurance;

(r)  Neither HM nor either of the Representing Parties has made any change in accounting policies or practices;

(s)  Neither the Representing Parties nor any officers or employees of HM has left or given notice he or she intends to leave HM;

(t)  Neither HM nor either of the Representing Parties has made any Tax election, changed its method of Tax accounting or settled any claim for Taxes;

(u)  Neither HM nor either of the Representing Parties has settled any Action; and

(v)  Neither HM nor the Representing Parties has agreed, whether in writing or otherwise, to do any of the foregoing.

5.17  <u>Contracts</u>.

(a)  Except as set forth on <u>Schedule 5.17(a)</u>, HM is not a party or is subject to, or its Assets are bound by any (herein, the "<u>HM Contracts</u>"):

(i)  Contract for the purchase by HM of materials, supplies, goods, services, equipment or other Assets;

(ii)  Contract for the sale by HM of materials, supplies, goods, services, equipment or other Assets or that requires HM to purchase its total requirements of any product or service from a third party;

(iii)  Employment, consulting, termination or severance Contract, other than any such Contract that is terminable at-will by HM without liability to HM;

(iv)  Contract containing noncompetition, nonsolicitation or confidentiality covenants restricting HM (including geographic restrictions);

(v)  Partnership, joint venture or similar Contract;

(vi)  Distribution, dealer, marketing, consultant, representative or sales agency Contract;

(vii)  Maintenance Contract pursuant to which HM is rendering or responsible for providing maintenance services;

(viii)    Contract evidencing an obligation to purchase, sell, lease or sublease personal property or Real Property;

(ix)    Guaranty, surety or contribution Contract or any Contract that provides for the indemnification by HM of any Person, the undertaking by HM to be responsible for consequential damages or the assumption by HM of any Tax, environmental or other liability;

(x)    Contract with any Governmental Entity;

(xi)    Note, debenture, bond, equipment trust, letter of credit, loan or other Contract for Indebtedness or lending of money (other than to employees for travel expenses in the ordinary course of business) or any undertaking of the Indebtedness or Liability of any other Person;

(xii)    Contract for any capital expenditures or leasehold improvements;

(xiii)    Contract that grants any distribution rights either to or from HM in any market, field or territory;

(xiv)    Contract that relates to the acquisition or disposition of any business (whether by merger, sale of stock, sale of Assets or otherwise);

(xv)    License, sublicense, royalty or similar agreements;

(xvi)    Collective bargaining Contract or other Contract with any labor organization, union or association;

(xvii)    Contract that contains exceptional or unusual terms or conditions or is not made at arm's length and in the best interest of HM; or

(xviii)    Contract that is otherwise material to HM and not previously disclosed pursuant to this Section 5.17.

(b)    The HM Contracts are in full force and effect and are in all material respects valid and binding obligations of the parties thereto, enforceable in accordance with their terms, and no defenses, off sets or counterclaims have been asserted or, to the knowledge of HM and the Representing Parties, may be made by any party thereto, nor has HM waived any right thereunder. HM's rights and obligations under all HM Contracts to be assigned hereby to YGYI are assignable as contemplated by this Agreement and will be duly and validly assigned to YGYI on the Closing Date; such assignment will not give rise to the ability of any other party to such agreements to terminate such agreements or to otherwise modify the rights and obligations thereunder; and such assignments will not result in any liability being imposed on YGYI other than to perform its assumed obligations under such agreements after the Closing.

(c)    Neither HM nor, to the knowledge of the Representing Parties, any other party thereto, is in default in the performance, observance or fulfillment of any obligation, covenant, condition or other term contained in any HM Contract, and HM has not given or received notice to or from any Person relating to any such alleged or potential default that has not been fully cured. No event has occurred which (with or without the giving of notice or lapse of time, or both) may conflict with or result in a violation or breach of, or give any Person the right to exercise any remedy under or accelerate the maturity or performance of, or cancel, terminate or modify, any HM Contract.

(d)    Except as set forth in the Schedule 5.17(d), neither HM nor either of the Representing Parties is required to obtain any Consent under any of the HM Contracts in connection with the execution and delivery by HM of this Agreement or the consummation of the Transactions.

(e)    The Representing Parties have delivered true and complete copies of each HM Contract to YGYI.

5.18     Litigation. Except as set forth on Schedule 5.18, there is no Action by any Person or Government Authority pending, or to the knowledge of HM or the Representing Parties, threatened: (i) against or affecting HM or its Assets, HM or the Representing Parties; (ii) that: challenges or seeks to prevent, enjoin or otherwise delay the Transactions; (iii) that could have the effect of restraining or prohibiting YGYI's ownership or operation (or that of its Subsidiaries or Affiliates) of all or any portion of the Business or Assets of HM; or (v) that could compel YGYI or its Affiliates to dispose of or hold separate all or any material portion of the Business or Assets of HM. . No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action. There is no Action against any current or former director, officer or employee of HM with respect to which HM has or is reasonably likely to have an indemnification obligation. There is no unsatisfied order, judgment, penalty or award against or affecting HM or any of its Assets.

5.19     Employee Benefits.

(a)     Schedule 5.19(a) sets forth a true and complete list of all Benefit Plans sponsored, maintained or contributed to or required to be contributed to HM for the benefit of any present or former directors, employees, contractors or consultants of HM (each a "HM Benefit Plan"). HM has no intent or commitment to create any additional Benefit Plans or amend any of its Benefit Plans.

(b)     The Representing Parties have delivered to YGYI a true and complete set of copies of (i) all HM Benefit Plans and related trust agreements, annuity contracts, other funding instruments, and all other material Contracts and agreements, including third party administration agreements and service agreements, maintained in connection with the operation of HM Benefit Plans; and (ii) any summaries of material modification, if any, concerning HM Benefit Plans.

(c)     Each HM Benefit Plan has been maintained, operated and administered in all material respects in accordance with such HM Benefit Plan's respective terms, and in compliance with all applicable laws.

(d)     With respect to each HM Benefit Plan, there are no Actions, (other than routine claims for benefits in the ordinary course) pending or threatened against any such HM Benefit Plan, HM or any trustee or agent of any such HM Benefit Plan.

(e)     Full payment has been made of all amounts which HM was required to have paid as a contribution to any HM Benefit Plan as of the last day of the most recent fiscal year of each HM Benefit Plan ended prior to the Closing Date.

(f)     Each HM Benefit Plan is, and its administration is and has been during the six-year period preceding the Closing Date, in compliance with, and HM has not received any claim or notice that any such HM Benefit Plan is not in compliance with, all applicable Laws.

(g)     HM is not in default in performing any of its contractual obligations under any of HM Benefit Plans or any related trust agreement or insurance contract.

(h)     There are no outstanding liabilities of any HM Benefit Plan other than liabilities for benefits to be paid to participants in any HM Benefit Plan and their beneficiaries in accordance with the terms of such HM Benefit Plan.

(i)     HM has the right under the terms of each HM Benefit Plan and under applicable Law to amend, revise, merge or terminate such plan (or its participation in such plan) or transfer the Assets of such plan to another arrangement, plan or fund at any time exclusively by action of HM, and no additional contributions would be required to properly effect such termination.

(j)     No HM Benefit Plan provides benefits to any individual after termination of employment.

(k)     The consummation of the Transactions will not (either alone or in conjunction with any other event) (i) entitle any current or former director, employee, contractor or consultant of HM to severance pay,

unemployment compensation or any other payment; (ii) accelerate the time of payment or vesting or increase the amount of compensation due to any such director, employee, contractor or consultant or result in the payment of any other benefits to any Person or the forgiveness of any Indebtedness of any Person;.

(l)   With respect to each HM Benefit Plan that is funded wholly or partially through an insurance policy, all premiums required to have been paid as of the Closing Date under such insurance policy have been paid, and, as of the Closing Date, there are no liabilities of HM under any insurance policy or ancillary agreement with respect to such insurance policy in the nature of a retroactive rate adjustment, loss sharing arrangement or other actual or contingent liability arising wholly or partially out of events occurring prior to the Closing Date.

(m)   HM has no duty or obligation to indemnify or hold another Person harmless for any liability attributable to any acts or omissions by such Person with respect to any HM Benefit Plan.

5.20    Labor and Employment Matters.

(a)   Schedule 5.20(a) sets forth (i) (A) a list of all directors, employees, contractors and consultants of HM (including title and position) as of the Closing Date and (B) the compensation and benefits of each such director, employee, contractor and consultant and (ii) a list of all former directors, employees, contractors and consultants of HM who are receiving benefits or scheduled to receive benefits in the future, and the pension benefit, medical insurance coverage and other benefits of each such former director, employee, contractor and consultant. None of the above referenced benefits includes unusual or exceptional terms or conditions. All directors, officers, employees, contractors and consultants of HM may be removed or terminated by HM at any time with or without cause, but only for reasons not prohibited by and otherwise consistent with federal, state and local Law and without any severance or other liability to HM or YGYI.

(b)   HM is not a party or subject to any labor union or collective bargaining agreement. There are no pending or threatened labor disputes, work stoppages, requests for representation, pickets, work slow-downs due to labor disagreements or any Actions which involve the labor or employment relations of HM. There is no unfair labor practice, charge or complaint pending, unresolved or, threatened before any governmental agency. No event has occurred or circumstance exists that may provide the basis of any work stoppage or other labor dispute.

(c)   HM has complied with each, and is not knowingly in violation of any, Law relating to anti-discrimination and equal employment opportunities and there are, and have been, no violations of any other Law with respect to the hiring, hours, wages, occupational safety and health, employment, promotion, termination or benefits of any employee or other Person. HM has filed and/or posted all reports, information and notices required under any Law with respect to the hiring, hours, wages, occupational safety and health, employment, promotion, termination or benefits of any employee or other Person, and will timely file all such reports, information and notices required by any Law to be given prior to the Closing. HM has maintained all records required by any applicable Law.

(d)   HM has paid or properly accrued in the ordinary course of business all wages and compensation due to employees, including all vacations or vacation pay, holidays or holiday pay, sick days or sick pay and bonuses.

(e)   HM is not a party to any Contract which restricts HM from relocating, closing or terminating any of its operations or facilities or any portion thereof. The consummation of the Transactions will not create liability for any act by HM on or prior to the Closing under any other Law respecting reductions in force or the impact on employees of plant closings or sales of businesses.

(f)   Schedule 5.20(f) sets forth a true and complete list of all employees of HM working in the United States who are not U.S. citizens and a description of the legal status under which each such employee is permitted to work in the United States. All employees of HM who are performing services for HM in the United States are legally able to work in the United States and will be able to continue to work in the United States following the consummation of the Transactions.

(g)  Except as set forth on Schedule 5.20(g), no Person that was engaged by HM as an independent contractor or in any other non-employee capacity can or will be characterized or deemed to be an employee of HM under applicable Law for any purpose whatsoever including, without limitation, for purposes of federal, state and local income taxation, workers' compensation, unemployment insurance and eligibility for HM's group benefit.

(h)  Except as set forth on Schedule 5.20(h), there are no covenants, agreements or restrictions, included but not limited to, employment agreements not to compete, prohibiting, limiting or in any way restricting any employee of HM from engaging in any type of business activity in any location. To the knowledge of HM and the Representing Parties, no employee, consultant or contractor of HM has been, is or will be, by performing services for HM, in violation of any term of any employment, invention disclosure or assignment, confidentiality, noncompetition or other restrictive covenant or agreement as a result of such employee's, consultant's or independent contractor's employment by or contract with HM or any services rendered by such employee, consultant or independent contractor.

5.21   Environmental.

(a)  HM has obtained and is in compliance with, all Environmental licenses, permits, consents and orders required by Environmental Law or Environmental Actions in connection with the operations of the Business and the Real Property, all of which are listed on Schedule 5.21(a). All such licenses, permits, consents and orders are valid and in full force and effect and none will be terminated or impaired or become terminable as a result of the Transactions. HM has been, and is currently, in compliance with all Environmental Laws and final Environmental Actions. Neither HM nor the Representing Parties has received notice alleging that HM is in violation of any Environmental Laws or final Environmental Actions.

(b)  There are no pending or to the knowledge of HM and the Representing Parties, threatened Environmental Actions against or affecting HM, and there are no facts or circumstances which could be expected to form the basis for any Environmental Action against HM.

(c)  HM has not entered into, agreed to or is the subject of, an Environmental Action relating to an investigation or cleanup of a Hazardous Material or any Environmental Law.

(d)  No Lien has been attached to or asserted or threatened against the Assets, the Real Property or the rights of HM pursuant to any Environmental Law or Environmental Action and there are no facts, circumstances or other conditions which could be expected to give rise to any Liens on or affecting the Assets or Real Property.

(e)  There has been no treatment, storage, disposal or release of any Hazardous Material at, from, into, on or under any Real Property or any other property currently or formerly owned, operated or leased by HM in violation of any Environmental Laws or final Environmental Action. No Hazardous Materials are present in, on, about or migrating to or from any Real Property that could be expected to give rise to the violation of an Environmental Law or give rise to an Environmental Action against HM.

(f)  There are no aboveground or underground storage tanks on, under or about the Real Property. Any aboveground or underground storage tanks previously located on, under or about the Real Property or any other property currently or formerly owned, operated or leased by HM or its Affiliates have been removed in accordance with all Environmental Laws and no residual contamination, if any, remains at such sites in excess of standards applicable to residential use of the Real Property.

(g)  HM has not transported or arranged for the treatment, storage, handling, disposal or transportation of any Hazardous Material to any off-site location which is an environmental clean-up site, and none of the Real Property is an environmental clean-up site.

(h)  The Representing Parties have provided to YGYI true and complete copies of, or access to, all written environmental assessments, materials, reports, data, analyses and compliance audits that have been prepared

by or on behalf of HM with respect to the Real Property or any other real property formerly owned, operated or leased by HM or its Affiliates.

5.22    <u>Insurance</u>.

(a)    <u>Schedule 5.22</u> sets forth: (i) a true and complete list of each insurance policy and fidelity bond which covers HM and the Business and Assets, its directors, and employees and (ii) a list of all pending claims and the claims history for HM during the current year and the preceding three years (including with respect to insurance obtained but not currently maintained). There are no pending claims under any of such policies as to which coverage has been questioned, denied or disputed by the insurer or in respect of which the insurer has reserved its rights. <u>Schedule 5.22</u> describes any self-insurance arrangement by or affecting HM and the loss experience for all claims that were self-insured in the current year and the preceding three years.

(b)    All such insurance policies are issued by an insurer that is financially sound and reputable, are in full force and effect and are enforceable in accordance with their terms and will continue in full force and effect with respect to HM following the Transactions. Such policies provide adequate insurance coverage for HM and the Business, Assets, directors, and employees and are sufficient for compliance with all Laws and Contracts to which HM is a party or by which it is bound.

(c)    All premiums due under such policies have been paid in full or, with respect to premiums not yet due, accrued. Neither HM nor the Representing Parties has received a notice of cancellation of any policy or of any changes that are required in the conduct of the Business as a condition to the continuation of coverage under or renewal of any such policy. There is no existing default or event which (with or without the giving of notice or lapse of time, or both) would constitute a default under any policy or induce any insurer to terminate or cancel any such policy. Neither HM nor the Representing Parties has knowledge of any threatened, or any basis for, termination of, or material premium increase with respect to any such policy and none of such policies provides for retroactive premium adjustments.

5.23    <u>Product Warranty</u>.

(a)    There are no warranties (express or implied) outstanding with respect to any products currently or formerly manufactured, sold, distributed, provided, shipped or licensed ("<u>Products</u>"), or any services rendered, by HM beyond that set forth in the standard conditions of sale or service or written warranty provided upon sale of a Product (which have been provided to YGYI), except as identified in <u>Schedule 5.23</u>.

(b)    All Products that have been or are being tested, developed, labeled, stored, promoted, distributed, manufactured, sold and/or marketed by HM have been and are being tested, developed, labeled, stored, promoted, distributed, manufactured, sold and/or marketed in compliance with all Product specifications, all express and implied warranties and all requirements under applicable Law.

(c)    There are no material design, manufacturing or other defects, latent or otherwise, with respect to any Product and such Products are not toxic when used in accordance with their intended use. Each Product that has been manufactured, sold, distributed, provided, shipped or licensed contained all warnings required by applicable Law and such warnings have been in accordance with reasonable industry practice.

(d)    HM has no any material liability arising out of any injury to individuals or property as a result of the ownership, possession or use of any Product. Neither HM nor any of its suppliers have committed any act or failed to commit any act, which would result in, and there has been no occurrence which would give rise to or form the basis of, any product liability, product defect or liability for breach of warranty in excess of Ten Thousand Dollars ($10,000) (whether covered by insurance or not) on the part of HM with respect to any Product.

(e)    Neither HM nor any of its suppliers has voluntarily made, or been required by any Governmental Entity to make, any recall of, or suspend or discontinue, any Product. To the knowledge of HM and the Representing Parties, there are no facts, circumstances or conditions that would reasonably be expected to form the basis for any Action with respect to a recall, suspension or discontinuance of any Product. Since December 31,

2010, there has been no inspections, inspection reports or other written correspondence from any Governmental Entity that asserts or alleges that the operation of HM is or was not or may not be in compliance with any applicable Laws or regulatory requirement.

(f) The Financial Statements reflect adequate reserves (in accordance with U.S. GAAP) for Product design and warranty claims and other damages in connection with any Product manufactured, sold, distributed, shipped or licensed, or service rendered, by HM on or prior to date of Balance Sheet. The accounting records of HM will reflect adequate reserves (in accordance with U.S. GAAP) for all such claims in connection with Products manufactured, sold, distributed, shipped or licensed, or services rendered by, HM from date of the Balance Sheet to the Closing Date.

5.24    Books and Records. The minute books (containing the records of the meetings, or written consents in lieu of such meetings, of the stockholders, the board of directors and any committees of the board of directors), the stock certificate books and the stock record books of HM are correct and complete and have been maintained in accordance with sound business practices. The minute books of HM contains true and complete records of all meetings or actions taken by written consent of the stockholders, the board of directors and any committees of the board of directors of HM, and no meeting or action by written consent in lieu of such meeting, of any such stockholders, the board of directors or committee of such board of directors, has been held for which minutes have not been prepared and not contained in the minute books. All of the books and records of HM, including minute books, are in the possession of HM. Current, true and correct copies of the minute books have been provided to YGYI.

5.25    Suppliers and Customers. Schedule 5.25 sets forth: (i) each supplier of material or manufacturing to HM; (ii) each supplier who constitutes a sole source of supply to HM; and (iii) each customer that has contributed in excess of five percent (5%) of HM's revenues for the most recent completed fiscal year. The relationships of HM with each such supplier, manufacturer, and customer are good commercial working relationships. No such supplier or customer has canceled or otherwise terminated or materially modified, or threatened to cancel or otherwise terminate or materially modify, its relationship with HM. Neither HM nor the Representing Parties has received notice or has reason to believe that any such supplier or customer may cancel or otherwise materially modify its relationship with HM or limit or reduce its supply of services, supplies or materials to, or its purchases of products, materials, goods or services from, HM, either as a result of the Transactions or otherwise. No supplier or customer of HM which was a material customer of or supplier to HM during the prior fiscal year has terminated its relationship with HM or been terminated by HM.

5.26    Consultants. HM has provided YGYI with a list of the names and addresses of all current and former Consultants of HM for the past three (3) fiscal years, copies of all Contracts between such Consultants and HM and the compensation paid to each Consultant for the past three (3) fiscal years. Except as set forth on Schedule 5.26 there are no suits, actions, claims, inquiries, investigations, legal, administrative or arbitration proceedings pending or, to the knowledge of HM or either of the Representing Parties, threatened, against or affecting HM or its directors, managers, officers or employees, including but not limited to the Representing Parties, by any Consultant or pending or threatened by HM against any Consultant. Except as set forth on Schedule 5.26, each Consultant is in compliance with such Consultant's written agreement with HM and the rules and regulations relating to HM's Consultants. Since January 1, 2013, HM has not received any notice from any Consultant of his or her intention to alter or terminate his or her business relationship with HM or to compete in any way with HM.

5.27    Bank Accounts. Schedule 5.27 sets forth the name of each bank, investment, safe deposit company or other financial institution in which HM has an account, lock box or safe deposit box, a list of each deposit, savings, brokerage, securities or similar account and the names of all persons authorized to draw thereon or have access thereto. All payments made by HM have been made in the ordinary course through banking channels.

5.28    Powers of Attorney. There are no outstanding powers of attorney executed by or on behalf of HM or the Representing Parties in favor of any Person.

5.29    Loans to or from Directors, Managers, Employees, or Consultants. Except as set forth on Schedule 5.29, HM has not loaned any monies to or borrowed any monies from, any director, manager or employee of, or consultant to, HM.

5.30   Arms-Length Transactions. Except as set forth on Schedule 5.30, all of the material transactions with any Person by HM have been conducted on an arms-length basis. Except as set forth on Schedule 5.30: (i) neither HM nor any director, officer or employee of HM or its Affiliates has any direct or indirect interest, profit participation or ownership (other than through non-controlling investments in securities of publicly-held corporations) in businesses which are competitors of HM and (ii) none of HM or any officer, director or employee of HM or its Affiliate is an Affiliate of any Person that has a material business relationship with HM.

5.31   Solvency.

(a) The fair value of HM's Assets exceeds the amount of HM's existing debts and liabilities (including known contingent liabilities). HM's Assets do not constitute unreasonably small capital to carry on the Business for the current fiscal year as now conducted and as proposed to be conducted, including its capital needs taking into account the particular capital requirements of the Business conducted by HM and projected capital requirements and capital availability thereof. The current cash flow of HM, together with the proceeds HM would receive were it to liquidate all of its Assets, after taking into account all anticipated uses of the cash, would be sufficient to pay all amounts on or in respect of its debt when such amounts are required to be paid. HM is, and has been, able to timely pay its debts, liabilities and obligations. HM intends to incur debts beyond its ability to pay such debts as they mature (taking into account the timing and amounts of cash to be payable on or in respect of its debts).

(b) Immediately after the Closing: (i) HM will be solvent, will be able to pay HM's debts as they mature and No solvency proceeding of any character, including bankruptcy, receivership, reorganization, composition or arrangement with creditors (including any assignment for the benefit of creditors), voluntary or involuntary, affecting the Business or the Representing Parties (other than as a creditor) is pending or is currently being contemplated by HM or the Representing Parties or, to the knowledge of HM and the Representing Parties, is being threatened against the Representing Parties or HM by any other Person. Neither HM nor the Representing Parties has made any assignment for the benefit of creditors or taken any action in contemplation of, or which would constitute the basis for, the institution of any such insolvency proceedings.

5.32   Completeness of Disclosure.

(a)  No representation or warranty by HM or of the Representing Parties in this Agreement, and no statement made by HM in the HM Disclosure Schedule or any Ancillary Document furnished or to be furnished to YGYI pursuant hereto contains any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading. Except as specifically set forth in this Agreement or the HM Disclosure Schedule, there are no facts or circumstances which, to the knowledge of HM or the Representing Parties, could be expected to have, individually or in the aggregate, a Material Adverse Effect.

(b)  No investigations by YGYI, YGYI's Representatives or any other Person shall reduce or otherwise affect the obligations or liabilities of HM or the Representing Parties with respect to any representations, warranties, covenants, or agreements made herein or in any Ancillary Document executed and delivered in connection with the Transactions.

5.33   Brokers or Finders. Other than as set forth on Schedule 5.33, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of HM or the Representing Parties.

The Representing Parties represent and warrant to YGYI that to the best of their actual knowledge, after reasonable inquiry, the statements contained in this Article V are true and correct, except as may be set forth in the HM Disclosure Schedule.

## ARTICLE VI

## CONDITIONS TO CONSUMMATION OF THE SALE

6.1     <u>Conditions to Obligations of HM and the Representing Parties</u>. The obligations of HM and the Representing Parties to consummate the Transactions shall be subject to the fulfillment, or written waiver by HM and the Representing Parties at or prior to the Closing, of each of the following conditions:

(a)   The representations and warranties of YGYI set out in this Agreement shall be true and correct in all material respects at and as of the time of the Closing as though such representations and warranties were made at and as of such time, except those that speak as of the date of this Agreement shall be updated;

(b)   YGYI shall have performed and complied in all material respects with all covenants, conditions, obligations and agreements required by this Agreement to be performed or complied with by YGYI on or prior to the Closing Date;

(c)   YGYI shall have delivered to HM and the Representing Parties an officer's certificate of YGYI to the effect that the conditions set forth in <u>Section 6.1(a)</u> and <u>(b)</u> have been satisfied; and

(d)   YGYI shall have paid the Closing Cash Payment.

6.2     <u>Conditions to Obligations of YGYI</u>. The obligations of YGYI to consummate the Transactions shall be subject to the fulfillment or written waiver by YGYI, at or prior to the Closing, of each of the following conditions:

(a)   The representations and warranties of HM and the Representing Parties set out in this Agreement shall be true and correct in all material respects at and as of the time of the Closing as though such representations and warranties were made at and as of such time, except that those that speak as of the date of this Agreement shall be updated;

(b)   HM shall have performed and complied in all material respects with all covenants, conditions, obligations and agreements required by this Agreement to be performed or complied with by HM on or prior to the Closing Date;

(c)   HM shall have delivered to YGYI a certificate of the Secretary of HM to the effect that the conditions set forth in <u>Section 6.2(a)</u> and <u>(b)</u> hereof have been satisfied;

(d)   HM shall have delivered to YGYI the financial statements described in <u>Section 3.5</u>;

(e)   HM shall have delivered to YGYI the additional information described in <u>Section 3.5</u>;

(f)   HM's stockholders shall have approved the transactions in accordance with Delaware law and evidence thereof shall have been provided to YGYI;

(g)   None of HM's stockholders shall have asserted any dissenters' rights under Delaware law;

(h)   HM shall have obtained any consent required from Dare Associates L.C. and ZenPrint, LLC for the transfer of the applicable Assets to YGYI or its designee;

(i)   HM shall have provided a form of an amended and restated Certificate of Incorporation satisfactory to YGYI that will be used to change of the name of HM to a name that does not include the words "heritage" or "maker (which filing shall be made effective promptly following the Closing); and

(j)   HM shall have provided any documents and necessary executed transfer forms confirming the assignment of all Intellectual Property owned by HM.

6.3     <u>Other Conditions to Obligations</u>. The obligations of the Parties to consummate the Transactions shall be subject to the fulfillment, or written waiver by each of YGYI and HM, at or prior to the Closing, of each of the following conditions:

(a)  All director, stockholder, lender, lessor and other parties' consents and approvals, as well as all filings with, and all necessary consents or approvals of, all federal, state and local governmental authorities and agencies, as are required under this Agreement, applicable law or any applicable contract or agreement (other than as contemplated by this Agreement) to complete the Transactions shall have been secured; and

(b)  No statute, rule, regulation, executive order, decree, preliminary or permanent injunction, or restraining order shall have been enacted, entered, promulgated or enforced by any Governmental Authority that prohibits or restricts the consummation of the Transactions.

## ARTICLE VII
## COVENANTS OF THE PARTIES

7.1     Access to Information. Until the Closing, HM shall:

(a)  Furnish to YGYI and each of its Representatives all financial, operating, and other data and information concerning the Business and the Assets that YGYI or its Representatives shall from time to time reasonably request;

(b)  Afford YGYI and each of its Representatives reasonable access to the offices, properties, books, records, contracts, and documents (including Tax Returns filed and those in preparation) of HM; and

(c)  Give YGYI and each of its Representatives the opportunity to ask questions of, and receive prompt answers from, HM's Representatives.

7.2     Conduct Pending the Closing. From the date of this Agreement until the Closing Date, except as otherwise agreed to in writing by YGYI or otherwise permitted or contemplated by this Agreement, HM shall:

(a)  Conduct its Business in the usual, regular, and ordinary course in substantially the same manner as heretofore conducted and use all commercially reasonable efforts to maintain and preserve the working capital consistent with past practices and present business organization of HM intact and to keep available the services of HM's present officers and employees and preserve the present relationships of HM with its suppliers and customers;

(b)  Maintain the books, accounts and records of HM on a basis consistent with past practices and in a businesslike manner in accordance with sound commercial practice, and not institute or introduce any new methods of purchase, sale, accounting, billing, or operation relating to HM that are not consistent with its past practices;

(c)  Not increase the compensation payable to or to become payable to any officer, employee or independent contractor of HM from the current compensation levels of any such Person (other than previously scheduled or contractually agreed compensation increases);

(d)  Not incur or agree to incur any liability (other than liabilities to third parties incurred in the ordinary course of business consistent with past business practices);

(e)  Not create any new Lien on any Asset, other than Permitted Liens;

(f)  Not sell, assign, lease or otherwise transfer or dispose of any of the Assets, except for sales of inventory in the ordinary course of business consistent with past business practices;

(g)  Not incur any individual capital expenditure in excess of Five Thousand Dollars ($10,000) or aggregate capital expenditures in excess of Ten Thousand Dollars ($25,000);

(h)  Not declare a dividend or distribution of any money, property or asset to any stockholders and not issue any debt securities of HM or any other debt security secured by any Asset;

(i)   Not adopt any new superannuation plan or Benefit Plan or arrangement;

(j)   Not amend any superannuation plan or Benefit Plan to accelerate the payment or vesting of any benefit or amount payable under such superannuation plan or Benefit Plan or increase, extend, expand, or enhance, in any manner, the benefits payable under any superannuation plan or Benefit Plan;

(k)   Not amend its Certificate of Incorporation or Bylaws or other Charter Documents;

(l)   Not allow the transfer by any HM stockholders of any shares of stock of HM; and/or

(m)  Not take any other action that would cause any representation and warranty of HM or the Representing Parties to be inaccurate as of the Closing Date.

7.3   <u>Consents</u>. HM will use commercially reasonable efforts to obtain all consents and approvals required under any Contract to which either HM is a party or by which either HM is bound to enable HM to effect the sale of the Assets pursuant hereto. HM shall promptly notify YGYI of any failure or prospective failure to obtain any such Consent and, if requested, shall provide to YGYI copies of the Consents obtained by HM. Anything in this Agreement to the contrary notwithstanding, this Agreement shall not constitute an agreement to assign any contract, or any claim or right or any benefit arising thereunder or resulting therefrom, if an attempted assignment thereof, without the consent of a third party thereto, would constitute a breach thereof or in any way affect the rights of YGYI or HM thereunder. If such consent is not obtained, or if an attempted assignment thereof would be ineffective or would affect the rights of HM thereunder so that YGYI would not in fact receive all such rights, HM will cooperate with YGYI in any arrangement designed to provide for YGYI the benefits under any of such contracts, including, without limitation, enforcement for the benefit of YGYI of any and all rights of HM against a third party thereto arising out of the breach or cancellation by such third party or otherwise; and any transfer or assignment to YGYI by HM of any contract which shall require the consent or approval of any third party, shall be made subject to such consent or approval being obtained.

7.4   <u>Regulatory Approvals and Filings</u>. Each Party covenants and agrees to use commercially reasonable efforts to promptly prepare and file all necessary permits, consents, approvals, and authorizations, and make all filings, with all Governmental Entities and all other Persons necessary or advisable to consummate the Transactions. The Parties will cooperate with each other and their Representatives in the preparation of any documents or other materials that may be required by any Government Entity to consummate the Transaction.

7.5   <u>Cooperation</u>. HM, the Representing Parties, YGYI shall consult with each other prior to making any filing with any Governmental Entity in connection with the Transactions and promptly after each such filing provide the other with a copy thereof.

7.6   <u>Public Announcements</u>. Neither YGYI, HM nor the Representing Parties nor any of their respective Affiliates or Representatives, shall issue any press releases or otherwise make any public statements with respect to this Agreement and the Transactions without the prior written consent of YGYI and HM (such consent not to be unreasonably conditioned, withheld or delayed); provided that YGYI may, without such approval, make such press releases or other public announcement, including, but not limited to, oral statements, as it believes are required pursuant to any listing agreement with any national securities exchange or stock market or applicable securities Laws, in which case the Party required to make the release or announcement shall allow the other Party reasonable time to comment on such release or announcement in advance of such issuance; provided, further, that each of the Parties may make internal announcements to their respective employees that are consistent with the Parties' prior public disclosures regarding the Transactions.

7.7     <u>Employees and Employee Benefits</u>.

(a)     Effective one Business Day before Closing Date, HM shall have terminated all Employees of the Business who are actively at work on such date, and at YGYI's sole discretion, YGYI or its Subsidiaries or Affiliates may offer employment, on an "at will" basis, to any or all of such Employees.

(b)     Unless assumed by YGYI pursuant to <u>Section 2.2</u>, HM shall be solely responsible, and YGYI shall have no obligations whatsoever for, any compensation or other amounts due and payable to any Employee (or former Employee) of HM, including, without limitation, hourly pay, commission, bonus, salary, accrued vacation, fringe, pension or profit sharing benefits, or severance pay payable to any Employee (or former Employee) of HM for any period relating to the service with HM at any time prior to the Closing Date and HM shall pay all such amounts to all entitled Employees on or prior to the Closing Date.

(c)     HM shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health, accident or disability benefits brought by or in respect of Employees (or former Employees) or agents of HM that were incurred or made prior to the Closing Date. HM shall remain solely responsible for all worker's compensation claims of any Employees (or former Employees) that relate to events occurring prior to the Closing Date or that were incurred or made prior to the Closing Date.  HM shall pay, or cause to be paid, all such amounts to the appropriate persons as and when due.

(d)     YGYI shall ensure that each Employee terminated by HM that is hired by YGYI receives full credit as an employee of YGYI for such Employee's accrued vacation, personal days and sick pay to which such Employee was entitled as an employee of HM, in the amounts set forth on <u>Schedule 7.7(d)</u> of the HM Disclosure Schedule, for purposes of eligibility and vesting for, and determining the amount of, vacation and paid time off under the policies of YGYI. If any such Employee described in this subsection demands that HM or YGYI pay or cash out any accrued vacation, personal days or sick pay to which such Employee claims he or she was entitled in connection with his or her employment with HM prior to the Closing, YGYI shall promptly pay to such Employee all such claimed accrued but unused vacation, personal days and sick pay of such Employee, up to the amounts set forth for such Employee on <u>Schedule 7.7(d)</u>.

**ARTICLE VIII**

**<u>COVENANTS OF HM AND THE REPRESENTING PARTIES</u>**

8.1     <u>Covenant to Satisfy Conditions</u>. HM shall use commercially reasonable efforts to take or cause to be taken all actions, and to do or cause to be done all things, necessary, proper, and advisable under Laws to preserve its Working Capital in the ordinary course of business, consistent with past practices, and to consummate and make effective the Transactions.

8.2     <u>No Shop</u>. HM and the Representing Parties covenant and agree to, not directly or through any representative, solicit or respond favorably to any solicitation from or otherwise enter into negotiations or reach any agreement with any person or entity regarding (i) the merger or consolidation of HM; (ii) the sale of any of the Assets of HM (other than sales of inventory in the ordinary course of business consistent with past practices); or (iii) the sale of any of the Capital Stock of HM, or any options, convertible securities, convertible debt, or other rights to acquire any Capital Stock of HM, and to promptly (within one Business Day) furnish YGYI copies of any proposals received from any Person proposing a transaction contemplated by this <u>Section 8.2</u>. HM and the Representing Parties, agree that the provisions of this <u>Section 8.2</u> shall be binding on HM and the Representing Parties through and including the Closing Date.

8.3     <u>Third Party Consents</u>. If any required Consent cannot be obtained prior to the Closing Date and such requirement has not been waived by YGYI , HM and the Representing Parties will cooperate as reasonably necessary with YGYI to obtain such Consent as soon as practical following the Closing.

8.4   Taxes. HM shall make all federal and tax filings, and pay all taxes of any kind then due, for all periods up to the Closing Date, except for such sales taxes and payroll taxes that have been accrued for and reflected on the Balance Sheet.

## ARTICLE IX

## INDEMNIFICATION

9.1   Indemnification by HM and the Representing Parties.

(a)  During the period commencing on the Closing Date and ending on the date that is eighteen (18) months after the Closing Date, HM shall indemnify and hold harmless YGYI and its respective officers, directors and stockholders (each an "**YGYI Indemnified Party**"), from and against any and all demands, claims, actions or causes of action, judgments, assessments, losses, liabilities, damages or penalties and reasonable attorneys' fees and related disbursements (collectively, "**Claims**") suffered by such YGYI Indemnified Party resulting from or arising out of any: (i) inaccuracy in or breach of any of the representations or warranties made by HM at the time they were made, and, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time), on and as of the Closing Date; (ii) breach or nonfulfillment of any covenants or agreements made by HM or the Representing Parties; (iii) misrepresentation made by HM in the Schedules or Exhibits annexed hereto or in any Ancillary Document furnished by HM or the Representing Parties pursuant hereto or in connection with the Transactions; and (iv) any Claim relating to any HM liability not expressly assumed by YGYI as herein provided.

(b)  During the period commencing on the Closing Date and ending on the date that is eighteen (18) months after the Closing Date, the Representing Parties shall indemnify and hold harmless the YGYI Indemnified Parties, from and against any and all Claims suffered by such YGYI Indemnified Party resulting from or arising out of any: (i) inaccuracy in or breach of the representations or warranties made by the Representing Parties in the last paragraph of Article V at the time they were made, and, except for representations and warranties that speak as of a specific date or time (which need only be true and correct as of such date or time), on and as of the Closing Date; or (ii) breach or nonfulfillment of any covenants or agreements made by HM or the Representing Parties.

9.2   Indemnification by YGYI. During the period commencing on the Closing Date and ending on the date that is eighteen (18) months after the Closing Date, YGYI shall indemnify and hold harmless HM, the Representing Parties, and their respective officers, directors, stockholders, members, managers, employees, and agents (each an "**HM Indemnified Party**"), from and against any and all Claims suffered by such HM Indemnified Party resulting from or arising out of any: (i) inaccuracy in or breach of the representations or warranties made by YGYI on and as of the Closing Date; (ii) breach or nonfulfillment of any covenants or agreements made by HM or the Representing Parties; (iii) misrepresentation made by YGYI in the Schedules or Exhibits annexed hereto or in any Ancillary Document furnished by YGYI pursuant hereto or in connection with the Transactions; (iv) any Claim relating to any liability assumed by YGYI as herein provided; and (v) any Claim brought by a third party based upon, resulting from, relating to or arising out of the business or operations of YGYI or any of its Affiliates conducted after the Closing.

9.3   Indemnification Procedures for Third-Party Claims. The party making a claim under this Article IX is referred to as the "**Indemnified Party**," and the party against whom such claims are asserted under this Article IX is referred to as the "**Indemnifying Party**."

(a)  Upon obtaining knowledge of any Claim by a third party that has given rise to, or is expected to give rise to, a claim for indemnification hereunder, the Indemnified Party shall give written notice ("**Notice of Claim**") of such claim or demand to the Indemnifying Party, specifying in reasonable detail such information as the Indemnified Party may have with respect to such indemnification claim (including copies of any summons, complaint or other pleading that may have been served on it and any written claim, demand, invoice, billing or other document evidencing or asserting the same). Subject to the limitations set forth in Section 9.3(b) hereof, no failure or delay by an Indemnified Party in the performance of the foregoing shall reduce or otherwise affect the obligation of the Indemnifying Party to indemnify and hold the Indemnified Party harmless, except to the extent that such

failure or delay shall have actually adversely affected the Indemnifying Party's ability to defend against, settle or satisfy any Claims for which the Indemnified Party is entitled to indemnification hereunder.

(b) If the claim or demand set forth in the Notice of Claim given by an Indemnified Party pursuant to Section 9.3(a) hereof is a claim or demand asserted by a third party, the Indemnifying Party shall have fifteen (15) days after the date on which the Notice of Claim is delivered to notify the Indemnified Party in writing of its election to defend such third party claim or demand on behalf of the Indemnified Party. If the Indemnifying Party elects to defend such third party claim or demand, the Indemnified Party shall make available to the Indemnifying Party and its agents and representatives all records and other materials that are reasonably required in the defense of such third party claim or demand and shall otherwise cooperate with, and assist the Indemnifying Party in the defense of, such third party claim or demand, and so long as the Indemnifying Party is defending such third party claim in good faith, the Indemnified Party shall not pay, settle or compromise such third party claim or demand. If the Indemnifying Party elects to defend such third party claim or demand, the Indemnified Party shall have the right to participate in the defense of such third party claim or demand at the Indemnifying Party's expense. In the event, however, that such Indemnified Party reasonably determines that representation by counsel to the Indemnifying Party of both the Indemnifying Party and such Indemnified Party could reasonably be expected to present counsel with a conflict of interest, then the Indemnified Party may employ separate counsel to represent or defend it in any such action or proceeding at its own expense. If the Indemnifying Party does not elect to defend such third party claim or demand or does not defend such third party claim or demand in good faith, the Indemnified Party shall have the right, in addition to any other right or remedy it may have hereunder, at the Indemnifying Party' expense, to defend such third party claim or demand; provided, however, that: (i) such Indemnified Party shall not have any obligation to participate in the defense of or defend any such third party claim or demand; (ii) such Indemnified Party's defense of or its participation in the defense of any such third party claim or demand shall not in any way diminish or lessen the obligations of the Indemnifying Party under the agreements of indemnification set forth in this Article IX; and (iii) such Indemnified Party may not settle any claim without the consent of the Indemnifying Party, which consent shall not be unreasonably withheld or delayed.

(c) Except for third party claims being defended in good faith, the Indemnifying Party shall satisfy its obligations under this Article IX in respect of a valid claim for indemnification hereunder that is not contested by the Indemnified Party in good faith by wire transfer of immediately available funds to the Indemnified Party within thirty (30) days after the date on which Notice of Claim is delivered to the Indemnified Party.

9.4     Indemnification Procedures for Non-Third Party Claims. In the event any Indemnified Party should have an indemnification claim against the Indemnifying Party under this Agreement that does not involve a claim by a third party, the Indemnified Party shall promptly deliver notice of such claim to the Indemnifying Party in writing and in reasonable detail. The failure by any Indemnified Party to so notify the Indemnifying Party shall not relieve the Indemnifying Party from any liability that it may have to such Indemnified Party, except to the extent that Indemnifying Party have been actually prejudiced by such failure. If the Indemnifying Party does not notify the Indemnified Party within fifteen (15) business days following its receipt of such notice that the Indemnifying Party dispute such claim, such claim specified by the Indemnified Party in such notice shall be conclusively deemed a liability of the Indemnifying Party under this Article IX and the Indemnifying Party shall pay the amount of such liability to the Indemnified Party on demand, or in the case of any notice in which the amount of the claim is estimated, on such later date when the amount of such claim is finally determined. If the Indemnifying Party disputes its liability with respect to such claim in a timely manner, the Indemnifying Party and the Indemnified Party shall proceed in good faith to negotiate a resolution of such dispute and, if not resolved through negotiations, such dispute shall be submitted to a court of law.

9.5     Indemnification Priority and Limitations.

(a) For all matters arising under or in connection with this Section 9.1, YGYI shall recover, subject to the limitations contained in this Article IX, (i) first, from the funds owed to HM for the 4% Payment (to the extent not previously distributed); and (ii) second, to the extent Losses are not fully recovered, the Indemnified Parties shall be entitled to recover any remaining Losses directly from HM and the Representing Parties.

(b) The indemnification provided for in Sections 9.1 and 9.2 shall be subject to the following limitations:

(i)   An Indemnifying Party shall not be liable to an Indemnified Party for indemnification hereunder until the aggregate amount of all Losses exceeds $25,000 (the "Deductible"), in which event the Indemnifying Party shall be responsible only for any such Losses in excess of such Deductible; and

(ii)   The aggregate liability of HM and the Representing Parties for indemnification under Section 9.1 shall not exceed Two Million Dollars ($2,000,000).

9.6   Survival.   Subject to the limitations and other provisions of this Agreement, the representations and warranties contained herein shall survive the Closing and shall remain in full force and effect until the date that is eighteen (18) months from the Closing Date; provided, that the representations and warranties in Sections 4.1, 4.2, 5.1, 5.2, 5.3, and 5.6 shall survive indefinitely.

9.7   Exclusive Remedy.   The Parties acknowledge and agree that their sole and exclusive remedy with respect to any and all Claims (other than Claims arising from fraud or willful misconduct on the part of a Party hereto in connection with the Transactions) for any breach of any representation, warranty, covenant, agreement or obligation set forth herein or otherwise relating to the subject matter of this Agreement shall be pursuant to the indemnification provisions set forth in this Article IX; provided however that nothing in this Agreement, including without limitation the provisions of Section 9.5, shall limit any Party's right to seek and obtain any equitable relief to which such Party shall be entitled or to seek any remedy on account of any Person's fraudulent or willful misconduct.

## ARTICLE X

## TERMINATION

10.1   Termination.   This Agreement may be terminated at any time prior to the Closing:

(a)   by mutual consent of YGYI, HM and the Representing Parties;

(b)   by YGYI or HM if the Closing shall not have occurred on or before August 15, 2013;

(c)   by YGYI, HM or Representing Parties if any Governmental Authority shall have issued an injunction, order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting any material portion of the Transactions and such injunction, order, decree, ruling or other action shall have become final and nonappealable;

(d)   by YGYI if any of the conditions to the Closing set forth in Section 6.2 shall not have been fulfilled by August 15, 2013 and shall not have been waived in writing by YGYI;

(e)   by HM if any of the conditions to the Closing set forth in Section 6.1 shall not have been fulfilled by August 15, 2013 and shall not have been waived in writing by HM.

10.2   Procedure and Effect of Termination.   In the event of termination of this Agreement pursuant to Section 10.1 hereof, written notice thereof shall forthwith be given by the terminating party to the other party, and, except as set forth below, this Agreement shall terminate and be void and have no effect and the Transactions shall be abandoned without any further action by the parties hereto. Notwithstanding the foregoing, if this Agreement is terminated other than pursuant to Section 10.1(a), such termination will not affect any right or remedy which accrued hereunder or under applicable Laws prior to or on account of such termination, and the provisions of this Agreement shall survive such termination to the extent required so that each party may enforce all rights and remedies available to such party hereunder or under applicable Laws in respect of such termination and so that any party responsible for any breach or nonperformance of its obligations hereunder prior to termination shall remain liable for the consequences thereof. If this Agreement is terminated as provided herein, each party hereto shall redeliver, and shall cause its agents (including, without limitation, attorneys and accountants) to redeliver, all

documents, work papers and other material of each party hereto relating to the Transactions, whether obtained before or after the date hereof.

## ARTICLE XI

## CONFIDENTIALITY AND NON-COMPETITION

11.1     Confidentiality. At all times after the Closing Date, HM and the Representing Parties shall retain in strictest confidence, and shall not use for its benefit or for the benefit of others all confidential information comprising or related to the Assets including, without limitation, the technology, trade secrets, customer lists transferred hereby to YGYI, pricing policies, marketing plans or strategies, product development techniques or plans, or technical processes, designs and design projects respecting the Business.

11.2     Non-Competition.

(a) (i) For a period of four (4) years from and after the Closing Date, HM shall not, directly or indirectly: (i) engage in a business or enterprise (either as proprietor, partner, employee, agent, consultant, or controlling stockholder) that qualifies as a "competing business" (as defined in subsection (b) hereof) or (ii) solicit or attempt to solicit sales or licenses of any competing businesses, interfere with, or disrupt or attempt to disrupt the relationship (contractual or otherwise) between HM, YGYI and their customers, suppliers, agents, consultants, officers or employees relating to the Product; and (ii) each of the Representing Parties agrees to the confidentiality and non-competition provisions set forth in their respective employment agreements, if any.

(b) The provisions of this Section 11.2 shall not prevent HM or the Representing Parties from investing their assets in securities of any corporation, or otherwise acquiring an equity interest in any enterprise, equity securities of which are publicly owned and traded, provided that such investments or interests shall not result in: (i) HM and the Representing Parties owning beneficially, in the aggregate, 10% or more of the equity securities of any enterprise engaged in a business offering products or services competitive to the Business (a "competing business") or (ii) HM or the Representing Parties being able to control or actively participate in the policy decisions of such competing business.

(c) It is the desire and intent of the parties that the provisions of this Section 11.2 shall be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought. If any particular provision or portion of this Section 11.2 shall be adjudicated to be invalid or unenforceable in any jurisdiction, this Section 11.2 shall be deemed amended to delete therefrom such provision or portion adjudicated to be invalid or unenforceable, such amendment to apply only with respect to the operation of this subsection (c) in the particular jurisdiction in which such adjudication is made. HM and the Representing Parties agree that it would be difficult to measure the damages to YGYI from the breach by of the provisions of this Section 11.2, that injury to YGYI from such breach would be impossible to calculate, and that monetary damages would therefor be an inadequate remedy; accordingly, HM and Representing Parties agree that YGYI shall be entitled, in addition to all other remedies it might have, to injunctions or other appropriate orders to restrain any such breach without showing or proving any actual damages. Nothing herein shall be construed as prohibiting YGYI from pursuing any other remedies for such breach or threatened breach.

(d) The undertakings and covenants of the HM and the Representing Parties contained in this Section 11.2 are an integral part of the transactions set forth in this Agreement and the consideration paid by YGYI pursuant to this Agreement shall be consideration not only for the Assets but also for such undertakings and covenants.

## ARTICLE XII

## MISCELLANEOUS

12.1     Reasonable Efforts. Subject to the conditions of this Agreement, each of the Parties shall use the efforts that a reasonable person would make so as to achieve that goal as expeditiously as possible to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary or advisable under applicable laws to

consummate the Transactions contemplated by this Agreement as promptly as practicable including but not limited to: (i) taking such actions as are necessary to obtain any required approval, consent, ratification, filing, declaration, registration, waiver, or other authorization and (ii) satisfying all conditions to Closing at the earliest possible time.

12.2    <u>Transaction Costs</u>. Each Party shall pay its own fees and expenses (including without limitation the fees and expenses of its representatives, attorneys, and accountants) incurred in connection with negotiation, drafting, execution, and delivery of this Agreement.

12.3    <u>Assignment</u>. No Party may assign any of its rights or delegate any performance under this Agreement except with the prior written consent of the other Parties.

12.4    <u>Binding</u>. This Agreement binds, and inures to the benefit of, the Parties and their respective permitted successors and assigns.

12.5    <u>Governing Law</u>. The laws of the State of California (without giving effect to its conflict of laws principles) govern all matters arising out of this Agreement, including without limitation tort claims.

12.6    <u>Entirety of Agreement</u>. This Agreement constitute the entire agreement of the parties concerning the subject matter hereof and supersedes all prior agreements, if any.

12.7    <u>Further Assurances</u>. Each of HM, the Representing Parties, YGYI and shall execute and deliver such additional documents and instruments and perform such additional acts as the other party may reasonably request to effectuate or carry out and perform all the terms of this Agreement and the Transactions contemplated hereby, and to effectuate the intent of this Agreement. In this regard, to the extent all consents and approvals required under any Contract to which either HM is a party or by which HM is bound to enable HM to effect the sale of the Assets pursuant hereto are not obtained on or before the Closing Date as contemplated by Section 7.3 above, within the thirty (30) day period after the date of this Agreement, HM will obtain all consents and approvals required under any Contract to which either HM is a party or by which HM is bound to enable HM to effect the sale of the Assets pursuant hereto.

12.8    <u>Jurisdiction; Service of Process</u>. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, any of this Agreement must be brought against any of the parties in the courts of the State of California, or, if it has or can acquire jurisdiction, in the United States District Court for San DiegoCounty, and each of the parties consents to the jurisdiction of those courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Nothing in this Section 13.8, however, affects the right of any party to serve legal process in any other manner permitted by law. All references to a time of day in this Agreement are references to the time in the State of California.

12.9    <u>Amendment</u>. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties.

12.10    <u>Counterparts</u>. This Agreement may be executed in several counterparts, each of which is an original and all of which together constitute one and the same instrument.

12.11    <u>No Third-Party Rights</u>. Nothing expressed or referred to in this Agreement gives any Person other than the Parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement, and this Agreement and all of its provisions are for the sole and exclusive benefit of the parties to this Agreement and their successors and permitted assigns. The undersigned are signing this Agreement on the date stated in the introductory clause.

12.12    <u>Headings</u>. The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

12.13    <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such

determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

12.14    <u>Notices</u>.   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); or (c) on the fourth day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective Parties at the addresses set forth in the first paragraph of this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed and delivered this Agreement as of the date first written above.

YOUNGEVITY INTERNATIONAL, INC.

By: _____
Name: STEVE WALLACH
Title: CEO

8 - 7 - 2013

HERITAGE MAKERS, INC.

By: _____
Name:
Title:

REPRESENTING PARTIES:

_____
CHRISTOPHER LEE

_____
DOUG CLOWARD

_____
SHARON MURDOCH

_____
JUSTIN BIGGS

_____
BRYTT CLOWARD

*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first written above.

**YOUNGEVITY INTERNATIONAL, INC.**

By: _____
Name:
Title:

**HERITAGE MAKERS, INC.**

By: *Patti Gardner*
Name: *Patti Gardner*
Title: *President*

**REPRESENTING PARTIES:**

_____
CHRISTOPHER LEE

_____
DOUG CLOWARD

_____
SHARON MURDOCH

_____
JUSTIN BIGGS

_____
BRYTT CLOWARD

*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first written above.

YOUNGEVITY INTERNATIONAL, INC.

By: _____
Name:
Title:

HERITAGE MAKERS, INC.

By: _____
Name:
Title:

REPRESENTING PARTIES:

_____
CHRISTOPHER LEE

_____
DOUG CLOWARD

_____
SHARON MURDOCH

_____
JUSTIN BIGGS

_____
BRYTT CLOWARD

*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first written above.

**YOUNGEVITY INTERNATIONAL, INC.**

By: _____
Name:
Title:


**HERITAGE MAKERS, INC.**

By: _____
Name:
Title:


**REPRESENTING PARTIES:**


_____
CHRISTOPHER LEE


_____
DOUG CLOWARD


_____
SHARON MURDOCH


_____
JUSTIN BIGGS


_____
BRYTT CLOWARD

IN WITNESS WHEREOF, the Parties have executed and delivered this Agreement as of the date first written above.

YOUNGEVITY INTERNATIONAL, INC.

By: _____
Name:
Title:


HERITAGE MAKERS, INC.

By: _____
Name:
Title:


REPRESENTING PARTIES:


_____
CHRISTOPHER LEE


_____
DOUG CLOWARD


_____
SHARON MURDOCH


_____
JUSTIN BIGGS


_____
BRYTT CLOWARD


*[Signature page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first written above.

YOUNGEVITY INTERNATIONAL, INC.

By: _____
Name:
Title:

HERITAGE MAKERS, INC.

By: _____
Name:
Title:

REPRESENTING PARTIES:

_____
CHRISTOPHER LEE

_____
DOUG CLOWARD

_____
SHARON MURDOCH

_____
JUSTIN BIGGS

_____
BRYTT CLOWARD

*[Signature page to Asset Purchase Agreement]*

Complaint
Exh. D
Page 142

**IN WITNESS WHEREOF**, the Parties have executed and delivered this Agreement as of the date first written above.

YOUNGEVITY INTERNATIONAL, INC.

By: _____
Name:
Title:

HERITAGE MAKERS, INC.

By: _____
Name:
Title:

REPRESENTING PARTIES:

_____
CHRISTOPHER LEE

_____
DOUG CLOWARD

_____
SHARON MURDOCH

_____
JUSTIN BIGGS

_____
BRYTT CLOWARD

**HM-3, LLC**

By: _____

Name:  CHRISTOPHER LEE

Title:  MANAGER

*EXECUTION VERSION*

## HM DISCLOSURE SCHEDULE

      This HM Disclosure Schedule (this "**Schedule**") is made and given pursuant to Article 5 of that certain Asset Purchase Agreement, dated as of August 7, 2013 (the "**Agreement**"), by and among Youngevity International, Inc., a Delaware corporation ("**YGYI**"), Heritage Makers, Inc., a Delaware corporation ("**HM**"), HM-3, LLC, a Utah limited liability company ("**HM-3**"), Christopher Lee ("**Lee**"), Doug Cloward ("**D. Cloward**"), Sharon Murdoch ("**Murdoch**"), Justin Biggs ("**Biggs**"), and Brytt Cloward ("**B. Cloward**" and together with HM-3, Lee, D. Cloward, Murdoch, and Biggs, the "**Representing Parties**").  All capitalized terms used but not defined herein shall have the meanings as defined in the Agreement, unless otherwise provided.

      The schedule numbers below correspond to the section numbers of the representations and warranties in the Agreement; provided, however, that any information disclosed herein under any schedule number shall be deemed to be disclosed and incorporated into any other schedule number in this Schedule to the extent it is reasonably apparent that such disclosure is applicable to such other schedule, whether or not repeated under any schedule number.  The non-numerical headings in this Schedule are for convenience only and shall not control or affect the meaning of this Schedule.

      Nothing in this Schedule is intended to broaden the scope of any representation or warranty contained in the Agreement or to create any covenant.  Inclusion of any item in this Schedule (1) does not represent a determination that such item is material or establish a standard of materiality, (2) does not represent a determination that such item did not arise in the ordinary course of business, (3) does not represent a determination that the transactions contemplated by the Agreement require the consent of third parties, (4) does not represent a determination that such item is required to be referred to or disclosed on this Schedule, and (5) shall not constitute, or be deemed to be, an admission to any third party concerning such item.  This Schedule includes brief descriptions or summaries of certain agreements and instruments, copies of which are available upon reasonable request.  Such descriptions do not purport to be comprehensive, and are qualified in their entirety by reference to the text of the documents described.

*EXECUTION VERSION*

## SCHEDULE 5.1

<u>Organization and Good Standing</u>

1.  HM is qualified to do business in Utah, and its Assets and employees are located in Utah.

2.  HM's independent consultants are located in all 50 states and in the following Canadian provinces: Alberta, British Columbia, Manitoba, New Brunswick, Nova Scotia, Ontario, and Saskatchewan.

*EXECUTION VERSION*

**SCHEDULE 5.2**

<u>Capitalization</u>

HM-3 owns 1,000 shares of the common stock of HM.

## SCHEDULE 5.4

<u>Conflicts; Authorizations</u>

1. The execution, delivery, and performance by HM of the Agreement and the other transaction documents to which HM is a party and the consummation of the transactions contemplated thereby will require the consent of and/or the waiver of the applicable terms by the other party to each of the following agreements:

   a. Lease Agreement (see Schedule 5.14).

   b. Services Agreement (see Schedule 5.17(a), item 4).

   c. Master Services Agreement (see Schedule 5.17(a), item 5).

   d. Merchant Application Processing Agreement (see Schedule 5.17(a), item 7).

   e. ISDN PRS, DSS Advanced or UAS Bulk Rated Agreement (see Schedule 5.17(a), item 9).

   f. Payment Gateway Merchant Service Agreement (see Schedule 5.17(a), item 10).

   g. Employer Services Agreement (see Schedule 5.17(a), item 14).

   h. Quick Confirmation Agreement (see Schedule 5.17(a), item 15).

2. The licenses and permits set forth on Schedule 5.11, items 1-3 are not transferable.

## SCHEDULE 5.5

Financial Statements/Internal Accounting Controls

1.  The Financial Statements are attached hereto.

2.  All liabilities associated with "Zero Dollar" points (given as marketing incentives) as of the Closing.  As of June 30, 2013, the "Zero Dollar" points outstanding were 318,872, which points are estimated to be valued at $63,774.

3.  All liabilities and obligations incurred or to be incurred in connection with the Top Achievers Club event to be held in January 2014.

4.  All liabilities and obligations incurred or to be incurred in connection with the Fall convention or conference.

5.  All liabilities and obligations arising under the executory contracts listed on Schedule 5.17(a).

6.  HM's monthly process for calculating deferred revenue and deferred expense associated with points is as follows:

    a.  Deferred revenue: HM defers revenue until points are used and the corresponding product is shipped or until points expire.  Revenue from points is recognized by adjusting the deferred revenue account on the balance sheet to match the deferred revenue report.  HM's IT department provides the accounting department with a spreadsheet report from the HM Studio web database that details points outstanding and corresponding cash paid for said points.  This report summarizes the deferred revenue balance (by points and cash paid for points), broken down by the month the points were purchased/issued.  As points are used or expire, they are eliminated from the report each month.  A journal entry is made in QuickBooks to adjust the general ledger deferred revenue balance.  The offsetting entry is recognized revenue.

    b.  Deferred costs: HM defers sales force commission and bonus costs and attempts to match them to revenue by deferring and recognizing costs in the same way revenues are deferred and recognized.  HM compares commission and bonus costs to sales booked each month.  The percentage that commission and bonus costs are to sales bookings in a given month is applied to the deferred revenue report (described above) to calculate deferred costs.  For example, if the deferred revenue balance from March 2013 purchases is $300,000 and the commission and bonus costs as a percentage of sales bookings for the corresponding period was 40%, then the deferred cost balance for March 2013 sales would be $120,000 ($300,000 X .40).  This same calculation is prepared for each of the prior twenty-four (24) months that still have points outstanding.  A journal entry is made in

QuickBooks to adjust the deferred cost balance.  The offsetting entry is recognized cost.

**SCHEDULE 5.5, ITEM 1 – ATTACHMENT**
**FINANCIAL STATEMENTS**

Case 3:16-cv-00704-BTM-JLB   Document 1   Filed 03/23/16   PageID.152   Page 152 of 199

*EXECUTION VERSION*

### SCHEDULE 5.6

<u>Title to Assets</u>

1.  See Schedule 5.4, item 1 (all subparts).

2.  See Schedule 5.12, items 2 and 3.

3.  See Schedule 5.14.

4.  See Schedule 5.15(b), item 2.

5.  See Schedule 5.17(a), items 10 and 24.

6.  See Schedule 5.23.

## SCHEDULE 5.7

<u>Inventory and Current Products</u>

HM offers the following Products:

| Item | Quantity on Hand as of June 30, 2013 |
|------|------|
| HM 12x12 Post-Album Page Protectors (10-pk) | 18,570 |
| HM 12x12 Storybook (Family Reunion) | 37 |
| HM 2013 Idea Book Spring/Summer | 7,058 |
| HM 7" HM Keepsake Bracelet Supply (10) | 211 |
| HM 8.5x11 Booklet Sample - HM Football | 112 |
| HM 8x10 Metal Prints | 18 |
| HM 8x8 Canvas Sample - "June" | 97 |
| HM 8x8 Sample Book (My Great Grandpa) | 99 |
| HM 8x8 Softbound Book Sample - Tucked In | 48 |
| HM Beautiful Shirt 2xl | 7 |
| HM Beautiful Shirt Large | 2 |
| HM Beautiful Shirt M | 9 |
| HM Beautiful Shirt Small | 5 |
| HM Beautiful Shirt XL | 7 |
| HM Book Sleeve 11.5x8.5 (yellow) | 123 |
| HM Book Sleeve 13x11 (purple) | 986 |
| HM Book Sleeve 5x5 (green) | 4,809 |
| HM Book Sleeve 7.5x10 (violet) | 1,332 |
| HM Book Sleeve 7x5 (orange) | 1,014 |
| HM Book Sleeve 8x8 (blue) | 3,080 |
| HM Book12x12 Book Cover | 81 |
| HM Build It Big DSWA Book | 26 |
| HM Business Builder Kit | 22 |
| HM Card Sampler | 66 |
| HM Charm Bracelet | 0 |
| HM Clearance! Idea Book 2012 Spring/Summer (25) | 13,775 |
| HM Connect Meeting Lanyards | 66 |
| HM Consultant Bag | 1,918 |
| HM Consultant Guide | 83 |

| Item | Quantity on Hand as of June 30, 2013 |
|---|---|
| HM Consultant Kit | 0 |
| HM Drawing Slips (100 slips) | 1,790 |
| HM Expanding Folder | 53 |
| HM Flipbook Sample - Sweet Boy | 87 |
| HM Flower Cadet Hat | 52 |
| HM Gift Bag | 360 |
| HM Host Coaching Cards (10) | 7,300 |
| HM Host Workshop Planners (25) | 21,850 |
| HM Idea Book Fall 2013 (64pg self cover) | 0 |
| HM Keepsake Necklace w/, Pendant Supply (10) | 2,357 |
| HM Lapboards (5 pack) | 580 |
| HM Love Mug | 41 |
| HM More Build It Big | 32 |
| HM New 2012-13 Your Story Your Way Magazine (10) | 16,440 |
| HM New Club HM Member Cards (10) | 3,950 |
| HM New Consultant training Cards (10) | 8,250 |
| HM Opportunity Brochure (25) | 14,500 |
| HM Order Forms (25) | 8,475 |
| HM Playing Card game Sample | 69 |
| HM Posts screw end sets PS4 | 1,800 |
| HM Read My Book Kid - M | 6 |
| HM Reunion Pen Pack | 137 |
| HM Sample Book 7x10 | 43 |
| HM Sample Product - 11.5x8.5 "Angelastro Family" | 110 |
| HM Sample Product - 8.5x11 Calendar | 292 |
| HM Sample Product - Post Album Book | 29 |
| HM Small Love Zip-Up Hoodie | 4 |
| HM Studio Art Sampler (10 Pack) | 5,100 |
| HM Studio Starter Guide (25) | 7,275 |
| HM Tradeshow Flyers (50) | 15,950 |
| HM Training DVD | 1,442 |
| HM Wood Blocks Reunion 2012 | 10 |
| HM Workshop Envelope | 3,810 |
| HM Workshop Invites (25) | 31,300 |
| HM Your Story Your Way Business Magazine (25) | 2,200 |

**SCHEDULE 5.9**

<u>Taxes</u>

1.  Federal and state corporate income taxes that will be incurred by HM in connection with the Transactions have not been provided for in the books and records of HM.

2.  HM is obligated to, and does, pay taxes in Canada.

*EXECUTION VERSION*

## SCHEDULE 5.11

<u>Licenses and Permits</u>

1. Utah State Tax Commission Sales Tax License and/or Use Tax Certificate of Registration, Account # J07179

2. Provo City Business License # 46953

3. HM pays sales taxes in the following jurisdictions and holds a sales tax license where required in such jurisdictions:

| | |
|---|---|
| AK | Kenai Peninsula Borough |
| | Others in consideration |
| AL | Seller Use |
| | City/County |
| | Alabaster |
| | Auburn |
| | Millbrook |
| | Montgomery |
| | Jefferson Co |
| | Montgomery Co |
| | AlaTax |
| | AlaRDS |
| | Birmingham |
| | STACS-Franklin Co. |
| | City of Prattville |
| | City of Hartselle |
| | STACS-Colbert Co. |
| | Helena |
| AR | State Return |
| AZ | State Return |
| | AZ RDS |
| | Chandler |
| | Mesa |
| | Peoria |
| | Phoenix |
| | Scottsdale |
| | Tucson |
| | Glendale |
| | Tempe |
| | Avondale |
| | Flagstaff |

*EXECUTION VERSION*

| | |
|---|---|
| CA | CA PrePay |
| | State Return |
| CO | State with PP, FR, and SPV RTA combined return |
| | Arvada |
| | Aurora |
| | Boulder |
| | Brighton |
| | Broomfield |
| | Centennial |
| | Colorado Springs |
| | Commerce |
| | Grand Junction |
| | Littleton |
| | Longmont |
| | Parker |
| | Thorton |
| | Westminster |
| | Castle Rock |
| CT | State Return |
| DC | State Return |
| DE | No Return |
| FL | State Return |
| GA | State Return |
| GU | No Return |
| HI | State Return |
| | Annual Reconciliation |
| IA | State Return |
| ID | State Return |
| IL | State Return |
| IN | State Return |
| KS | State Return |
| KY | State Return |
| LA | State Return |
| | Ascension |
| | Bienville |
| | Bossier City |
| | Caddo Shreveport |
| | Livingston |
| | Baton Rouge |
| | Desoto |

*EXECUTION VERSION*

|  | St. Landry |
|  | St. Tammany |
| MA | State Return |
| MD | State Return |
| ME | State Return |
| MI | State Return |
|  | Annual Reconciliation |
| MN | State Return |
| MO | State Return |
| MS | State Return |
| MT | No Return |
| NC | State Return |
| ND | State Return |
| NE | State Return |
| NH | No Return |
| NJ | State Return |
| NM | State Return |
| NV | State Return |
| NY | State Return |
| OH | State Return |
| OK | State Return |
| OR | No Return |
| PA | State Return |
| PR | No Return |
| RI | Payment |
|  | Annual Reconciliation |
| SC | State Return |
| SD | State Return |
| TN | State Return |
| TX | AAA TX PrePay |
|  | State Return |
| UT | State Return |
| VA | State Return |
| VT | State Return |
| WA | State Return |
|  | Longview, WA  B&O tax |
| WI | State Return |
| WV | State Return |
| WY | State Return |
| CAN | GST/HST -Canadian Return |

*EXECUTION VERSION*

## SCHEDULE 5.12

<u>Title to Personal Properties</u>

1. HM owns the following personal property with a current book value in excess of $5,000:

| Fixed Asset Category | Description |
|---|---|
| Computer Equipment | Mac Book Pro, accessories, Mac hard drive, external HD, Creative Suite, photoshop Elements |
| Computer Equipment | Patti Exp Rpt -2 Apple computers :Brytt's MacBoo Pro Retina SN: C02JP0JQDKQ2, Don L.'s - MacBook Pro C02GP22ZDV10 |

2. Certain cell phones used by employees for work purposes are owned by such employees (see Schedule 5.19(a), item 4).

3. The following UCC-1 Financing Statements (including any amendments and/or addendums thereto) have been filed in the jurisdictions listed below by the secured parties listed below with respect to certain assets (or potential assets) of HM, all as described in such financing statements:

| Secured Party | UCC-1 File Number | Jurisdiction |
|---|---|---|
| Xerox Corporation | 393974201146 | Utah |
| Dell Financial Services L.L.C. | 81645066 | Delaware |
| Xerox Corporation | 82623914 | Delaware |
| Xerox Corporation | 94195795 | Delaware |
| TCF Equipment Finance, Inc. | 00484364 | Delaware |

4. See Schedule 5.17(a), items 10 and 24.

## SCHEDULE 5.14

<u>Real Property</u>

    HM leases that certain real property located at 1837 South East Bay Blvd, Suite 201, Provo, Utah 84606 pursuant to the terms of that certain Lease Agreement dated September 25, 2006 with Dare Associates, L.C.

*EXECUTION VERSION*

## SCHEDULE 5.15

<u>Intellectual Property</u>

<u>Schedule 5.15(a)</u>

1.  HM owns the following domain names and the websites and information located thereat. HM has not applied for or received any copyrights with respect to the following.

    a.  heritagemakers.com
    b.  clubhm.com
    c.  tuckedin.com
    d.  whileimaway.org
    e.  iwishforyou.org
    f.  thestaryouare.org
    g.  thehmmall.com
    h.  myhmstudio.com
    i.  myheritagemakers.com
    j.  heritagemakers.biz
    k.  heritagemakers.info
    l.  heritagemakers.net
    m.  heritagemakers.org
    n.  heritage-makers.com
    o.  hmbeta.com
    p.  heratagemakers.com
    q.  heritigemakers.com
    r.  heritagemakers.co.uk

2.  Heritage Studio (the website) and all of the corresponding software, including the associated and integrated internal software Heritage utilizes to manage the increase and reduction of points.

3.  See Schedule 5.15(b), item 2.

4.  See Schedule 5.15(c).

5.  See Schedule 5.15(f).

<u>Schedule 5.15(b)</u>

1.  Each independent contractor that has done work for HM is required to enter into an Artist/Publisher License Agreement, the form of which has been provided to YGYI.

2.  Non-exclusive, perpetual software licenses have been issued to HM in connection with the following applications:

| Serial Number | Installed Applications |
| --- | --- |
| cronus | Adobe ColdFusion |
| hmfiler01 | Adobe ColdFusion |
| MXX65005R7 NA680 | Adobe ColdFusion |
| 8D7Y3H1 | Adobe ColdFusion |
| 8Y7SFN1 | Adobe ColdFusion |
| MXX65005R7 NA680 | Adobe ColdFusion 8 with JRun |
| 8D7Y3H1 | Adobe ColdFusion 9 with JRun |
| 8Y7SFN1 | Adobe ColdFusion 9 with JRun |
| 8Y7SFN1 | Adobe ColdFusion Builder |
| 8Y7SFN1 | Adobe Creative Suite  Design Standard |
| 8Y7SFN1 | Adobe Creative Suite  Web Premium |
| 8Y7SFN1 | Adobe Flash Builder |
| HDRKYJ1 | Adobe Photoshop Elements |
| 16BDQ81 | Adobe Photoshop Elements |
| HDRKYJ1 | AVG |
| HDRKYJ1 | AVG |
| 1JQDYD1 | AVG |
| 1JQDYD1 | AVG |
| 14HWY81 | AVG |
| 14HWY81 | AVG |
| 3GH0BG1 | AVG |
| 3GH0BG1 | AVG |
| DMW0CG1 | AVG |
| DMW0CG1 | AVG |
| HDH89C1 | AVG |
| HDH89C1 | AVG |
| 16BDQ81 | AVG |
| 16BDQ81 | AVG |
| HDRKYJ1 | AVG CloudCare |
| 1JQDYD1 | AVG CloudCare |
| 14HWY81 | AVG CloudCare |
| 3GH0BG1 | AVG CloudCare |
| DMW0CG1 | AVG CloudCare |
| HDH89C1 | AVG CloudCare |
| 16BDQ81 | AVG CloudCare |
| hmdc1 | AVG Remote Administration |
| 8Y7SFN1 | AVG Remote IT |
| HJ4JW61 | Camtasia Studio |
| 8D7Y3H1 | CCH ZIPproduct Manager |

*EXECUTION VERSION*

| Serial Number | Installed Applications |
|---|---|
| 8Y7SFN1 | CCH ZIPproduct Manager |
| 14HWY81 | CCScore |
| HDH89C1 | Charles |
| HDH89C1 | Charles |
| 8Y7SFN1 | Charles |
| MXX65005R7 NA680 | CollabNet Subversion |
| MXX65005R7 NA680 | FogBugz |
| 8Y7SFN1 | Git version |
| cronus | GoodSync |
| MXX65005R7 NA680 | HM Build PDF |
| 8D7Y3H1 | HM Build PDF |
| 8D7Y3H1 | HM ContentItemX Repair |
| MXX65005R7 NA680 | HM FTP Service |
| MXX65005R7 NA680 | HM Master Controller |
| MXX65005R7 NA680 | HM Postprocessor Service |
| MXX65005R7 NA680 | HM Preprocessor Service |
| MXX65005R7 NA680 | HM Production 3 Creator |
| 8D7Y3H1 | HM Production 3 Creator |
| MXX65005R7 NA680 | HM Production Creator |
| MXX65005R7 NA680 | HM Undelete Pages |
| MXX65005R7 NA680 | ImageGenerator |
| 8D7Y3H1 | ImageMagick -3 Q16 |
| 8Y7SFN1 | ImageMagick -3 Q16 |
| cronus | ImgBurn |
| 1JQDYD1 | IP Office Admin Suite |
| 14HWY81 | IP Office Admin Suite |
| 3GH0BG1 | IP Office Admin Suite |
| DMW0CG1 | IP Office Admin Suite |
| HDH89C1 | IP Office Admin Suite |
| HJ4JW61 | IP Office Admin Suite |
| 16BDQ81 | IP Office Admin Suite |

| Serial Number | Installed Applications |
|---|---|
| hmfiler01 | Ipswitch WS_FTP Pro |
| MXX65005R7 NA680 | Ipswitch WS_FTP Pro |
| MXX65005R7 NA680 | Java 2 SDK, SE |
| 8D7Y3H1 | Java 2 SDK, SE |
| 8Y7SFN1 | Java SE Development Kit 7 Update |
| DMW0CG1 | KODAK i1200 - Smart touch |
| HJ4JW61 | KODAK i1200 - Smart Touch |
| DMW0CG1 | KODAK i1210/i1220 Scanner |
| HJ4JW61 | KODAK i1210/i1220 Scanner |
| DMW0CG1 | Kodak s1220 Photo Scanning System |
| HJ4JW61 | Kodak s1220 Photo Scanning System |
| cronus | LogMeIn |
| MXX65005R7 NA680 | Macromedia ColdFusion MX |
| 6KR6G51 | Microsoft Exchange Server |
| 6KR6G51 | Microsoft Exchange Server Best Practices Analyzer Tool |
| hmdc1 | Microsoft Group Policy Management Console with SP1 |
| HDRKYJ1 | Microsoft IntelliPoint |
| HDRKYJ1 | Microsoft IntelliType Pro |
| 16BDQ81 | Microsoft Office 2003 Basic |
| 16BDQ81 | Microsoft Office 2003 PowerPoint |
| 16BDQ81 | Microsoft Office 2003 PowerPoint Viewer |
| 14HWY81 | Microsoft Office 2003 Professional |
| HJ4JW61 | Microsoft Office 2003 Professional |
| MXX65005R7 NA680 | Microsoft Office 2003 Web Components |
| 14HWY81 | Microsoft Office 2007 |
| accounting06 | Microsoft Office 2007 Basic |
| 1JQDYD1 | Microsoft Office 2007 Basic |
| 3GH0BG1 | Microsoft Office 2007 Basic |
| DMW0CG1 | Microsoft Office 2007 Basic |
| HDH89C1 | Microsoft Office 2007 Basic |
| 16BDQ81 | Microsoft Office 2007 Basic |
| 14HWY81 | Microsoft Office 2007 Professional Hybrid |
| 1JQDYD1 | Microsoft Office 2007 Service Pack 3 (SP3) |
| 14HWY81 | Microsoft Office 2007 Service Pack 3 (SP3) |
| 3GH0BG1 | Microsoft Office 2007 Service Pack 3 (SP3) |
| DMW0CG1 | Microsoft Office 2007 Service Pack 3 (SP3) |
| HDH89C1 | Microsoft Office 2007 Service Pack 3 (SP3) |

| Serial Number | Installed Applications |
|---|---|
| 16BDQ81 | Microsoft Office 2007 Service Pack 3 (SP3) |
| 8Y7SFN1 | Microsoft Office 2007 Service Pack 3 (SP3) |
| 8Y7SFN1 | Microsoft Office 2007 Visual Web Developer |
| HDRKYJ1 | Microsoft Office 2010 Home and Business |
| 8Y7SFN1 | Microsoft Office 2010 Home and Business |
| HDRKYJ1 | Microsoft Office 2010 Service Pack 1 (SP1) |
| 8Y7SFN1 | Microsoft Office 2010 Service Pack 1 (SP1) |
| HDRKYJ1 | Microsoft Office 2010 Single Image |
| 8Y7SFN1 | Microsoft Office 2010 Single Image |
| cronus | Microsoft Security Client |
| cronus | Microsoft Security Essentials |
| hmfiler01 | Microsoft SQL Server |
| 8Y7SFN1 | Microsoft SQL Server |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Analysis Services |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Backward compatibility |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Books Online |
| 8Y7SFN1 | Microsoft SQL Server 2005 Express Edition |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Integration Services |
| 8D7Y3H1 | Microsoft SQL Server 2005 Mobile Developer Tools |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Notification Services |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Performance Dashboard Reports |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Reporting Services |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Standard Edition |
| MXX65005R7 NA680 | Microsoft SQL Server 2005 Tools |
| 6KR6G51 | Microsoft SQL Server Desktop Engine |
| MXX65005R7 NA680 | Microsoft SQL Server Native Client |
| 8Y7SFN1 | Microsoft SQL Server Native Client |
| MXX65005R7 NA680 | Microsoft SQL Server Setup Support Files |
| 8Y7SFN1 | Microsoft SQL Server Setup Support Files |
| MXX65005R7 NA680 | Microsoft SQL Server VSS Writer |
| 8Y7SFN1 | Microsoft SQL Server VSS Writer |

| Serial Number | Installed Applications |
|---|---|
| hmdc1 | Microsoft Virtual Server 2005 |
| 8D7Y3H1 | Microsoft Visual Studio 2005 64bit Prerequisites (x64) - ENU |
| MXX65005R7 NA680 | Microsoft Visual Studio 2005 Premier Partner Edition - ENU |
| 8D7Y3H1 | Microsoft Visual Studio 2005 Remote Debugger (x64) - ENU |
| 8D7Y3H1 | Microsoft Visual Studio 2005 Team Edition for Software Developers - ENU |
| accounting06 | Microsoft Visual Studio 2005 Tools for Office Runtime |
| 8D7Y3H1 | Microsoft Visual Studio 2005 Tools for Office Runtime |
| accounting06 | QuickBooks |
| hmdc1 | QuickBooks |
| 14HWY81 | QuickBooks Premier Edition |
| hmdc1 | QuickBooks Premier Edition |
| accounting06 | QuickBooks Premier: Accountant Edition |
| hmdc1 | QuickBooks Premier: Accountant Edition |
| hmdc1 | QuickBooks Server |
| HJ4JW61 | QuickLink Mobile |
| 8D7Y3H1 | SeeFusion |
| cronus | Sentinel HASP Run-time |
| hmfiler01 | ServerProtect Normal Server |
| MXX65005R7 NA680 | ServiceCapture |
| hmfiler01 | SQL Delta |
| MXX65005R7 NA680 | SQL Delta |
| 8Y7SFN1 | SQL Server 2008 R2 SP1 Common Files |
| 8Y7SFN1 | SQL Server 2008 R2 SP1 Management Studio |
| MXX65005R7 NA680 | SQLXML4 |
| 14HWY81 | staticcr |
| hmdc1 | Symantec AntiVirus |
| hmdc1 | Symantec System Center |
| accounting06 | Tax Forms Helper 2011 |
| accounting06 | Tax Forms Helper 2012 |
| MXX65005R7 NA680 | Thumbnail Generator |
| 8D7Y3H1 | VisualSVN Server |
| HDRKYJ1 | Windows 7 Pro |
| 8Y7SFN1 | Windows 7 Pro |
| hmdc1 | Windows Server 2003 |

*EXECUTION VERSION*

| Serial Number | Installed Applications |
|---|---|
| 6KR6G51 | Windows Server 2003 |
| hmfiler01 | Windows Server 2003 |
| MXX65005R7 NA680 | Windows Server 2003 |
| hmfiler01 | Windows Server 2003 Service Pack |
| hmdc1 | Windows Server 2003 Service Pack 1 Administration Tools Pack |
| 8D7Y3H1 | Windows Server 2003 x64 |
| accounting06 | Windows XP Pro |
| cronus | Windows XP Pro |
| 1JQDYD1 | Windows XP Pro |
| 14HWY81 | Windows XP Pro |
| 3GH0BG1 | Windows XP Pro |
| DMW0CG1 | Windows XP Pro |
| HDH89C1 | Windows XP Pro |
| HJ4JW61 | Windows XP Pro |
| 16BDQ81 | Windows XP Pro |
| 1JQDYD1 | Windows XP Service Pack 3 |
| 14HWY81 | Windows XP Service Pack 3 |
| 3GH0BG1 | Windows XP Service Pack 3 |
| cronus | Zebra Font Downloader |
| cronus | Zebra Setup Utilities |

3.  See Schedule 5.17(a), items 2, 3, 4, 5, and 13.

Schedule 5.15(c)

1.  Pursuant to the Terms of Service (see Schedule 5.17(a), item 28), HM grants to each customer a "non-exclusive, non-transferable, nonsublicensable, limited right and license to access the Service, including any images, text, graphics, data, files, links and other materials incorporated into the Service (other than your Submissions), solely as made available by us, solely as necessary to access the Service and solely for your own personal, non-commercial, home purposes, provided that you keep intact all copyright and other proprietary notices."

2.  See Schedule 5.17(a), items 3, 5, and 29.

Schedule 5.15(f)

1.  HM owns the mark "ScanParty," registration # 3,474,294, which was registered with the United States Patent and Trademark office on July 22, 2008.

*EXECUTION VERSION*

*EXECUTION VERSION*

## SCHEDULE 5.17

<u>Contracts</u>

<u>Schedule 5.17(a)</u>

1.  Master Services Agreement and Account Request by and between HM and Veracity Networks dated October 5, 2012.

2.  IMN Hosted Services Agreement by and between HM and iMakeNews, Inc. dated July 1, 2010 and the corresponding IMN Services Order Form by and between HM and iMakeNews, Inc. dated effective August 1, 2010.

3.  Software Rental Agreement by and between HM and iCentris, Inc. dated January 5, 2010.

4.  Services Agreement by and between HM and Infotrax Systems, L.C. dated June 30, 2004.

5.  Master Services Agreement by and between HM and ZenPrint, LLC dated August 17, 2011 and the corresponding Statement of Work dated August 17, 2011.

6.  Lease/Rental Agreement by and between HM and Superior Water and Air, Inc., dated August 28, 2009.

7.  Merchant Application and Processing Agreement by and between HM and PowerPay dated August 14, 2006.

8.  Agreement by and between HM and Preferred CFO Solutions, L.C. dated January 2011.

9.  ISDN PRS, DSS Advanced or UAS Bulk Rated Agreement by and between HM and Qwest Corporation d/b/a CenturyLink QC dated October 12, 2011.

10. Payment Gateway Merchant Service Agreement by and between Patti Gardner and Authorize.Net dated September 14, 2012.

11. Rental Agreement by and between Heritage Makers, Inc. and Hasler dated February 18, 2010.

12. Insurance Policy by and between Heritage Makers, Inc. and Diversified Insurance Group and Sentinel Insurance Company, Limited with expiration of September 18, 2013.

13. Development Agreement by and between HM and Clever Coding LLC dated April 10, 2013.

14. Employer Services Agreement by and between HM and A Plus Benefits, Inc. dated August 8, 2006.

15. Quick Confirmation Agreement by and between HM and MSR Resort Lodging Tenant, LLC d/b/a Arizona Biltmore for events on August 7, 2013 through August 11, 2013.

16. 2013 Partner Agreement by and between HM and Deseret Book Company dated January 14, 2013.

17. American Express Card Acceptance Agreement entered into by HM.

18. Invoice # 802947 and Invoice # 802948 by and between HM and Destinations, Inc., each dated August 16, 2012.

19. Agreement by and between HM and Direct Selling Women's Alliance Inc., dated May 21, 2013.

20. Convertible Promissory Note #2 dated August 17, 2011 issued by ZenPrint, LLC in favor of HM in the original principal amount of $500,000.

21. Asset Purchase Agreement dated August 17, 2011 by and between ZenPrint, LLC, and HM (the "**ZenPrint Purchase Agreement**").

22. Bill of Sale dated August 2011 by and between ZenPrint, LLC and HM.

23. Pursuant to the ZenPrint Purchase Agreement, HM assigned its agreements with Dell Business Credit, TCF Equipment Finance, Inc. and Xerox Corporation to ZenPrint, LLC. However, such third parties have refused to consent to and recognize such transfers. Therefore, HM is ultimately liable for the obligations under such agreements.

24. HM has a version of Jetpack Mobile Hotspot contract that was moved to Patti Gardner's personal account to save money.  Patti is reimbursed the $40 per month cost.  The contract can be cancelled on June 14, 2014, or HM can pay the early termination fee.

25. Each of the independent consultants of the Company is required to agree to HM's Consultant Agreement Terms and Conditions and Heritage Makers Compensation Plan.

26. Each of the employees listed on Schedule 5.20(a), item 1, except Don Vance, has entered into an Agreement Concerning Confidentiality, Intellectual Property Rights and Distributorship.

27. When a customer buys points, it signs an agreement that includes terms and conditions of the purchase of points. Under HM's policy, sales consultants are to obtain a signed agreement from each customer pursuant to which the customer acknowledges the two-year term for all points.

28. Each customer of HM agrees to abide by HM's Terms of Purchase and Terms of Service.

29. Content License Agreement dated August 8, 2006 by and between HM and Scrap Girls, LLC.

30. See Schedule 5.14.

31. See Schedule 5.15(b), items 1 and 2.

32. All of the agreements under which the employee benefits set forth on Schedule 5.19(a), items 1-3 and 5 are provided.

Schedule 5.17(b)

See Schedule 5.4, item 1 (all subparts).

Schedule 5.17(d)

See Schedule 5.4, item 1 (all subparts).

*EXECUTION VERSION*

## SCHEDULE 5.18

<u>Litigation</u>

In early 2012, one of HM's customers notified HM through customer support that the customer was dissatisfied with the expiration of points on the customer's account.  The customer questioned the legality of such expirations and indicated she was considering legal remedies. HM's customer support responded with a reminder of the terms of HM's service contracts, which govern the use of points, and no further communication has occurred since then.

*EXECUTION VERSION*

## SCHEDULE 5.19

### Employee Benefits

Schedule 5.19(a)

1. Following a 30-day waiting period, each eligible employee of HM has the opportunity to participate in the following employee benefits:

    a. Paid time off ("**PTO**"): PTO is a combined paid leave benefit that coves vacation and sick days and may be used for any reason.

        i. Level 1

            1. Full-time A employees are required to work 40 hours per week to be eligible for PTO. If hours are between 35 and 40 per week, it is optional for an employee to use PTO to make sure such employee has 40 hours each week. PTO hours will automatically be used to bring an employee's hours to 40 per week if they fall below 35 hours per week. Working less than 30 hours per week will cause a probationary period for all benefits and reevaluation period with no PTO accrual until this period is over.

            2. Full-time B employees scheduled to work less than 40 but more than 30 hours, regular part-time and temporary employees or consultant/interns are not eligible for PTO.

            3. Full-time C employees (new or seasonal) have a 90-day evaluation period from hire date before benefits are determined and offered.

            4. PTO Accrual:

| Year | Monthly Accrual (per month) | Days per Year | Maximum Accrual | Max Carry Over |
|------|------------------------------|---------------|-----------------|----------------|
| Year 1 | 5.33 hours | 8 days | 6 days - 48 hrs. | 32 hrs. |
| Year 2 | 6.67 hours | 10 days | 8 days - 64 hrs. | 40 hrs. |
| Year 3 | 8.00 hours | 12 days | 10 days - 88 hrs. | 48 hrs. |
| Year 4 | 9.33 hours | 14 days | 12 days - 104 hrs. | 56 hrs. |
| Year 5 | 10.67 hours | 16 days | 14 days - 120 hrs. | 64 hrs. |

            5. Once an employee reaches the Maximum Accrual days indicated in the table above, PTO stops accruing. The employee will be required to use some of the employee's PTO time in order to start accruing PTO hours again.

6. Up to 50% of accrued Days Per Year at the end of the current year may be rolled to the next calendar year, but the same restrictions apply for Maximum Accrual.

7. Monthly Accrual amounts will change with payroll after the anniversary of the actual first day of Full-Time A employment.

ii. Level 2

1. Full-time Level 2 employees are required to work 40 hours per week to be eligible for PTO. PTO hours begin accruing immediately at hire date.

2. Regular part-time and temporary employees or consultants are not eligible for PTO.

3. PTO Accrual:

| Year | Monthly Accrual (per month) | Days per Year | Maximum Accrual | Max Carry Over |
|------|------|------|------|------|
| Year 1 | 6.67 hours | 10 days | 8 days - 64 hrs. | 40 hrs. |
| Year 2 | 8.67 hours | 13 days | 11 days - 88 hrs. | 52 hrs. |
| Year 3 | 10.67 hours | 16 days | 14 days - 112 hrs. | 64 hrs. |
| Year 4 | 12.67 hours | 19 days | 17 days - 136 hrs. | 76 hrs. |
| Year 5 | 14.00 hours | 21 days | 19 days - 152 hrs. | 84 hrs. |

4. Once an employee reaches the Maximum Accrual days indicated in the table above, PTO will stop accruing. The employee will be required to use some of the employee's PTO time in order to start accruing PTO hours again.

5. Up to 50% of accrued Days Per Year at the end of the current year may be rolled to the next calendar year, but the same restrictions apply for Maximum Accrual.

6. Monthly Accrual amounts will change with payroll after the anniversary of the actual first day of Full-Time Level 2 employment.

b. Holidays: New Year's Day, Civil Rights Day, Presidents Day, Memorial Day, Independence Day, Labor Day, Thanksgiving and the day after, Christmas Eve (half day) and Christmas (available for all full-time employees working 35 hours or more per week)

    c. Group health, dental, vision, disability, and life insurance, HSA, and FSA: Level 2 employees who choose to waive insurance coverage are offered a $100 per month stipend in place of what HM would have paid in premiums for their insurance coverage.  Contributions by HM to employee health plans are capped at $500 per month, and all plans require some participation by the employee.

    d. 401(k) retirement plan

2. A special employee discount on HM products is available for all current employees, their spouses, and children living in their homes.  In addition, HM employees receive a $30 credit each month to spend towards personal publishing.  Such credit can be redeemed at the employee-pricing rate.  Any costs or purchases above the $30 credit are charged at the employee-pricing rate.  Employees are not allowed to carry over points from one month to the next.  Special exception has been given to department head employees who may carry points over for up to three months.  As part of her benefits package, Patti Gardner does not have to pay for personal publishing.

3. Employees are reimbursed at a rate of $0.52 per mile for work-related travel.

4. The following employees receive the monthly cell phone and internet reimbursements indicated below:

| Name | Cell Phone Reimbursement | Internet Reimbursement |
|------|--------------------------|------------------------|
| Patti Gardner | $100 | $40 |
| Brytt Cloward | $100 | $40 |
| Ryan Harper | $80 | $40 |
| Don Lenhof | $40 | |
| Suzy Berg | $40 | |
| Bryndi Cloward | $40 | |

5. Wendy McGee receives a $750 car allowance each month that she qualifies as a Diamond Executive.

6. See Schedule 5.20(a), items 1 and 2.

*EXECUTION VERSION*

**SCHEDULE 5.20**

Labor and Employment Matters

Schedule 5.20(a)

    1.  Employee Compensation:



CONFIDENTIAL INFORMATION REDACTED

        The employees listed above may also be eligible to receive an annual bonus based on the achievement of HM's objectives.

    2.  In general, the HM consultant compensation plan is designed to pay out approximately 45% compensation on sales volume.  This includes a 2-3% host reward program and a 3-5% TAC program. Bonuses and commissions alone have been averaging approximately 38% over the last 12 months.  The HM consultant compensation plan consists of a primary bonus, secondary bonus, and team building bonus.  Secondary bonuses are commission bonuses and are paid bi-monthly.  The other bonuses are paid once per month.  Additional details are set forth in the HM Compensation Guide for consultants.

3.  See Schedule 5.19(a), items 1-4.

## SCHEDULE 5.22

Insurance

Business Owners Policy, Sentinel Insurance Company, Limited, policy # 34 SBA PN1682 SC.

*EXECUTION VERSION*

## SCHEDULE 5.23

<u>Product Warranty</u>

HM offers the Heirloom Assurance product warranty, which allows any customer the chance to buy a replacement of a damaged product at half the current retail price.

*EXECUTION VERSION*

## SCHEDULE 5.25

Suppliers and Customers

Substantially all HM product orders are fulfilled by ZenPrint, LLC.

*EXECUTION VERSION*

**SCHEDULE 5.26**

<u>Consultants</u>

Consultants join and leave the Business each month in varying numbers.

### SCHEDULE 5.27

<u>Bank Accounts</u>

1.  HM has bank accounts at Zions Bank and Bank of American Fork.

2.  Chris Lee, Patti Gardner, and Don Vance have access to HM's bank accounts.

*EXECUTION VERSION*

## SCHEDULE 5.30

<u>Arms-Length Transactions</u>

1. Chris Lee is a board member of ZenPrint, LLC and owns a minor ownership interest in such entity.

2. See Schedule 5.17(a), items 10 and 24.

*EXECUTION VERSION*

**SCHEDULE 5.31**

<u>Solvency</u>

None.

*EXECUTION VERSION*

## SCHEDULE 7.7(d)

<u>Employees – Paid Time Off</u>

As of August 13, 2013

<u>Employee</u>                                <u>PTO</u>

CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

# EXHIBIT E

## NONDISCLOSURE AGREEMENT

**AGREEMENT**, made this _le_ day of _January_, 20_14_ between **Youngevity International, Inc**, a Delaware corporation with a principal place of business located at 2400 Boswell Road, Chula Vista, CA 91914 ("Youngevity"), and _Patti Gardner_, Youngevity employee ("Employee").

**WHEREAS**, it is agreed:

1.  Information of any kind pertaining to Youngevity's business, whether disclosed orally or in writing, and all other written Information which does not pertain to Youngevity's business but which is marked by the disclosing party as "Confidential" or "Proprietary", shall be treated by employee as secret and confidential. It is the Company's policy to ensure that all operations, activities and business affairs of the Company and business associates are kept confidential to the greatest extent possible. Confidential information includes all non-public information that might be of use to competitors, or that might be harmful to the Company or its clients if disclosed.

2.  Employee acknowledges and agrees that, in the event of any breach of any provision of this Agreement could result in Company imposed sanction, up to and including dismissal. Youngevity shall also be entitled to enforce such provisions by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other rights or remedies which it may have at law or in equity.

3.  The obligations herein shall not apply to information which is already publicly available.

4.  Youngevity is a publicly traded company. It is important that any information, whether it is positive or negative, be distributed to all shareholders at the same time so that no shareholder has information that other shareholders do not. Youngevity creates press releases and telephonic press conferences to inform members of the public simultaneously. It is critical that the public receive information from the Company through the proper channels. As such, non-public information cannot be shared with any outside source or persons and cannot be used by you for the purpose of buying or selling stock. Anyone providing material, non-public information to any outside source, or personally using such information, is in violation of securities laws and the Company's Prohibition of Insider Trading Policy. Any violation of this policy could result in Company imposed sanction, up to and including dismissal.

5.  This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

6.  The Company will ask from time to time to sign Nondisclosure Agreements such as this agreement.

_Patti Gardner_                    _1-13-2014_
Employee Signature                 Date

_Patti Gardner_
Print Name

## NONDISCLOSURE AGREEMENT

**AGREEMENT**, made this ___7___ day of ___Jan___, 20_14_ between **Youngevity International, Inc**, a Delaware corporation with a principal place of business located at 2400 Boswell Road, Chula Vista, CA 91914 ("Youngevity"), and ___Brytt Cloward___, Youngevity employee ("Employee").

**WHEREAS**, it is agreed:

1. Information of any kind pertaining to Youngevity's business, whether disclosed orally or in writing, and all other written Information which does not pertain to Youngevity's business but which is marked by the disclosing party as "Confidential" or "Proprietary", shall be treated by employee as secret and confidential. It is the Company's policy to ensure that all operations, activities and business affairs of the Company and business associates are kept confidential to the greatest extent possible. Confidential information includes all non-public information that might be of use to competitors, or that might be harmful to the Company or its clients if disclosed.

2. Employee acknowledges and agrees that, in the event of any breach of any provision of this Agreement could result in Company imposed sanction, up to and including dismissal. Youngevity shall also be entitled to enforce such provisions by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other rights or remedies which it may have at law or in equity.

3. The obligations herein shall not apply to information which is already publicly available.

4. Youngevity is a publicly traded company. It is important that any information, whether it is positive or negative, be distributed to all shareholders at the same time so that no shareholder has information that other shareholders do not. Youngevity creates press releases and telephonic press conferences to inform members of the public simultaneously. It is critical that the public receive information from the Company through the proper channels. As such, non-public information cannot be shared with any outside source or persons and cannot be used by you for the purpose of buying or selling stock. Anyone providing material, non-public information to any outside source, or personally using such information, is in violation of securities laws and the Company's Prohibition of Insider Trading Policy. Any violation of this policy could result in Company imposed sanction, up to and including dismissal.

5. This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

6. The Company will ask from time to time to sign Nondisclosure Agreements such as this agreement.

_____     __1/7/14__
Employee Signature                                      Date

_Brytt Cloward_
Print Name

## NONDISCLOSURE AGREEMENT

AGREEMENT, made this 3 day of January, 2014, between **Youngevity International, Inc,** a Delaware corporation with a principal place of business located at 2400 Boswell Road, Chula Vista, CA 91914 ("Youngevity"), and Michael Casperson, Youngevity employee ("Employee").

**WHEREAS,** it is agreed:

1. Information of any kind pertaining to Youngevity's business, whether disclosed orally or in writing, and all other written Information which does not pertain to Youngevity's business but which is marked by the disclosing party as "Confidential" or "Proprietary", shall be treated by employee as secret and confidential. It is the Company's policy to ensure that all operations, activities and business affairs of the Company and business associates are kept confidential to the greatest extent possible. Confidential information includes all non-public information that might be of use to competitors, or that might be harmful to the Company or its clients if disclosed.

2. Employee acknowledges and agrees that, in the event of any breach of any provision of this Agreement could result in Company imposed sanction, up to and including dismissal. Youngevity shall also be entitled to enforce such provisions by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other rights or remedies which it may have at law or in equity.

3. The obligations herein shall not apply to information which is already publicly available.

4. Youngevity is a publicly traded company. It is important that any information, whether it is positive or negative, be distributed to all shareholders at the same time so that no shareholder has information that other shareholders do not. Youngevity creates press releases and telephonic press conferences to inform members of the public simultaneously. It is critical that the public receive information from the Company through the proper channels. As such, non-public information cannot be shared with any outside source or persons and cannot be used by you for the purpose of buying or selling stock. Anyone providing material, non-public information to any outside source, or personally using such information, is in violation of securities laws and the Company's Prohibition of Insider Trading Policy. Any violation of this policy could result in Company imposed sanction, up to and including dismissal.

5. This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

6. The Company will ask from time to time to sign Nondisclosure Agreements such as this agreement.

Employee Signature                    1/3/14
                                      Date

Michael A. Casperson
Print Name

From: John taylor   Fax: (385) 200-7710   To: +13109341002   Fax: +18009987020   Page 4 of 6   10/21/2017 2:43:42

## NONDISCLOSURE AGREEMENT

**AGREEMENT**, made this ⟨2 day of _January_ 20 14 between **Youngevity International, Inc**, a Delaware corporation with a principal place of business located at 2400 Boswell Road, Chula Vista, CA 91914 ("Youngevity"), and _Marin Barney_, Youngevity employee ("Employee").

**WHEREAS**, it is agreed:

1. Information of any kind pertaining to Youngevity's business, whether disclosed orally or in writing, and all other written Information which does not pertain to Youngevity's business but which is marked by the disclosing party as "Confidential" or "Proprietary", shall be treated by employee as secret and confidential. It is the Company's policy to ensure that all operations, activities and business affairs of the Company and business associates are kept confidential to the greatest extent possible. Confidential information includes all non-public information that might be of use to competitors, or that might be harmful to the Company or its clients if disclosed.

2. Employee acknowledges and agrees that, in the event of any breach of any provision of this Agreement could result in Company imposed sanction, up to and including dismissal. Youngevity shall also be entitled to enforce such provisions by temporary or permanent injunctive or mandatory relief obtained in an action or proceeding instituted in any court of competent jurisdiction without the necessity of proving damages and without prejudice to any other rights or remedies which it may have at law or in equity.

3. The obligations herein shall not apply to information which is already publicly available.

4. Youngevity is a publicly traded company. It is important that any information, whether it is positive or negative, be distributed to all shareholders at the same time so that no shareholder has information that other shareholders do not. Youngevity creates press releases and telephonic press conferences to inform members of the public simultaneously. It is critical that the public receive information from the Company through the proper channels. As such, non-public information cannot be shared with any outside source or persons and cannot be used by you for the purpose of buying or selling stock. Anyone providing material, non-public information to any outside source, or personally using such information, is in violation of securities laws and the Company's Prohibition of Insider Trading Policy. Any violation of this policy could result in Company imposed sanction, up to and including dismissal.

5. This Agreement shall be construed and interpreted in accordance with the laws of the State of California.

6. The Company will ask from time to time to sign Nondisclosure Agreements such as this agreement.

_____     1-6-14
Employee Signature                            Date

_Marin Barney_
Print Name

# EXHIBIT F

## CONSULTING AGREEMENT
### *AL INTERNATIONAL, INC. & LIVINITY, INC.*

**THIS CONSULTING AGREEMENT** ("Agreement") is made and entered into as of the _10_ day of July, 2012, by and among AL International, Inc., a publicly traded Delaware corporation, with offices located at 2400 Boswell Road, Chula Vista, California (hereinafter "Company") and Livinity, Inc., a Kansas corporation, with offices located at 802 North Maple, Russell, Kansas, (hereinafter "Consultant").    Collectively referred to as the "Parties"

**WHEREAS,** Consultant is recognized as an expert in multilevel marketing and specifically marketing of the Livinity line of services and goods; and

**WHEREAS,** the Company desires to retain Consultant to provide services related to and in support of efforts in which Consultant has expertise;

**WHEREAS,** Company and Consultant have executed a Bill of Sale and Consignment Agreement with respect to the Livinity business, inventory and intellectual property; now

**THEREFORE,** in consideration of the mutual conditions and promises herein contained, the Parties agree as follows:

**1.** **Consulting Services.** Consultant shall furnish the Company with its best effort, advice, information, judgment and knowledge with respect to the promotion of the Company and its direct sales and multi-level marketing plan and more specifically to the maintenance of the Livinity business distributor down-line.

**2.** **Term.** The term of this Agreement shall begin on July 1, 2012, and shall, subject to the provisions for termination set forth herein, continue for a period of 48 months.    This Agreement is not renewable.

**3.** **Compensation.** CONFIDENTIAL INFORMATION REDACTED

CONFIDENTIAL INFORMATION REDACTED

Page 1 of  6

# CONFIDENTIAL INFORMATION REDACTED

**4.     Confidential Information, Non-Circumvention and Intellectual Property.**

a)   Consultant shall maintain in strict confidence, and not use or disclose except pursuant to written instructions from the Company, any Confidential Information (as defined below) of the Company, for so long as the pertinent data or information remains Confidential.   The obligation to protect the confidentiality of any such information or data shall not be excused if such information or data ceases to qualify as Confidential Information as a result of the acts or omissions of Consultant.

b) The termination of this Agreement for any reason whatsoever does not terminate Consultant's duties and obligations to maintain the Confidential Information strictly confidential.

c)   Consultant may disclose Confidential Information pursuant to any order or legal process requiring the disclosing party (in its legal counsel's reasonable opinion) to do so, provided that the request or order to so disclose the Confidential Information in sufficient time to

Page 2 of  6

Complaint
Exh. F

allow the Company to seek an appropriate protective order.

DEFINITION:  "Confidential Information" shall mean any nonpublic information of a competitively sensitive or personal nature, other than Trade Secrets, acquired by Consultant in connection with performing services for the Company, including (without limitation) oral and written information concerning the Company's financial positions and results of operations (revenues, margins, assets, net income, etc.)), annual and long-range business plans, marketing plans and methods, account invoices, oral or written customer information, and personnel information.
DEFINITION:  "Company" shall include the Company and all of its direct and indirect subsidiaries and any predecessors of the Company.

    d)  Consultant may not use any of the Confidential Information and/or business contacts, information regarding distributors/vendors/suppliers and other business associates of Company, or other types of confidential and proprietary business information transmitted to Consultant by Company, for the purpose of circumventing Company's business operations.

    e) In the event Consultant shall breach, violate or threaten to violate the provisions of this Section, damages at law will be an insufficient remedy and the Company shall be entitled to equitable relief including but not limited to injunction, monetary damages, punitive damages, and specific liquidated damages in the amount of the prior years earnings for disclosure of Confidential Information and/or use of such information to solicit company's customers. In addition, other remedies or rights available to the Company and no bond or security will be required in connection with such equitable relief.

    f)  The existence of any claim or cause of action that Consultant may have against the Company will not at any time constitute a defense to the enforcement by the Company of the restrictions or rights provided by this Section, but the failure to assert such claim or cause of action shall not be deemed to be a waiver of such claim or cause of action.

5.    **Original Works of Authorship** that result from the performance by Consultant of his duties hereunder, are deemed to be "works made for hire" under the copyright laws of the United States, and will be and will remain the sole and exclusive property of the Company. Consultant, at the Company's request and expense, will assign to the Company in perpetuity all proprietary

rights that he may have in such works of authorship. Should the Company elect to register claims of copyright to any such works of authorship, Consultant will, at the expense of the Company, do such things, sign such documents and provide such reasonable cooperation as is necessary for the Company to register such claims, and obtain, protect, defend and enforce such proprietary rights. Consultant shall have no right to use any trademarks or proprietary marks of the Company without the express, prior written consent of the Company regarding each use.

6.    **Acts Discreditable.** Consultant shall at all times refer to Company and its operating units in terms that further its business objectives. Consultant shall not refer to Company or its operating units in a manner that damages Company's position in the marketplace.

7.    **Termination.** This Agreement may be terminated by either party upon written notice if the other party breaches any of its obligations hereunder and the breaching party fails to cure such breach within thirty (30) days after receipt of notice of such breach.

8.    **Severable Provisions.** The provisions of this Agreement are severable, and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions, and any partially enforceable provision to the extent enforceable in any jurisdiction, shall nevertheless be binding and enforceable.

9.    **Binding Agreement.** The rights and obligations of the Company under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Company. The rights, obligations and duties of Consultant hereunder may not be assigned or delegated without the Company's prior written consent.

10.    **Relationship of Parties.** The Consultant is an independent contractor. Both parties acknowledge and agree that Consultant's engagement hereunder is not exclusive and that either party may provide to, or retain from, others similar such services provided that it does so in a manner that does not otherwise breach this Agreement. Neither party is, nor shall claim to be, a legal agent, representative, partner or employee of the other, and neither shall have the right or authority to contract in the name of the other nor shall it assume or create any obligations, debts, accounts or liabilities for the other.

11.    **Notices.** Any notices or other communications required or permitted under this

Page 4 of  6

Agreement shall be in writing and shall be deemed to have been duly given and delivered when delivered in person, two (2) days after being mailed postage prepaid by certified or registered mail with return receipt requested, or when delivered by overnight delivery service or by facsimile to the recipient at the following address or facsimile number, or to such other address or facsimile number as to which the other party subsequently shall have been notified in writing by such recipient:

If to the Company:    AL International, Inc.
2400 Boswell Road
Chula Vista, California 91914
Attention: Steve Wallach, CEO
Facsimile: 619-934-5009

If to the Consultant:    Livinity, Inc.
802 North Maple
Russell KS 67665
Attention: Dave and Barb Pitcock
[company fax]

**12.    Waiver.** Either party's failure to enforce any provision or provisions of this Agreement shall not in any way be construed as a waiver of any such provision or provisions as to future violations thereof, nor prevent that party thereafter from enforcing each and every other provision of this Agreement. The rights granted the parties herein are cumulative and the waiver by a party of any single remedy shall not constitute a waiver of such party's right to assert all other legal remedies available to him or it under the circumstances.

**13.    Governing Law.** This Agreement will be governed by and interpreted in accordance with the substantive laws of the State of California without reference to conflicts of law.   Venue shall be in the Superior Court of California, County of San Diego, South County Branch Court.

**14.    Captions and Section Headings.** The various captions and section headings contained in this Agreement are inserted only as a matter of convenience and in no way define, limit or extend the scope or intent of any of the provisions of this Agreement.

**15.    Entire Agreement.** With respect to its subject matter, this Agreement and its Exhibits

Page 5 of  6

constitute the entire understanding of the parties superseding all prior agreements, understandings, negotiations and discussions between them whether written or oral, and there are no other understandings, representations, warranties or commitments with respect thereto.

**IN WITNESS WHEREOF,** the parties have executed this Agreement effective as of the date first written above.

AL International, Inc.

By: _____
Steve Wallach, CEO

Consultant, Livinity, Inc., Consultant:

By: _____
Dave Pitcock, President

Page 6 of 6