Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Jonathan W. Emord, Esq.  (pro hac vice)
jemord@emord.com
Eric A. Awerbuch, Esq.  (pro hac vice)
eawerbuch@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361
Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

YOUNGEVITY INTERNATIONAL CORP., a Delaware corporation; and JOEL D. WALLACH, DVM, ND, a California resident,

Plaintiffs,

v.

TODD SMITH, an individual and Utah resident; WAKAYA PERFECTION, a Utah corporation; TOTAL NUTRITION TEAM D/B/A TNT, a Utah corporation; BLAKE GRAHAM, an individual and Utah resident; WILLIAM ANDREOLI, an individual and New Hampshire resident; ANDRE VAUGHN, an individual and Maryland resident; DAVE PITCOCK, an individual and Kansas resident; PATTI GARDNER, an individual and Utah resident; BRYTT CLOWARD an individual and Utah resident; and DOES 1–10, inclusive.

Case No. 3:16-cv-00704-W-JLB

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEFFOR:**

1. Intentional Interference with Prospective Economic Advantage;

2. Intentional Interference with Contract/Inducing Breach of Contract;

3. Breach of Contract;

4. Misappropriation of Trade Secrets (Cal. Civ. Code § 3426);

5. Misappropriation of Likeness (Cal. Civ. Code § 3344)

6. Lanham Act (15 U.S.C. 1125);

7. Breach of Fiduciary Duty;

8. Unfair Competition (Cal. B & P Code § 17200); and

9. False Advertising (Cal. B&P Code §§ 17500, *et seq.*).

|  | |
|---|---|
| Defendants. | JURY TRIAL DEMANDED |

## FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1.      Plaintiffs Youngevity International Corp. ("YGYI" or "Youngevity") and Joel D. Wallach, BS, DVM, ND, by counsel, file this First Amended Complaint for Damages and Injunctive Relief against the above-named Defendants.  Plaintiff YGYI filed its original Complaint (Dkt. 1) on March 23, 2016.  It completed service on all defendants on April 1, 2016 (Dkt. 14).

2.      This is an action for intentional interference with business relations, inducement of breach of contract, breach of contract, misappropriation of trade secrets, misappropriation of likeness, violations of the Lanham Act, breach of fiduciary duty, unfair competition, and false advertising.  For at least the past year, the Defendants have conspired and acted in concert to interfere with Youngevity business operations, Youngevity contractual relations, and Youngevity distributor relations in order to convert business opportunities meant for Youngevity to their own competing multi-level marketing startup, doing so maliciously and in breach of fiduciary duties, while for much of that time serving as either top executives of or top level distributors in Youngevity.

3.      The Defendants have betrayed their unique positions of trust and confidence in Youngevity by diverting Youngevity resources and business opportunities to their own competing venture and inducing formerly loyal Youngevity distributors and Youngevity employees to breach their contracts with Youngevity and assist in building that competing enterprise, Wakaya Perfection, LLC, a Utah-based multi-level marketing company operated by them ("Wakaya"). The Defendants took unlawful actions from within Youngevity, preying on the trust, confidence, and prominence they had within Youngevity and using confidential and trade secret information to which they had unique access to induce

breaches of contract and to convert business opportunities intended for Youngevity to Wakaya.

4.      The Defendants have thus built their competing business unlawfully at Youngevity's expense.  Acting with malice and with the intent to cause permanent and lasting injury to Youngevity, the Defendants have employed tactics of tortuous interference, misappropriation, inducement to breach contract, breach of contract, breach of fiduciary duty, and unfair competition.

5.      The company created by the Defendants, Wakaya, has been organized, initiated, and operated as an unlawful pyramid scheme in violation of state and federal law.

## I.      PARTIES

**The Plaintiff:**

6.      Organized in 1997, Plaintiff Youngevity, a publicly traded company, operates under the laws of Delaware with its principal place of business in Chula Vista, California.  Youngevity develops and distributes consumer products through a global network of independent, direct-sellers known as "distributors." Youngevity is a successful, nineteen year-old company that operates through direct selling networks worldwide, as well as wholly owned subsidiaries, including, e.g., AL Global Corporation; CLR Roasters, LLC; Financial Destinations, Inc.; and FDI Management, Inc.

7.      Originally a domestic company that sold specialty liquid based vitamin and mineral formulas created by plaintiff Dr. Joel D. Wallach, BS, DVM, ND ("Dr. Wallach"), Youngevity has fulfilled Dr. Wallach's vision of becoming a global enterprise, selling a wide range of consumer and lifestyle products, including, but not limited to, health, food, gourmet coffee, wellness, beauty, cosmetic, high-end clothing, photo organization and ancestry, and jewelry products to consumers globally through its distributor network.  Distributors generally sell through peer-to-peer relationships, e-commerce, and social marketing.

Youngevity's distributors market products through corporate-backed marketing channels, including internet websites, media, trade shows, lectures, community events, local shops, and home meetings.  Youngevity invests more than seventy million dollars annually on sales, incentives, and marketing efforts to support its distributor networks.  Youngevity now sells in excess of 1,000 products, including, but not limited to, nutritional products, sports and energy drinks, health and wellness-related services, lifestyle products, gourmet coffees, and cosmetics.

8.     Through its charity, Youngevity Be the Change Foundation, Youngevity directs hundreds of thousands of dollars and a large volume of clothing and consumer goods annually to those in need around the world and to other charities that serve veterans and the needy.

9.     Youngevity's subsidiary owns a 1,000-acre Coffee Plantation in Nicaragua.  The Plantation holds the unique distinction of being Fair Trade, Organic, Rain Forest Alliance and Bird Friendly certified.  Through its own foundation and from its Fair Trade Certification, Youngevity has invested hundreds of thousands of dollars to provide modern housing and a hydroelectric plant for the one hundred and eighty families who live and work on the plantation. Additionally, Youngevity has opened a school on the plantation to provide Kindergarten through 8th grade education for the children of the families residing there.

10.     Youngevity is publicly traded under the symbol:  YGYI.

11.     Plaintiff Dr. Wallach is an individual and resident of California.  Dr. Wallach has been actively involved with biomedical research and clinical medicine for more than five decades.  His research resulted in the publication of more than seventy peer-reviewed and refereed journal articles in diverse fields including veterinary medicine, veterinary pathology, comparative pathology, nutrition, and pharmaceutical research.

12.     Dr. Wallach founded American Longevity Corporation in 1997, which became Youngevity in 2006.  Youngevity has grown and thrived under Dr. Wallach's direction, and as a result of his research and reputation.

13.     Dr. Wallach is a celebrity within the field of nutrition and in the direct selling market.  He is a frequent speaker or lecturer on nutritional science and medicine.  Youngevity's expressed approval or authorization is always required before anyone may make use of Dr. Wallach's name or likeness in commerce.  Youngevity and Dr. Wallach reserve the right to withdraw that permission within their sole discretion and at any time.

**The Defendants:**

14.     Defendant Wakaya Perfection ("Wakaya" or "Wakaya Perfection") is a limited liability company formed and operated under the laws of the State of Utah. Wakaya lists just one founding member in its documentation filed with the Utah Secretary of State:  Todd Smith.  Mr. Smith has identified himself in other papers as the sole member and founder of Wakaya Perfection LLC.  Wakaya is a Utah resident and business for jurisdictional purposes.

15.      From 1997until March of 2016, Todd Smith was a top level Youngevity distributor.  Wakaya is a multi-level marketing company that competes directly with Youngevity.

16.     Through improper and unlawful means, and trade on the trust and confidence of their prominent Youngevity positions, Wakaya's owners, operators, and promoters (all of whom were affiliated with Youngevity as officers, employees, or top level distributors) have interfered with and injured Youngevity's business interests by, *inter alia*:  unlawfully inducing Youngevity employees and distributors to violate Youngevity contractual agreements; intentionally converting business opportunities intended for Youngevity to Wakaya by falsely representing that they had authority to make acquisition decisions for Youngevity and diverting those opportunities to Wakaya; disseminating false information concerning

Youngevity's business and financial health to induce distributors to subscribe to the erroneous view that Youngevity was failing in order to induce them to affiliate with Wakaya; aiding and facilitating the unauthorized use of Youngevity's intellectual property to divert business opportunities and commissions from Youngevity to Wakaya; and committing other acts of unfair competition through deceptive marketing, promotional, and advertising claims (performance and comparative claims).

17.     Todd Smith served as a trusted, top-level distributor in Youngevity, and had ownership interests in entities that distributed Youngevity products. While a top-level distributor for Youngevity, yet acting as an undisclosed agent for Wakaya, and serving the interests of Wakaya, Smith intentionally converted Youngevity business opportunities through misrepresentation, subterfuge, and deceit.  Smith has facilitated, aided, and abetted the violation of Youngevity contractual agreements in an effort to induce Youngevity distributors to breach their contracts with Youngevity and to cause business opportunities meant for Youngevity to be diverted to Wakaya.  Smith has encouraged or solicited Youngevity distributors to take actions that violate their contractual agreements with Youngevity.  He has disseminated false and misleading information concerning Youngevity's finances and financial standing in an effort to disparage Youngevity and thereby draw distributors and business away from Youngevity and to Wakaya.  He has falsely represented himself to be authorized by Youngevity to negotiate and consummate acquisition contracts for Youngevity acquisitions, only to conceal and divert at least one offer meant for Youngevity to Wakaya.

18.     William "Bill" Andreoli is an individual and resident of the state of New Hampshire.  Andreoli has undisclosed personal financial interests in Wakaya Perfection.  Through November of 2015, Andreoli served as President of Youngevity, received a seven figure salary of pay, stock, and benefits, and received commissions as a Youngevity distributor.  While acting as an undisclosed

agent for Wakaya, and serving the interests of Wakaya, Andreoli breached his contractual agreements with Youngevity for the purpose of helping create and advance the interests of Wakaya.  Andreoli acted to injure Youngevity while serving as Youngevity's President, aiding and abetting the unlawful poaching of Youngevity business opportunities and inducing Youngevity employees and distributors to breach their contracts with Youngevity to work for, and assist in the promotion of, Wakaya.  Andreoli also violated his fiduciary duty to Youngevity by placing his family and friends in profitable positions within Youngevity's marketing chain without approval from Youngevity.

19.     Andre Vaughn is an individual and resident of the state of Pennsylvania.  Vaughn served as a top-level distributor in Youngevity until March of 2016.  A confidant of Andreoli, Vaughn is now a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants, Vaughn while still a Youngevity distributor induced breach of Youngevity contractual agreements in an effort to secure business opportunities for Wakaya from Youngevity distributors.  Vaughn has encouraged or solicited Youngevity distributors to violate their contractual agreements with Youngevity.  As part of his effort to induce such breaches, Vaughn has falsely disparaged the company, claiming it to be financially bereft and teetering on the brink of dissolution or bankruptcy.

20.     Dave Pitcock is an individual and resident of the state of Kansas.  Pitcock served as a top-level distributor in Youngevity until March of 2016, and held ownership interests in the Livinity Corporation, which Youngevity purchased from Pitcock in 2012.  As part of that agreement, Pitcock entered into a consulting agreement with Youngevity containing non-compete and nondisclosure clauses.  While still a Youngevity distributor and subject to the consulting agreement, Pitcock became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants while still a

Youngevity distributor, Pitcock has induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Pitcock has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  As part of his effort to induce such breaches, Pitcock has falsely disparaged the company, claiming it to be financially bereft and teetering on the brink of dissolution or bankruptcy.

21.     Total Nutrition, Inc., d/b/a "TNT," is a corporation organized and operated under the laws of Utah since 1996 and, until March of 2016, a Youngevity distributor.  Founded by and owned by Todd Smith and Blake Graham, both residents of Utah, TNT distributed Youngevity nutritional products and information.

22.     Blake Graham is an individual and resident of the state of Utah.  Until March of 2016, Graham served as a top-level distributor in Youngevity, and, together with Smith, held ownership interests in TNT.  Acting individually and in concert with other Defendants, while still a Youngevity distributor, Graham has facilitated, aided, or abetted violations of Youngevity contractual agreements in aid of efforts to secure business opportunities for Wakaya.  For example, in December 2015, Graham lied to Youngevity to conceal Smith's involvement in Wakaya.  Further, under his control, TNT employed Wakaya distributors and assisted Wakaya in developing promotional materials used in soliciting Youngevity distributors to breach their contracts with the company.  Graham helped support a false narrative that the Defendants' defection from Youngevity was acceptable to Youngevity management by dispatching, in the first quarter of 2016 shortly after Smith's public announcement of his establishment of Wakaya, an unauthorized email and text message to all Youngevity distributors which thanked Smith for his service to Youngevity and wished him well in his new endeavor, materially omitting reference to Smith's actions that were in violation of Youngevity

contractual requirements and unapproved by Youngevity.  Graham orchestrated a campaign of deception, whereby he represented to Youngevity and its distributors that he was a loyal Youngevity distributor despite having direct knowledge of actions taken by Smith to injure Youngevity and divert its business opportunities and distributors to Wakaya.  He aided in inducing breaches of contract by Youngevity distributors employed by TNT, to secure their service as distributors for Wakaya Perfection.  He concealed from Youngevity those facts and additional facts and circumstances detrimental to its business operations, distributor relations, and business dealings with third parties.

23.     Patti Gardner is an individual and resident of Utah.  Patti Gardner served as the President of Heritage Makers, Inc.  In August 2013, Youngevity acquired Heritage Makers and entered into an Asset Purchase Agreement with Heritage Makers.  Gardner then became Youngevity's vice president of sales.  While still employed by Youngevity, Gardner became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually and in concert with other Defendants, while still employed at Youngevity, Gardner induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Gardner has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  Gardner violated the Asset Purchase Agreement which she signed on behalf of Heritage Makers.

24.     Brytt Cloward is an individual and resident of Utah.  Brytt Cloward served as the Vice President of Sales and Marketing of Heritage Makers, Inc.  In August2013, Youngevity acquired Heritage Makers and entered into an Asset Purchase Agreement with Heritage Makers.  Cloward signed that agreement on behalf of himself.  Cloward then became Youngevity's vice president of marketing.  While still employed by Youngevity, Cloward became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Acting individually

and in concert with other Defendants while still employed at Youngevity, Cloward induced Youngevity distributors to breach their contracts with Youngevity in an effort to secure distributors and business opportunities for Wakaya.  Cloward has encouraged or solicited other Youngevity distributors to violate their contractual agreements with Youngevity.  Cloward violated the Asset Purchase Agreement which he signed on behalf of himself.

25.    Defendants DOES 1-10 are presently unidentified or unknown individuals and/or entities who have or that have facilitated and participated or cooperated in the unlawful activities described herein.  The nature and identity of those defendants will become known through discovery.

## II.    JURISDICTION AND VENUE

26.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks relief under the federal laws of the United States. Plaintiff presents Counts under the Lanham Act, 15 U.S.C. § 1125, for false and misleading advertising, and unfair competition.  Plaintiffs' remaining state law claims are subject to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) because those state claims are related to Plaintiffs' federal Lanham Act claim and form part of the same case or controversy under Article III of the United States Constitution.

27.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiff Youngevity is domiciled in California, while no other named Defendant resides in California and no Defendant corporation is owned by a resident of California.  Defendant Smith is the sole member/owner of Wakaya and both Wakaya and Defendant Smith are residents of Utah.  The matter in controversy yields damages of millions of dollars and, thus, substantially exceeds $75,000.

28.    The plaintiffs are completely diverse from all defendants for purposes of 28 U.S.C. § 1332.  None of the individual defendants resides in California.

Wakaya Perfection has just one owner/member, Todd Smith, who resides in Utah. Wakaya Perfection, LLC, is a Utah corporation operating under the laws of Utah and with its principal place of business in Utah.  Likewise, TNT, owned by Defendants Todd Smith and Blake Graham, has Utah members and none from any other state. All Plaintiffs reside in California.  Youngevity has its principal place of business in California.

29.   This Court has personal jurisdiction over all Defendants and venue is proper in this District because Youngevity maintains its principal place of business in this District and all Defendants have sufficient minimum contacts with California, including conducting business with Youngevity.  All Defendants knowingly injured Youngevity with knowledge that Youngevity is located in this District and that the damages would be incurred by Youngevity in this District.

30.   Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Youngevity's claims herein occurred in this District.  Youngevity is a California Corporation with its principal place of business located in San Diego County, California.

## III.   ALLEGATIONS COMMON TO ALL CLAIMS FOR RELIEF

31.   Wakaya is a Utah limited liability company founded in 2015.  The vast majority of MLM startups ultimately fail or remain unprofitable. To survive, Wakaya needed to create, coincidental with the public announcement of the company's start of operations, extensive marketing appeal with a strong direct-selling network of distributors who could move consumer goods.  Wakaya was introduced to the public on or about February 19, 2016.  Wakaya has attempted to build that network by unlawfully converting to its own use Youngevity's business opportunities, employees, intellectual property, distributors and distributor networks.  Wakaya has attempted to accomplish those unlawful acts by interfering with Youngevity's relations with its distributors, inducing Youngevity employees

and distributors to violate their contractual agreements with Youngevity, and converting business opportunities intended for Youngevity to Wakaya.

32.     Youngevity is a direct selling company that depends on the integrity of its direct-selling distributor network to operate a profitable business. Youngevity's distributors are deemed independent contractors, but sales and commissions earned by each distributor are shared with other Youngevity members according to the well-defined corporate structure.

33.     Youngevity distributors are encouraged to enroll additional distributors, thus increasing Youngevity's sales force and expanding the company's ability to provide Youngevity products at the consumer level to people worldwide.  New distributors who enroll under an existing distributor are said to fall within that enrolling distributor's "downline."  Those enrolling distributors fall within the new distributor's "upline."  The relationships of distributors are all mapped through a Youngevity distributor "genealogy."

34.     Each upline distributor receives commissions for the sales by those distributors in the downline.  That compensation package encourages enrolling distributors to actively assist their downlines, train them, and support them in product promotions and sales.  The success of any Youngevity genealogy is commensurate with teamwork, effort, and resources available to those in the genealogy.

35.     Because upline distributors have a direct financial interest in their downlines (or genealogy generally), Youngevity requires all distributors to adopt, execute, and follow the Youngevity Policies & Procedures Agreement (hereinafter "Procedures").  *See* Declaration of Steve Wallach, attached as Exhibit A, at ¶ 5. Those Procedures govern all aspects of distributor relations, from dispute resolution to advertising practices.

36.     All Youngevity distributors are bound by the Procedures.  All distributors must submit an Application/Agreement Form to become a distributor.

Almost all Applications/Agreements are now submitted through Youngevity's website.  When accepting the submission of applications to become a distributor electronically, the Youngevity website requires all distributors and prospective distributors to affirmatively agree to the Procedures.  Once an individual becomes a Youngevity distributor, he or she must accept the Procedures each time before successfully logging into and accessing his or her back office.  In addition, each time the Procedures are updated, the Youngevity website provides the update to distributors, and requires the distributors to affirmatively agree to the updates.

37.     The integrity of Youngevity genealogies is essential for the successful operation of Youngevity's business.  Like most direct selling companies, Youngevity's Policies and Procedures therefore impose strict prohibitions against activities like "cross-recruiting" among the various Youngevity genealogies.  For example, Section E12 of the Youngevity Procedures states:

> Distributors are strictly forbidden from Cross-Recruiting, and shall not sell, recruit, propose, or in any other way induce or attempt to induce any other Distributor to purchase any product or service, or to participate in any other income opportunity, investment, venture, or commit any other activity deemed, at the full discretion of the Company, as cross-recruiting.  This includes any such activities across any divisions of the Company, should any separate divisions with different compensation plans or hierarchy structures exist, unless, and as specifically stated otherwise.  The integrity of the hierarchy and the relationships therein is of paramount importance to every Distributor as well as to the Company.  Any Distributor violating this provision may be subject to immediate termination for cause, forfeiting any and all commissions due him or her.

*See* Exh. A at pp. 85–86, § E12.

38.     Section E7 of those Procedures similarly prohibits the use of Youngevity's proprietary information to cross-recruit.  *Id.* at 7 (including the use

of "[d]istributor lists, including downline sales organization information," which is "proprietary and confidential to the Company"). Section E7 states:

> Without limiting the generality of the foregoing, no such information may be used in cross-recruiting or with the intent to entice Company Distributors into other network marketing organizations

*Id.* at p. 86.

39.    Wakaya was founded by disgruntled former Youngevity distributor Todd Smith who, once loyal to the company, came to resent it as the growth of the company brought in more distributors with status equal to his own and income exceeding his. Smith joined with the above-named Defendants—all former Youngevity employees, distributors, or executives—to build a competing network marketing company by disparaging Youngevity, inducing Youngevity distributors to break their contracts with Youngevity and work for Wakaya, converting Youngevity business opportunities intended for Youngevity to Wakaya, and unlawfully converting Youngevity resources to promote Wakaya.

40.    Smith had enjoyed a long period of success within Youngevity, had achieved prominence in the company, and garnered the trust and confidence of the company's distributors. He developed a reliable income stream through Youngevity's system and helped grow the business. Youngevity supported Smith and assisted in his business development for nineteen years.

41.    Smith grew dissatisfied with Youngevity management, his dissatisfaction reaching a pinnacle when he received corporate reprimands for unlawfully entering the international market of Mexico without Youngevity authorization or Mexican legal approvals, and engaging in unlawful sales of product in Mexico, exposing the company to potential liability for foreign advertising claims and sales. Smith translated his dissatisfaction with those reprimands and his increasing immersion in a sea of up and coming new Youngevity leaders into a design to induce Youngevity distributors to defect from

the company, to divert business opportunities intended for the company, and to redirect resources of the company to facilitate the creation of a competing direct sales company: Wakaya.

42.    Smith and the other Defendants first tested whether they could induce a mass exodus of Youngevity distributors from the company to their fledgling start-up while on a Youngevity expense-paid cruise for distributors in January 2015.  On that cruise, a top level Youngevity distributor, Tom Chenault, called a meeting to help organize and assist Youngevity distributors.  At that meeting, co-conspirators Dave Pitcock (a top-level Youngevity distributor), his wife Barb Pitcock (a top-level Youngevity distributor), Andre Vaughn (a top-level Youngevity distributor), Bill Andreoli (President of Youngevity), and Todd Smith (a top-level Youngevity distributor), all publicly expressed dissatisfaction with Youngevity and condemned company officers.  Inviting dissent rather than defending Youngevity interests, Andreoli stated that if anyone in attendance left Youngevity, he would leave with them.

43.    After that cruise, Smith worked with his co-conspirators to lay the foundation for a new competing MLM.  Wakaya Perfection was acquired on October 22, 2015, in the State of Utah.  Smith identifies himself as a co-founder.

44.    While Smith was a top-level Youngevity distributor, he arranged meetings ostensibly as a Youngevity representative with outside businesses seeking to contract with Youngevity.  Unbeknownst to those entities, Smith used his position in Youngevity to redirect business opportunities intended for Youngevity to Wakaya, all the while concealing the opportunities from Youngevity.

45.    In or about July, 2015, a distributor in Smith's Youngevity "downline," Mia Magistro, introduced Todd Smith to David Smith, the owner of the Great American Clay Company based in Austin, Texas (hereinafter

"GAC").[1] *See* Declaration of Mia Magistro, attached as Exhibit B, at ¶ 7.  GAC expressed interest in contracting with Youngevity for Youngevity to sell GAC's bentonite clay products, which are helpful detoxifying agents.  *Id.* at ¶¶ 5–7, 9, 11–12.  GAC also indicated its willingness to work with Dr. Joel Wallach on a book publishing project related to Youngevity's business.  *Id.* at ¶ 11.

46.  On August 25, 2015, Todd Smith, Graham, David Smith, Lynn Jenkins (a part owner of GAC), and Mia Magistro met at TNT's offices in Pleasant Grove, Utah.  *Id.* at ¶ 9.  Magistro identified Todd Smith as a Youngevity distributor in her upline, and Todd Smith met with GAC as a representative of Youngevity.  *Id.*  He led GAC owner David Smith to understand that he, Todd Smith—and he alone—was the point of contact for Youngevity.  GAC had been scheduled to meet with Dr. Wallach in November of 2015 in North Carolina.  *Id.* at ¶ 14.  Todd Smith asked GAC to cancel that meeting with Wallach, stating that he (Todd Smith) was already working on the account and had been given Youngevity's authorization to develop new products himself.  *Id.* at ¶¶ 15–16.  Those representations were false. Todd Smith had no authority from Youngevity to determine whether Youngevity would contract with a product supplier.

47.  Todd Smith asked GAC not to disclose the reasons for cancelling GAC's meeting with Wallach and Youngevity's representatives asked David Smith to keep all information concerning Wakaya confidential.  *Id.* at ¶¶ 12, 18.  Meanwhile, Todd Smith continued his negotiations with GAC for the development and formulation of four GAC products all the while still purporting to do so on Youngevity's behalf.  *Id.* at ¶¶ 19–20.

48.  Todd Smith then prepared a contract for GAC which named as contracting parties not Youngevity and GAC but instead Wakaya Perfection and GAC.  This led GAC's owner to engage in email correspondence expressing

---

[1]David Smith and Todd Smith are unrelated and have no familial connections.

confusion as to why Wakaya and not Youngevity was the named contracting party. Given further assurances by Todd Smith, GAC then contracted with Wakaya to prepare its four clay products developed at Todd Smith's request for the exclusive marketing of Wakaya.  At no point did Todd Smith inform Youngevity that GAC had been seeking to contract with Youngevity or that GAC's owner had desired a meeting with Youngevity's Dr. Joel D. Wallach.  Exh. A at ¶ 12; Declaration of Joel D. Wallach, attached as Exhibit C, at ¶ 10.  In fact, Todd Smith requested that GAC's owner keep his negotiations with Todd Smith confidential.  Exh. B at ¶¶ 12, 19.

49.    Todd Smith falsely represented that he had authority to contract for Youngevity, used his color of title within Youngevity to secure business meetings allegedly on Youngevity's behalf, concealed those meetings from Youngevity, discouraged prospective businesses from contracting with Youngevity, and then converted those Youngevity business opportunities to his new Wakaya venture. That conduct was unquestionably tortious, unlawful, and deceitful.

50.    GAC now provides products exclusively for sale through Wakaya, and continues to develop products at Wakaya's direction.  The Wakaya-GAC products include nutritional supplements or products that now compete directly with Youngevity nutritional products.

51.    Had Youngevity been aware of Great American Clay, Youngevity would have wanted to enter a contract with Great American Clay for the sale of the Great American Clay products, or enter into negotiations to purchase the Great American Clay Company.  Exh. A at ¶ 12.

52.    Had Dr. Wallach known about the potential opportunities with David Smith and Great American Clay, he would have been interested in pursuing those opportunities.  Exh. C at ¶ 11.  Dr. Wallach would have been interested in pursuing the opportunity to learn more about the Great American Clay products, in pursuing the opportunity to co-author a book concerning the Great American Clay products,

in pursuing the opportunity to pursue an arrangement to promote Great American Clay through media appearances, and in pursuing the opportunity to create a commercial relationship between Youngevity and Great American Clay for the sale of its clay products.  Exh. C at ¶ 11.

53.     Wakaya's agents have promoted the new Wakaya venture by reference to Wakaya's "exclusive" sales rights to the GAC bentonite clay product.

54.     Smith intended to (and did) induce Youngevity distributors to break their contracts with Youngevity and become Wakaya participants, investors, and distributors.

55.     Many of the first people to endorse Wakaya's social media publications were Youngevity distributors or former Youngevity distributors recruited by Todd Smith or at Todd Smith's request.

56.     As of April 22, 2016, approximately 125 of Wakaya's 268 (are 46.6%) are Ambassadors[2] are currently or were Youngevity distributors.  Exh. A at ¶ 11.

57.     As of April 22, 2016, approximately 77 of Wakaya's 125 (about 61%) "Founder Qualified" Wakaya ambassadors are currently or were Youngevity distributors.  *Id.*

58.     The fact that, within approximately two months of Wakaya's public launch, nearly half (1/2) of all Wakaya ambassadors are or were Youngevity distributors is evidence that Defendants cross-recruited Youngevity distributors to join Wakaya as ambassadors while defendants concurrently purportedly to work within the Youngevity organization and operate in Youngevity's interests.

59.     The fact that, within approximately two months of Wakaya's public launch, nearly two thirds (2/3) of all Wakaya "Founder Qualified" ambassadors are or were Youngevity distributors is evidence that Defendants cross-recruited

[2]Wakaya refers to its distributors as "ambassadors."

Youngevity distributors to join Wakaya as ambassadors while defendants simultaneously purported to work within the Youngevity organization and operate in Youngevity's interests.

60.    To promote Wakaya, Wakaya employees and distributors conducted conference calls.  During those calls, Wakaya has used Youngevity top level distributors, including Pitcock and Vaughn, as primary presenters, which calls, text messages, and related social media posts are then communicated to a broad audience of Youngevity distributors, derived from Youngevity's confidential distributor lists.

61.    Smith manipulated relationships with Youngevity distributors to secure economic advantages for Wakaya, thus attempting to dismantle Youngevity business networks from within the Youngevity corporation.  To preserve his prior income stream from Youngevity business, Smith purported to convey his interests in Youngevity distributorships to his long-time personal friend, partner, and fellow Youngevity distributor, Blake Graham.  Smith conveyed those interests through a strawman transaction wherein no valuable consideration was exchanged and Smith continued to derive Youngevity income and resources from Graham and TNT despite conspiring with Graham to convince Youngevity that, unlike Smith, Graham had not defected from Youngevity and should thus be entitled to receive all distributorships and commissions previously divided by Graham and Smith.  On information and belief, Graham and Smith maintained financial ties and enabled Youngevity commissions and resources to be available to and used by Smith in support of Wakaya.  That arrangement was a violation of Youngevity agreements that Smith enabled and encouraged.

62.    Graham continued operation of TNT purportedly without Smith as a named partner, but in fact permitted the direct recruiting and cross-recruiting of TNT distributors and the diversion of business opportunities by Wakaya.  Graham maintained TNT as a Youngevity front that aided and abetted Smith's tortious

conduct.  Both Graham and Smith profited at Youngevity's expense while Graham permitted Smith to drive Youngevity business, resources, and opportunities away from Youngevity to Wakaya.  Both Graham and Smith were aware of the Youngevity agreements executed to prevent business losses through that type of conduct.

63.    TNT retains control over Youngevity websites that drive commerce to TNT based on the unauthorized use of the Youngevity founder's name and likeness, those of Dr. Joel Wallach.  Dr. Wallach has exclusively licensed his name, likeness, and image to Youngevity.  Exh. C at ¶ 6.  Youngevity has not granted to TNT, Graham, or Smith approval to use Dr. Wallach's name, likeness, or identity and has in fact demanded that Smith, Graham, and TNT cease all use of the unauthorized marks.  Exh. A at ¶¶ 7–8.

64.    For example, TNT and Graham retain control over the website: www.wallachonline.com.  Exh. A at ¶ 7.  That webpage captures prospective Youngevity purchasers and traffic.  The website ranks within the top pages when individuals search for Dr. Wallach online.  The phone number for TNT is 1-800-925-5224 (or 1-800-WALLACH), thus further trading off of Dr. Wallach's name without authorization.  Calls to 1-800-Wallach and product purchases increase when Dr. Wallach makes daily radio and other appearances.

65.    TNT, Graham, and Smith continue to control websites that trade on Youngevity's and Dr. Wallach's marks, like www.yteamtools.com, which promotes Youngevity materials and is designed to assist Youngevity distributors in the management of their business.  Exh. A at ¶ 8.  On Yteamtools.com, TNT sells commercial goods including CDs, DVDs, flyers, and clothing, bearing Youngevity's name which infringes on Youngevity's registered trademark: "Youngevity."*Id.* at ¶ 7.

66.    While distributors are permitted to trade on and benefit from Dr. Wallach's name and likeness if given approval or permission from Youngevity,

Youngevity does not allow such uses unless pre-approved and reserves the right to revoke that permission or approval in its sole discretion and at any time. *Id.* at ¶ 6.

67.    To the extent TNT had permission or authorization to trade on and profit from Dr. Wallach's name and likeness, Youngevity revoked that permission and authorization on March 21, 2016, when it terminated each of Graham's and Smith's distributorships and instructed them to "remove the web site entitled Wallachonline.com and [] transfer all URLs and other authorizations for use of the name and any other site including the name of Dr. Joel D. Wallach and Youngevity to Youngevity." *Id.* at ¶ 8, p. 121.

68.    Youngevity has and continues to lose business opportunities that are otherwise directed to the defendants' "Youngevity" websites.  For example, following Dr. Wallach's presentations, lectures, and radio appearances, the Defendant-controlled phone number 1-800-Wallach and websites like www.wallachonline.comreceive substantial traffic from prospective Youngevity customers or participants.

69.    The Defendants' continued control over those websites causes Youngevity irreparable harm because Youngevity customers are mistakenly associating with Youngevity's competitors (rather than Youngevity distributors) while thinking they have contacted Youngevity directly.  Youngevity therefore loses its ability to control its goodwill and reputation.

70.    Youngevity's distributors have further lost the ability to rely on support websites like "yteamtools" that are no longer controlled by Youngevity or its distributors.

71.    On March 30, 2016, Jonny Steele, a Youngevity Distributor and cousin of Defendant Todd Smith, sent an e-mail to Steve Wallach, Youngevity's Chief Executive Officer.  *See* Steele e-mail, attached as Exhibit D.  That e-mail explained how and why TNT's, Smith's, and Graham's control over Wallachonline.com and Yteamtools.com cause Youngevity and Youngevity

distributors irreparable harm.  For example, Steele explained that "[i]f Todd and Blake continue to operate wallachonline and yteamtools, they will have the potential to negatively affect our downline and our livelihood." *Id.* "The damage [to Youngevity distributors] can be devastating and long term, even if they continue to operate for only a couple more weeks let alone for the next few months or years." *Id.*

72.    Aware of Todd Smith's actions to form a competing company that would cross-recruit Youngevity distributors, Graham withheld that information from Youngevity for months, until after Smith recently made a public announcement of his formation of Wakaya.  Youngevity commissions were paid to distributorships owned by Smith, Graham, and both of them, during that time and from which they drew income, and some of those funds were diverted to help establish and further the business interests of Wakaya.  In addition, Graham purported to receive, at or before the start of 2016, a transfer, assignment, or purchase of all Youngevity distributorships in which Todd Smith held an interest or received income, but the alleged transfer was a sham without complying with company rules that required authorization from Youngevity before so doing.  Graham attempted to mislead Youngevity into believing Smith was no longer involved in or receiving income from any Youngevity distributorship when in fact Smith remained involved in and received income from Youngevity distributorships.   Graham did so in an effort to have all distributorships previously held jointly or from which funds were divvied up between the two restructured to be in Graham's name only but with no restrictions as to Graham's dispensation of the funds, including payment back to the defecting Todd Smith or to Wakaya.  Graham falsely informed Youngevity that TNT, a Youngevity distributor, had been assigned to him exclusively and that it had nothing to do with Smith or Smith's company Wakaya.

73.     On February 22, 2016, Graham sent an email and text letter to all Youngevity distributors using Youngevity's confidential distributor list without Youngevity authorization. Graham's unauthorized correspondence, issued while under suspension, complimented Todd Smith on his departure and wished him well in the new venture, as if written with Youngevity's authorization when it was not. *See* Graham e-mail, attached as Exhibit E.  The content was contrary to Youngevity's position on the departure of Todd Smith.  A top level distributor, Graham used the email and text communication and the confidential distributor list to convey the false impression that Youngevity had no issues with Todd's departure or formation of a competing MLM, thus implying that further moves to induce Youngevity distributors to become Wakaya distributors would likewise not offend the company.

74.     Graham has admitted that certain individuals employed by TNT are in fact also employed by Wakaya Perfection and are also distributors for Wakaya Perfection, thereby causing a Youngevity distributor, TNT, to condone, aid, and support Wakaya Perfection's recruitment efforts, including Wakaya Perfection's efforts at cross-recruitment of Youngevity distributors and creation of certain Wakaya promotional materials.  Those promotional materials have been used by Wakaya distributors to induce Youngevity distributors to breach their contracts with Youngevity.

75.     While still employed by or serving as distributors for Youngevity, Defendants encouraged high ranking Youngevity distributors and Youngevity employees to work for or enroll in Wakaya.  All of those individuals were advised and encouraged to maintain secrecy about their dealings with Wakaya Perfection until after public announcement of the company by Smith.  Most continued working for Youngevity at a superficial level, while concurrently gathering Youngevity information and using Youngevity relationships to lay the foundation for and promotion of Wakaya.

76.     Bill Andreoli had owned Financial Destination, Inc., FDI Management, Inc., FDI Realty, LLC, and MoneyTRAX, LLC (collectively, "FDI").  FDI was not a successful company, was experiencing a severe decline in its finances, and had just lost a major contract for one of its services when, on or about August 13, 2011, Andreoli contracted Youngevity concerning the sale of FDI to Youngevity.  Youngevity agreed to allow Andreoli, as an accommodation, to maintain and staff an office in New Hampshire.  As part of the transaction, Andreoli and Youngevity entered into an Employment Agreement which included non-circumvent and non-disclosure clauses.  *See* Andreoli Employment Agreement, attached as Exhibit F.  That agreement contains the following relevant terms:

- Andreoli must "devote his full working time, attention, and energy to [Youngevity …] and shall not … be engaged in any other business activity if pursued for gain, profit, or other pecuniary advantage without [Youngevity's] prior written consent …."  *Id.* at § 7.

- Andreoli cannot disclose any confidential information, including customer information, to any third party.  *Id.* at § 9(a)

- Andreoli cannot use any of Youngevity's trade secrets to compete with Youngevity.  *Id.* at § 9(b).

- Andreoli was required to promptly disclose any new discoveries or improvements that he developed to Youngevity.  *Id* .at §10.

77.     Over a period of approximately four years, Andreoli in his capacity as President of Youngevity, caused in excess of a dozen "forced qualifications" or automatic rank advancements to be bestowed upon individuals and entities who did not earn those advancements through increased product sales volumes, as required by Youngevity rules. Through those forced qualifications, Andreoli breached his fiduciary duty to Youngevity.  The effect was to cause the company to pay those individuals and entities higher than justified commissions, bonuses, and car bonuses.  Among those given these forced qualifications were Andreoli's parents,

his wife and children, Andre Vaughn, and Monique Vaughn.  For example, as a result of Andreoli's forced qualification of Andre Vaughn, Youngevity paid Vaughn $40,000.00 in car bonuses and in excess of $600,000.00 in commissions and other bonuses over a four year period.

78.   Andre Vaughn and Monique Vaughn are married, share their assets, and co-mingle their funds.  Andre was a top distributor for Youngevity.  While both Andre and Monique maintained Youngevity distributor accounts, Andre was by far the more active in the Youngevity business.  Monique claims that she has not accessed her Youngevity back office in over three years, and, upon information and belief, Monique has never been to a YGYI distributor meeting.

79.   Andre Vaughn is now a participant, promoter, and distributor for the Wakaya venture.  Andre used his contacts at Youngevity to induce Youngevity distributors to enroll in his downline at Wakaya.

80.   Andre has unlawfully promoted Wakaya by making false and misleading claims.  For example, Andre has represented that Wakaya distributors can earn a free cruise in only 12 hours.

81.   Andreoli participated in, and helped facilitate, the Wakaya venture while serving as President of Youngevity and while under contractual obligations to refrain from such participation and facilitation.  Andreoli's contractual agreements with Youngevity expressly precluded and prohibited his involvement with other network marketing companies.

82.   Nonetheless, while serving as Youngevity's President in August 2015, Andreoli acted to encourage widespread dissention from Youngevity management during key distributor meetings and on occasional visits to other Youngevity offices.

83.   In October 2015, again while under contract with Youngevity and while serving as Youngevity's President, Andreoli contacted other Youngevity distributors in an effort to induce contract breaches by causing them to become

PLAINTIFFS' FIRST AMENDED COMPLAINT
- 25 -

distributors for Wakaya Perfection.  Andreoli made additional contacts with distributors in November 2015, again soliciting their involvement in the Wakaya venture.  Andreoli hosted Wakaya corporate events at his New Hampshire facilities.  Andreoli was unquestionably a participant in and promoter of the Wakaya venture.  Andreoli took those actions despite contractual provisions that expressly and directly forbad him from so doing.

84.     Also in October 2015, Andreoli, while serving as Youngevity's President, contacted world renowned oncologist and immunologist Dr. Charles B. Simone, who had been in talks with Youngevity concerning possible licensing of a Simone health product to Youngevity.  Andreoli informed Simone that Andreoli was involved in a new MLM venture and urged Simone to join Andreoli in consummating a deal with that venture.  The offer to Simone was not made known to Youngevity's CEO or other officers or directors, and Simone declined to accept the offer.

85.     Effective December 30, 2015 in accordance with its lease agreement Youngevity closed its New Hampshire office.  A Youngevity employee, John Taylor, flew to New Hampshire to pack up the office equipment, including computers and data contained within same.  That office employed Mike Randolph, a Youngevity Executive Vice President and "consiglieri" to Andreoli.  Youngevity also employed Mike Randolph.  When John Taylor attempted to obtain the computer used by Mike Randolph's son, Taylor discovered that the computer was missing and had been replaced by an older computer.  Taylor was unable to recover the contents of the computer he sought, which had included proprietary Youngevity information.  In addition, at Andreoli's request, Taylor did not remove approximately $40,000 worth of office furniture to which Youngevity was entitled.

86.     Youngevity also employed Jimmy Hyun, Andreoli's brother-in-law, at the New Hampshire office.  Hyun refused to supply Youngevity with passwords essential to updating Youngevity's distributor information sections on

Youngevity's website.  Youngevity was therefore required to expend employee hours to rebuild and replace that part of their website.

87.    On or about August 7, 2013, Youngevity purchased Heritage Makers, Inc.  Patti Gardner signed that Agreement (the "HM Agreement") on behalf of Heritage Makers, and Brytt Cloward signed that Agreement on behalf of himself. *See* Heritage Makers Agreement, attached as Exhibit G.  Article XI of that agreement contains confidentiality and non-competition clauses.  *See id.* at p. 33.  Under that article, neither Gardner nor Cloward may use, for their or Wakaya's benefit, customer lists or other information that HM transferred to Youngevity.  *Id*.  Further, those individuals cannot engage in a business or enterprise that qualifies as a "competing business" until at least August, 2017, or solicit or attempt to solicit sales or licenses of any competing businesses, interfere with, disrupt, or attempt to disrupt the relationship between HM, Youngevity and their customers, suppliers, agents, consultants, officers or employees relating to the Heritage Makers' products sold to Youngevity.  *Id.*

88.    In August, 2015, Andreoli, acting as President of Youngevity, had Youngevity's key employees, its marketing team, comprised of Mike Casperson, Brytt Cloward, and Patti Gardner, fly to Andreoli's Youngevity office in New Hampshire purportedly to work on Youngevity's marketing.  On information and belief, however, Andreoli had those three Youngevity employees travel to New Hampshire to discuss in secret Wakaya and their prospective employment by that competing company.  While at Youngevity, Cloward reported directly to Andreoli.

89.    Patti Gardner was employed by Youngevity as Vice President of Sales.  Gardner was in charge of making Youngevity's travel reservations and making reservations for Youngevity's events.  Gardner has a "travel agent number" which allows her to receive commissions on such reservations.  While in Youngevity's employ, Gardner was required to forward all commissions she

earned from making reservations for Youngevity back to Youngevity.  Gardner currently owes Youngevity in excess of $20,000.00 from such commissions.

90.    While at Youngevity, Gardner reported directly to Andreoli and became close with Andreoli.  When Gardner left Youngevity, she failed to return several binders of information to Youngevity, which included contact information for Youngevity's distributors.   Gardner is now the Vice President of Sales at Wakaya.  While at Youngevity, Marin Barney reported directly to Cloward.  Casperson, Cloward, and Barney all resigned from Youngevity, at the same time as Andreoli, in October2015 to "pursue some other options" and "work on some new projects."

91.    Youngevity maintained valid and enforceable Nondisclosure agreements with Casperson, Cloward, Barney, and Gardner.  *See* Nondisclosure Agreements, attached as Exhibit H.

92.    As part of their resignation, Casperson, Cloward, and Barney all asked to keep their Youngevity work computers.  Youngevity refused to release those work computers, and sent an employee to the Utah office to retrieve the computers where Casperson, Cloward, and Barney worked.  That employee discovered each computer's hard drive and memory were completely erased of content so that Youngevity could not retrieve any of its confidential information contained therein and any of Casperson's, Cloward's, or Barney's work product.  Those laptop computers had contained sensitive and proprietary Youngevity data and work product.  The laptops also included Youngevity marketing materials, graphics, and data belonging exclusively to Youngevity.

93.    Barney is now the Senior Creative Director, Corporate Visual Branding, at Wakaya.  Mike Casperson and Brytt Cloward are also employed at Wakaya in different capacities.  New publications and promotional content published by Wakaya have adopted the format and content developed on those computers by these same employees for Youngevity during the times Barney,

Cloward, and Gardner were employed at Youngevity.  On information and belief, Wakaya or its agents facilitated, aided, abetted, and orchestrated the departure of Youngevity employees and the conversion to Wakaya's use of sensitive and proprietary Youngevity data and work product.  Wakaya benefitted from that departure, and has used Youngevity proprietary information gleaned from those departing employees to its economic advantage and to Youngevity's economic disadvantage.

94.     Brytt Cloward and Patti Gardner violated their obligations under the Heritage Makers Agreement.  By working for Wakaya, they are engaging in a business venture that directly competes with Youngevity, in violation of the HM Agreement.  Cloward and Gardner further violated the HM Agreement by using Youngevity's proprietary information, including Youngevity's customer and distributor lists, to develop work product for and to solicit and attempt to solicit sales for Wakaya at Youngevity's expense.

95.     In October 2015, Youngevity began to experience injury from Wakaya's campaign to induce Youngevity employees and distributors to break their contracts with Youngevity.  As discussed *supra*, several Youngevity executives and employees suspiciously departed within the same two week window, including:  Brytt Cloward (Youngevity Vice President of Marketing); Patti Gardner (President of Youngevity's Heritage Makers); Marin Barney (Youngevity Senior Creative Director); Mike Randolph; Mike Casperson; and President, Bill Andreoli.  Those individuals departed Youngevity abruptly, declining to identify their new positions or business plans.  Marin Barney indicated on social media that she was "starting a new project [in] November 2015" and that she had left Youngevity to "fill new Creative Management Position at a new corporation, launching 2016."

96.     All of those individuals have become executives in, employees of, or distributors for Wakaya Perfection.

97.    Those employees abruptly departed Youngevity in unison under suspicious circumstances that reflect a conspiracy—a uniform effort or agreement to participate in Wakaya and disadvantage Youngevity long before discontinuing their service to or within Youngevity.  Those employees were in constant and direct contact with Defendants, including Youngevity's former President, Andreoli.  Those employees, executives, and distributors were bound by various non-compete agreements and non-disclosure agreements that would have prevented their involvement with Wakaya, and would have particularly prevented their cross-recruiting of Youngevity distributors and their disclosure of Youngevity proprietary business information to and conversion of Youngevity work product to Wakaya.

98.    Dave Pitcock was the owner of Livinity, Inc.  On or about July 10, 2012, Pitcock sold Livinity, Inc.'s assets to Youngevity.  As part of that transaction, Livinity and Youngevity entered into a Consulting Agreement with valid non-disclosure and non-circumvent clauses, wherein Pitcock agreed to serve as a Consultant for Youngevity.  *See* Livinity Consulting Agreement, attached as Exhibit I.

99.    That agreement prohibited Livinity and Pitcock from disclosing any confidential information and from using confidential information, including business contacts, information regarding distributors/vendors/supplies and other business associates of Youngevity, for the purpose of circumventing Youngevity's business operations.  *Id.* at §§ 4(c)–(d).  Furthermore, Livinity was required, at all times, to refer to Youngevity in terms that further Youngevity's business objectives and not refer to Youngevity in a manner that damages Youngevity's position in the marketplace.  *Id.* at § 6.The Livinity Consulting Agreement provides for extensive relief to Youngevity, including an "injunction, monetary damages, punitive damages, and specific liquidated damages in the amount of the

prior year's earnings for disclosure of Confidential Information and/or use of such information to solicit Youngevity's customers." *Id.* at § 4(e).

100.   Dave Pitcock and his wife, Barb Pitcock, are now distributors for the Wakaya venture.  They were the joint owners of Youngevity distributor accounts and co-mingled their funds.

101.   The documentary and testimonial evidence demonstrates that Wakaya founders, investors, distributors, executives, and participants operated an unlawful scheme to prey upon Youngevity's distributor networks, business interests, proprietary information, accounts, sales, commissions, and goodwill.  Wakaya, through its agents, has interfered with Youngevity business operations, has interfered with Youngevity distributor relationships, and has induced Youngevity employees and distributors to violate their contracts with the company.  Wakaya unlawfully benefitted (or sought to benefit) from Youngevity's proprietary and confidential business information, in part, by using that information to recruit participants in Wakaya and promote Wakaya's business at Youngevity's expense.

102.   Wakaya, through its agents, facilitated and encouraged the breach of Youngevity employment contracts.  Those actions were taken by individuals—like Smith, Vaughn, Pitcock, Graham, Cloward, Gardner, Casperson, and Andreoli— who had knowledge of Youngevity's contractual relationships, and who were aware that their conduct was in violation of same (or would result in violation of same).  Indeed, the Defendants, specifically former Youngevity leaders Smith and Graham, and former Youngevity President Andreoli, were the same people responsible in prior years for enforcing or causing distributors to uphold Youngevity's Policies and Procedures—including Youngevity's prohibition against cross-recruiting.  They held positions of prominence in Youngevity that caused Youngevity distributors to view them with trust and confidence.  Thus, the Defendants' solicitation to join Wakaya conveyed implicit as well as explicit false

connotations that doing so would not offend Youngevity, would be legally protected, and would be accepted by Youngevity without further recourse.

103.   Wakaya, through its agents, intentionally converted Youngevity business opportunities through misrepresentation, deceit, and trickery.  Wakaya met with potential Youngevity acquisitions while holding its agents out as Youngevity representatives, only to direct those accounts to Wakaya through subterfuge, concealment, and misrepresentation.

104.   Wakaya's agents, including its co-founder Smith, displayed a consciousness of potential liability.  He repeatedly coerced or encouraged individuals to maintain secrecy surrounding his unlawful and anti-competitive activities.  Through misrepresentation, he solicited the secrecy of distributors and potential Youngevity clients.

105.   The intentional targeting of Youngevity resources, and the manipulation of Youngevity's business from within—all for the economic advantage of Wakaya—violated business ethics and constituted actionable tortious conduct.  Youngevity distributors, employees, and executives are free to work outside of Youngevity during or after their time with Youngevity.  They are not, however, free to use Youngevity resources, confidential information, contacts, and opportunities against Youngevity while purporting to hold interests with Youngevity.  That latter conduct is unlawful, and is the subject of this lawsuit.  All Defendants were aware of the contractual obligations prohibiting the conduct alleged herein and maliciously violated those obligations, fiduciary duties, and trust.

106.   Wakaya and the Defendants have made unauthorized use of Youngevity's distributor lists to facilitate interference with Youngevity contractual relations and induce breach of contract by Youngevity distributors.  They have used Youngevity's name and intellectual properties to cross-recruit.

107.   The individual Defendants used their well-known identities within Youngevity as President, in the case of Andreoli, and as corporate employees or as prominent top level distributors, in the case of the other individual named Defendants, to mislead Youngevity distributors into believing that they could become Wakaya distributors and recruit additional Youngevity distributors into Wakaya without loss of their Youngevity distributorships and commissions, thus causing those distributors wittingly or unwittingly to breach their Youngevity contracts as a result of the Defendants' exercise of artifice, guile, misrepresentation, and deceit.

108.   The Defendants, specifically Andreoli, Smith, and Graham, held prominent positions within Youngevity or its distributor hierarchy which enabled them to enjoy distributor trust and confidence, which trust and confidence they manipulated to induce distributors to breach their Youngevity contracts in the mistaken belief that Youngevity would not take any adverse action as a result of those breaches.

109.   Defendants' conduct is unfair competition.  Defendants have also manipulated commercial markets through false and deceptive advertising and promotional claims.  Defendants have lured distributors into its venture through the promise of unreasonable income generation.  Acting through its agents, Defendants have published or disseminated demonstrably false information concerning Youngevity's business.  Defendants' dissemination of false information was intended to disparage Youngevity.  In an effort to secure more business from Youngevity directly, Defendants have attempted to cast Youngevity as a financially bereft corporation on the brink of bankruptcy when in fact it is financially robust and profitable, having experienced considerable success and growth.

110.   Defendants' conduct includes false and misleading claims.  Defendants have represented that Wakaya distributors can earn large incomes.  In

fact, to date no Wakaya distributors are earning large commission-generated incomes and the substantial majority of Wakaya distributors will not earn the amount of income Wakaya has represented they will earn; indeed, most will not even recoup their investments in the company.  Todd Smith, Dave Pitcock, and Andre Vaughn, among others, have made such illegal income claims.

111.    Wakaya is a company formed almost entirely from a select few disgruntled Youngevity employees, distributors, and executives who came to believe that a competing direct network MLM venture would bring greater fortune than possible through Youngevity alone, despite their high salaries and large volume commissions from Youngevity.  Rather than expanding their fledgling venture through traditional means, however, the Defendants have relied substantially on business stolen or converted from Youngevity's operations.  The Defendants have attempted to secure business opportunities through unlawful means.

## COUNT ONE

### Intentional Interference with Prospective Economic Advantage
### (All Defendants)

112.   The allegations of paragraphs 1through111are incorporated herein by reference.

113.   Defendants Smith, Graham, and Wakaya interfered with Youngevity's prospective economic relationship with Mr. David Smith, the owner of GAC.

114.   Youngevity had a prospective economic relationship with GAC when Smith, as a purported Youngevity representative, met with GAC, and that relationship had the probability of conferring future economic benefit on Youngevity.

115.   At all times relevant herein, Defendants Smith, Graham, and Wakaya were aware of the prospective relationship between GAC and Youngevity.

116.   Defendants Smith, Graham, and Wakaya engaged in intentional acts to disrupt Youngevity's prospective relationship with GAC.  For example, Smith and Graham met with GAC falsely as representatives of Youngevity, told GAC to cancel its meeting with Youngevity's Dr. Joel Wallach without Youngevity authorization, concealed their meetings with GAC from Youngevity, and used their positions within Youngevity to mislead GAC into consummating a contract with Wakaya.

117.   As a result of Smith's, Graham's and Wakaya's action, GAC now provides products for sale exclusively through Wakaya, and continues to develop products at Wakaya's direction.

118.   Wakaya's agents have described the GAC bentonite clay product as a unique and exclusive product that can only be sourced from the GAC mines.

119.   Defendants Smith, Graham, and Wakaya caused Youngevity harm because, but-for Smith's, Graham's, and Wakaya's interference with GAC and Youngevity's relationship, GAC would be producing products for sale through Youngevity and at Youngevity's direction and all profits to Wakaya from the sale of GAC products would instead flow to Youngevity.

120.   All Defendants have interfered with Youngevity business opportunities by unlawfully diverting potential profits and sales away from Youngevity into the Wakaya enterprise.  Defendants accomplished that diversion by encouraging the breach of Youngevity agreements, and through exploitation of Youngevity's proprietary and confidential information.

121.   Defendants were aware that their actions would deliberately target and disrupt Youngevity's prospective relationships with customers and potential distributors.  Defendants corruptly and unlawfully interfered with those relationships, in part, by encouraging the breach of Youngevity agreements and persuading Youngevity distributors to breach existing contractual duties.

122.   Defendants formed and operated a conspiracy to interfere with Youngevity's prospective economic advantages.  For example, Defendants Smith, Graham, and Wakaya conspired to, and succeeded in, diverting Youngevity's opportunity for an economic relationship with GAC and also conspired to, and succeeded in, encouraging Youngevity distributors to breach their agreements with Youngevity causing Youngevity's prospective business relations with potential customers to be diverted to Wakaya.  Defendants' conspiracies caused Youngevity damage, including lost business opportunities with GAC and lost profits and sales.

## COUNT TWO

### Intentional Interference with Contract/Inducing Breach of Contract (All Defendants)

123.   The allegations of paragraphs 1 through 122 are incorporated herein by reference.

124.   All Defendants interfered with contracts Youngevity had with third parties, and induced those parties to breach their contracts with Youngevity.

125.   Youngevity maintains valid and enforceable contracts with all of its distributors.  Exh. A pp. 76–113.  Youngevity also maintained valid non-disclosure agreements with Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney, Exh. H, and a valid asset purchase contract with Gardner and Cloward through Youngevity's purchase of Heritage Makers, Inc.  *See* Exh. G.

126.   At all times relevant herein, all Defendants were aware that Youngevity maintained valid and enforceable contracts with all of its distributors. Further, at all relevant times herein, Wakaya and Andreoli were aware that Youngevity maintained valid non-disclosure agreements with Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney, and were aware that Youngevity maintained a valid contract with Gardner and Cloward through Youngevity's purchase of Heritage Makers, Inc.

127.   All Defendants intentionally induced Youngevity distributors to breach their contracts with Youngevity.  The Defendants contacted Youngevity distributors directly to tell them about Wakaya and recruit them to join Wakaya. For example, Defendant Graham sent an unauthorized e-mail and text to all Youngevity distributors, acting as though Youngevity endorsed the e-mail, and explained that Todd Smith is engaging in a new enterprise.  Exh. E.  That e-mail had the effect of encouraging Youngevity distributors to be aware of Wakaya and to comprehend joining Wakaya to be an option acceptable to Youngevity, when it was in fact a contractual breach damaging to Youngevity and its distributor networks. Cross-recruiting is prohibited under Youngevity's Contract with distributors.  Exh. A, p. 85 § E12.  Defendants Wakaya and Andreoli induced Casperson, Gardner, Cloward, and Barney to violate their agreements with Youngevity by, *inter alia*, engaging in an enterprise that competes with Youngevity, Wakaya.

128.   The actions of Defendants Smith, Andreoli, Wakaya, TNT, Graham, Vaughn, and Pitcock caused Youngevity distributors to breach their Youngevity contracts, inter alia, by cross-recruiting for Wakaya.  The action of Defendants Andreoli and Wakaya caused Patti Gardner, Mike Casperson, Brytt Cloward, and Marin Barney to breach their contracts with Youngevity by, inter alia, using Youngevity's proprietary information and resources to benefit Wakaya.

129.   Defendants were aware that their actions would deliberately target and disrupt Youngevity's prospective relationships with customers and potential distributors.  Defendants corruptly and unlawfully interfered with those relationships, in part, by encouraging the breach of Youngevity agreements and persuading Youngevity distributors to breach existing contractual duties.

130.   Youngevity has suffered damages and continues to suffer damages as a result of those distributors and employees' violations of their contracts with Youngevity and inducement of others to violate their contracts with Youngevity.

131.   Defendants formed and operated a conspiracy to interfere with Youngevity's contractual relations and induce breach of those contractual relations by conspiring to contact Youngevity distributors and encouraging them to breach their agreements with Youngevity.  Defendants' conspiracy caused Youngevity damage, including lost profits and sales resulting from distributors leaving Youngevity.

## COUNT THREE

**Breach of Contract**
**(Defendants Andreoli, Pitcock, Gardner, Cloward)**

132.   The allegations of paragraphs 1 through 131 are incorporated herein by reference.

133.   Defendants Andreoli, Pitcock, Gardner, and Cloward have all entered into valid contracts with Youngevity.  Exhs. F–I.

134.   Youngevity has performed all obligations required under those contracts.

135.   Defendants Andreoli, Pitcock, Gardner, and Cloward have all breached their contracts with Youngevity.  All of those defendants breached the implied covenant of good faith and fair dealing present in every contract.  Further, Defendant Andreoli breached his employment contract with Youngevity by, for example, failing to devote all of his working time and attention to Youngevity, disclosing confidential customer information and using Youngevity's trade secrets to compete with Youngevity, attempting to divert business opportunities of Youngevity to Wakaya, and failing to promptly notify Youngevity about those business opportunities.  Pitcock violated his consulting agreement with Youngevity by using confidential information, including business contacts, information regarding distributors/vendors/supplies and other business associates of Youngevity, for the purpose of circumventing Youngevity's business operations and by referring to Youngevity in terms that do not further Youngevity's business

objectives.  Gardner and Cloward violated the HM Agreement by, for example, working for Wakaya, a business that competes directly with Wakaya, and by using Youngevity's confidential information, including customer and distributor lists, to solicit business for Wakaya at Youngevity's expense.

136.   As a direct, proximate, and legal result of the breaches by Defendants Andreoli, Pitcock, Gardner, and Cloward, Youngevity has been damaged in an amount to be proven at trial.

137.   Defendants Andreoli, Pitcock, Gardner, and Cloward agreed and conspired to breach their contracts with Youngevity.  Those breaches caused Youngevity damage in an amount to be proven at trial.

## COUNT FOUR

### Misappropriation of Trade Secrets
### (Cal. Civ. Code § 3426)
### (All Defendants)

138.   The allegations of paragraphs 1 through 137 are incorporated herein by reference.

139.   Defendants misappropriated Youngevity's trade secrets, including distributor and customer lists, and Youngevity marketing and business information to benefit Wakaya at the expense of Youngevity.

140.   All Defendants aggressively solicited Youngevity's employees and distributors to leave Youngevity and work for and/or become distributors for Wakaya.  By virtue of their experience and positions within Youngevity, Defendants are well aware of the contractual restrictions placed on Youngevity's distributors and employees, in particular the obligation to refrain from using or divulging Youngevity's customer lists and distributor lists.

141.   The proprietary information, including customer and distributor lists, is, and at all relevant times has been, the subject of Youngevity's reasonable efforts

under the circumstances to maintain its secrecy.  Youngevity has taken reasonable measures to prevent the unauthorized disclosure or use of its proprietary customer and distributor lists.

142.   The Defendants' actions constitute misappropriation of trade secrets in violation of Cal. Civil Code sections 3426.1 and 3426.2 because Defendants knew or had reason to know that Youngevity's trade secrets were acquired or were accomplished under circumstances that gave rise to a duty to maintain the secrecy of Youngevity's customer and distributor lists.  Moreover, every time the Defendants' accessed their Distributor back door office, they were required to acknowledge and agree that the information was confidential and not to be used to Youngevity's detriment.  Defendants were well aware of the numerous policies Youngevity has about the nature and protection of its confidential, proprietary information.

143.   Defendants misappropriated Youngevity's trade secrets by, among other things, retaining or utilizing Youngevity's distributor and customer information and confidential Youngevity work product for the purpose of soliciting, directing or advising Youngevity's customers and distributors to switch their business away from Youngevity and to Wakaya's competing business.  For example, Defendant Graham used Youngevity's distributor lists to support the resignation of Defendant Smith, reveal Wakaya as a competing MLM business opportunity, and mislead Youngevity distributors into believing that Smith's resignation and new venture were not objected to by Youngevity.

144.   As a direct and proximate result of Defendants' misappropriation of Youngevity's trade secrets, Youngevity has suffered and will continue to suffer damage.  Furthermore, Defendants have been unjustly enriched by their misappropriation and use of Youngevity's trade secrets and confidential information.

145.   Defendants' conduct was done and continues to be done willfully and maliciously.  Youngevity is therefore entitled to exemplary damages pursuant to Civil Code section 3426.3, subdivision (c), and reasonable attorneys' fees pursuant to Civil Code section 3426.4.

146.   Defendants and agreed and conspired to misappropriate Youngevity's trade secrets and confidential information to recruit Youngevity distributors into Wakaya and to promote Wakaya using Youngevity's trade secrets.  That misappropriation caused Youngevity damage in lost sales and profits from loss of those distributors.

## COUNT FIVE

### Misappropriation of Name and Likeness
### (Cal. Civ. Code § 3344)
### (Defendants TNT, Graham, Smith)

147.   The allegations of paragraphs 1 through 146 are incorporated herein by reference.

148.   Defendants TNT, Graham, and Smith have used and continue to use Dr. Joel Wallach's name, likeness, and identity without his permission.  Dr. Wallach granted Youngevity an exclusive license to use of his name, likeness, and identity.

149.   Those Defendants have gained a commercial benefit and advantage by using Dr. Wallach's name, likeness, and identity in commerce.

150.   The Defendants named herein this Count have used Dr. Wallach's mark, brand, and likeness on websites such as www.wallachonline.com and www.yteamtools.com, and through the phone number 1-800-Wallach, without Youngevity permission and despite Youngevity demands for immediate cessation of the unauthorized uses.

151.   Youngevity and its founder, Dr. Joel D. Wallach, have been harmed by the unlawful and improper misappropriation and use of his name, likeness, and identity.

152.   The Defendants have used the websites to divert Youngevity consumer traffic away from Youngevity.  At the very least, Youngevity continues to lose business opportunities that would otherwise flow from the websites herein identified.

153.   The Defendants' conduct was a substantial factor in causing that harm.

154.   Dr. Wallach's privacy interests, including the right to limit use of commercial trading on his name, likeness and identity outweigh any public interest served by the Defendants' improper use of Dr. Wallach's name, likeness, and identity.

155.   To the extent any implied license ever existed (and Youngevity does not concede that such license existed), that license has been revoked or rescinded. Yet the Defendants continue to hold and use websites and domains that feature Dr. Wallach's name and likeness and protected content.

156.   Defendants TNT, Graham, and Smith agreed and conspired to misappropriate Dr. Wallach's name and likeness by continuing to profit from his name and likeness through 1-800-WALLACH, yteamtools.com, and wallachonline.com.  That conspiracy to misappropriate caused Youngevity and Dr. Wallach damage in diversion of sales, profit, internet traffic, and consumer contact information that should have gone to Youngevity and authorized Youngevity distributors.

## COUNT SIX

### Lanham Act False or Misleading Advertising
### 15 U.S.C. § 1125
### (All Defendants)

157.   The allegations of paragraphs 1 through 158 are incorporated herein by reference.

**False and Misleading Advertising:**

158.   Defendants have made false statements of fact in commercial advertisements about allegedly superior commercial opportunities available to Wakaya distributors, by claiming, for example, that Wakaya distributors would be able to earn $100,000.00 per month or even $250,000 per month ("income claims"). Those statements by Wakaya are false on their face or by necessary implication, inaccurate, and/or the statements are likely to mislead or confuse a substantial portion of their intended audience.

159.   Wakaya's agents have pledged that individuals will have $600-$800 in earnings simply by signing on with Wakaya and without performing any work.

160.   Its agents have promised significant income results for all members. In one promotional call, Wakaya agents promised that "a year from now, many of us will be million dollar earners."[3]

161.   During promotional events, Wakaya encouraged product sales and memberships by informing individuals that they could be "million dollar earners."[4]

162.   Wakaya representatives, including Defendant Andre Vaughn (part of Wakaya's leadership team), claimed that participants could easily earn more than $85,000 within ninety days.  He later represented that participants could earn "a quarter million dollars in one month."

163.   Wakaya's founder, Defendant Todd Smith, explained on April 24, 2016 (and has reiterated several times) that individuals participating in Wakaya will be able to replace their living wages through money earned in Wakaya.

---

[3]*See, e.g.,* https://www.youtube.com/watch?v=4dW5-yCgJRE (last visited April 25, 2016).
[4]https://youtu.be/qpVPTIKiVmw (last visited April 27, 2016).

164.   On April 24, 2016, Mr. Smith provided the following warning along with a guarantee to participants in Wakaya:

> One of the things that I want to leave you with is kind of a word of warning, maybe a word of counsel, because I started out at the beginning congratulating you for being on this call, because those of you who are seriously looking at participating right now and getting people involved, you're going to be paid very, very well. I'm telling you right now, you're going to earn a *lot* of money. And, I'm not shy in telling you that.  I've been showing the plan to people; I've been sitting through multiple meetings today with distributors; and introducing and explaining the plan.  And I want you to know that those of you who take this with both hands and go to work, the amounts of money you're going to earn in this program are—right now, you won't even be able to imagine.  They are almost incalculable … because of the way this is set up.

165.   Defendant Smith then encouraged prospective Wakaya participants to avoid letting the "incredible income that you earn, and the prestige, and the popularity, and all the fame and everything—don't let it change you."

166.   In truth, Wakaya's income claims are utterly false and misleading. Wakaya's compensation model cannot produce the financial benefits claimed for the large majority of new recruits or enrollees and few, if any, individuals will be able to replace their existing income with income from Wakaya that is equal to or greater than their current salaries.

167.   The Defendants' unsubstantiated income claims actually deceived or have the potential to deceive a substantial segment of the intended audience. Those statements have induced Youngevity distributors to breach their contracts and enroll in Wakaya, and have misled the audience into believing that they can and will earn $100,000.00 per month or even $250,000 per month working as a distributor for Wakaya, which is utterly false.

168.   Defendants have promoted the Wakaya business as a joint venture with David Gilmour, the wealthy founder of the Fiji Water company and the owner

of the Wakaya tropical island.  Wakaya advertising describes Mr. Gilmour as a "partner" or "founder" of the Wakaya venture.  Wakaya's promotional brochures feature Mr. Gilmour's likeness and include quotations from Mr. Gilmour.  Wakaya holds Mr. Gilmour out as an individual who personally participates in the Wakaya venture, or backs the Wakaya venture financially.  Wakaya informational videos refer to "Mr. Gilmour, the founder of our company."  Wakaya routinely provided Mr. Gilmour's information, including books and literature, to prospective Wakaya members, and held Todd Smith out as Mr. Gilmour's "partner."  Wakaya sales pitches and promotional material frequently rely on Mr. Gilmour's biography and successes.  Wakaya intended those promotional statements to create an impression that Gilmour, a billionaire, was intimately involved in the direct-selling venture or a financial supporter of same.  For instance, Wakaya agents proclaim during sales presentations that "Mr. David Gilmour is our founder; the same founder of Fiji water."  At other times, agents have said that "a billionaire's backing it," referring to David Gilmour while promoting the Wakaya venture.  Other promotional videos have stated that David Gilmour is "backing everything" related to the company.[5]

169.   In conference calls promoting Wakaya, Defendant Smith pledged that all Wakaya members would meet Mr. Gilmour, and spoke about "how excited Mr. Gilmour is to see and meet every single one of you [Wakaya participants]." Defendants thus marketed the Wakaya enterprise by touting financial support of and involvement in Wakaya by Mr. Gilmour, even pledging that Wakaya participants would have an opportunity to meet and work with Mr. Gilmour. Defendants have thus marketed Wakaya through Mr. Gilmour's reputation.  Those efforts were designed to lend credibility to the Wakaya venture so that prospective recruits would think the business had facial legitimacy.

---

[5]*See, e.g.*, https://youtu.be/OHNNj-0BjPI (last visited April 25, 2016).

170.   In a promotional webinar, one Wakaya recruiter sold the opportunity through the following statement:

> The great part about this particular company is that it's founded by David Gilmour…[M]any people probably on this line didn't really know who David Gilmour was, but they knew about Fiji Water. They knew about Clairtone stereos.  They knew about all of these other companies [that Gilmour started].   And all of those companies went through exactly what we're going through.[6]

Thus, Wakaya promoted itself by trading on Mr. Gilmour's name and reputation and by falsely representing his relationship with the Utah-based direct-selling network venture.

171.   In reality, Defendant Todd Smith is the sole founder of the Wakaya Perfection direct-selling network, a startup business that purchased the Wakaya Perfection brand from Mr. Gilmour.  Mr. Gilmour created the Wakaya Perfection brand in 2011, and sold his products at retail.  Mr. Gilmour later sold the rights to the Wakaya brand to Todd Smith.  Defendant Smith is the sole owner and operator of the Wakaya Perfection LLC venture based out of Utah.  Mr. Gilmour is not involved with the Wakaya Perfection LLC direct-selling network and is not an owner of Wakaya Perfection LLC, despite Defendants advertisements to the contrary.  Mr. Gilmour has not appeared at Wakaya events, including "pre-launch" events.  He has not participated in marketing "conferences."  Mr. Gilmour is not involved in the Wakaya Perfection direct-selling network.

172.   The Defendants' advertising claims concerning Mr. Gilmour's involvement and the false income statements were material to consumers and prospective recruits entering Wakaya.

---

[6]*See, e.g.,* https://www.youtube.com/watch?v=2SpzlBlaxjA&feature=youtu.be (last visited April 27, 2016).

173.   Defendants Wakaya, Smith, Graham, TNT, Pitcock, and Vaughn have maliciously and unlawfully promoted Wakaya through false and misleading claims about Youngevity.  To lure business opportunities away from Youngevity, Defendants have falsely claimed that Youngevity has financial troubles. Defendants have falsely claimed that Youngevity was unable to pay commissions. Defendants have thus attempted to characterize Youngevity as a failing organization.

174.   In fact, Youngevity's financial health has never been stronger.  The company maintains excellent ratings with the Dunn & Bradstreet corporate credit monitoring organization.  Youngevity's sales and profits have grown consistently over the past decade.   As a publicly traded corporation, it most recently posted sales revenues over $156 million.  The Defendants have not informed prospective Wakaya customers that Youngevity terminated their accounts for cause.

175.   Wakaya has advertised products based on their alleged origin in the Fijian islands.

176.   A significant source of Wakaya's promoted value for products comes the "Fijian" qualities said to be inherent in the products sold.  For instance, Wakaya has marketed the following products primarily based on their origin in the Fijian islands and the benefits and qualities inherent in products sources from Fiji: Wakaya Bula Bottles, Wakaya Sava Cosmetics, Wakaya Detox Caps, Wakaya Essential Oils.

177.   Those products are in fact not sourced from Fiji.  The Bula Bottles are produced primarily in Idaho.  The Detox Caps are manufactured primarily in Idaho.  The Essential Oils are manufactured in Kansas.

178.   The Defendants' misleading claims are material and are likely to influence the willingness of the audience to become Wakaya distributors by purchasing that business opportunity.  Wakaya's false and misleading claims were

designed to, and did, usurp business from Youngevity on the promise of false hope for those who enrolled in the Wakaya venture.

179.   Defendants profited directly from the false and misleading claims.

180.   The Defendants' caused their false statements to enter interstate commerce by publishing those statements on the internet.

181.   Youngevity is or is likely to be injured as a result of the Defendants' false income claims by direct diversion of distributors to and sales of competing products by Wakaya.

## Unlawful Pyramid Scheme:

182.   The allegations of paragraphs 1 through 183 are incorporated herein by reference.

183.   Wakaya drives its compensation plan heavily through sign-up bonuses designed to compensate the acquisition of downline members in a marketing "matrix," as opposed to direct consumer sales.  Wakaya pays "bonuses" based on the enrollment of new members.  Wakaya's agents have explained that members must "join the program at $499."[7]

184.   The Wakaya product "Packs" are sold at exorbitant cost, and Wakaya encourages new members to purchase those packs for at least $499 per order.  New members must purchase those packs at $499 to remain eligible for profits within the system.  Those goods are sold at considerable markup, indicating little value attributed to the goods themselves—meaning that the purported value actually comes exclusively through the business opportunity.

185.   For example, before Wakaya Perfection began its direct-marketing business in 2016, a package of three Wakaya Beauty and Wellness products (e.g., Ginger Body Soak (16oz), Ginger Body Scrub (15oz), and Organic Pink Fijian

---

[7]*See, e.g.,* https://youtu.be/BKUWHmKHaHY (last visited April. 26, 2016).

Ginger (5.8oz)) sold online through Costco for $49.00.[8]  Those same three products now cost $187.90 through the Wakaya Perfection direct-selling network, which actually represents a discount at the "preferred customer" rates displayed online:  $38.25 for Pink Ginger Body Scrub 18oz; $84.40 for Pink Fijian Ginger Body Soak (16.9oz); and $65.25 for Organic Pink Fijian Ginger Powder (6.7oz).

186.   That significant price markup is necessary to support the significant "bonuses" and "commissions" promised to distributors participating in the direct-selling business.

187.   Wakaya's compensation plan pays bonuses for recruitment of new enrollees, including so-called qualifying, coding, or other bonuses linked exclusively to recruitment of new Wakaya distributors, *not* product sales or customer acquisition.  Wakaya compensation is thus largely tied to recruiting new members.

188.   Wakaya enrollment bonuses are tied to the number of members Wakaya participants can enroll.  Wakaya pledges to pay distributors $100 per enrollee in the system, and that bonus is not contingent on product sales.  It promises "matrix bonuses" that also compensate upline members solely for the recruitment of new participants without regard to product sales.  The system encourages reps to recruit new members rather than sell product.

189.   The Wakaya promotional campaign focuses on luxury lifestyles, large financial gains, cruises, and other indications of wealth, rather than product attributes, price points, or consumer need.  The false promise of luxury and wealth absent commercial substance and outside "customers" indicates that Wakaya is primarily a pyramid scheme without regard to product sales.

190.   Wakaya markets niche luxury products with little commercial utility through the use of distraction and hope.  Wakaya's marketing focuses on bucolic

---

[8] *See, e.g.,* http://www.costco.com/Wakaya-Perfection-Beauty-and-Wellness-Collection.product.100168158.html (last visited April 26, 2016).

images of sandy beaches and tropical islands.  Its sales pitches promise rags-to-riches success, even pledging that participation in Wakaya will help families "avoid foreclosure" or procure additional funds for luxury living.  Wakaya dangles "car bonuses" for those willing to participate in the program.  In reality, all but a few top corporate participants will be eligible for those benefits, if at all.

191.   The Wakaya venture's primary (if not exclusive) source of revenue and income is sourced from *within* the Wakaya organization, meaning the only individuals purchasing product are those involved in the business opportunity itself.  Wakaya has no significant independent source of income.  The reinvestment of income from downline members is thus essential for the promised payment of upline bonuses and commissions.

192.   Wakaya Perfection compels new distributors or enrollees to purchase goods in an effort to "qualify" accounts for earnings (e.g., commissions and bonuses).  Wakaya compels new enrollees to purchase the Paradise Starter Packs (at $500).  It also compels new enrollees to accept a monthly auto-ship (i.e., a continuity plan) at a cost of $150 per month.  *See* Wakaya Ambassador Application, attached as Exhibit J.  Therefore, Wakaya distributors become the primary source of product purchases.  New enrollees are considered "qualified" only if they also pay the $500 "starter pack" fee.  Although products ship along with the $500 fee, the "starter pack" is designed as an initial fee for new enrollees, which funds help to pay "bonuses" promised to upline distributors.  The Wakaya scheme therefore reaps profits almost exclusively based on new acquisition of enrollees and not from product sales, a hallmark of unlawful pyramid schemes.[9]

---

[9] Wakaya's compensation plan does allow distributors to qualify through personal retail sales in excess of $1,000 over a three month window.  Distributors must be "qualified" before they can earn commissions and bonuses within the Wakaya business engine.  However, those distributors would otherwise "qualify" through one purchase of the $499 Paradise Starter Pack.  Thus, Wakaya made the most expedient and affordable method for qualifying an account the purchase of a

193.   Wakaya offers a product line consisting of luxury beauty and cosmetic products (e.g., body scrubs and facial products), along with several nutrition or "wellness" products at exorbitant prices.  Those products are unlikely to generate substantial residual income streams, particularly from Wakaya's flagship offerings that are, essentially, culinary spices commonly available at retail like Ginger and Turmeric powder.  Wakaya sells Turmeric Powder for $65.25 (7.5oz), Pink Ginger for $65.25 (6.7oz), and Kosher Sea Salt for $39.35 (12oz).  Moreover, at those elevated prices, individuals looking to replace living wages through the Wakaya system are unlikely to find any value in Wakaya's compulsory product purchases.

194.   Wakaya's promotional events, marketing, videos, and literature focus exclusively on the business opportunity and growth of "downline" distributors. Wakaya's promotional content provides no guidance, instructions, or encouragement related to product sales outside of the organization to legitimate customers.

195.   Indeed, because Wakaya's direct-selling network supplies Wakaya products at a considerable premium over market rate, few legitimate "customers" would be expected outside of the Wakaya business plan.

196.   In truth, the Wakaya business plan promotes false and misleading earnings and opportunity claims, because the "residual" income promised by the Company is mathematically impractical for all but a few top-level distributors with high placements in the corporation.  The Wakaya venture is thus designed to produce large profits for "founders" or top-level corporate participants at the expense of those lower in the business hierarchy. Based on the Wakaya

Starter Pack by those distributors within Wakaya's organization.  Moreover, those sponsoring participants benefit most directly and efficiently by having their enrollees purchase the Paradise Starter Pack, making the sponsors' interests primarily geared towards that qualification process as they introduce prospects into the Wakaya system.  Again, the Wakaya system is designed almost exclusively to drive recruitment—*NOT* product sales—a hallmark of unlawful pyramid schemes.

compensation plan, only a few individuals can expect to earn any significant income, including so-called "residual" income through product commissions.

197.   Most Wakaya participants will spend more money to participate in Wakaya than they earn through their involvement with the company, and the majority of Wakaya representatives will not make the substantial incomes promised.

198.   Those Wakaya advertising claims concerning the business opportunity are therefore false and misleading.  The average Wakaya participant will not experience significant financial gains through the Wakaya startup venture.

199.   The Federal Trade Commission has determined that similar business structures that share elements of the Wakaya business methodology are unlawful pyramid schemes, in part, based on similar fact presented herein in this Complaint. *See F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878 (9th Cir. 2014) (affirming district court's holding that the defendant was an illegal pyramid scheme); *see also F.T.C. v. Vemma Nutrition Co.,* No. CV-15-01578-PHX-JJT (D. Ariz. Aug. 21, 2015) (Order granting preliminary injunction against illegal pyramid scheme); *F.T.C. v. Fortune Hi-Tech Mktg., Inc.*, No. 5:13-cv-123-KSF (E.D. Ky. May 9, 2014) (Stipulated Order for Permanent Injunction and Monetary Judgment against illegal pyramid scheme).

200.   Wakaya has many hallmarks of an unlawful pyramid scheme:

a.   It requires payments for entry into the business organization, which entrance fees are then used to pay existing participants;

b.   The Wakaya income is based predominantly on the number of people that are recruited into the program, and not based on how much product is actually sold.  The Wakaya marketing materials focus solely on recruiting other representatives or affiliates.

c.   The Wakaya venture requires new enrollees to purchase product through a continuity plan, meaning that most of the product

"sales" are derived from within the business organization itself. Wakaya requires a continuity plan equivalent to $150/month or $1,800/year, the same value the FTC found unlawful in its Vemma lawsuit. *F.T.C. v. Vemma Nutrition Co.*, No. CV-15-01578-PHX-JJT, 2015 WL 9694632 (D. Ariz. Sept. 18, 2015) (explaining that "[t]he FTC objects to Vemma's proposed compensation plan on the grounds that it still incentives recruitment of Affiliates over retail sales").

d.   The Wakaya promotional materials promise luxurious living, luxury cars, vacations, etc., without disclosing the average or expected yields to those distributors who become downline participants.

e.   The Wakaya products provide little value when compared with, or in exchange for, the investment in the business opportunity. Wakaya's direct-selling products commonly available at retail are marked up substantially over the prices previously offered at retail in prior years predating the direct-selling organization.

f.   The Wakaya venture has few (if any) "customers" that are beyond the business organization itself.  Sales occur only between people inside the pyramid structure or to new recruits joining the structure.  The lack of retail sales is a common indication of an unlawful pyramid scheme.

g.   The Wakaya venture lures new recruits by touting the exotic and luxurious qualities of Wakaya's products sourced from "Fijian Islands."  The benefits of the "Fijian" sourcing are difficult for consumers to verify and, indeed, misleading to the extent Wakaya suggests that the Fijian source produces any significant health or commercial benefit.  New recruits are led to disregard

the commercial impracticalities through distractive emphasis on the foreign-sourced, luxury or tropical branding.

201.   Unlawful pyramid schemes are by definition false and misleading. New recruits, distributors, and participants are encouraged to participate in the scheme without critical disclosures or warnings related to the risk of monetary loss.

202.   Wakaya has misrepresented the true nature of its business opportunity. Defendants cannot reasonably expect that the Wakaya venture will be as lucrative as advertised.

203.   Wakaya has embraced the false and misleading nature of its pyramid scheme.  It has encouraged blind enrollment in the Wakaya "matrix" and targeted vulnerable recruits looking for profit and wealth.  At public Wakaya events and on corporate webinars, several Wakaya agents have described the desired enrollment process as "ignorance on fire."

204.   One Wakaya recruiter described the recruitment process as a means to keep prospective recruits ignorant of key business aspects:

> We don't want people to know everything.  We want people – even Andre [Vaughn], when we were at the [Wakaya Prelaunch] event this weekend, Andre was like 'I know like 15% of everything that's, you know, where this company is concerned.' He said 'I'm ignorance on fire right now.'  And that's what we want.  We don't want to have a bunch of experts running around thinking that they need to tell everybody everything about anything because then your prospects are going to think that they need to know and do the same thing."[10]

205.   Another recruiter separately explained that she had enrolled individuals without even having the name of the Wakaya company:

---

[10]*See, e.g.,* https://www.youtube.com/watch?v=2SpzlBlaxjA&feature=youtu.be(last visited April 27, 2016).

[T]alk about ignorance on fire, the first person I signed up on this was my rep Dave.   And [in] our phone conversation … I had forgotten to ask what the name of the company was.   So here I am signing Dave up and he's like, 'what's the name?'   I said 'do you want to know the name of the company?'   He said 'no I don't care.'   And I said 'that's good [because] I forgot to ask.'   I had no idea.   But you know what, I was so excited that it didn't matter.   Does it really matter what the name is?   No.[11]

206.   Youngevity suffers direct and proximate injury stemming from the false and misleading Wakaya advertising and business model.   Youngevity competes directly with Wakaya in the direct-selling network business.   Wakaya competes directly against Youngevity in the multi-level marketing field.   Youngevity sells products that compete directly with Wakaya, including, but not limited to:   ginger products, essential oils, natural detoxification products, turmeric products, and cosmetic products.

207.   Wakaya therefore profits at Youngevity's expense because revenues flowing to Wakaya and linked to Wakaya's unlawful activity would otherwise be available to Youngevity and Youngevity's distributors who supply products in the same competitive field.

208.   Youngevity has suffered direct and proximately losses from Wakaya's false advertising.   Wakaya's false and deceptive marketing has convinced Youngevity distributors to leave Youngevity's business organization for Wakaya's business model.

209.   Therefore, the Defendants' representations discussed herein Count Seven are false or misleading and constitutes a deceptive act or practice in violation of the Lanham Act, 15 U.S.C. § 1125.

210.   Defendants agreed and conspired to violate the Lanham Act by making false representations concerning the nature of Wakaya and David

---

[11] *Id.*

Gilmour's interest in Wakaya, as described above. Those misrepresentations caused Youngevity to suffer damage, including convincing Youngevity distributors to leave Youngevity's business organization for Wakaya's business model.

## COUNT SEVEN

### Breach of Fiduciary Duty
### (Defendant Andreoli)

211.    The allegations of paragraphs 1 through 210 are incorporated herein by reference.

212.    Bill Andreoli, as President of Youngevity, owed fiduciary duties to Youngevity. Those duties included notifying Youngevity and obtaining authorization from Youngevity before force qualifying any individuals or entities. Those duties also obligated actions from Andreoli that served the interests of Youngevity over competing ventures. Those duties also required Andreoli to exercise reasonable care and to maintain his loyalty to Youngevity.

213.    Andreoli breached his fiduciary duties to Youngevity, in part, by force qualifying his friends and family without obtaining authorization from Youngevity. He breached his fiduciary duties by encouraging the infliction of financial loss to Youngevity's business by other Youngevity distributors and employees.

214.    Andreoli's breach of his fiduciary duties to Youngevity proximately caused Youngevity damages. Youngevity then paid those individuals and entities higher than justified commissions and bonuses over the course of four years, at the direct and substantial expense of Youngevity.

## **COUNT EIGHT**

**Unfair Competition
Cal. Bus. & Prof. Code § 17200
(All Defendants)**

215.   The allegations of paragraphs 1 through 214 are incorporated herein by reference.

216.   The Defendants' conduct, as alleged above, constitutes unlawful, unfair, and/or fraudulent business practices, as defined in the California Business and Professions Code § 17200 *et seq.*  California Business and Professions Code § 17200 *et seq.* borrows violations from other statutes and laws and makes them unlawful to engage in as a business practice. Plaintiff's California Business and Professions Code § 17200 allegations are tethered to the following violations:

217.   Defendants Smith's, Graham's and Wakaya's interference with Youngevity's prospective economic relationship with Mr. David Smith, the owner of GAC,  constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

218.   Defendants' interference with contracts Youngevity had with third parties, and inducement to those parties to breach their contracts with Youngevity, constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

219.   Defendant Andreoli's, Pitcock's, Cloward's, and Gardner's breaches of contracts with Youngevity constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

220.   Defendant TNT's, Graham's, and Smith's use of Dr. Joel Wallach's name, likeness, and identity without permission constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

221.   Defendants' violation of the Lanham Act by making false income and other claims constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

222.   Defendants' violation of the California's False Advertising Law by making advertising claims constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

223.   Defendant Andreoli's breach of fiduciary duty to Youngevity constitutes unlawful conduct under California Business and Professions Code § 17200 *et seq.*

224.   Defendants' participation in, organization of, and operation of an unlawful pyramid scheme violates federal law, is unlawful under California law, and constitutes an unlawful practice under California law.

225.   TNT's selling of commercial goods, including CDs, DVDs, flyers, and clothing, bearing Youngevity's name is an unfair act because it infringes on Youngevity's registered trademark, to wit, "Youngevity."

**Unlawful Endless Chain Scheme:**

226.   The allegations of paragraphs 1 through 225 are incorporated herein by reference.

227.   Cal. Penal Code § 327 ("Section 327") prohibits a person from willfully contriving, preparing, setting up, or operating an organization which gives compensation to some person when that compensation is given by the organization to the person for the chance to receive compensation for introducing one or more additional persons into participation in the scheme, or, for the chance to receive compensation when a person introduced by the participant introduces a new participant."  *People v. Frederick*, 48 Cal. Rptr. 3d 585, 598 (Cal. Ct. App. 2006).

228.   Even if Wakaya's distributors make "retail sales, [those sales] do not legalize the pyramid marketing scheme which violates Penal Code section 327…

the question is whether the focus of [Wakaya]—rather than the product sales themselves—was the recruitment of more members into the scheme." *People v. Sweeney*, 175 Cal. Rptr. 3d 31, 37–38 (Cal. Ct. App. 2014).

229.   As the facts alleged herein demonstrate, Wakaya is an unlawful endless chain scheme as defined by Section 327.  Wakaya gives compensation to individuals who enroll other individuals into Wakaya.  The primary focus of Wakay is the recruitment of more members into the scheme.

230.   Defendants willfully contrived, prepared, set up, and operated Wakaya in violation of Section 327.

231.   As a result of Defendants' wrongful conduct, Youngevity has suffered and will continue to suffer damages and injuries according to proof at trial.

232.   Defendants conspired to violate California's unfair competition law by agreeing to take actions that are unlawful, unfair, and fraudulent as described above.  As a result of Defendants' conspiracy to violate California's unfair competition law, Youngevity has suffered and will continue to suffer damages and injuries according to proof at trial.

## COUNT NINE

### False Advertising
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*
### (All Defendants)

233.   The allegations of paragraphs 1 through 232 are incorporated herein by reference.

234.   The Defendants have acted cooperatively and in concert to promote and encourage consumers to join Wakaya.

235.   As detailed herein, the Defendants have used and stated false and/or misleading advertising claims to encourage consumers to join Wakaya.  Those false and misleading advertising statements include, but are not limited to:

- Defendant Graham using the email, text communication, and the confidential distributor list to convey the false impression that Youngevity had no issues with Todd's departure or formation of a competing MLM, thus implying that further moves by Youngevity distributors to become Wakaya distributors would likewise not offend the company.
- Defendant Vaughn representing that Wakaya distributors can earn a free cruise in only 12 hours.
- The Defendants' attempts to cast Youngevity as a financially bereft corporation on the brink of bankruptcy.
- The Defendants' representations that Wakaya distributors can earn large incomes, including ones of $100,000 or even $250,000 per month.
- The Defendants false representations that Wakaya is a joint venture with David Gilmour, the wealthy founder of the Fiji Water company and the owner of the Wakaya tropical island.
- The Defendants misleading promotion of an unlawful pyramid or "endless chain" scheme.

236.   The Defendants knew or should have known that their statements to consumers were false.

237.   The Defendants dissemination of false and misleading advertising is likely to deceive—and has deceived—end consumers.

238.   The Defendants' false advertising has caused Youngevity competitive injury.

239.   The Defendants have therefore acted in concert to violate California statutory restrictions on false or misleading advertising, causing harm to Youngevity.

240.   The Defendants have also conspired to violate California's false advertising law as described above.  That conspiracy has damaged Youngevity, including causing Youngevity competitive injury.

### **PRAYER FOR RELIEF:**

WHEREFORE, Youngevity prays for judgment in its favor and against Defendants and requests that this Court award NIC the following:

A.       An award of exemplary or punitive damages under Cal. Civ. Code § 3294, 15 U.S.C. § 1117,and other applicable laws and statutes for Defendants' conduct undertaken with intent to injure Plaintiff, or with a willful and conscious disregard of Youngevity's rights.  This is an exceptional case that involves a Company's top officers, employees, and distributors conspiring together, while employed at Youngevity, to create a business in direct competition with Youngevity. An award of punitive damages sufficient to deter and prevent that misconduct in future is appropriate in this case.

B.       A permanent injunction enjoining the Defendants, their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, subsidiaries, affiliated companies or entities, all those in privity with same, and all those in active concert or participation who receive actual notice of the judgment: (1) from using any of Youngevity's proprietary and confidential information in any manner not expressly authorized by Youngevity; (2) from profiting from any of their illegal activities, including profits made from Wakaya employees and/or distributors who were employed by and/or distributors for Youngevity; (3) from recruiting any additional Youngevity employees or distributors; (4) from maintaining distributorships with those recruited from Youngevity through unlawful means, including through cross-recruiting; (5) from operating an unlawful pyramid scheme; (6) from making any further commercial use of the name and likeness of Joel D. Wallach, BS, DVM, ND, including, but not limited to, making commercial use of the name and likeness of Joel D. Wallach, BS,

DVM, ND through the websites wallachonline.com and yteamtools.com, and through the phone number 1-800-WALLACH; and (7) from making any further commercial use of the name "Youngevity," including, but not limited to, making commercial use of the name "Youngevity" through the websites wallachonline.com and yteamtools.com, and through the phone number 1-800-WALLACH.

C.      An Order requiring the Defendants to file with this Court a compliance plan under oath describing the method and manner in which Defendants intend to comply with the injunction(s), including a description of any new operating procedures and policies, to be filed within 30 days after service of an injunction;

D.      Order that defendants specifically perform contractual provisions binding on Defendants Smith, Andreoli, Graham, Pitcock, Gardner, and Vaughn that require those defendants to return all proprietary and confidential information to Youngevity;

E.      An award to Plaintiff Youngevity of costs and reasonable attorney fees and expenses incurred by Youngevity in connection with this action;

F.      An award to Plaintiff Youngevity of all of Defendants' profits and incomes since October, 2015;

G.      An award to Plaintiff Youngevity of all damages suffered by Youngevity as a result of Defendants' unlawful acts;

H.      An award to Plaintiff Youngevity of all damages allowed under the contracts and agreements between Youngevity and defendants Smith, Andreoli, Graham, Vaughn, Pitcock, Cloward, and Gardner;

I.      An award to Plaintiff Youngevity of all Wakaya sales receipts and proceeds from the sale of GAC products exclusively licensed to Wakaya;

J.      An accounting of all Defendants' profits, revenues, accounts, and proceeds received or obtained, directly or indirectly, since the date Wakaya was founded.

K.      Pre-judgment and post-judgment interest on the above damage awards;

L.      An order adjudging all Defendants jointly and severally liable, as the law allows, under each cause of action asserted by Youngevity and for all damages awarded against any Defendant;

M.      Such other and further relief as this Court deems just.

DATED:  May 6, 2016

Respectfully submitted,

YOUNGEVITY INTERNATIONAL, CORP.

By:      */s/ Peter A. Arhangelsky*
Peter A. Arhangelsky, Esq. (SBN 291325)
*Attorney for Plaintiff Youngevity*
E-mail: parhangelsky@emord.com
Emord & Associates, P.C.
3210 S. Gilbert Road, Suite 4
Chandler, AZ 85286
Phone: (602) 388-8899
Fax: (602) 393-4361

# CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Kyle M. Van Dyke
Hurst & Hurst
701 B Street
Suite 1700
San Diego, CA 92101
(619) 236-0016
(619) 236-8569 (fax)
kvandyke@hurst-hurst.com
*Attorney for Defendants Todd Smith, Wakaya Perfection, Total Nutrition Team, Blake Graham, Andre Vaughn, Dave Pitcock, Patti Gardner, Brytt Cloward, and Does 1–10*

Jonathan R. Schofield
Jonathan O. Hafen
Parr Brown Gee & Loveless
101 South 200 East, Suite 700
Salt Lake City, UT 84111
801-532-7840
Fax: 801-532-7750
jschofield@parrbrown.com
jhafen@parrbrown.com
*Attorneys for Defendant Wakaya perfection*

    /s/ Peter A. Arhangelsky
    Peter A. Arhangelsky