Kyle Van Dyke (171186)
kvandyke@hurst-hurst.com
HURST & HURST
701 B Street, Suite 1700
San Diego, CA 92101
Telephone: (619) 236-0016
Facsimile: (619) 236-8569

Jonathan O. Hafen (admitted pro hac vice, Utah #6096)
jhafen@parrbrown.com
Jonathan R. Schofield (admitted pro hac vice, Utah #8742)
jschofield@parrbrown.com
PARR BROWN GEE & LOVELESS, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
Facsimile: (801) 532-7750

Attorneys for Defendants

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOUNGEVITY INTERNATIONAL CORP. and JOEL D. WALLACH, DVM, ND, <br><br> Plaintiff, <br><br> v. <br><br> TODD SMITH; WAKAYA PERFECTION; TOTAL NUTRITION TEAM dba TNT; BLAKE GRAHAM; WILLIAM ANDREOLI; ANDRE VAUGHN; DAVE PITCOCK; PATTI GARDNER; and BRYTT CLOWARD, <br><br> Defendants. <br> ------------------------------------------- <br> WAKAYA PERFECTION, LLC; TODD SMITH; BLAKE GRAHAM; DAVE PITCOCK; BARB PITCOCK; ANDRE VAUGHN; TOTAL NUTRITION, INC. dba TNT, <br><br> Counterclaim Plaintiffs, | Case No.  3:16-CV-00704-L-JLB <br><br> **FIRST AMENDED ANSWER AND COUNTERCLAIM** <br><br><br> Judge M. James Lorenz <br><br> Magistrate Judge Jill L. Burkhardt <br><br> <u>JURY TRIAL REQUESTED</u> |

v.

YOUNGEVITY INTERNATIONAL,
INC.; DR. JOEL WALLACH; STEVE
WALLACH; MICHELLE
WALLACH; DAVE BRISKIE; DOES
1-10,

          Counterclaim Defendants.

Defendants Todd Smith ("Smith"), Wakaya Perfection ("Wakaya"), Total Nutrition Team d/b/a TNT ("TNT"), Blake Graham ("Graham"), William Andreoli ("Andreoli"), Andre Vaughn ("Vaughn"), Dave Pitcock ("Pitcock"), Patti Gardner ("Gardner"), and Brytt Cloward ("Cloward" or, collectively with Smith, Wakaya, TNT, Graham, Andreoli, Vaughn, Pitcock, and Gardner, "Defendants"), by and through their undersigned legal counsel, hereby answer and respond to the specific allegations in the Third Amended Complaint for Damages and Injunctive Relief (the "Complaint") filed by Plaintiffs Youngevity International Corp. ("Youngevity") and Joel D. Wallach, DVM, ND ("Wallach" or, collectively with Youngevity, "Plaintiffs").

This case involves Smith's decision to cease acting as a Youngevity distributor and the subsequent vendetta carried out by Youngevity, its management, and its counsel in this matter. After spending two decades building some of Youngevity's most successful distributorships, Smith became disillusioned by what he viewed as counter-productive and unprofessional behavior on the part of Youngevity's management and decided to make a clean break from Youngevity. In the course of his extensive experience as a Youngevity distributor, Smith had observed the Youngevity management's defensive and retaliatory responses to other distributors who had left the company. Wishing to avoid such a response, Smith specifically chose Wakaya because it would allow him to market and distribute high-quality products that were not direct competitors for Youngevity products. But despite the care Smith took to avoid even the appearance of competition with Youngevity, Youngevity and its management have engaged in a concerted campaign to destroy Smith, Wakaya, and everyone perceived to be associated with Wakaya. This campaign has included the summary and wrongful termination of distributors, baseless and harassing litigation, and defamatory material published to the media and the larger network-marketing community.

## ANSWER

Defendants hereby answer and respond to the specific allegations in Plaintiffs' Complaint as follows:

## FIRST DEFENSE

Defendants respond to the numbered paragraphs of the Complaint as follows (headings prior to the Second Defense set forth below correspond to the headings found in the Complaint):

1.     Admit to the extent the documents speak for themselves.  Deny the remainder of this paragraph for lack of knowledge or information.

## PARTIES

**The Plaintiffs:**

2.     Admit that Youngevity is a multi-level-marketing company doing business in California.  Deny the remainder of this paragraph for lack of knowledge or information.

3.     Admit that Youngevity has sold products through multi-level-marketing networks.  Deny the remainder of this paragraph for lack of knowledge or information.

4.     Admit that Youngevity has sold products, including products created by Wallach.  Deny the remainder of this paragraph for lack of knowledge or information.

5.     Admit that Youngevity sells products through multi-level-marketing networks of distributors.  Deny the remainder of this paragraph for lack of knowledge or information.

6.     Admit that Youngevity distributors market and sell products through a number of channels, including both in person and on the Internet.  Deny the remainder of this paragraph for lack of knowledge or information.

7.     Deny this paragraph for lack of knowledge or information.

8.     Admit that Wallach markets himself as an author and doctor.  Deny

2

1    the remainder of this paragraph for lack of knowledge or information.

2          9.     Deny this paragraph for lack of knowledge or information.

3          10.     Admit that Wallach was involved with founding Youngevity.  Deny

4    the remainder of this paragraph for lack of knowledge or information.

5          11.     Admit that Wallach has been involved with Youngevity over time.

6    Deny the remainder of this paragraph for lack of knowledge or information.

7    **The Defendants:**

8          12.     Admit.

9          13.     Deny.

10         14.     Admit that Smith is an individual and Utah resident, held ownership

11    interests in TNT—which distributed Youngevity products—and formed Wakaya.

12    Deny the remainder of this paragraph. Affirmatively allege that Smith deliberately

13    chose Wakaya because it did not compete with Youngevity in the marketplace.

14         15.     Admit to the extent the documents speak for themselves.  Deny the

15    remainder of this paragraph.  Affirmatively allege that Smith and Wakaya are not

16    alter egos of each other.

17         16.     Admit that Andreoli is a resident of New Hampshire, is currently

18    President of Wakaya, and through November 2015 was President of Youngevity.

19    Further admit that Andreoli's compensation plan while with Youngevity speaks for

20    itself. Deny the remainder of this paragraph.

21         17.     Admit that Vaughn is an individual and resident of Pennsylvania,

22    served as a distributor for Youngevity until March of 2016, and currently is a

23    distributor for Wakaya. Deny the remainder of this paragraph.

24         18.     Admit that Pitcock is an individual and Kansas resident, was formerly

25    a top-level distributor of Youngevity products, and held ownership interests in

26    Livinity Corporation ("Livinity"), which was purchased from Pitcock by

27    Youngevity in 2012.  Deny the remainder of this paragraph.  Affirmatively allege

28    that Pitcock and Livinity are not alter egos of each other.

19.     Admit to the extent the documents speak for themselves.  Deny the remainder of this paragraph.

20.     Admit that TNT is a Utah corporation founded by Smith and Graham, that Smith transferred his ownership interest in TNT to Graham in December 2015, and that Youngevity attempted to wrongfully terminate TNT's distributorship of Youngevity products in March 2016.  Deny the remainder of this paragraph.

21.     Admit that Graham is an individual and Utah resident, held ownership interests in TNT—which distributed Youngevity products—and now distributes Wakaya products.  Deny the remainder of this paragraph.

22.     Admit that Graham holds interests in entities which own yteamtools.com and engevity.co.jp.  Deny the remainder of this paragraph.

23.     Admit that Gardner is an individual and Utah resident, formerly served as President of Heritage Makers, Inc. ("Heritage"), formerly served as Vice President of Sales at Youngevity after it acquired Heritage, and is currently Vice President at Wakaya.  Deny the remainder of this paragraph.

24.      Admit that Cloward is an individual and Utah resident, formerly served as Vice President of Sales and Marketing at Heritage, formerly served as Vice President of Marketing at Youngevity after it acquired Heritage, and is currently Vice President of Marketing at Wakaya.  Deny the remainder of this paragraph.

25.     Deny.

## JURISDICTION AND VENUE

26.     Admit that this Court currently appears to have subject matter jurisdiction under 29 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367(a).

27.     Admit that this Court currently appears to have subject matter jurisdiction under 28 U.S.C. § 1332.

28.     Admit that this Court currently appears to have personal jurisdiction

4

over Defendants.

29.     Admit that Youngevity is a multi-level-marketing company doing business in California.  Deny the remainder of this paragraph for lack of knowledge or information and as a legal conclusion.

## COUNT ONE
## LANHAM ACT FALSE OR MISLEADING ADVERTISING
## 15 U.S.C. § 1125

30.     Admit that Wakaya is primarily engaged in the business of selling goods and services through Wakaya.  Deny the remainder of this paragraph.

31.     Deny.   Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

32.     Deny.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

33.     Deny.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

**A. Income Claims (Against Wakaya Only)**

34.     Admit that Wakaya's distributors earn significant incomes.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for

5

itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

35.    Admit that individuals may earn significant incomes after becoming a distributor of Wakaya products.  Deny the remainder of this paragraph. Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

36.    Admit that the cited YouTube video speaks for itself.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

37.    Admit that the cited YouTube video speaks for itself and that distributors of Wakaya may earn over a million dollars.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

38.    Admit that distributors of Wakaya products may earn significant incomes.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by

6

Youngevity.

39.    Admit that individuals participating in Wakaya have replaced their living wages through money earned in Wakaya.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

40.    Admit that distributors of Wakaya products may earn significant incomes.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

41.    Deny.  Affirmatively allege that any statements of fact made by Wakaya have been truthful, that distributors of Wakaya products may earn significant incomes, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

42.    Deny.  Affirmatively allege that any statements of fact made by Wakaya have been truthful, that distributors of Wakaya products may earn significant incomes, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a

self-serving characterization by Youngevity.

43.   Deny.  Affirmatively allege that any statements of fact made by Wakaya have been truthful, that distributors of Wakaya products may earn significant incomes, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

44.   Deny.  Affirmatively allege that any statements of fact made by Wakaya have been truthful, that distributors of Wakaya products may earn significant incomes, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity, and that any loss of distributors or potential distributors by Youngevity to Wakaya has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as further described in the Counterclaims below.

45.   Deny.  Affirmatively allege that any statements of fact made by Wakaya have been truthful, that distributors of Wakaya products may earn significant incomes, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, that Wakaya's compensation plan speaks for itself, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to

8

Counterclaim Plaintiffs, as further described below.

**B. David Gilmour's Involvement (Against Wakaya Only)**

46.     Admit that Wakaya's promotional materials speak for themselves. Deny the remainder of this paragraph.

47.     Admit that Wakaya's advertising speaks for itself.  Deny the remainder of this paragraph.

48.     Admit that Wakaya's promotional materials speak for themselves. Deny the remainder of this paragraph.

49.     Admit that Wakaya's advertising and promotional materials speak for themselves.  Deny the remainder of this paragraph.

50.     Admit that Wakaya's informational videos speak for themselves. Deny the remainder of this paragraph.

51.     Admit that Wakaya's advertising and promotional materials speak for themselves.  Deny the remainder of this paragraph.

52.     Admit that Wakaya's advertising and promotional materials speak for themselves.  Deny the remainder of this paragraph.

53.     Admit that Wakaya's statements regarding Mr. David Gilmour ("Gilmour") speak for themselves.  Deny the remainder of this paragraph.

54.     Admit that Gilmour founded Wakaya and Fiji Water and that such statements would speak for themselves.  Deny the remainder of this paragraph. Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

55.     Admit that Gilmour remains involved with Wakaya.  Deny the remainder of this paragraph.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements selectively quoted herein

1   have been taken out of context and given a self-serving characterization by

2   Youngevity.

3        56.    Admit that Wakaya distributors have met Gilmour and will continue

4   to do so.  Deny the remainder of this paragraph.  Affirmatively allege that

5   individuals identified herein and other distributors of Wakaya's products neither

6   are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements

7   selectively quoted herein have been taken out of context and given a self-serving

8   characterization by Youngevity.

9        57.    Deny.

10       58.    Admit that Smith founded Wakaya and that the Wakaya brand was

11  ultimately acquired from Gilmour.  Deny the remainder of this paragraph.

12       59.    Admit that Gilmour does not currently hold an ownership interest in

13  Wakaya and that such advertisements speak for themselves.  Deny the remainder

14  of this paragraph.

15       60.    Deny.

16       61.    Admit to the extent such advertising claims speak for themselves.

17  Deny the remainder of this paragraph. Affirmatively allege that individuals

18  identified herein and other distributors of Wakaya's products neither are agents of

19  Wakaya nor speak for or on behalf of Wakaya and that the statements selectively

20  quoted herein have been taken out of context and given a self-serving

21  characterization by Youngevity.

22       62.    Deny. Affirmatively allege that individuals identified herein and other

23  distributors of Wakaya's products neither are agents of Wakaya nor speak for or on

24  behalf of Wakaya and that the statements selectively quoted herein have been

25  taken out of context and given a self-serving characterization by Youngevity.

26       63.    Deny.  Affirmatively allege that any claims made by Wakaya

27  concerning Gilmour were and are true, that any loss of distributors or potential

28  distributors by Youngevity to Wakaya has been the direct result of the actions

1   taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are

2   further described in the Counterclaims below—and that individuals have chosen to

3   join Wakaya and purchase Wakaya products for a wide variety of reasons.

4   **C. Statements About Youngevity's Finances (Against Wakaya, Smith,**

5   **Graham, and Pitcock)**

6       64.    Deny.

7       65.    Deny.  Affirmatively allege that Youngevity has had financial

8   problems and other issues that could cause Youngevity to go out of business, that

9   any such statements referenced in this paragraph speak for themselves, and that

10   individuals identified herein and other distributors of Wakaya's products neither

11   are agents of Wakaya nor speak for or on behalf of Wakaya.[1]

12       66.    Admit that Dunn & Bradstreet monitors the corporate credit of

13   Youngevity and Wakaya.  Deny the remainder of this paragraph.

14       67.    Deny.

15       68.    Deny.

16       69.    Deny.

17       70.    Deny.

18       71.    Deny.  Affirmatively allege that such statements of fact were and are

19   true, that any injury to or loss of distributors or potential distributors by Plaintiffs

20   has been the direct result of the actions taken by Youngevity, Wallach, and the

21   other Counterclaim Defendants—as are further detailed in the Counterclaims

22   below—and that individuals have chosen to join Wakaya and purchase Wakaya

23   products for a wide variety of reasons.

24   **D. False Origin Statements About Wakaya Products (Against Wakaya and**

25   **Smith)**

26       72.    Admit to the extent such advertisements speak for themselves.

27

28   [1] Plaintiffs mistakenly included two paragraphs numbered as 65.  Defendants'
paragraph 65 herein is responsive to both of those paragraphs.

11

73.     Admit to the extent such marketing speaks for itself and that Smith has been involved with Wakaya, including by reviewing, approving, or consenting to the issuance and use of certain advertising, marketing, and other promotional materials.  Deny the remainder of this paragraph.

74.     Admit to the extent the name speaks for itself.  Deny the remainder of this paragraph.  Affirmatively allege that Wakaya has never claimed, implicitly or otherwise, that "all" aspects of its products—from ingredients to packaging—are "sourced from Wakaya Island."

75.     Admit to the extent such statements made on Facebook by Wakaya speak for themselves.  Deny the remainder of this paragraph.

76.     Admit to the extent such statements made on YouTube by Wakaya speak for themselves.

77.     Admit to the extent such statements made by Smith on social-media platforms speak for themselves.  Deny the remainder of this paragraph.

78.     Admit to the extent such statements made by Smith on social-media platforms speak for themselves.  Affirmatively allege that any such statements of fact were and are true.

79.     Admit to the extent such statements made on Facebook by or to Wakaya speak for themselves.  Deny the remainder of this paragraph. Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

80.     Admit to the extent such statements made in Wakaya's catalog speak for themselves.  Deny the remainder of this paragraph.  Affirmatively allege that any such statements of fact were and are true.

81.     Admit to the extent such statements made on YouTube by Wakaya speak for themselves.  Deny the remainder of this paragraph.  Affirmatively allege

that any such statements of fact were and are true.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

82. Deny.

83. Admit that Smith has been involved with Wakaya's marketing and that such marketing promotes the fact that products originate from Wakaya Island. Deny the remainder of this paragraph.

84. Admit that Wakaya has production, manufacturing, and sourcing facilities throughout the United States that create aspects of certain products, including Bula Bottles, Bula Caps, Essential Oils, Wakaya Pop! Popcorn, and Wakaya Calcium Bentonite Clay.  Deny the remainder of this paragraph.

85. Deny.

86. Deny.

87. Deny.  Affirmatively allege that such statements of fact were and are true and that Wakaya's products are superior to those offered by competitors.

88. Deny.  Affirmatively allege that such statements of fact were and are true.

89. Deny.  Affirmatively allege that such statements of fact were and are true, that any injury to or loss of distributors or potential distributors by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

**E. Sale of Unsafe, Adulterated, or Deleterious Products (Against Wakaya Only)**

90. Admit.

91.    Admit.

92.    Admit to the extent Wakaya's labeling speaks for itself.

93.    Admit to the extent such statements speak for themselves.  Deny the remainder of this paragraph.  Affirmatively allege that such statements of fact were and are true, that there is no such "risk of injury due to elevated arsenic and lead" in Wakaya's products, and that Wakaya complies with all labeling requirements.

94.    Deny.

95.    Admit to the extent such statements speak for themselves. Affirmatively allege that such statements of fact were and are true, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

96.    Admit to the extent such statements speak for themselves. Affirmatively allege that such statements of fact were and are true, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

97.    Admit to the extent such statements speak for themselves. Affirmatively allege that such statements of fact were and are true, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

98.    Deny.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable

14

1  privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further
2  described below.

3      99.   Deny.  Moreover, upon information and belief, affirmatively allege
4  that Plaintiffs have published and publicized these and other defamatory statements
5  outside the scope of these proceedings and waived any potentially applicable
6  privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further
7  described below.

8      100.  Deny.  Affirmatively allege that the FDA warning quoted by Plaintiffs
9  is for a product called "Bentonite Me Baby" by Alikay Naturals—which is neither
10  a Wakaya product nor Wakaya.

11     101.  Deny.  Moreover, upon information and belief, affirmatively allege
12  that Plaintiffs have published and publicized these and other defamatory statements
13  outside the scope of these proceedings and waived any potentially applicable
14  privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further
15  described below.

16     102.  Deny.  Affirmatively allege that there are no such risks and that
17  Wakaya fully complies will all labeling requirements.

18     103.  Deny.  Moreover, upon information and belief, affirmatively allege
19  that Plaintiffs have published and publicized these and other defamatory statements
20  outside the scope of these proceedings and waived any potentially applicable
21  privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further
22  described below.

23     104.  Admit to the extent such statements speak for themselves.
24  Affirmatively allege that such statements of fact were and are true.

25     105.  Admit to the extent such statements made in Wakaya's catalog speak
26  for themselves.  Affirmatively allege that such statements of fact were and are true.

27     106.  Admit to the extent such statements made on Facebook by Wakaya
28  speak for themselves.  Affirmatively allege that such statements of fact were and

1   are true.

2       107.   Admit to the extent such statements made on Facebook by Wakaya

3   speak for themselves.  Affirmatively allege that such statements of fact were and

4   are true.

5       108.   Admit to the extent such statements by Wakaya in advertising and

6   promotional materials for its ginger product speak for themselves.  Deny the

7   remainder of this paragraph. Affirmatively allege that Wakaya's ginger products

8   are safe for human consumption and free from any contamination.

9       109.   Deny.  Affirmatively allege that Youngevity's test is erroneous, that

10   Youngevity is misreporting the results and implications of such tests, and/or that

11   Youngevity is mischaracterizing the quantity and kind of CFUs naturally present in

12   ginger powder.

13       110.  Deny.

14       111.   Deny.  Affirmatively allege that there are no such "substantially

15   elevated levels of lead and arsenic that are toxic and excess levels of bacteria."

16       112.   Deny.  Affirmatively allege that any injury to or loss of distributors or

17   potential distributors by Plaintiffs has been the direct result of the actions taken by

18   Youngevity, Wallach, and the other Counterclaim Defendants—as are further

19   described in the Counterclaims below—and that individuals have chosen to join

20   Wakaya and purchase Wakaya products for a wide variety of reasons.

21   **F.  Unlawful Pyramid Scheme (Against Wakaya Only)**

22       113.   Admit to the extent that Wakaya's compensation plan speaks for

23   itself. Deny the remainder of this paragraph.  Affirmatively allege that individuals

24   identified herein and other distributors of Wakaya's products neither are agents of

25   Wakaya nor speak for or on behalf of Wakaya and that the statements selectively

26   quoted herein have been taken out of context and given a self-serving

27   characterization by Youngevity.

28       114.   Deny.  Affirmatively allege that individuals identified herein and

1    other distributors of Wakaya's products neither are agents of Wakaya nor speak for

2    or on behalf of Wakaya and that the statements selectively quoted herein have been

3    taken out of context and given a self-serving characterization by Youngevity.

4         115.   Deny.

5         116.   Deny.

6         117.   Deny.

7         118.   Deny.

8         119.   Deny. Affirmatively allege that Wakaya's compensation plan speaks

9    for itself and that Wakaya pays commissions solely on the basis of product sales.

10        120.   Deny. Affirmatively allege that Wakaya's compensation plan speaks

11   for itself and that Wakaya pays commissions solely on the basis of product sales.

12        121.   Admit to the extent Wakaya's advertising speaks for itself and that

13   distributors of Wakaya products may earn significant incomes. Deny the remainder

14   of this paragraph. Affirmatively allege that any statements of fact made by Wakaya

15   have been truthful, that individuals identified herein and other distributors of

16   Wakaya's products neither are agents of Wakaya nor speak for or on behalf of

17   Wakaya, and that the statements selectively quoted herein have been taken out of

18   context and given a self-serving characterization by Youngevity.

19        122.   Deny.

20        123.   Deny.

21        124.   Deny. Affirmatively allege that Wakaya distributors are not obligated

22   to purchase any product or participate in an auto-ship program.

23        125.   Deny. Affirmatively allege that Wakaya distributors are not obligated

24   to purchase any product or participate in an auto-ship program.

25        126.   Deny.

26        127.   Deny.

27        128.   Deny.  Affirmatively allege that individuals identified herein and

28   other distributors of Wakaya's products neither are agents of Wakaya nor speak for

or on behalf of Wakaya and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

129.  Deny.

130.  Deny.

131.  Deny.

132.  Deny.

133.  Deny.

134.  Deny.

135.  Deny.

136.  Deny.

137.  To the extent a response is required to this paragraph, deny.

138.  Deny.

139.  Deny.

140.  Deny.  Affirmatively allege that such statements speak for themselves, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

141.  Deny.  Affirmatively allege that such statements speak for themselves, that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya, and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

142.  Admit to the extent such statements speak for themselves. Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya and that the statements selectively quoted herein have been taken out of context and given a self-serving characterization by Youngevity.

18

143.   Deny.  Affirmatively allege that any injury to or loss of distributors or potential distributors by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further described in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

**COUNT TWO**
**FALSE ADVERTISING**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***
**(OMITTED BY PLAINTIFFS)**


**COUNT THREE**
**UNFAIR COMPETITION**
**Cal. Bus. & Prof. Code §§ 17200**
**(Wakaya)**

144.   Admit to the extent California Business and Professions Code § 17200 *et seq.* ("UCL") speaks for itself.

**A. Unlawful Endless Chain Scheme**

145.   Admit to the extent Cal. Penal Code § 327 and *People v. Frederick*, 48 Cal. Rptr. 3d 585, 598 (Cal. Ct. App. 2006), speak for themselves.

146.   Deny.

147.   Admit that Wakaya compensates its distributors based on a variety of factors.  Deny the remainder of this paragraph.

148.   Deny.

149.   Deny.  Affirmatively allege that any damages or injuries suffered by Plaintiffs have been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

**B. Unlawful Sale of Misbranded and Adulterated Foods or Dietary Supplements**

150.   Admit that Wakaya's clay and ginger products are natural and safe. Deny the remainder of this paragraph.

151.   Admit to the extent Wakaya's corporate materials and advertising speak for themselves and that Wakaya markets and advertises its clay and ginger products as natural, safe, detoxifying, and pure.  Deny the remainder of this paragraph.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

152.   Admit to the extent Wakaya's promotional and advertising materials speak for themselves.  Deny the remainder of this paragraph.

153.   Deny.

154.   Deny.

155.   Deny.

156.   Deny.

157.   Admit to the extent Cal. Health & Safety Code § 110545 speaks for itself.  Deny the remainder of this paragraph.

158.   Deny.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

159.   Admit to the extent Cal. Health & Safety Code § 110620 speaks for itself.  Deny the remainder of this paragraph.

160.   Admit.

161.   Deny.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements

outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

162.   Deny.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

163.   Deny.  Affirmatively allege that Wakaya is not a direct competitor of Youngevity, that any damages or injuries suffered by Plaintiffs have been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below— and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.  Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

164.   Deny.  Affirmatively allege that Youngevity has no "competing health products," that any damages or injuries suffered by Plaintiffs have been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

**C. General Allegations Concerning Defendants' Violations of California's UCL (OMITTED)**

## COUNT FOUR
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (All Defendants)

165.   To the extent a response is required to this paragraph, deny.

**A. Todd Smith, Blake Graham, and Wakaya's Tortious Interference with the Great American Clay Company**

166.   Deny.

167.   Deny.

168.   Deny.

169.   Deny.

170.   Deny.  Affirmatively allege that any economic harm suffered by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below.

171.   Deny.

172.   To the extent a response is required to this paragraph, deny.

173.   Deny.

174.   Admit.

175.   Deny.

176.   Deny.

177.   Deny.

178.   Deny.

179.   Deny.

180.   Deny.

181.   Deny.

182.   Deny.

183.   Admit that Smith lacked authority to contract with Great American Clay Company ("GAC") on behalf of Youngevity.  Deny the remainder of this

22

paragraph.

184.   Deny.

185.   Deny.

186.   Admit that Wakaya and GAC entered into an agreement.  Deny the remainder of this paragraph.

187.   Admit that Smith never informed Plaintiffs that GAC sought to contract with Youngevity because, in fact, GAC had not "been seeking to contract with Youngevity."  Deny the remainder of this paragraph.

188.   Deny.

189.   Admit that GAC provides products for sale through Wakaya.  Deny the remainder of this paragraph.

190.   Admit to the extent that any such statements by Wakaya speak for themselves.  Affirmatively allege that individuals identified herein and other distributors of Wakaya's products neither are agents of Wakaya nor speak for or on behalf of Wakaya.

191.   Deny.

192.   Deny.  Affirmatively allege that any economic harm suffered by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below.

193.   Deny.  Affirmatively allege that any economic harm suffered by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below.

194.   Deny.

195.   Deny.

196.   Deny.

197.   Deny.

198. Deny.  Affirmatively allege that any economic harm suffered by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below.

**B. All Defendants' Tortious Interference with Youngevity's Distributor Relationships**

199. To the extent a response is required to this paragraph, deny. Affirmatively allege that Defendants never encouraged any Youngevity distributors to breach any agreement or recruit any other Youngevity distributor, that any injury to or loss of distributors or potential distributors by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further described in the Counterclaims below— and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons

200. Deny.

201. Deny.

202. Deny.

203. Deny.  Affirmatively allege that Youngevity's distributor agreement allows distributors to join other organizations and distribute other products.

204. Deny.

205. Deny.

206. Deny.

207. Deny.

208. Deny.  Affirmatively allege that any such statements of fact made by Defendants regarding Youngevity were and are true.

209. Deny. Affirmatively allege that any such statements of fact made by Defendants were and are true.

210. Admit that Graham sent an email to certain Youngevity distributors in

February 2016 and that such an email speaks for itself.  Deny the remainder of this paragraph.  Affirmatively allege that any statements of fact made by Graham in such an email were and are true and that the statements selectively referenced herein have been taken out of context and given a self-serving characterization by Youngevity.

211.  Deny.

212.  Deny.

213.  Deny.  Affirmatively allege that any loss of distributors and sales revenues by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

214.  Admit that individuals associated with Youngevity have endorsed and participated in Wakaya for a wide variety of reasons.  Deny the remainder of this paragraph.

215.  Deny.

216.  Deny.

217.  Deny.

218.  Deny.

219.  Deny.

220.  Deny.

221.  Deny.

222.  Deny.

223.  Deny.  Affirmatively allege that any loss of distributors and sales revenues by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

## COUNT FIVE
### BREACH OF CONTRACT
### (Defendants Andreoli, Pitcock, Cloward)

224.   Admit to the extent the documents speak for themselves.

225.   Deny.

**A. Defendant Andreoli Breached His Contract with Youngevity**

226.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.  Affirmatively allege that Youngevity failed to fulfill its obligations under the FDI purchase agreement and related agreements, that Youngevity management engaged in misbehavior as further detailed in the Counterclaims below, and that Andreoli has filed a separate action against Youngevity for constructive discharge resulting from Youngevity's mismanagement.

227.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

228.   Deny.

229.   Deny.

230.   Deny.

231.   Deny.

232.   Deny.

233.   Deny.

**B. Defendant Pitcock Breached His Contract with Youngevity**

234.   Admit that Pitcock was an owner of Livinity.  Deny the remainder of this paragraph.

235.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

236.   Deny.

237.   Deny.

238.   Admit to the extent any such agreements speak for themselves.  Deny

26

1  the remainder of this paragraph.

2  239.   Admit to the extent any such agreements speak for themselves.  Deny

3  the remainder of this paragraph.

4  240.   Admit to the extent any such agreements speak for themselves.  Deny

5  the remainder of this paragraph.

6  241.   Admit to the extent any such agreements speak for themselves.  Deny

7  the remainder of this paragraph.

8  242.  Deny.

9  243.   Deny.  Affirmatively allege that any such statements of fact made by

10  Pitcock were and are true.

11  **D. Defendant Cloward Breached His HM Agreement with Youngevity**

12  **(GARDNER OMITTED)**

13  244.  Admit.

14  245.   Admit to the extent any such agreements speak for themselves.  Deny

15  the remainder of this paragraph.

16  246.   Admit to the extent any such agreements speak for themselves.  Deny

17  the remainder of this paragraph.

18  247.   Admit to the extent any such agreements speak for themselves.  Deny

19  the remainder of this paragraph.

20  248.   Admit to the extent any such agreements speak for themselves.  Deny

21  the remainder of this paragraph.

22  249.  Deny.

23  250.  Deny.

24  251.  Deny.

25  **COUNT SIX**

26  **INTENTIONAL INTERFERENCE WITH CONTRACT/INDUCING**
**BREACH OF CONTRACT**

27  **(Defendants Wakaya, TNT, Smith, Graham, Pitcock, Andreoli, and Vaughn)**

28  252.  Deny.

**A. Defendants Wakaya, TNT, Smith, Graham, Pitcock, and Vaughn's International Interference with Youngevity's Contracts with Distributors**

253.   To the extent a response is required to this paragraph, deny.

254.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

255.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

256.   Deny.

257.   Deny.

258.   Deny.

259.   Deny.

260.   Deny.  Affirmatively allege that Youngevity's distributor agreement allows distributors to join other organizations and distribute other products, that any loss of sales revenues by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

261.   Deny.

262.   Deny.

**B. Wakaya's and Andreoli's International Interference with Youngevity's Employment Contracts (OMITTED)**

<u>COUNT SEVEN</u>
**MISAPPROPRIATION OF TRADE SECRETS**
**(Cal. Civ. Code § 3426)**
**(Defendants Wakaya, Andreoli, Pitcock, Gardner, and Cloward)**

263.   Deny for lack of knowledge or information.

264.   Deny.

265.   Deny.

266.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

267.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

268.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

269.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

270.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

271.   Deny.

272.   Deny.

273.   Deny.

274.   Deny.

275.   Deny.

276.   Deny.

277.   Deny.

278.   Deny.

279.   Deny.

280.   Deny. Affirmatively allege that any lost product sales by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further described in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons.

**COUNT EIGHT**
**MISAPPROPRIATION OF NAME AND LIKENESS**
**(Cal. Civ. Code § 3344)**
**(Defendants TNT and Graham)**

281.   Admit that Wallach speaks and lectures on nutritional science and

29

medicine in multi-level-marketing networks.  Deny the remainder of this paragraph.

282.   Admit that nutritional supplements and similar products are sold using Wallach's name and likeness.  Deny the remainder of this paragraph.

283.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

284.   Admit that TNT previously distributed Youngevity products pursuant to certain agreements and that such agreements speak for themselves.  Deny the remainder of this paragraph.

285.   Admit that TNT distributed Youngevity products for years without objection from any party.

286.   Admit that TNT owned wallachonline.com, yteamtools.com, myyoungevity.com, and 1-800-925-5224 (which also spells 1-800-WALLACH). Further admit that TNT created a variety of copyrighted tools designed to promote Youngevity products and assist Youngevity distributors with Youngevity's full knowledge. Deny the remainder of this paragraph.

287.   Admit to the extent any such agreements speak for themselves. Deny the remainder of this paragraph.

288.   Admit that TNT was authorized to use Wallach's name and likeness and Youngevity's mark. Deny the remainder of this paragraph.

289.   Admit that TNT was authorized to use Wallach's name and likeness and Youngevity's mark. Deny the remainder of this paragraph.

290.   Admit to the extent any such agreements speak for themselves.  Deny the remainder of this paragraph.

291.    Admit to the extent Youngevity's letter to TNT speaks for itself. Deny the remainder of this paragraph.  Affirmatively allege that any such termination was invalid, unlawful, and in breach of the agreements between the parties.

292.   Admit to the extent Youngevity's communications attempting to suspend such distributor accounts in March 2016 speak for themselves.  Deny the remainder of this paragraph.  Affirmatively allege that any such suspension was invalid, unlawful, and in breach of the agreements between the parties.

293.   Deny.  Affirmatively allege that any such use has been authorized.

294.   Deny.  Affirmatively allege that any such use has been authorized.

295.   Deny.  Affirmatively allege that any such use has been authorized.

296.   Admit to the extent any document speaks for itself. Deny the remainder of this paragraph.

297.   Deny for lack of knowledge or information.

298.   Admit that TNT and Graham have hosted Wakaya events.  Deny the remainder of this paragraph.

299.   Admit that TNT gained a commercial benefit prior to being wrongfully terminated by Youngevity.

300.   Admit that TNT has complied with this Courts December 1, 2016 Order.  Deny the remainder of this paragraph.

301.   Deny.

302.   Deny.

303.   Admit to the extent wallachonline.com speaks for itself and that wallachonline.com obtained high search-engine rankings. Deny the remainder of this paragraph.

304.   Deny.

305.   Deny.

306.   Admit to the extent such an email speaks for itself.  Deny the remainder of this paragraph.

307.   Deny.

308.   Admit to the extent Youngevity's March 2016 letter speaks for itself.  Deny the remainder of this paragraph. Affirmatively allege that any such

31

revocation was invalid, unlawful, and in breach of the agreements between the parties.

309.   Deny.

310.   Deny.

311.   Deny.  Affirmatively allege that that any damage or injury to or loss of distributors or potential distributors by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants.

<u>COUNT NINE</u>
**LANHAM ACT TRADEMARK INFRINGEMENT**
**15 U.S.C. § 1114**
**(Defendants TNT and Graham)**

312.   Admit to the extent such a trademark speaks for itself.

313.   Admit that TNT owned the websites yteamtools.com and wallachonline.com (the "Websites").  Deny the remainder of this paragraph.

314.   Admit that TNT was a Youngevity distributor with many rights, including the right to sell Youngevity goods and trade on Youngevity's mark, and that Yougevity wrongfully terminated TNT's distributorship in March 2016.  Deny the remainder of this paragraph.

315.   Admit to the extent Youngevity's March 2016 letter speaks for itself. Deny the remainder of this paragraph.  Affirmatively allege that any such termination was invalid, unlawful, and in breach of the agreements between the parties.

316.   Admit that TNT previously sold products through the Websites.  Deny the remainder of this paragraph.

317.   Admit that TNT is no longer a Youngevity distributor. Deny the remainder of this paragraph.

318.   Deny.

319.   To the extent a response is required to this paragraph, deny.

320.   Deny.

321.   Deny.

322.   Deny.  Affirmatively allege that that any damage or injury to or loss of distributors or potential distributors by Plaintiffs has been the direct result of the actions taken by Youngevity, Wallach, and the other Counterclaim Defendants—as are further detailed in the Counterclaims below—and that individuals have chosen to join Wakaya and purchase Wakaya products for a wide variety of reasons. Moreover, upon information and belief, affirmatively allege that Plaintiffs have published and publicized these and other defamatory statements outside the scope of these proceedings and waived any potentially applicable privilege in doing so, making Plaintiffs liable to Counterclaim Plaintiffs, as further described below.

**COUNT TEN**
**Breach of Fiduciary Duty**
**(Defendant Andreoli)**

323.   Admit.

324.   Admit.

325.   Deny.

326.   Deny.

327.   Deny.

328.   Deny.

329.   Deny.

330.   Deny.

331.   Deny.

332.   Deny.

**PRAYER FOR RELIEF:**

To the extent a response is required, deny.

**SECOND DEFENSE**

Except as expressly admitted hereinabove, Defendants deny generally and specifically each and every allegation set forth in the Complaint, including all allegations contained in the separate Prayer for Relief and any of the underlying

33

factual assumptions or assertions made in any allegation that is hereby denied.

### THIRD DEFENSE

The Complaint fails to state a claim against Defendants upon which relief can be granted and, therefore, should be dismissed.

### FOURTH DEFENSE

Some or all of Plaintiffs' alleged claims asserted in the Complaint are barred by the doctrines of accord and satisfaction.

### FIFTH DEFENSE

Some or all of Plaintiffs' alleged claims asserted in the Complaint are barred by the doctrines of waiver, estoppel, and/or laches.

### SIXTH DEFENSE

Some or all of Plaintiffs' alleged claims are barred by failure to mitigate any alleged damages.

### SEVENTH DEFENSE

Some or all of Plaintiffs' alleged claims are barred by the doctrines of failure of consideration and/or lack of consideration.

### EIGHTH DEFENSE

Some or all of Plaintiffs' claims are barred because Plaintiffs' own acts or omissions were the sole proximate cause, or substantial proximate cause, of the damage sought.

### NINTH DEFENSE

Plaintiffs' claims are barred due to Plaintiffs' own bad faith or unlawful actions.

### TENTH DEFENSE

Some or all of Plaintiffs' alleged claims are barred by the doctrine of unclean hands.

### ELEVENTH DEFENSE

Some or all of Plaintiffs' alleged claims are barred because the alleged

damages, if any, were proximately caused by acts or omissions, negligence, or intentional acts by third parties over whom Defendants had no control or right of control or, if Defendants had any right of control, were acting beyond the scope of any relationship with Defendants, or such damages were caused by conditions or events over which Defendants had no control or right of control.

## TWELFTH DEFENSE

Some or all of Plaintiffs' claims against Defendant are barred by failure of a condition precedent.

## THIRTEENTH DEFENSE

Some or all of Plaintiffs' claims against Defendant are barred by proper accounting of amounts owed under the Agreement.

## FOURTEENTH DEFENSE

Some or all of Plaintiffs' claims are barred by the doctrine of unjust enrichment.

## FIFTEENTH DEFENSE

Some or all of Plaintiffs' claims are barred by the doctrine of avoidable consequences.

## SIXTEENTH DEFENSE

Some or all of Plaintiffs' claims are barred by the doctrine of substantial compliance and/or performance of contractual obligations by Defendants.

## SEVENTEENTH DEFENSE

Some or all of Plaintiffs' claims are barred by Plaintiffs' material breach of the relevant agreements.

## EIGHTEENTH DEFENSE

Some or all of Plaintiffs' claims are barred by the doctrines of course of performance and/or course of dealing.

## NINETEENTH DEFENSE

Some or all of Plaintiffs' claims fail because they are preempted by federal

law, including, but not limited to, the Copyright Act.

## TWENTIETH DEFENSE

Some or all of Plaintiffs' claims fail because the statements upon which they are based are statements of opinion or true or substantially true.

## TWENTY-FIRST DEFENSE

Some or all of Plaintiffs' claims fail because the statements upon which they are based are privileged.

## TWENTY-SECOND DEFENSE

Defendants hereby reserves the right to add any additional affirmative defense that may be revealed to apply as a result of discovery in this lawsuit.

## PRAYER FOR RELIEF

WHEREFORE, having fully answered the Complaint, Defendants pray for judgment against Plaintiffs and in favor of Defendants as follows:

A.    Denying Plaintiffs any relief whatsoever for their claims and dismissing the Complaint with prejudice;

B.    Awarding Defendants attorneys' fees and costs incurred in defending this lawsuit pursuant to agreements between the parties and statutory authority; and

C.    For such other and further relief as the Court deems appropriate.

## JURY DEMAND

Defendants request a jury trial for all issues so triable.

36

# **COUNTERCLAIM**

Plaintiffs Wakaya Perfection, LLC ("Wakaya"), Todd Smith ("Smith"), Blake Graham ("Graham"), Andre Vaughn ("Vaughn"), Dave Pitcock, Barb Pitcock, and Total Nutrition, Inc. ("TNT" or, collectively with Wakaya, Smith, Graham, Vaughn, Dave Pitcock, and Barb Pitcock, "Counterclaim Plaintiffs") hereby allege, aver, and complain of Defendants Youngevity International, Inc. ("Youngevity"), Dr. Joel Wallach, Michelle Wallach, Steve Wallach, and Dave Briskie (collectively, "Counterclaim Defendants") as follows:

## **INTRODUCTION**

1.     Counterclaim Plaintiffs assert the claims herein to address Youngevity's breaches of contract, as well as the individual Counterclaim Defendants' independently tortious behavior.  Several Counterclaim Plaintiffs are former Youngevity distributors who have dedicated years, even decades, to building successful businesses selling Youngevity products.

2.     In response to several instances of serious misconduct by the individual Counterclaim Defendants, Smith left Youngevity, where he had worked to build successful Youngevity distributorships for nearly two decades, to pursue other opportunities.  He founded Wakaya in late 2015.

3.     Rather than accepting responsibility for their own misdeeds, the individual Counterclaim Defendants—who are all either officers and board members at Youngevity or the founder of the company—through Youngevity, engaged in a concerted campaign to destroy Wakaya in its infancy.

4.     Acting out of personal spite and without any legal justification, the individual Counterclaim Defendants threatened any Youngevity distributor who expressed an interest in working with Wakaya, either in addition to or instead of working for Youngevity.

5.     On information and belief, the individual Counterclaim Defendants' goal was to prevent Smith from successfully launching Wakaya and to punish

Smith for his perceived disloyalty to Youngevity—a disloyalty that existed solely in the minds of the individual Counterclaim Defendants.

6.     At the same time, the individual Counterclaim Defendants continued to engage in counterproductive and damaging ways, driving away high-ranking Youngevity distributors, as well as members of Youngevity's corporate staff.

7.     Not content to allow these distributors to associate with Wakaya—as was their legal right—the individual Counterclaim Defendants, acting through Youngevity and without legal justification, summarily terminated the distributorships of any distributor they believed was associating with Smith or Wakaya, including the distributorships of Vaughn, Dave and Barb Pitcock (the "Pitcocks"), and TNT, which is owned and operated by Graham (collectively, the "Distributor Counterclaim Plaintiffs").

8.     The Distributor Counterclaim Plaintiffs, despite dedicating years, even decades, to building successful businesses selling Youngevity Products, found themselves caught up in the individual Counterclaim Defendants' vendetta against Smith and Wakaya.  The individual Counterclaim Defendants, acting through Youngevity and without legal justification, arbitrarily and vindictively destroyed the Distributor Counterclaim Plaintiffs' Youngevity businesses and threatened their livelihoods.

9.     On information and belief, the individual Counterclaim Defendants have threatened to do the same to any Youngevity distributor they perceive as "disloyal."

10.     Thus, this case is about a small group of individuals using their positions within Youngevity to carry out personal vendettas against anyone they perceive as disloyal, even if that perception is totally unfounded.

**PARTIES, JURISDICTION, AND VENUE**

11.     Wakaya was at all relevant times herein a limited liability company duly formed under the laws of the State of Utah.  Wakaya was formed by Smith

38

and has its headquarters in Lindon, Utah.  It focuses on marketing, among other products, 100% organic and kosher healing products grown and cultivated on a unique 2,200-acre island in the Fiji archipelago called the Wakaya Island ("Wakaya Products").

12.    TNT is a corporation incorporated in the State of Utah and a former distributor for Youngevity.

13.    Smith is a resident of Utah and the founder of Wakaya.

14.    Graham is a resident of Utah and owner of TNT, through which he managed Youngevity distributorships.

15.    Vaughn is a resident of Maryland and a former distributor for Youngevity.

16.    Dave Pitcock ("Dave") is a resident of Kansas and a former distributor for Youngevity.

17.    Barb Pitcock ("Barb") is a resident of Kansas and a former distributor for Youngevity.

18.    Counterclaim Plaintiffs are informed, believe, and thereon allege that Youngevity was at all relevant times herein, and still is, a Delaware corporation with its headquarters in Chula Vista, California, that is and has been registered to do business and doing business in the State of Utah during all relevant times hereto. Youngevity touts itself as a nutritional and coffee company offering more than 1,000 products, including nutritional supplements, sports and energy drinks, health and wellness products (e.g., spa, bath, garden, and pet-related products), digital products (including scrapbooks), gourmet coffee, skincare and cosmetics, weight management products, packaged foods, pharmacy discount cards, and apparel/accessories ("Youngevity Products").

19.    Counterclaim Plaintiffs are informed, believe, and thereon allege that Dr. Joel Wallach is a resident of California.  Dr. Wallach is founder of Youngevity and remains the driving force behind the company's philosophy.  Dr. Wallach

frequently visits Utah for business-related activities.

20.    Counterclaim Plaintiffs are informed, believe, and thereon allege that Michelle Wallach is a resident of California.  Michelle Wallach is married to Steve Wallach and is currently Chief Operating Officer of Youngevity, as well as a member of its board of directors.  Michelle Wallach frequently visits Utah for business-related activities.

21.    Counterclaim Plaintiffs are informed, believe, and thereon allege that Steve Wallach is a resident of California.  Steve Wallach is Dr. Wallach's son and Chief Executive Officer of Youngevity, as well as a member of its board of directors.  Steve Wallach frequently visits Utah for business-related activities.

22.    Counterclaim Plaintiffs are informed, believe, and thereon allege that Dave Briskie is a resident of California.  Briskie is currently President of Youngevity, as well as a member of its board of directors.  Briskie frequently visits Utah for business-related activities.

23.    Does 1-10 are the owners and/or operators of the website wakayaperfectiontellall.com, which is currently registered through the proxy service Domains by Proxy. Counterclaim Plaintiffs will amend this Counterclaim to name Does specifically and individually upon learning their respective identities.

24.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1332.

25.    Counterclaim Defendants have sufficient minimum contacts with the State of California in conducting their business operations with the Counterclaim Plaintiffs herein so as to make the exercise of jurisdiction over Counterclaim Defendants in this state foreseeable and reasonable under the facts and circumstances alleged herein.

**<u>GENERAL ALLEGATIONS</u>**

**<u>Youngevity Distributor Agreements</u>**

26.     Youngevity and Wakaya are both multi-level marketing companies. Under this model, products are sold through a distribution chain of independent distributors. Each distributor recruits other distributors to join his or her organization, building their own dedicated network of down-line distributors, with each distributor purchasing products supplied by the company with which they are affiliated and selling those products to others.

27.     It is a common practice within the multi-level marketing industry for distributors to have multiple distributorships within different companies.

28.     Counterclaim Plaintiffs challenge the interpretation and enforceability of certain purported restrictive covenants entered into between Youngevity and its distributors that the individual Counterclaim Defendants, through Youngevity, are attempting to use as a tool to prevent current Youngevity distributors from becoming Wakaya distributors. Youngevity is attempting to enforce the policies and procedures manual for Youngevity, purported to be the source of such restrictions ("Policies and Procedures"). A copy of the Policies and Procedures is attached as Exhibit A hereto.

29.     The standard distributor agreement used by Youngevity is a one-page document combined with an application document. A copy of what is believed to be the distributor agreement used by Youngevity with all of its distributors is attached as Exhibit B hereto ("Distributor Agreement").  As potentially relevant to this lawsuit, the Policies and Procedures contain the following clause relating to the Youngevity distributors' right and ability to associate with another direct sales company:

> All Distributors are Independent Contractors; the Company [Youngevity] imposes no restrictions on any Distributor's participation or sales activities in other businesses or programs other than Youngevity except as said activities or programs would cause or

create a violation of Distributor's agreement with Company or any of these policies and procedures.

[Policies and Procedures at 9, ¶ E6 ("Non-Compete Provision").]

30.    The Non-Compete Provision on its face expressly allows Youngevity distributors to affiliate with other companies and other sales programs. Further, nothing in the Distributor Agreement precludes Youngevity distributors from choosing to become Wakaya distributors.

31.    As potentially relevant to this lawsuit, the Policies and Procedures contains the following clause relating to the Youngevity distributors' right and ability to recruit other Youngevity distributors to work for another direct sales company:

> Distributors are strictly forbidden from Cross-Recruiting, and shall not sell, recruit, propose, or in any way induce or attempt to induce any other Distributor to purchase any product or service, or to participate in any other income opportunity, investment, venture, or commit any other activity deemed, at the full discretion of [Youngevity], as cross-recruiting. This includes any such activities across any divisions of [Youngevity], should any separate divisions with different compensation plans and or hierarchy exist, unless, and as specifically stated otherwise. The integrity of the hierarchy and the relationships therein is of paramount importance to every Distributor as well as to [Youngevity]. Any Distributor violating this provision may be subject to immediate termination for cause, forfeiting any and all commission due him or her.

[Policies and Procedures at 10-11, ¶ E12 ("Non-Solicitation Provision").]

32.    As potentially relevant to this lawsuit, the Policies and Procedures contains the following clause relating to the confidentiality of Youngevity's distributor lists:

> Distributor lists, including downline sales organization information, is proprietary and confidential to [Youngevity], with the exception of first level, personally enrolled Distributors. [Youngevity] may forward genealogical information at a nominal cost to Distributors, in strict and complete confidence, to help them manage their downline sales organization and for no other purpose.

42

> Every Distributor who is provided with such information shall treat it as confidential and take care to maintain its secrecy as well as refrain from making any use thereof for any purpose other than the management of his/her downline sales organization. Without limiting the generality of the foregoing, no such information may be used in cross-recruiting or with the intent to entice Company Distributors into other network marketing organizations.

> Any violation of this policy by a Distributor will result in the immediate suspension and/or termination of the offending Distributor. Furthermore, the offending Distributor could be subject to legal action for injunctive relief and/or damages.

[Policies and Procedures at 9-10, ¶ E7 ("Confidential Information Provision").]

33. Youngevity asserts the Non-Solicitation and Confidential Information Provisions as its basis for terminating the Distributor Counterclaim Plaintiffs' distributorships.

34. To the extent that the Non-Compete, Non-Solicitation, and Confidential Information Provisions restrict Counterclaim Plaintiffs' ability to engage in any lawful business, they are void under California law.

35. Youngevity's attempt to enforce invalid contractual provisions is a violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.

**The Distributor Counterclaim Plaintiffs**

36. Not long after Youngevity was founded, Smith and Graham began working as independent distributors for Youngevity in 1997, building their distributorship downline and contributing to the company.

37. Smith and Graham formed TNT in 1997, through which they operated Youngevity distributorships.

38. Over the years, Smith and Graham, through TNT, became some of Youngevity's most successful distributors, achieving the highest levels and awards

43

1  offered by Youngevity.

2      39.    Through TNT, Graham created a variety of tools that were both used

3  within TNT's distributorships and sold to other Youngevity distributors. These

4  tools include CDs, DVDs, and literature promoting Youngevity and Dr. Wallach's

5  message, which were marketed through TNT's registered website domains,

6  wallachonline.com and yteamtools.com, and 1-800-WALLACH.  All of these tools

7  and avenues were used with Youngevity's and Dr. Wallach's knowledge, and

8  without objection, for the entirety of TNT's relationship with Youngevity, which

9  has spanned nearly two decades.

10      40.    Vaughn began his relationship with Youngevity when the multi-level

11  marketing company he was working for, FDI, was acquired by Youngevity in

12  2011.

13      41.    Vaughn spent tremendous efforts working to develop his Youngevity

14  downline distributorships, promoting Youngevity's products and message,

15  becoming one of Youngevity's most successful distributors, and achieving the

16  highest levels and awards offered by Youngevity.

17      42.    In July 2012, Youngevity acquired Livinity Inc., a nutritional and

18  essential oils multi-level marketing company, which was owned and operated by

19  the Pitcocks.  As a result of the acquisition, the Pitcocks and most of Livinity's

20  distributors became Youngevity distributors.

21      43.    The Pitcocks spent tremendous efforts working to develop their

22  Youngevity downline distributorships, promoting Youngevity's products and

23  message, becoming some of Youngevity's most successful distributors, and

24  achieving the highest levels and awards offered by Youngevity.

25      44.    Smith, Graham, and Distributor Counterclaim Plaintiffs worked

26  closely together at Youngevity and, over the years, became personal friends.

27  **Youngevity Misconduct and Its Effect**

28      45.    Youngevity is controlled by Steve Wallach, CEO; Michelle Wallach,

44

COO; and Dave Briskie, President, (collectively, "Wallach Group").  Each member of the Wallach Group is on Youngevity's Board of Directors, and on information and belief they collectively own a controlling majority of Youngevity's publicly traded stock.

46. Together with Youngevity's founder, Dr. Wallach, the Wallach Group engaged in counterproductive behavior, including undermining promising acquisitions, promoting ill-conceived and unprofitable business decisions, concealing certain acts from management, and engaging in inappropriate and dishonest behavior.  The following examples, as set forth in Paragraphs 46-58, are illustrative of such behavior:

47. On information and belief, Youngevity's Founder, Dr. Wallach, frequently engaged in a pattern of traveling with and sharing hotel rooms at Youngevity events with a variety of female companions other than his wife, some of whom are Youngevity distributors. This behavior was widely known within the Youngevity community.

48. Taking advantage of the influence he held as founder of Youngevity, Dr. Wallach routinely attempted to coerce distributors, including Vaughn and the Pitcocks, into inserting Dr. Wallach's female companions into favored positions in their distributors' organization. The Wallach Group tolerated, and thereby condoned, this behavior, despite its highly inappropriate nature.

49. When the Distributor Counterclaim Plaintiffs protested about Dr. Wallach's manipulation of their organizational structures, the Wallach Group reacted in vindictive and defensive ways. For example, when any distributor refused to insert Dr. Wallach's companions into his or her organization, Dr. Wallach threatened to never participate in events or otherwise help them promote their business. Often this threat from the founder of the company was enough to compel compliance.

50. When the Pitcocks objected to Dr. Wallach's attempts to force

distributors to insert his companions into their organizations—which the Pitcocks viewed as an abuse of power and highly damaging to the morale of Youngevity's distributors—consistent with their usual practice, the Wallach Group reacted defensively and vindictively.

51.    For example, on information and belief, Michelle Wallach fabricated emails accusing Barb of cross-recruiting, which emails were intended to discredit Barb and damage her reputation both within Youngevity and in the larger direct marketing community.

52.    Finally losing patience with Youngevity management's unproductive behavior, Dave left Youngevity in the fall of 2014, citing the fabricated emails and Dr. Wallach's practice of coercing distributors to include his female companions into their organizations as his reasons for leaving.  Barb remained with Youngevity and managed her distributorships until Youngevity summarily terminated them in March of 2016.

53.    Vaughn observed Dr. Wallach and Michelle Wallach yelling at company employees in public, intimidating and bullying distributors, and generally undermining morale. More damning, the Wallach Group engaged in and tolerated cross-line recruiting within Youngevity. Cross-line recruiting involves one party recruiting members of another party's downline, and is prohibited by the Policies and Procedures. The Wallach Group used their personal standing within the company to engage in this prohibited practice to the benefit of themselves and their favored distributors.

54.    Although Vaughn was initially content to work for Youngevity, he became increasingly disillusioned with the company because of inappropriate and unprofessional behavior on the part of senior management, including Dr. Wallach, Michelle Wallach, and Briskie.  Fed up with the Wallachs' self-dealing, favoritism, and unprofessional behavior, Vaughn began looking for other opportunities outside of Youngevity.

55.    At a Youngevity event in September 2014, Briskie, then Chief Financial Officer and director of international development for Youngevity, and Steve Wallach, then Chief Executive Officer of Youngevity, announced that Youngevity had completed all of the requirements for allowing Youngevity businesses to operate in Mexico. Briskie and Steve Wallach also announced that Youngevity's office in Guadalajara, Mexico was open and that Youngevity's warehouse in Mexico was stocked with product to sell.

56.    Smith had lunch with Briskie and Steve Wallach that same day.

57.    During that lunch meeting, Smith specifically verified with Briskie and Steve Wallach that Youngevity had obtained the required regulatory approvals to distribute its products in Mexico.

58.    During that conversation, Smith informed Briskie and Steve Wallach that he planned to begin establishing Youngevity distributorships in Mexico.

59.    At no point did Briskie or Steve Wallach correct Smith's express understanding that Youngevity had completed all of the requirements to conduct business in Mexico.

60.    Based on the public announcement and Briskie and Steve Wallach's private reiteration, Smith began preparations to set up Youngevity distributorships in Mexico. He booked meeting spaces and organized several large events, which cost a substantial amount of money.

61.    However, in January 2015, the day before Smith was due to fly to Mexico to begin operations, Briskie informed him that Youngevity had not, in fact, completed the requirements to enter the Mexican market.

62.    Upon investigating, Smith discovered Youngevity was nowhere near ready to conduct lawful operations in the country and was, in fact, shipping Youngevity products into Mexico in furniture crates. On information and belief, Youngevity took these measures to avoid customs inspections.

63.    The Wallach Group's conduct not only had an adverse effect on

Youngevity distributors, but also affected Youngevity corporate employees and their desire to work for Youngevity.  For example, Youngevity's former president, William Andreioli, resigned in or about November 2015, citing the following issues with the Wallach Group:

        a.     The Wallach Group consistently undermined efforts to promote Youngevity by cancelling distributor incentives;

        b.     The Wallach Group, without consulting the rest of Youngevity management, pursued ill-conceived business ventures, such as a fashion line, with no plan in place for their long-term viability and no clear connection to Youngevity's other product lines;

        c.     The Wallach Group announced expansions into international markets—engendering costs associated with "grand openings"—without first obtaining the required regulatory clearances for Youngevity products;

        d.     The Wallach Group approved of and supported extra bonuses, commissions, and overrides for favored distributors, thereby treating those favored distributors differently than other distributors;

        e.     The Wallach Group allow certain favored distributors to acquire product significantly below the usual distributor pricing and to sell that product on Ebay and Amazon at below distributor pricing, thereby undermining the closed distributor network on which the other distributors depend;

        f.     The Wallach Group approved of, or at least did nothing to stop, the smuggling of Youngevity products into Mexico. On information and belief, the Wallach Group authorized the smuggling operation because Youngevity had yet to obtain the necessary regulatory approvals to import its products into Mexico;

        g.     The Wallach Group authorized exorbitant expenditures

48

of Youngevity funds, such as spending $800,000 on a K cup coffee machine.

**The Founding of Wakaya & Wakaya's Lawful Interaction with Youngevity Distributors & Employees**

64.   Following the Mexico debacle, Smith decided to leave Youngevity to pursue other opportunities, including founding a line of healthy, Asian-inspired restaurants.

65.   In or about the fall of 2015, Smith was presented with the opportunity to acquire Wakaya. Seeing the potential to turn Wakaya into a successful multi-level marketing company, Smith acquired Wakaya in October 2015. Smith specifically chose Wakaya because it did not market products that competed with Youngevity's.

66.   Graham was not involved with the purchase of Wakaya, or its conversion to a multi-level marketing company.  At no time prior to March 21, 2016, was Graham a distributor for or otherwise involved in Wakaya.

67.   On or about December 31, 2015, Smith sold his interest in TNT and all its assets to Graham, leaving Graham to operate the TNT Youngevity distributorships.

68.   Graham remained with Youngevity and continued to operate TNT, wallachonline.com, yteamtools.com, and 1-800-WALLACH.

69.   After hearing through the grapevine that Smith was starting another company, Vaughn approached Smith about becoming a Wakaya distributor.  At all times, Vaughn wanted to and intended to retain his Youngevity business while also pursuing other opportunities, as was his legal right.

70.   Upon learning of Wakaya, Dave approached Smith about becoming a distributor for Wakaya.  It was always the Pitcocks' intention that Barb would remain a Youngevity distributor, devoting her time and energy into the building of her Youngevity distributorship.

71.     Barb initially refused to have anything to do with Wakaya, preferring to avoid even the appearance of impropriety. At all times, Barb wanted to and intended to retain her Youngevity business and continue to operate her Youngevity distributorship and work to promote Youngevity.

72.     At no point prior to March of 2016 was Barb involved with Wakaya.

73.     At no point did Smith or anyone else at Wakaya approach the Distributor Counterclaim Plaintiffs or any other Youngevity distributor about joining Wakaya.

74.     None of the Distributor Counterclaim Plaintiffs engaged in any cross-recruiting or made use of any Youngevity proprietary information to contact anyone concerning Wakaya. To the extent any Youngevity distributors have become Wakaya distributors, it is as a result of those distributors approaching the Distributor Counterclaim Plaintiffs and inquiring about Wakaya.

75.     Given the toxic environment within Youngevity as a result of the Wallach Group's influence, several Youngevity employees, upon learning about Wakaya, approached Smith about employment opportunities.  Neither Wakaya nor Smith initiated any contact to hire Youngevity employees.

**Youngevity's Wrongful Termination and Retaliatory Conduct against Counterclaim Plaintiffs**

76.     Because other Youngevity distributors have expressed interest in Wakaya, Youngevity has engaged in or threatened litigation against both the Distributor Counterclaim Plaintiffs (or current distributors with the intent of trying to intimidate them and thereby prevent distributors from leaving to join Wakaya) and against Wakaya, claiming the Youngevity Policies and Procedures prevent Youngevity distributors from distributing the Wakaya Products instead of, or in addition to, the Youngevity Products.

77.     In or about February of 2016, Youngevity summarily suspended the TNT distributorships and began to withhold TNT's commission payments.

50

Youngevity subsequently terminated the TNT distributorships in March 2016. On information and belief, Youngevity's decision to terminate the TNT distributorships was driven by Smith's founding of Wakaya, which Youngevity viewed as a threat.

78.    In or about February of 2016, Youngevity summarily suspended Barb's distributorships and began to withhold her commission payments. Youngevity terminated Barb's distributorships in March 2016. On information and belief, Youngevity's decision to terminate the Barb Pitcock's distributorships was driven by the fact that Dave Pitcock had become a Wakaya distributor.

79.    In or about February of 2016, Youngevity suspended Vaughn's distributorship and withheld his commission payments when it learned of his interest in Wakaya. Youngevity terminated Vaughn's distributorships in March 2016. On information and belief, Youngevity's decision to terminate Vaughn's distributorships was driven by his interest in becoming a distributor for Wakaya.

80.    Notwithstanding the fact that Youngevity's Policies and Procedures allow Youngevity distributors to work for multiple companies, and have distributorships within competing MLM companies, Youngevity claims that the Distributor Counterclaim Plaintiffs are in violation.

81.    Youngevity's Policies and Procedures also allow for multiple members of the same household to work for different companies and even have distributorships within competing MLM companies.

82.    In terminating the Distributor Counterclaim Plaintiffs, Youngevity is attempting to selectively enforce certain provisions that are neither legally enforceable nor have they been enforced in the past.  For example, Youngevity has allowed and continues to allow distributors to work for multiple companies or operate multiple distributorships with multiple companies within the same household, including but not limited to the following current Youngevity distributors: Kurt and Theresa Venekamp, Scott and Juliette Fardulis, Iggy and

Victoria Baran, Dr. Luis and Evelia Arriaza, Tom and Denice Chenault, and many others.

83.     Following the termination of the TNT distributorships and Youngevity's decision to withhold the commission checks, Graham was approached by another Youngevity distributor with an offer to purchase wallachonline.com, 1-800-WALLACH, and the media items Graham had created.

84.     On information and belief, Youngevity, through Steve Wallach and Briskie, told the buyer it would not approve of the sale if any of the profits would flow to Graham or Smith. Fearful of reprisal from Youngevity, the buyer backed out. On information and belief, Briskie and Steve Wallach interfered with the sale of TNT's assets in an effort to punish and intimidate Graham and any other distributor perceived to be associated with Wakaya and/or Smith.

85.     In another situation involving the potential sale of TNT assets, partners in Heirloom Enterprises, which has multiple Youngevity distributor positions and is owned by TNT, Sam Steele, and Michael Weeks, wanted to buy TNT's interest in Heirloom.  Youngevity, again through Briskie and Steve Wallach, interfered with the transaction, claiming that they would not approve of the sale or pay commissions to Heirloom Enterprises if one penny went to Graham. On information and belief, Briskie and Steve Wallach threatened the Heirloom Enterprises partners as part of a scheme to punish and intimidate Graham and any other distributors perceived to be associated with Wakaya and/or Smith.

86.     Among other things, Youngevity, through the Wallach Group and Dr. Wallach, have informed Youngevity distributors wishing to join Wakaya that they would be "pursued and crushed," or words to that effect.

87.     On information and belief, Youngevity has, without any legal justification, terminated and/or threated to terminate the distributorships of and/or withhold Youngevity commission checks from distributors who expressed an interest in working with Wakaya.

**Counterclaim Defendants' Conspiracy to Defame Counterclaim Plaintiffs**

88.     Counterclaim Defendants, together with all other individuals revealed through discovery, have engaged in a concerted effort to defame Counterclaim Plaintiffs.

89.     After terminating the Distributor Counterclaim Plaintiffs, Youngevity, through Dr. Wallach and the Wallach Group, have made a series of false and defamatory statements concerning the Distributor Counterclaim Plaintiffs.

90.     For example, Dr. Wallach has stated that Smith and Graham stole Youngevity distributors; they stole money; they stole our staff; they stole thumb drives with people's names, numbers and emails; stating that he knew for a fact that they were contacting and took people who are certain ranks within Youngevity.  Dr. Wallach stated that Smith and Graham have perpetrated crime and compared them to rapists.

91.     Dr. Wallach further stated that Smith stole business opportunities from Youngevity and that he did it because he was desperate for money, making disparaging remarks about Smith's family and his finances and business, stating that Smith was going bankrupt and was going to lose his house because his restaurants weren't doing well.

92.     These statements are false, defamatory per se, personally hurtful, and threaten to harm Smith's and Graham's reputations in the network marketing community.

93.     On information and belief, Dr. Wallach made these statements in order to discredit Smith and Graham and deter Youngevity distributors from working with Wakaya.

94.     Dr. Wallach further asserted that the Pitcocks had raided and destroyed four prior multi-level marketing companies. He stated that Youngevity was the fourth company in ten years that the Pitcocks destroyed.

95.     These statements are false.

96.     Such false statements, which suggest the Pitcocks intentionally raided the multi-level marketing companies they worked with in the past, are extremely harmful to Barb's business as a consultant within the larger direct-sales community.

97.     On March 21, 2016, Steve Wallach sent an email to the Youngevity network of distributors ("Wallach Email"). A copy of the Wallach Email is attached hereto as Exhibit C.

98.     The Wallach Email accuses Smith, Wakaya, and, on information and belief, the Distributor Counterclaim Plaintiffs, of engaging in theft, misappropriation of confidential information, and breaching various provisions of the Youngevity Policies and Procedures.

99.     These accusations are entirely false, defamatory per se, and harmful to Counterclaim Plaintiffs' reputations in the network-marketing community—in which personal reputation and relationships are extremely important—and/or have the tendency to injure Counterclaim Plaintiffs' businesses.

100.    One of Youngevity's top distributors is Sheryl Emord, wife of Plaintiffs' counsel in this matter, Jonathan W. Emord.

101.    Prior to Counterclaim Defendants' wrongful termination of TNT's distributorships, Sheryl Emord was in TNT's direct "upline."

102.    When Counterclaim Defendants terminated TNT's distributorships, the commissions that were supposed to have been paid to TNT rolled up to those in its upline, including Sheryl Emord.

103.    Thus, Sheryl Emord—and by extension Jonathan W. Emord—were personally enriched by TNT's wrongful termination and by the Counterclaim Defendant's subsequent intimidation of Youngevity distributors.

104.    On March 23, 2016, Plaintiffs filed a Verified Complaint for Damages and Injunctive Relief in this matter against Counterclaim Plaintiffs and others,

alleging a variety of contract and tort claims ("Verified Complaint"). [Dkt. 1.]

105.    The Verified Complaint was signed by Steve Wallach, through which he certified under penalty of perjury that he had read the Verified Complaint and that the contents of that complaint were true and accurate.

106.    In the Verified Complaint, Counterclaim Defendants repeat many of the same false allegations contained in the Wallach Email.

107.    In addition to the false and defamatory statements echoing those in the Wallach Email, the Verified Complaint contains numerous additional allegations that are false and defamatory.

108.    By way of example, among the most serious of the defamatory statements, the Verified Complaint alleges that Smith unlawfully engaged in the sale of Youngevity products in Mexico without authorization from Youngevity and without required approvals from Mexican authorities. [Dkt.1 at ¶ 32.]

109.    These allegations, which accuse Smith of committing a crime across international borders, are entirely false.

110.    As described in paragraphs 54 through 57 above, Youngevity was smuggling product into Mexico with, on information and belief, Steve Wallach's full knowledge and approval.

111.    The Verified Complaint also falsely alleged that Andreoli, Gardner, and Cloward engaged in criminal conduct. [Dkt. 1 at ¶¶ 62-63, 66-69.]

112.    These and other defamatory allegations are entirely false.

113.    Despite the fact that the Verified Complaint falsely accused Counterclaim Plaintiffs of engaging in a variety of criminal acts, on information and belief, Youngevity has deliberately published and publicized the Verified Complaint—as well as other filings in this and related litigation—to Youngevity distributors, the media, and the broader network-marketing community.

114.    Specifically, counsel for Plaintiffs, Jonathan Emord and Peter Arhangelsky, issued a press release on March 23, 2016, summarizing the Verified

Complaint. ("Emord Press Release"). A copy of the Emord Press Release is attached hereto as Exhibit D.

115.    The Emord Press Release was issued on the same day as the Verified Complaint was filed and expressly stated: "Copies of the [Verified] Complaint and related pleadings are available upon request." [Ex. D.]

116.    The Emord Press Release also invited readers to contact Jonathan W. Emord or Peter A. Arhangelsky for more information about the case. [Ex. D.]

117.    Subsequently, Counterclaim Defendants' false and defamatory allegations in this and related litigation have been republished by various blogs associated with the network-marketing community ("Blog Posts"). A copy of the Blog Posts is attached hereto as Exhibit E.

118.    As licensed attorneys, counsel for Plaintiffs knew or should have known that publishing or publicizing the Verified Complaint—or any other filing—beyond the scope of the applicable proceedings waived any privilege that would otherwise work to shield such allegations.

119.    In addition to the defamatory statements published and publicized by the Wallach Group and Dr. Wallach, on information and belief, Plaintiffs' counsel in this matter have stepped beyond their role as advocates and have personally participated in the Counterclaim Defendants' conspiracy to defame the Counterclaim Plaintiffs. Counterclaim Plaintiffs are currently investigating the possibility of naming Plaintiffs' counsel individually as co-conspirators in this action and reserve the right to amend this Counterclaim as further information is discovered.

120.    On information and belief, Counterclaim Defendants, and any other individuals revealed in discovery, have continued to publicize and publish filings in this and related litigation, which contain additional defamatory statements. *See* Ex. E (blog posts quoting from Counterclaim Defendant's amended complaint and other filings).

121.   Many of the allegations contained in the Verified Complaint and other filings are defamatory per se in that they accuse Counterclaim Defendants of criminal activities.

122.   Notably, many of the most defamatory statements contained in the Verified Complaint have since disappeared from Counterclaim Defendants' filings in this matter—after those statements were disseminated to third parties—and the Counterclaim Defendants' subsequent amended complaints are no longer verified. [*Compare* Dkt. 1 *with* Dkt. 25; Dkt. 47; *and* Dkt. 64.]

123.   On or about June 2016, the website wakayaperfectiontellall.com (the "Website") was registered through the proxy service Domains by Proxy, LLC ("Domains by Proxy").

124.   Domains by Proxy allows its users to register a website domain anonymously.

125.   The Website purports to tell "The Truth Behind Wakaya Perfection," accuses Wakaya and related individuals of engaging in questionable business practices, and republishes and republicizes many of the same defamatory statements contained in the Verified Complaint.

126.   The Website also hosts a copy of the Emord Press Release, which invites readers to contact Emord or Arhangelsky for copies of the Verified Complaint and other filings in this and related litigation.

127.   The Website also contains a link to Youngevity's Second Amended Complaint in this action.

128.   On information and belief, Youngevity, its agents, and all others found through discovery are responsible for the Website and its defamatory content.

**Counterclaim Defendants' Tortious Interference with Wakaya**

129.   Even after this Action was initiated, Youngevity and its agents have continued to interfere with Wakaya's business.

130.   Since February, 2016, Wakaya has had a business relationship with LiveWell, L.L.C. ("LiveWell"), an Idaho limited liability company.

131.   As part of this business relationship, Wakaya and LiveWell entered into a license agreement (the "License Agreement") wherein Wakaya would license, and eventually acquire, all rights to technology and intellectual property owned and developed by LiveWell.

132.   Under the License Agreement, Wakaya was granted an irrevocable, exclusive license to all of LiveWell's technology and accompanying intellectual property.

133.   Wakaya was to pay a royalty percentage on all sales of the LiveWell technology.

134.   After Wakaya's royalty payments reached a contractually determined limit, Wakaya was to obtain all rights to the technology and accompanying intellectual property.

135.   The LiveWell technology became an integral part of the Bula Bottle, a flagship Wakaya product.

136.   As a corollary to the License Agreement, Wakaya entered into a separate royalty agreement (the "Royalty Agreement") with Rick Anson ("Anson"), who assisted with the development of the LiveWell technology.

137.   In recognition of Anson's role in developing the LiveWell technology, Wakaya agreed to pay Anson a royalty percentage of all sales of the LiveWell technology.

138.   Under the Royalty Agreement, Anson agreed not to disclose any of Wakaya's confidential information.

139.   Anson also covenanted that—while the Royalty Agreement was in effect and for one year thereafter—he would not engage in any competing business as proprietor, partner, employee, agent, consultant, or shareholder.

140.   The Royalty Agreement expressly defined a competing business as

any business that offers its products or services through a multi-level marketing model.

141.   In addition to the Royalty Agreement, Anson took a position as Vice President of Product Development at Wakaya.

142.   As a vice president of Wakaya, Anson owed fiduciary duties to Wakaya independent of any contractual obligation.

143.   On information and belief, Youngevity and its agents were aware of Wakaya's relationship with LiveWell and Anson.

144.   On information and belief, Youngevity and its agents were in contact with Anson at least as early as October 2016.

145.   On information and belief, Youngevity worked to convince Anson to breach his contractual and fiduciary obligations to Wakaya by further publishing and publicizing the defamatory material Youngevity had already included in its Verified Complaint and other filings.

146.   Anson breached his fiduciary obligations to Wakaya by misappropriating Wakaya's confidential information and using that confidential information to convince LiveWell to terminate its contractual relationship with Wakaya.

147.   On information and belief, Anson took those actions at Youngevity's request and encouragement.

148.   LiveWell and Anson terminated their contractual relationship with Wakaya in January 2017.

149.   On February 7, 2017—only a month after terminating his relationship with Wakaya—Anson appeared at a Youngevity event in the Dominican Republic at which he announced the launch of a new Youngevity product line featuring the LiveWell technology.

150.   Youngevity's new product line is substantially identical to Wakaya's Bula Bottle.

151.   On information and belief, Anson is now a vice president at Youngevity.

152.   As a result of Youngevity's interference, Wakaya has lost a valuable business relationship, as well as a flagship product.

153.   Wakaya has also lost the potential long-term benefits of the License Agreement, under which Wakaya was working to eventually acquire all rights to the LiveWell technology.

**Counterclaim Defendants' Actions Have Harmed Counterclaim Plaintiffs**

154.   Counterclaim Defendants' actions have harmed Counterclaim Plaintiffs in numerous ways.

155.   When Counterclaim Defendants summarily terminated the Distributor Counterclaim Plaintiffs' distributorships without legal justification, the Distributor Counterclaim Plaintiffs' current and future livelihoods were jeopardized. Despite committing years, even decades, to building their Youngevity businesses—which benefitted Youngevity—the Distributor Counterclaim Plaintiffs were terminated without warning to, on information and belief, retaliate against Smith, Wakaya, and anyone perceived to have associated with them.

156.    Beyond the retaliatory termination of the Distributor Counterclaim Plaintiffs, Counterclaim Defendants threatened to, and did, terminate the distributorships of any Youngevity distributor who expressed interest in or support for Smith, Wakaya, or anyone perceived to have associated with them. This had the effect of deterring qualified distributors from associating with Wakaya.

157.   Counterclaim Defendants have defamed Counterclaim Plaintiffs with the intent of harming Counterclaim Plaintiffs' standing in the network marketing community, and such statements have, in fact, harmed Counterclaim Plaintiffs' reputations and damaged their businesses.

158.   Acting out of personal spite, Counterclaim Defendants have

1  unlawfully interfered with the sale of TNT's valuable intellectual property.

2  159.   Although Counterclaim Plaintiffs do not yet know the full extent of

3  the damages they have suffered because of Counterclaim Defendants' unlawful

4  actions, their initial calculations estimate damages of not less than tens of millions

5  of dollars.

6  **FIRST CLAIM FOR RELIEF**

7  **(Declaratory Judgment –Youngevity)**

8  160.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 159

9  of this Counterclaim by reference, as if fully set forth herein.

10  161.   A dispute has arisen concerning the rights, status, and legal relations

11  between Distributor Counterclaim Plaintiffs and Youngevity.

12  162.   Specifically, Youngevity has interpreted its Policies and Procedures to

13  prevent its distributors, including Distributor Counterclaim Plaintiffs, from

14  exercising their freedom to work as distributors for Wakaya or to join Wakaya and

15  continue to work as Youngevity distributors.

16  163.   The Distributor Counterclaim Plaintiffs believe and assert that there is

17  no valid contractual or legal basis to support Youngevity's conduct in attempting

18  to intimidate and coerce its distributors from leaving to become Wakaya

19  distributors or to join Wakaya and continue to work as Youngevity distributors.

20  164.   Pursuant to 28 U.S.C. § 2201, the Distributor Counterclaim Plaintiffs

21  are entitled to a declaratory judgment, determining and declaring the rights, status,

22  and legal relations of the parties hereto, at least as follows: (1) determining that

23  California law applies to the instant dispute between the parties; (2) declaring that

24  the Policies and Procedures does not preclude any of Youngevity's distributors,

25  including Distributor Counterclaim Plaintiffs, from becoming distributors of

26  Wakaya; (3) alternatively, determining the Policies and Procedures, and/or

27  Distributor Agreement, if interpreted to restrict or prevent Youngevity distributors

28  from becoming Wakaya Distributors (as Youngevity seeks) is unenforceable

pursuant to applicable California law, particularly California Business and Professions Code section 16600, which states that "every contract by which anyone is restrained from engaging in a lawful profession, trade or business of any kind is to that extent void"; and (4) for any additional relief consistent with the above declarations.

165.   Counterclaim Plaintiffs are entitled to recover their attorney fees and court costs incurred herein.

### SECOND CLAIM FOR RELIEF
### (Breach of Contract – Youngevity)

166.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 165 of this Counterclaim by reference, as if fully set forth herein.

167.   Distributor Counterclaim Plaintiffs entered into valid contracts with Youngevity. Specifically, the Distributor Counterclaim Plaintiffs' relationships with Youngevity are governed by the Policies and Procedures and/or the Distributor Agreement.

168.   Distributor Counterclaim Plaintiffs have performed all obligations required under the Policies and Procedures and the Distributor Agreement.

169.   Youngevity has breached the Policies and Procedures and/or the Distributor Agreement by summarily terminating the Distributor Counterclaim Plaintiffs' distributorships without legal justification and unlawfully withholding Distributor Counterclaim Plaintiffs' commission payments as set forth in paragraphs 71 through 82 above.

170.   Youngevity's breach has harmed the Distributor Counterclaim Plaintiffs. Youngevity's actions have damaged the Distributor Counterclaim Plaintiffs' businesses, which were built over years and decades with Youngevity. As a result, the Distributor Counterclaim Plaintiffs have suffered financial hardship because Youngevity has wrongfully withheld payments to which the Distributor

62

Counterclaim Plaintiffs are entitled, leading to direct and consequential damages in an amount to be proven at trial. Moreover, Youngevity's breach has deprived the Distributor Counterclaim Plaintiffs of future income streams from their Youngevity businesses in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

### (Breach of the Covenant of Good Faith and Fair Dealing - Youngevity)

171.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 170 of this Counterclaim by reference, as if fully set forth herein.

172.   The Distributor Counterclaim Plaintiffs entered into valid contracts with Youngevity.

173.   The Distributor Counterclaim Plaintiffs performed all of their obligations arising from their contracts with Youngevity.

174.   All conditions required for Youngevity's performance have already occurred.

175.   Youngevity unfairly interfered with the Distributor Counterclaim Plaintiffs' rights to receive the benefits of their contracts when it summarily terminated their distributorships without legal justification and withheld their commission payments.

176.   As a result, the Distributor Counterclaim Plaintiffs have been damaged in an amount to be proven at trial.

### FOURTH CLAIM FOR RELIEF

### (Conversion – Youngevity)

177.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 176 of this Counterclaim by reference, as if fully set forth herein.

178.   The Distributor Counterclaim Plaintiffs had a property interest in their Youngevity businesses and the income derived therefrom. Specifically, the Distributor Counterclaim Plaintiffs spent years, even decades, building their Youngevity businesses and have successfully built substantial downlines.

179.   Youngevity wrongfully terminated the Distributor Counterclaim Plaintiffs' distributorships and has withheld the Distributor Counterclaim Plaintiffs' commission checks, thereby converting the Distributor Counterclaim Plaintiffs' property for Youngevity's use. Moreover, the Distributor Counterclaim Plaintiffs' downlines continue to produce substantial commissions, which rightfully belong to the Distributor Counterclaim Plaintiffs. Instead of making payments to the Distributor Counterclaim Plaintiffs, Youngevity has converted all of the continuing profits for its own use and/or has diverted these commissions to other favored Youngevity distributors, including, but not limited to, Sheryl Emord.

180.   The Distributor Counterclaim Plaintiffs have been damaged in an amount to be proven at trial through Youngevity's conversion of the past, current, and future commission payments derived from the Distributor Counterclaim Plaintiffs' downlines.

## FIFTH CLAIM FOR RELIEF

### (Tortious Interference with Existing Economic Relations – Youngevity)

181.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 180 of this Counterclaim by reference, as if fully set forth herein.

182.   The Distributor Counterclaim Plaintiffs have valid economic relationship with the distributors in their downlines.

183.   Youngevity knew of the economic relationship between the Distributor Counterclaim Plaintiffs and the distributors in their downlines.

184.   Youngevity intentionally interfered with that economic relationship when it wrongfully terminated the Distributor Counterclaim Plaintiffs' distributorships.

185.   The wrongful termination of the Distributor Counterclaim Plaintiffs did, in fact, disrupt their contractual relationship with the distributors in their downline.

186.   As a result, the Distributor Counterclaim Plaintiffs have been

damaged in an amount to be proven at trial.

### SIXTH CLAIM FOR RELIEF

**(Tortious Interference with Existing Economic Relations – Youngevity)**

187.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 186 of this Counterclaim by reference, as if fully set forth herein.

188.   Wakaya had a valid economic relationship with LiveWell and Anson.

189.   Youngevity knew of that relationship.

190.   Youngevity and its agents intentionally interfered with that relationship when, on information and belief, it contacted Anson—then Vice President of Product Development at Wakaya—and republished or republicized its defamatory allegations, thereby convincing Anson to terminate his and LiveWell's relationship with Wakaya.

191.   This interference did, in fact, cause Anson and LiveWell to terminate that relationship.

192.   As a result, Wakaya has lost a valued business relationship, a flagship product, and its future rights to the LiveWell technology.

### SEVENTH CLAIM FOR RELIEF

**(Tortious Interference with Prospective Economic Advantage – Youngevity)**

193.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 192 of this Complaint by reference, as if fully set forth herein.

194.   As detailed in paragraphs 71 through 82 above, Youngevity distributors, including some Distributor Counterclaim Plaintiffs, expressed interest in joining Wakaya as distributors, in addition to maintaining their Youngevity businesses as allowed for by the Policies and Procedures.

195.   Youngevity knew its distributors, including some Distributor Counterclaim Plaintiffs, were interested in joining Wakaya.

196.   In an effort to intimidate and coerce Youngevity distributors from joining Wakaya, Youngevity terminated the Distributor Counterclaim Plaintiffs'

distributorships and withheld their commission checks. Youngevity also threatened its other distributors, implying that their distributorships—and thus the distributors' livelihoods—would be terminated if they contemplated joining Wakaya.

197.   Moreover, Youngevity and its agents have engaged in a concerted campaign to smear and defame Wakaya in an effort to deter potential distributors from joining Wakaya, either in addition to or instead of acting as distributors for Youngevity.

198.   Youngevity distributors who had expressed interest in joining Wakaya have been intimidated and deterred from becoming Wakaya distributors.

199.   Wakaya has been damaged in an amount to be proven at trial because Youngevity has prevented qualified distributors from joining Wakaya's sales force.

**EIGHTH CLAIM FOR RELIEF**

**(Tortious Interference with Prospective Economic Advantage – Youngevity, Briskie, Steve Wallach)**

200.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 199 of this Complaint by reference, as if fully set forth herein.

201.   As detailed in paragraphs 39 and 83-85 above, Graham, through TNT, is owner of a website, phone number, and other intellectual property that he and Smith developed while distributors at Youngevity. Following the termination of his distributorship by Youngevity, Graham received an offer to purchase these valuable assets from a Youngevity distributor in good standing.

202.   Youngevity knew of the possible sale.

203.   Briskie and Steve Wallach vindictively informed the buyer that they would not approve of the sale if any proceeds from the sale would flow to either Graham or Smith.

204.   As a result, the buyer withdrew his offer, and Graham has been unable to sell his interest in the website, phone number, and other copyrighted materials

1   owned by Graham and TNT.

2      205.   Graham and TNT have been harmed by Youngevity's actions because

3   they were unable to complete the sale of their assets and because Briskie and Steve

4   Wallach have indicated they will not approve ANY sale of the assets.

5                    **NINTH CLAIM FOR RELIEF**

6   **(Defamation – Youngevity, Dr. Wallach, Michelle Wallach, Steve Wallach)**

7      206.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 205

8   of this Complaint by reference, as if fully set forth herein.

9      207.   In a public conversation with several Youngevity distributors, Dr.

10  Wallach falsely accused Smith and Graham of crimes, including theft and

11  industrial espionage. Dr. Wallach also falsely accused Dave and Barb of destroying

12  several multi-level marketing companies with which they had previously worked.

13     208.   Michelle Wallach fabricated emails accusing Barb of cross-recruiting

14  with the intent of harming Barb's reputation within the direct-sales community.

15     209.   In an email widely disseminated to Youngevity distributors, Steve

16  Wallach accused Smith, Wakaya, and the Distributor Counterclaim Plaintiffs of

17  engaging in theft, misappropriation of confidential information, and other acts

18  incompatible with the operation of Counterclaim Plaintiffs' lawful businesses.

19     210.   Counterclaim Defendants alleged numerous false and defamatory

20  statements in the Verified Complaint, as described in paragraphs 100 through 127

21  above, which counsel for Plaintiffs' subsequently publicized and published widely

22  within the network-marketing community. On information and belief,

23  Counterclaim Defendants have publicized and published other filings in this and

24  related litigation, which contain similar false or defamatory material.

25     211.   Counterclaim Defendants knew their statements were false, or in the

26  alternative, recklessly disregarded the falsity of their statements.

27     212.   These statements were not privileged and/or Counterclaim Defendants

28  have waived any privilege through excessive publication.

213.   Counterclaim Plaintiffs' reputations and businesses have been harmed and Counterclaim Plaintiffs are entitled to an award of actual, special, and exemplary damages in an amount to be determined at trial.

## TENTH CLAIM FOR RELIEF

### (False Light – Youngevity, Dr. Wallach, Michelle Wallach)

214.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 213 of this Complaint by reference, as if fully set forth herein.

215.   Dr. Wallach publicly and falsely accused Smith and Graham of engaging in criminal activity and falsely accused Dave and Barb of raiding and destroying four businesses with which they had previously worked.

216.   Michelle Wallach fabricated emails purporting to show that Barb cross-recruited.

217.   In a widely publicized email, Steve Wallach falsely accused Smith, Wakaya, and the Distributor Counterclaim Plaintiffs of engaging in theft, misappropriation of confidential information, and other acts of dishonesty.

218.   In the Verified Complaint, Youngevity falsely accused Smith of committing international crimes.

219.   Counterclaim Defendants, through their legal counsel and other agents, subsequently publicized and published the Verified Complaint and, on information and belief, other filings in this and related litigation, which contain similar false or defamatory material.

220.   These statements would be highly offensive to a reasonable person.

221.   Counterclaim Defendants knew their statements were false, or in the alternative, recklessly disregarded the falsity of their statements.

222.   Counterclaim Plaintiffs' reputations and businesses have been harmed by Counterclaim Defendants statements and Counterclaim Plaintiffs are entitled to an award of actual, special, and exemplary damages in an amount to be determined at trial.

**ELEVENTH CLAIM FOR RELIEF**

**(Business Disparagement – Youngevity)**

223.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 222 of this Complaint by reference, as if fully set forth herein.

224.   Counterclaim Defendants have publicized and published numerous statements relating to Wakaya's products and business activities, including those contained in the Verified Complaint and other filings in this and related litigation.

225.   These statements are false or highly offensive to a reasonable person.

226.   As a result of Counterclaim Defendants' false statements, Wakaya has suffered economic losses due to decreased sales and distributors who were deterred from associating with Wakaya.

227.   Counterclaim Defendants intended to harm Wakaya's business when they made these false statements.

228.   Wakaya has suffered damages in an amount to be proven at trial.

**TWELFTH CLAIM FOR RELIEF**

**(Unfair Competition – all Counterclaim Defendants)**

**(Cal. Bus. & Prof. Code § 17200 et seq.)**

229.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 228 of this Complaint by reference, as if fully set forth herein.

230.   California's Unfair Competition Law ("UCL") borrows violations from other laws by making them independently actionable as unfair competitive practices.

231.   Virtually any violation of federal, state, or local law can form the predicate offense under California's UCL.

232.   Counterclaim Defendants' actions in summarily terminating the Distributor Counterclaim Plaintiffs' distributorships without cause constitutes unfair competition under California law.

233.   Counterclaim Defendants' attempts to enforce unlawful noncompete

and nonsolicitation provisions constitutes unfair competition under California law.

234.   Counterclaim Defendants' actions in threatening and intimidating Youngevity distributors, including the Distributor Counterclaim Plaintiffs, in an attempt to prevent distributors from working for Wakaya constitutes unfair competition under California law.

235.   Counterclaim Defendants' conversion of the Distributor Counterclaim Plaintiffs' businesses, and the profits derived therefrom, constitutes unfair competition under California law.

236.   Counterclaim Defendants' interference in the sale of Graham's interest in the wallachonline.com, 1-800-WALLACH, and assorted media items constitutes unfair competition under California law.

237.   Counterclaim Defendants' actions in conspiring to interfere with Wakaya's and the Distributor Counterclaim Plaintiffs existing and prospective economic relations constitutes unfair competition under California law.

238.   Counterclaim Defendants' conspiracy to publish and publicize defamatory statements constitute unfair competition under California law.

239.   As a result of Counterclaim Defendants' unlawful, unfair, or fraudulent practices, Counterclaim Plaintiffs have suffered and continue to suffer damages in an amount to be proved at trial.

## THIRTEENTH CLAIM FOR RELIEF

### (Fraud/Negligent Misrepresentation – Youngevity and Briskie)

240.   Counterclaim Plaintiffs hereby incorporate paragraphs 1 through 239 of this Complaint by reference, as if fully set forth herein.

241.   As detailed in paragraphs 55 through 62 above, in his capacity as Chief Financial Officer of Youngevity, Briskie represented to Smith and other Youngevity distributors at a public Youngevity event that Youngevity had complied with all of the necessary legal requirements to open Youngevity businesses in Mexico.

242.   At the time he made these statements, Briskie knew they were false. Alternatively, Briskie made the statements without a reasonable basis for believing them to be true.

243.   Nevertheless, Briskie intended Smith and the other Youngevity representatives present at the meeting to rely on his statements.

244.   Based on Briskie's position as Chief Financial Officer of Youngevity, and the officer in charge of international expansion, Smith's reliance on Briskie's statement that Mexico was "open for business" was reasonable.

245.   In reliance on Briskie's statements, Smith expended spent significant time and money on preparations for opening Youngevity businesses in Mexico.

246.   Accordingly, Smith was damaged in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaim Plaintiffs pray for judgment against Counterclaim Defendants as follows:

1.   UNDER THE FIRST CLAIM FOR RELIEF, for declaratory relief as set forth in such claim plus reasonable attorney fees and costs incurred in this manner;

2.   UNDER THE SECOND CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by the Distributor Counterclaim Plaintiffs related to Youngevity's breach of contract plus reasonable attorney fees and costs incurred in this matter;

3.   UNDER THE THIRD CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by the Distributor Counterclaim Plaintiffs related to Youngevity's breach of the implied covenant of good faith and fair dealing plus reasonable attorney fees and costs incurred in this matter;

4.   UNDER THE FOURTH CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by the Distributor Counterclaim Plaintiffs related to Youngevity's conversion of the Distributor Counterclaim Plaintiffs'

property, including their Youngevity businesses and all associated profits, and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

5.     UNDER THE FIFTH CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by the Distributor Counterclaim Plaintiffs related to Youngevity's tortious interference with the Distributor Counterclaim Plaintiffs' economic relationships with their distributor networks and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

6.     UNDER THE SIXTH CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by Wakaya related to Youngevity's tortious interference with Wakaya's economic relationships with LiveWell and Anson; disgorgement of all profits related to Youngevity's new Bula Bottle-like product, which was obtained through such tortious interference; an award of exemplary damages pursuant to California Civil Code section 3294; and reasonable attorney fees and costs incurred in this matter;

7.     UNDER THE SEVENTH CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by Wakaya related to Youngevity's tortious interference with Wakaya's prospective economic relationships with qualified distributors and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

8.     UNDER THE EIGHTH CLAIM FOR RELIEF, for judgment against Youngevity, Steve Wallach, and Briskie for all damages suffered by Graham and TNT related to Youngevity's tortious interference in the sale of the Counterclaim Plaintiffs' valuable assets and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

9.     UNDER THE NINTH CLAIM FOR RELIEF, for judgment against Youngevity, Dr. Wallach, Michelle Wallach, and Steve Wallach for all damages suffered by Counterclaim Plaintiffs related to Counterclaim Defendants' defamatory statements and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

10.    UNDER THE TENTH CLAIM FOR RELIEF, for judgment against Youngevity, Dr. Wallach, Michelle Wallach, and Steve Wallach for all damages suffered by Counterclaim Plaintiffs related to Counterclaim Defendants' false statements and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

11.    UNDER THE ELEVENTH CLAIM FOR RELIEF, for judgment against Youngevity for all damages suffered by Wakaya as a result of Counterclaim Defendants' false statements and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

12.    UNDER THE TWELFTH CLAIM FOR RELIEF, judgment against all Counterclaim Defendants and an injunction requiring Counterclaim Defendants to (1) cease their attempts at enforcing invalid and unlawful contractual provisions; (2) cease their efforts at threatening and intimidating existing Youngevity distributors from working with Wakaya, as is their legal right; (3) cease publicizing and publishing false and defamatory material about Counterclaim Plaintiffs; and (4) cease their efforts to interfere with Wakaya and the Distributor Counterclaim Plaintiffs' existing and prospective economic relations, as described in this Counterclaim;

13.    UNDER THE THIRTEENTH CLAIM FOR RELIEF, judgment against Youngevity and Briskie for all damages suffered by Smith as a result of Briskie's fraudulent announcement that Youngevity distributors could operate in

73

Mexico and an award of exemplary damages pursuant to California Civil Code section 3294, plus reasonable attorney fees and costs incurred in this matter;

14.    UNDER ALL CLAIMS, for any additional relief deemed proper by the Court.

## JURY DEMAND

Counterclaim Plaintiffs respectfully request a jury as to all claims so triable.

RESPECTFULLY SUBMITTED this 23rd day of February 2017.

PARR BROWN GEE & LOVELESS

/s/ *Jonathan R. Schofield*
Jonathan O. Hafen
Jonathan R. Schofield

HURST & HURST
Kyle Van Dyke

Attorneys for Defendants and
Counterclaim Plaintiffs

74