UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOUNGEVITY INTERNATIONAL, INC. AND JOEL D. WALLACH,<br><br>Plaintiffs,<br><br>v.<br><br>TODD SMITH et al.,<br><br>Defendants.<br><br>AND RELATED COUNTER ACTION. | Case No.: 16-cv-704 BTM (JLB)<br><br>**ORDER DENYING DEFENDANTS' MOTION TO COMPEL PRODUCTION OF UNREDACTED COMMUNICATIONS AND GRANTING PLAINTIFFS' CROSS-MOTION ON PRIVILEGE LOG ISSUE**<br><br>**[ECF Nos. 154 & 155]** |

Before the Court is Defendants' and Counterclaim Plaintiffs' Motion to Compel Production of Unredacted Communications and Plaintiffs' and Counterclaim Defendants' Cross-Motion on Privilege Log Issue. (ECF Nos. 154 & 155.) Specifically, Defendants seek production, in unredacted form (and Plaintiffs seek continued protection), of email communications[1] described in Plaintiffs' privilege log as follows:

---

[1] As noted by Plaintiffs, the documents submitted to the court *in camera* are Bates Stamped "ANSON.000217-ANSON.000218" and "ANSON.000189- ANSON.000191," but Plaintiffs identified

| | | | | Rick Anson, George Rondeau, Eric Awerbuch, Peter Arhangelsky | Attorney-Client; Work-Product; Common-Interest | Email reflecting legal advice. |
| --- | --- | --- | --- | --- | --- | --- |
| ANSON000213 | ANSON000214 | Email | 12/14/2016 | | | |
| ANSON000185 | ANSON000187 | Email | 12/14/2016 | Rick Anson, George Rondeau, Clay Carley, Peter Arhangelsky, Eric Awerbuch | Attorney-Client; Work-Product; Common-Interest | Email reflecting legal advice. |

The parties have provided the Court with an agreed-upon cast of characters. (ECF Nos. 150-7 (sealed), 155-1.) As to those in the part of the email chains at issue, Peter Arhangelsky and Eric Awerbuch are counsel for Plaintiff Youngevity International Corp. (Youngevity). Steve Wallach is Chief Executive Officer of Youngevity. George Rondeau is an attorney for both Livewell L.L.C. (Livewell) and Rick Anson. Rick Anson is and was the owner of Livewell, and at the time of circulation of the relevant emails, was Vice President of Product Development for Defendant Wakaya Perfection (Wakaya). Clay Carley was an officer for, and investor in, Livewell. (*Id.*)

The relevance and responsiveness of these documents is not disputed. Plaintiffs argue that the documents are properly withheld from production because they contain attorney-client and work product privileged information and that the privilege has not been waived because these emails were shared only with those with a common interest. Defendants argue that any privilege has been waived.

## I. Factual Background

Plaintiff Youngevity is a multi-level marketing (MLM) direct selling company (DSC) which markets products in such categories as nutrition, sports and energy drinks, health and wellness, and lifestyle. (ECF No. 1 at 3-4.)[2] Defendant Wakaya is also an MLM

---

these documents as "ANSON000213-ANSON000214" and "ANSON000185-ANSON000187," respectively, in their privilege log. (ECF No. 154 at 2.) The Court uses ANSON000213-ANSON000214 and ANSON000185-ANSON000187 or Courts Exhibits 1 and 2 to refer to these documents. By this Order, the Court directs the Clerk of Court to file the relevant emails, attached as Court Exhibits 1 and 2, under seal, viewable by court personnel only, to preserve the record of what was reviewed *in camera* by the Court.

[2] All citations to page numbers in this Order refer to the page numbers generated by the CM/ECF system.

company which was formed by former Youngevity distributor Defendant Todd Smith. (ECF No. 83 at 5, 7.)

Livewell is a company owned by Anson. (ECF Nos. 150-7 (sealed), 155-1.) Livewell was a vendor of Wakaya beginning in February 2016. (*Id*.) In February 2016, Wakaya and Livewell entered into a license agreement and Wakaya and Anson entered into a royalty agreement providing Wakaya with a license to the Livewell products Anson had developed. (ECF Nos. 83 at 60, 150-7 (sealed); 155-1.) In addition, Anson was employed as Wakaya's Vice President of Product Development. (ECF No. 83 at 61.) All of these relationships were severed sometime in mid-January, 2017. (ECF Nos. 150-7 (sealed), 154 at 4 ("The parties ended their relationship in mid-Jan. 2017."), 155 at 7.) The severance process was initiated on December 16, 2016, when Rick Anson sent Wakaya a Notice of Default as to the royalty agreement and Livewell sent a Notice of Default as to the license agreement (Notices). Both agreements provide for notice and a period to cure. (ECF No. 155 at 7.)

Plaintiffs filed the instant action in March 2016. (ECF No. 1.) Youngevity filed an additional, separate lawsuit against Defendant Wakaya in November 2016. (ECF No. 155-1 at 43.)

The emails at issue are dated December 14, 2016 and December 15, 2016. On December 14, 2016, Youngevity's counsel sent an email to Rondeau, Livewell and Anson's counsel, on the subject of the Notices. (Court Exh. 1 at 4.) Rondeau forwarded the email to Anson; and Rondeau, Anson, and Livewell officer Clay Carley proceeded to exchange communications regarding the Notices and Anson's separation from Wakaya. (*Id*. at 2-3.) On December 15, 2016, Anson forwarded the communications between himself, Rondeau and Carley to Youngevity's CEO, Steve Wallach. (*Id*. at 2.) The next day, Anson and Livewell provided the Notices to Wakaya. (ECF No. 155 at 7.) The Court must determine whether the email chains contain privileged material and whether any such privilege was waived (1) when Youngevity's counsel shared the material with Anson and

Livewell's counsel, and (2) when the communications between Anson, Rondeau and Carley were shared with Wallach.

Plaintiffs argue that the communications were privileged and that there was no waiver because the common interest doctrine applies. Specifically, Plaintiffs argue that "LiveWell and Youngevity shared a common interest in litigation against Wakaya Perfection, LLC." (ECF No. 154 at 2.) Plaintiffs argue that when Anson sent the communications to Youngevity's CEO, Wallach, "Anson did not thereby waive any privilege because LiveWell shared a common interest with Youngevity: legal opposition to Wakaya predicated on Wakaya's tortious acts and breaches of contract." (*Id*. at 6.) Plaintiffs argue that the same alleged wrongdoings by Wakaya that form the basis for Youngevity's lawsuits against Wakaya also underlie the Notices Anson and Livewell sent to Wakaya. (*Id*. at 7-8.)

Defendants argue that "Youngevity and its counsel cannot have had a common *legal* enterprise with Anson during the time Anson served as Wakaya VP." (ECF No. 155 at 8.) Defendants argue that "Youngevity may assert a commercial interest in assisting Anson in terminating the Agreements, but it has no legal interest in such termination." (*Id*. at 9.) Defendants further ague that Youngevity and Anson could not have had a common legal interest, and therefore could not benefit from the common interest doctrine, because California Rule of Professional Conduct 2-100 precluded Youngevity's attorneys from communicating with Anson during the time he was an officer of Wakaya. (*Id*. at 8.) Finally, citing a crime-fraud doctrine case, Defendants argue that Anson violated his ethical and contractual obligations by sharing draft Notices, containing confidential information, with Youngevity, a business competitor and litigation opponent of Wakaya, and "Youngevity and Anson cannot rely on claims of attorney-client or common-interest privilege to hide their tortious conduct." (*Id*. at 9.)

II. **Legal Standards**

The attorney-client privilege protects confidential communications between a client and his or her attorney for the purposes of obtaining legal advice. *In re Grand Jury*

*Investigation*, 974 F.2d 1068, 1070 (9th Cir. 1992). The party asserting the attorney-client privilege has the burden of establishing the existence of the attorney-client privilege. *Id*. at 1070-71. The party asserting the privilege must establish: "(1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived." *Id*. at 1071 n.2 (quoting *Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977)).

The work product doctrine provides a qualified immunity for materials prepared in anticipation of litigation by a party, an attorney, or other representatives of the party. *Hickman v. Taylor*, 329 U.S. 495 (1947); Fed. R. Civ. P. 26(b)(3). The party asserting work product protection bears the burden of proving that the privilege applies. *Hickman*, 329 U.S. at 510-12.

Attorney-client communications "made in the presence of, or shared with, third-parties destroys the confidentiality of the communications and the privilege protection that is dependent upon that confidentiality." *Nidec Corp. v. Victor Co. of Japan*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) (citation omitted). Any exception to this rule must be construed narrowly to avoid "creating an entirely new privilege." *In re Pac. Pictures Corp.*, 679 F.3d 1121, 1128 (9th Cir. 2012).

Similarly, work product protections may be waived when disclosure to a third party "enables an adversary to gain access to the information." *Nidec Corp.,* 249 F.R.D. at 580 (quoting *United States v. Bergonzi*, 216 F.R.D. 487, 497 (N.D. Cal. 2003)). *See also Goff v. Harrah's Operating Co.*, 240 F.R.D. 659, 661 (D. Nev. 2007) (work product protections may apply in spite of disclosure to a third party "unless the breach 'has substantially increased the opportunities for potential adversaries to obtain the information'") (quoting Charles A. Wright, Arthur R. Miller & Richard L. Marcus*, Federal Practice & Procedure: Civil 2d* § 2024 (3d ed.)). "If a document otherwise protected by work-product immunity is disclosed to others with an actual intention, or reasonable probability, that an opposing

party may see the document, the party who made the disclosure cannot subsequently claim work-product immunity." *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 299 F.R.D. 638, 645 (E.D. Cal. 2014) (citing *In re Imperial Corp. of Am.*, 167 F.R.D. 447, 456 (S.D. Cal. 1995), *aff'd*, 92 F.3d 1503 (9th Cir. 1996)).

The "common interest" or "joint defense" doctrine is an exception to the general rule that disclosure of protected material to third parties constitutes a waiver. *Nidec Corp.*, 249 F.R.D. at 578; *Cal. Sportfishing Prot. Alliance*, 299 F.R.D. at 646. The common interest doctrine is "designed to allow attorneys for different clients pursuing a common legal strategy to communicate with each other." *In re Pac. Pictures Corp.*, 679 F.3d at 1129 (citing *Hunydee v. United States,* 355 F.2d 183, 185 (9th Cir. 1965)). The exception is available regardless of whether litigation has actually commenced. *Continental Oil Co. v. United States*, 330 F.2d 347, 350 (9th Cir. 1964). The common interest exception applies when "(1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *Bergonzi*, 216 F.R.D. at 495 (citing *In re Mortgage Realty Trust*, 212 B.R. 649, 653 (Bankr. C.D. Cal. 1997)).

There must be "an on-going and joint effort to set up a common defense strategy" for the common interest exception to apply. *U.S. ex rel. Burroughs v. DeNardi Corp.*, 167 F.R.D. 680, 685 (S.D. Cal. 1996). "[A] shared desire to see the same outcome in a legal matter is insufficient to bring a communication between two parties within this exception." *In re Pac. Pictures Corp.*, 679 F.3d at 1129. "Instead, the parties must make the communication in pursuit of a joint strategy in accordance with some form of agreement— whether written or unwritten." *Id*. An agreement to set up a common defense strategy "may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation." *United States v. Gonzalez*, 669 F.3d 974, 979 (9th Cir. 2012) (quoting *Continental Oil Co.*, 330 F.2d at 350).

//

The existence of an express or implied joint defense agreement "is not necessarily an all-or-nothing proposition." *Id*. at 981. The separate parties "need not have identical interests and may even have some adverse motives," but must share a common interest in litigation. *Id*. (citing *Hunydee*, 355 F.2d at 185). For example, in *United States v. Gonzalez*, the Ninth Circuit held that an express or implied joint defense agreement existed between husband and wife who were initially codefendants, even though their trials were severed and the husband ultimately asserted a defense that was adverse to the wife's interests. *Id*. at 980.

In the attorney-client privilege context, such an agreement must be founded on "a common legal, as opposed to commercial, interest." *Nidec Corp.*, 249 F.R.D. at 579 (quoting *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995)). Additionally, the communications at issue must be "designed to further *that* legal effort." *Id*. (quoting *Bergonzi*, 216 F.R.D. at 495) (emphasis in original). "The protection of the privilege under the community of interest rationale, however, is not limited to joint litigation preparation efforts. It is applicable whenever parties with common interests join forces for the purpose of obtaining more effective legal assistance." *Id*. at 578 (quoting Rice, Attorney Client Privilege in the United States § 4:36, at 216). Parties may have both common commercial and legal interests, such as when the parties are discussing a merger or negotiating for a patent license. *See, e.g.*, *Louisiana Mun. Police Employees Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 310 (D.N.J. 2008) ("The weight of case law suggests that, as a general matter, privileged information exchanged during a merger between two unaffiliated business would fall within the common-interest doctrine.") (quoting *Cavallaro v. United States*, 153 F.Supp.2d 52, 61 (D. Mass. 2001), *aff'd* 284 F.3d 236 (1st Cir. 2002)); *In re Regents of Univ. of California*, 101 F.3d 1386, 1390 (Fed. Cir. 1996) (communications between defendant and third party negotiating for exclusive license to defendant's patents were protected under the common interest exception, reasoning in part that the communications were designed to reduce or avoid litigation). *Compare Santella v. Grizzly Indus., Inc.*, 286 F.R.D. 478, 482 (D. Or. 2012)

(third party waived privilege when it sent "offering package" with its attorney's opinion to numerous potential investors because potential investors had only a commercial interest in the information).

"The common interest exception is construed more narrowly in the context of attorney-client privilege than it is in the context of the attorney work product doctrine." *Cal. Sportfishing Prot. Alliance*, 299 F.R.D. at 646. In the work product context, "[e]ssentially, a court must decide if disclosure is consistent with the work product doctrine's purpose of preserving the adversary system." *Id.* "So long as transferor and transferee anticipate litigation against a common adversary on the same issue or issues, they have strong common interests in sharing the fruit of the trial preparation efforts." *United States v. Am. Tel. & Tel. Co.*, 642 F.2d 1285, 1299 (D.C. Cir. 1980).

Once a common interest or joint defense agreement is formed, one party to the agreement cannot unilaterally waive the privilege for other holders. *Gonzalez*, 669 F.3d at 982.

### III. Analysis

As the party asserting attorney-client privilege and work product protection, Youngevity bears the burden of establishing that privilege was not waived over the email chains at issue. *Hickman*, 329 U.S. at 510-12; *In re Grand Jury Investigation*, 974 F.2d at 1070-71.

**A. Work Product Protection of the Material Youngevity Sent to Anson and Livewell's Counsel**

On December 14, 2016, Youngevity's counsel emailed Anson and Livewell's counsel materials containing the mental impressions, opinions and legal theories of counsel regarding the Notices and Youngevity's claims against Wakaya. (*See* Court Exh. 1 at 4; Court Exh. 2 at 2-3.) At this time, Youngevity was already engaged in litigation with Wakaya. The Notices themselves set forth Wakaya's alleged defaults and breaches under the two agreements that arguably triggered the termination provisions of the agreements. Accordingly, the Court is satisfied Youngevity has met its burden to show that, absent

waiver, these communications qualify for work product protection as materials prepared in anticipation of litigation by an attorney. *See Hickman*, 329 U.S. at 510-12.

The question, then, is whether Youngevity waived this protection by sending the material to third parties Livewell and Anson. The Court finds that the common interest exception applies because the communications were made by separate parties in the course of a matter of common interest; the communications at issue were designed to further that effort; and the privilege was not waived by disclosure to a party outside of the common interest. *See Bergonzi*, 216 F.R.D. at 495. At the time of the email communications, all parties had or were preparing to assert legal claims against Wakaya. Youngevity and Wakaya were already engaged in litigation. Livewell and Anson were preparing to assert their claims against Wakaya in the Notices that were sent two days later, on December 16, 2016. Accordingly, counsel for Youngevity, Livewell and Anson shared legal advice related to their common legal claims against Wakaya. The parallels between the Notices and Youngevity's allegations in the instant litigation evidence this common legal strategy. Specifically, both the Notices and Youngevity's Third Amended Complaint, filed on December 21, 2016, allege that Wakaya: (1) made misrepresentations about David Gilmour's status at Wakaya, (2) falsely claimed that the ingredients of all Wakaya products were sourced from Wakaya island, (3) marketed ginger products with excessive bacteria, and (4) distributed clay products with high levels of lead and arsenic. (ECF No. 154 at 7) Although there was no written agreement, the Court concludes that the parties' exchange of confidential communications regarding Youngevity, Livewell and Anson's legal claims against Wakaya evidences an implied agreement to pursue a common legal strategy. *See Gonzalez*, 669 F.3d at 979.

Wakaya argues that Youngevity could not have had a common legal interest with Anson during the time Anson served as an officer of Wakaya. (ECF No. 155 at 8.) Wakaya's argument seems to be premised on the position that Anson could not have a common interest with Youngevity, a competitor and litigation opponent of Wakaya, while Anson served as an officer of Wakaya. The Ninth Circuit's analysis in *United States v.*

*Gonzalez* is somewhat instructive. In *Gonzalez*, the car of Gonzalez's wife was found burned in a field, with a gas can in the backseat, ten days after the wife had taken out an insurance policy on the vehicle. *Gonzalez*, 669 F.3d at 976. Gonzalez initially admitted to burning the car and stated that his wife knew nothing of the plan, but later argued that he was not involved in the burning of the vehicle and had lied to investigators to protect his wife. *Id*. After trial, Gonzalez's wife filed an ineffective assistance of counsel claim and the government sought communications between the wife's counsel and Gonzalez's counsel, arguing that the communications were not protected by the common interest exception because the trials had been severed and Gonzalez asserted a defense adverse to his wife's interests. *Id*. The court held that an express or implied joint defense agreement existed, as the existence of such an agreement "is not necessarily an all-or-nothing proposition." *Id*. at 981. The case was remanded to the district court to determine the extent and duration of the agreement, noting that "[i]f their mutual interest is defined more narrowly . . . then it is possible that their other adverse positions did not undermine their joint defense privilege on this specific issue." *Id*. at 980-81.

As in *Gonzalez*, while Anson's position as an officer of Wakaya meant he had some interests that were adverse to Youngevity, it does not establish that Anson was adverse to Youngevity in all respects. Wakaya presents no evidence that Anson took any action adverse to the common legal strategy agreement between Youngevity, Livewell and Anson. To the contrary, the record shows that at the time of the email correspondence at issue, Anson was actively working to sever all ties with Wakaya by drafting the Notices and seeking legal advice on separation as an employee of Wakaya. Although Anson and Youngevity may not have had "identical interests and may even have [had] some adverse motives," the record shows they shared a common legal interest in asserting common claims against Wakaya. *See id*.

Wakaya also argues that Rule 2-100 of the California Rules of Professional Conduct prohibited Youngevity's counsel from communicating with Anson while he was an officer of Wakaya. (ECF No. 155 at 8.) Rule 2-100 states, in part, "While representing a client,

a member shall not communicate directly or indirectly about the subject of the representation with a party the member knows to be represented by another lawyer in the matter, unless the member has the consent of the other lawyer." There is no evidence before the Court that counsel for Youngevity communicated with Anson except through Anson's counsel, Rondeau. The Court is not persuaded by Wakaya's argument that the application of Rule 2-100 means Anson and Youngevity could not have had a common interest in sharing the fruits of litigation preparation.

Citing a case on the crime-fraud exception to privilege protection, Wakaya further argues that "Youngevity and Anson cannot rely on claims of attorney-client or common-interest privilege to hide their tortious conduct" and "Anson cannot shield his improper disclosure of Wakaya's confidential information to Youngevity by funneling such disclosure through counsel." (*Id*. at 9.) To the extent that Wakaya endeavors to rely on the crime-fraud exception to privilege protection, it has failed to persuade the Court of its applicability to the current situation. Although Wakaya asserts the conduct of Anson and Youngevity was unethical and tortious, it makes no argument that either was "engaged in or planning a criminal or fraudulent scheme," the first requirement for showing the application of the crime-fraud exception to privilege protection. *In re Grand Jury Proceedings*, 87 F.3d 377, 381 (9th Cir. 1996).

Accordingly, the Court concludes that Youngevity did not waive work product protection by forwarding work product to counsel for Livewell and Anson because the parties shared a common legal interest.[3]

### B. Attorney-Client Privilege Protection of the Email Communications Between Livewell, Anson and Counsel Forwarded to Youngevity

The common interest exception also applies to the email communications exchanged by Livewell, Anson and Rondeau that were forwarded to Wallach. Livewell and Anson

---

[3] Wakaya does not argue, and the Court does not address, whether work product protection of the email correspondence should nonetheless be overcome based on a showing of substantial need for the materials. *See* Fed. R. Civ. P. 26(b)(3).

exchanged privileged attorney-client communications with their counsel when they sought legal advice, in confidence, regarding the claims asserted in the Notices of Default and Anson's separation from Wakaya. *See In re Grand Jury Investigation*, 974 F.2d at 1071 n.2; Court Exh. 1 at 2-3. These attorney-client communications were sent to a third party, Wallach, destroying privilege unless an exception to waiver applies. *See Nidec Corp.*, 249 F.R.D. at 578. Here, the common interest exception applies.

The attorney-client privilege was not waived when Anson forwarded the email communications to Wallach because Livewell, Anson and Youngevity had an implied agreement to pursue a common legal strategy. *See Gonzalez*, 669 F.3d at 979. Having reviewed the email communications, the Court finds that the email communications at issue furthered that common legal interest. As evidenced by the common claims asserted by the parties against Wakaya, the communications were based on "a common legal, as opposed to commercial, interest." *Nidec Corp.*, 249 F.R.D. at 579 (quoting *Bank Brussels Lambert*, 160 F.R.D. at 447). Youngevity, Anson and Livewell "join[ed] forces for the purpose of obtaining more effective legal assistance," as memorialized in the Notices and Youngevity's allegations against Wakaya in the instant litigation. *See id.* at 578 (quoting Rice, Attorney Client Privilege in the United States § 4:36, at 216). *See also Sealed Air Corp.*, 253 F.R.D. at 310. At the time of the email communications at issue, Youngevity, Anson and Livewell shared a common legal interest in pursuing parallel claims against Wakaya. Thus, the Court concludes that Youngevity has met its burden to show the email communications are privileged.

## IV.  Conclusion

For the foregoing reasons, Defendants' motion to compel production of ANSON000213-ANSON000214 and ANSON00185-ANSON00187 is hereby **DENIED**, and Plaintiffs' cross-motion for continued protection of the email correspondence is **GRANTED**.

The Court hereby directs the Clerk of Court to file the email correspondence reviewed *in camera*, Court Exhibits 1 and 2, under seal for the Court's eyes only. Good

cause exists to place Court Exhibits 1 and 2 under seal because the Court concludes that these documents are protected by the attorney-client privilege and work product doctrine.

**IT IS SO ORDERED.**

Dated: September 22, 2017

_____
Hon. Jill L. Burkhardt
United States Magistrate Judge