Peter A. Arhangelsky, Esq. (SBN 291325)
parhangelsky@emord.com
Jonathan W. Emord (pro hac vice)
jemord@emord.com
Eric J. Awerbuch (pro hac vice)
eawerbuch@emord.com
Bethany R. Kennedy (pro hac vice)
bkennedy@emord.com
Joshua S. Furman (pro hac vice)
jfurman@emord.com
Emord & Associates, P.C.
2730 S. Val Vista Dr.
Bldg. 6, Ste. 133
Gilbert, AZ 85295
Phone: (602) 388-8899
Fax: (602) 393-4361

James S. McAuliffe, III (pro hac vice)
smcauliffe@milesstockbridge.com
Miles & Stockbridge, P.C
11 N. Washington St., Ste. 700
Rockville, MD 20850
Phone: (301) 762-1600
Fax: (301) 762-0363

Laura G. Liff (pro hac vice)
lliff@milesstockbridge.com
Miles & Stockbridge, P.C
1751 Pinnacle Dr., Suite 1500
Tysons Corner, VA 222102
Phone: (703) 610-8651
Fax: (301) 610-8686

Martin R. Denney (pro hac vice)
mrdenney@dennlaw.com
The Denney Lawfirm
68 South Main Street, 6th Floor
Salt Lake City, UT 84101
Phone: (801) 530-7314

Corrie J. Klekowsi (SBN 251338)
cklekowski@paulplevin.com
Paul Pleven Sullivan & Connaughton LLP
101 West Broadway, Suite 900
San Diego, CA 92101
Phone: (619) 237-5200
Fax: (619) 615-0700

Attorneys for Plaintiffs/Counterclaim Defendants

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

YOUNGEVITY INTERNATIONAL CORP., a Delaware corporation; and JOEL D. WALLACH, DVM, ND, a California resident,

                    Plaintiffs,

     v.

TODD SMITH, an individual and Utah resident; WAKAYA PERFECTION, a Utah corporation; TOTAL NUTRITION TEAM D/B/A TNT, a Utah corporation; BLAKE GRAHAM, an individual and Utah resident; WILLIAM ANDREOLI, an individual and New Hampshire resident; ANDRE VAUGHN, an individual and Pennsylvania resident; DAVE PITCOCK, an individual and Kansas resident; BARB PITCOCK, an individual and Kansas Resident; PATTI GARDNER, an individual and Utah resident; BRYTT CLOWARD an individual and Utah resident; MIKE RANDOLPH, an individual and New Hampshire resident; MIKE CASPERSON, an individual and Utah Resident; and DOES 1–10, inclusive,

                    Defendants.

---------------------------------------------

TODD SMITH, et al.,

             Counterclaim Plaintiffs,

     v.

YOUNGEVITY INTERNATIONAL, INC., et al.,

             Counterclaim Defendants.

Case No. 3:16-cv-00704-BTM-JLB

**FOURTH AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:**

1. Lanham Act (15 U.S.C. § 1125);
2. Unfair Competition (Cal. B & P Code § 17200);
3. Intentional Interference with Prospective Economic Advantage;
4. Breach of Contract;
5. Intentional Interference with Contract/Inducing Breach of Contract;
6. Misappropriation of Trade Secrets (Cal. Civ. Code § 3426);
7. Misappropriation of Likeness (Cal. Civ. Code § 3344);
8. Lanham Act (15 U.S.C. § 1114);
9. Breach of Fiduciary Duty; and
10. Breach of the Duty of Loyalty

<u>JURY TRIAL DEMANDED</u>

## FOURTH AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

1.      Plaintiffs Youngevity International Corp. ("YGYI" or "Youngevity") and Joel D. Wallach, BS, DVM, ND ("Dr. Wallach") (collectively, "Plaintiffs"), by counsel, file this Fourth Amended Complaint for Damages and Injunctive Relief against the above-named Defendants.

## PARTIES

**The Plaintiffs:**

2.      Organized in 1997, Plaintiff Youngevity, a publicly traded company (NASDAQ symbol: YGYI), operates under the laws of Delaware with its principal place of business in Chula Vista, California.

3.      For the past nineteen years, Youngevity has sold products through direct selling networks worldwide, as well as wholly owned subsidiaries, including, e.g., AL Global Corporation; CLR Roasters, LLC; Financial Destinations, Inc.; and FDI Management, Inc.

4.      Originally U.S.-centric, selling specialty liquid based vitamin and mineral formulas created by plaintiff Dr. Joel D. Wallach, Youngevity has become global, selling over 1,000 products through direct sales worldwide, including, but not limited to, weight-loss products, nutritional products, sports and energy drinks, health and wellness-related services, lifestyle products, gourmet coffees, and cosmetics.

5.      Youngevity develops and distributes consumer products through independent, direct-sellers known as "distributors," who are Youngevity agents bound by the Youngevity distributor agreement.  Each has a "genealogy" within Youngevity that consists of other distributors in an "upline" or "downline."  Distributors in the upline predate, and those in the downline post-date, the distributor's enrollment.  Sales flowing from downline distributors are also shared

with upline distributors, who generally have a limited commission payable for all sales in their respective downlines.  The integrity of the Youngevity genealogies is essential to Youngevity's business model.

6.     Youngevity's distributors market products through corporate-backed marketing channels, including internet websites, media, trade shows, lectures, community events, local shops, and home meetings.  Distributors generally sell through peer-to-peer relationships, e-commerce, and social media marketing.

7.     Youngevity invests more than seventy million dollars annually in sales, incentives, and marketing efforts to support its distributor networks.

8.     Plaintiff Dr. Joel D. Wallach is an individual and resident of California, a doctor of veterinary medicine, author of leading texts and articles on veterinary medicine and comparative pathology, and a doctor of naturopathic medicine.

9.     Dr. Wallach has been actively involved in biomedical research and clinical medicine for over five decades.  His research is contained in more than seventy peer-reviewed and refereed journal articles in diverse fields including veterinary medicine, veterinary pathology, comparative pathology, nutrition, and pharmaceutical research.

10.     Dr. Wallach founded American Longevity Corporation in 1997, which became Youngevity in 2006.

11.     Youngevity has grown and thrived under Dr. Wallach's direction, and due to his research and reputation.

**The Defendants:**

12.     Defendant Wakaya Perfection, LLC ("Wakaya" or "Wakaya Perfection") is a limited liability company formed and operated under the laws of Utah.  Wakaya has one founding member in its documentation filed with the Utah

---

Secretary of State:  Todd Smith.  Smith acquired Wakaya in October. 2015.
Wakaya is a Utah resident and business for jurisdictional purposes.

13.     Wakaya is a multi-level marketing company that competes directly
with Youngevity for executives, employees, distributors, and customers.

14.     Defendant Todd Smith is an individual and Utah resident.  From 1997
until March of 2016, Todd Smith was a top level Youngevity distributor.  Smith
had ownership interests in entities that distributed Youngevity products.  Smith
formed Wakaya Perfection while still a distributor for Youngevity and thereafter,
and designed Wakaya specifically to compete against Youngevity.

15.     Todd Smith is the alter ego of Wakaya.  As Wakaya's sole owner,
President, and director, Smith authorizes Wakaya's actions.  Smith and Wakaya
share a unity of interest such that their separate personalities no longer exist.  For
example, he has signed contracts in his individual capacity to benefit Wakaya
Perfection, LLC.  Wakaya's address and registered agent address, as identified by
the Utah Secretary of State, is Smith's home address.  *See* Exh. 1 (Utah SoS
Page).  Smith is Wakaya's registered agent.  *Id.*  No one other than Smith or
Wakaya Perfection, LLC has been identified in Utah Secretary of State documents
as a registered agent or manager of Wakaya.  *See* Exh. 2 (Utah SoS
Documents).  Many of Wakaya Perfection's website URLs are registered in
Smith's name.  In addition, Wakaya maintains poor credit ratings with Dun &
Bradstreet.  *See* Exh. 3 (D&B Report).  Wakaya has a Paydex rating of 67, *id.*,
which indicates that Wakaya has a poor history of payment
performance.  Wakaya's supplier credit risk is an "8," *id.*, which indicates that
Wakaya is unable to meet its ongoing financial obligations.  Youngevity is
therefore informed and believes that Smith caused Wakaya to be undercapitalized
or Wakaya's debts exceed its revenues.  Smith has controlled and managed all of
Wakaya's actions and advertising, and encouraged Wakaya's alleged illegal
actions identified below.  Upon information and belief, Smith has personally

profited from Wakaya's false advertising and other illegal acts identified below, and allowing him to hide behind the corporate veil causes an inequitable result, especially where, as here, he has undercapitalized Wakaya.

16.     William "Bill" Andreoli is an individual and resident of New Hampshire.  Andreoli is Wakaya's President.  Through November of 2015, Andreoli served as Youngevity's President, received from Youngevity a seven figure salary, stock, and benefits, and received commissions as a Youngevity distributor.

17.     Andre Vaughn is an individual and resident of Pennsylvania.  Vaughn served as a top-level distributor in Youngevity until March of 2016.  A confidant of Andreoli, Vaughn participates and invests in, distributes for, and promotes Wakaya Perfection.

18.     Dave Pitcock and Barb Pitcock are individuals and residents of Kansas.  The Pitcocks served as top-level distributors in Youngevity until March of 2016, and held ownership interests in Livinity Corporation, which Youngevity purchased from the Pitcocks in 2012.

19.     As part of the Youngevity agreement to purchase Livinity Corporation, Dave Pitcock executed a consulting agreement with Youngevity containing non-compete and nondisclosure clauses.  Dave Pitcock is personally bound by that agreement because he was the alter ego of Livinity.  While still a Youngevity distributor and subject to that consulting agreement, Dave Pitcock became a participant and investor in, distributor for, and promoter of Wakaya Perfection.  While still a Youngevity distributor, Barb Pitcock became a participant and investor in, distributor for, and promoter of Wakaya Perfection,

20.     Total Nutrition, Inc., d/b/a "TNT," is a corporation organized and operated under the laws of Utah since 1996 and, until March of 2016, a Youngevity distributor.  TNT was founded and wholly owned by defendants Todd Smith and Blake Graham, both residents of Utah, until approximately December

31, 2015.  On that date, Smith purportedly transferred his ownership interest in TNT to Graham.

21.  Blake Graham is an individual and resident of Utah.  Until March of 2016, Graham served as a top-level distributor in Youngevity, and, together with Smith, held ownership interests in TNT.  Graham is now a participant and investor in, distributor for, and promoter of Wakaya Perfection.

22.  Graham controls the content on the websites yteamtools.com and www.engevity.co.jp.

23.  Patti Gardner is an individual and resident of Utah.  Gardner served as the President of Heritage Makers, Inc.  In August 2013, Youngevity acquired Heritage Makers and entered into an Asset Purchase Agreement with Heritage Makers.  Gardner then became Youngevity's Vice President of Sales.  While still employed by Youngevity, Gardner became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Gardner is now Wakaya's Vice President.

24.  Brytt Cloward is an individual and resident of Utah.  Cloward served as the Vice President of Sales and Marketing of Heritage Makers, Inc.  In August 2013, Youngevity acquired Heritage Makers through an Asset Purchase Agreement.  Cloward signed that agreement in his personal capacity.  Cloward then became Youngevity's Vice President of Marketing.  While still employed by Youngevity, Cloward became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Cloward is now Wakaya's Vice President of Marketing.

25.  Mike Casperson is an individual and resident of Utah.  Through November 7, 2015, Casperson served as Youngevity's Vice President of Distributor Relations.  While still employed by Youngevity, Casperson became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Casperson is now Wakaya's Vice President.

26.  Mike Randolph is an individual and resident of New Hampshire.  Through November 7, 2015, Randolph served as Youngevity's Executive Vice

President.  While still employed by Youngevity, Randolph became a participant and investor in, agent for, and promoter of Wakaya Perfection.  Randolph is now Wakaya's Executive Vice President.

27.    Defendants DOES 1-10 are presently unidentified or unknown individuals and/or entities who have or that have facilitated and participated or cooperated in the unlawful activities described herein.  The nature and identity of those defendants will become known through discovery.

## JURISDICTION AND VENUE

28.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff seeks relief under the federal laws of the United States. Plaintiff presents Counts under the Lanham Act, 15 U.S.C. §§ 1111 *et seq.*, for false and misleading advertising, trademark infringement, and unfair competition. Plaintiffs' remaining state law claims are subject to this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) because those state claims are related to Plaintiffs' federal Lanham Act claim and form part of the same case or controversy under Article III of the United States Constitution.

29.    This Court additionally has original subject matter jurisdiction under 28 U.S.C. § 1332 because Plaintiffs Youngevity and Dr. Wallach are domiciled in California, while no named Defendant resides in California and no Defendant corporation is owned by a resident of California.  The plaintiffs are completely diverse from all defendants for purposes of 28 U.S.C. § 1332.  Defendant Smith is the sole member/owner of Wakaya and both Wakaya and Defendant Smith are Utah residents.  Defendant Graham is the sole member/owner of TNT and both TNT and Graham are Utah residents.  The matter in controversy yields damages in the tens of millions of dollars and, thus, substantially exceeds $75,000.

30.    This Court has personal jurisdiction over all Defendants and venue is proper in this District because Youngevity maintains its principal place of business in this District and all Defendants have sufficient minimum contacts with

California, including conducting business with Youngevity. All Defendants knowingly injured Youngevity with knowledge that Youngevity is located in this District and that the damages would be incurred by Youngevity in this District.

31.     Venue is proper under 28 U.S.C. § 139(b)(2) because a substantial part of the events giving rise to Youngevity's claims herein occurred in this District. Youngevity is a California Corporation with its principal place of business in San Diego County, California.

## COUNT ONE
## LANHAM ACT FALSE OR MISLEADING ADVERTISING
## 15 U.S.C. § 1125

32.     Wakaya, and all others identified in this Count below and found through discovery to have acted in concert with Wakaya, is primarily engaged in the business of selling goods and services through Wakaya.

33.     Wakaya, and all others identified in this Count below and found through discovery to have acted in concert with Wakaya, made the below identified false and misleading statements to induce individuals to become Wakaya distributors and/or sell Wakaya products, at the expense of Youngevity.

34.     Wakaya, and all others identified in this Count below and found through discovery to have acted in concert with Wakaya, made the below identified false and misleading statements to individuals who were Youngevity distributors or potential distributors or Youngevity customers or potential customers. The conduct described herein below violates federal law.

### A. Income Claims (Against Wakaya, Barb Pitcock, Dave Pitcock, Vaughn, Andreoli)

35.     Defendants Wakaya Perfection, Dave Pitcock, Barb Pitcock, William Andreoli, Andre Vaughn, and all others found through discovery to have acted in concert with them, have made false statements of fact in commercial

advertisements about allegedly superior commercial opportunities available to Wakaya distributors, by claiming, for example, that Wakaya distributors would be able to earn $100,000.00 per month or even $250,000 per month ("income claims").

36.    Wakaya's agents have pledged that individuals will have $600-$800 in earnings simply by signing to become Wakaya distributors and without performing any work.

37.    Wakaya agents promised that "a year from now, many of us will be million dollar earners."[1]

38.    Wakaya encouraged product sales and memberships by informing individuals that they could be "million dollar earners."[2]

39.    Wakaya representatives claimed that participants could easily earn more than $85,000 within ninety days and that participants could earn "a quarter million dollars in one month."

40.    Wakaya represented that individuals participating in Wakaya will be able to replace their living wages through money earned in Wakaya.

41.    Wakaya represented to participants that they will earn amounts of money that they "won't even be able to imagine" and that "are almost incalculable …"

42.    In or about January, 2017, Wakaya introduced a new commission plan and began a marketing campaign referred to as "Plan to a Grand."  Through its Plan to a Grand marketing campaign, Wakaya claimed in its official flyers, promotional videos, and blog posts, and through its employees and agents, either expressly or by implication, that Wakaya Ambassadors could easily earn more than

---

[1]*See, e.g.,* https://www.youtube.com/watch?v=4dW5-yCgJRE (last visited Dec. 7, 2016).

[2] https://youtu.be/qpVPTIKiVmw (last visited Dec. 7, 2016).

$1,000 per month and that that ninety-five percent (95%) of its Ambassadors will earn more than $1,000 per month.

43.     Defendants Dave Pitcock, Barb Pitcock, Andre Vaugn, and William Andreoli all personally participated in Wakaya's "Plan to a Grand" false advertising campaign.  At a Wakaya boot camp event in Utah, Andreoli stated that Wakaya's Plan to a Grand" is a "defining moment for Wakaya."

44.     On a YouTube video posted by Wakaya Perfection on January 17, 2017, defendant Andre Vaughn claimed that Wakaya "focuses on the 95%." During that video, defendant Andreoli claimed that "here with the plan to a grand, with this destruction in the industry, we set up the company for the ninety-five percenters to win…"

45.     In a January 14, 2017 YouTube video posted by Wakaya Leaders, defendant Dave Pitcock claimed that Wakaya's Plan to a Grand is "for the ninety-five percent of the people who get involved, share this with a few people…"

46.     On March 30, 2017, Barb and Dave Pitcock hosted a Wakaya event in Salina, Kansas.  They shared that event via Facebook live and maintain a video of that event on their Facebook account, "Dave and Barb Pitcock with Wakaya." During that event, Dave Pitcock stated that Wakaya will have 1,000 people making at least $1,000 per month.

47.     On information and belief, the above identified income claims are representative of other promotional claims made by Wakaya, all such claims designed and intended to promote Wakaya's business opportunity through the express and implied claim that 95% of Wakaya members will earn at least $1,000 per month.

48.     In reality, as Wakaya admits, each Wakaya Ambassador must sign up thirty-four other customers, and have those customers each order 150 BV worth of products (i.e., approximately $250–500 of products (depending on products purchased)) per month before the Ambassador is eligible to earn at least $1,000 per

month.  Despite Wakaya's representations that earning $1,000 per month as a Wakaya ambassador is "not far away" and that 95% of Wakaya ambassadors can earn at least $1,000 per month, the vast majority of Wakaya Ambassadors do not, and will not, earn $1,000 or more per month.

49.    Wakaya and its agents' statements of fact concerning the amount of income Wakaya distributors will make actually deceived or had the tendency to deceive a substantial segment of its audience because the audience would likely believe that Wakaya's false income claims were truthful.

50.    The income claims are material because, if true, the intended audience would likely contract to become Wakaya distributors to earn the promised substantial income.

51.    Wakaya and its agents have made unsubstantiated income claims through conference calls, social media, promotional videos, and internet webcasts, causing those claims to enter interstate commerce.

52.    Youngevity has suffered injury as a result of Wakaya's false income claims because Youngevity distributors, or potential distributors, have joined Wakaya instead of Youngevity or have reduced their sales promotions of Youngevity products to spend more time in sales promotions of Wakaya products in reliance on those claims.

53.    Those income claims are, in fact, false and misleading.  Few, if any Wakaya distributors have earned the amounts claimed above and none is likely to ever earn the money promised by Wakaya's agents.  In fact, only the top-level distributors or founders are ever likely to see a profit, if at all, from their participation in Wakaya, which is a corporation operating in the red without any serious prospect of becoming profitable.

**B. David Gilmour's Involvement (Against Wakaya Only)**

54.    Defendant Wakaya, and all others acting in concert (to be determined through discovery) with Wakaya, has promoted the Wakaya business as a joint

venture with David Gilmour, the billionaire founder of Fiji Water company and the owner of the tropical island Wakaya.

55.    Wakaya advertising describes Gilmour as a "partner" or "founder" of Defendant Smith's Wakaya venture.

56.    Wakaya's promotional brochures feature Gilmour's likeness and include quotations from him.

57.    Wakaya holds Gilmour out as an individual who personally participates in the Wakaya venture and who backs the Wakaya venture financially.

58.    Wakaya informational videos refer to "Mr. Gilmour, the founder of our company" and the official Wakaya Perfection Facebook page states that "Wakaya Perfection is a collection of wellness products by David H. Gilmour, the founder of Fiji Water."

59.    Wakaya routinely provides Gilmour's information, including books and literature, to prospective Wakaya members, and hold Smith out as Gilmour's "partner."

60.    Wakaya sales pitches and promotional material frequently rely on Gilmour's biography and successes.

61.    Wakaya intends promotional statements associating Gilmour with Defendant Smith's Wakaya to create the impression that Gilmour is intimately involved in the direct-selling venture and a financial supporter of same, which representations are false.

62.    Wakaya agents proclaim during sales presentations that "Mr. David Gilmour is our founder; the same founder of Fiji water."

63.    Wakaya agents have also said that "a billionaire's backing it," referring to Gilmour while promoting the Wakaya venture.  Other promotional videos have stated that Gilmour is "backing everything" related to the company.[3]

_____

[3] *See, e.g.,* https://youtu.be/OHNNj-0BjPI (last visited Dec. 7, 2016).

64.     On March 31, 2017, Wakaya released a brochure entitled "New 8 Steps to Paradise Training Guide." *See* Exh. 4 (Guide).  In that Guide, Wakaya claims that "Wakaya Perfection is the fulfillment of a serial entrepreneur's dream. This, the twelfth successful Start-Up by Billionaire David H. Gilmour…." *Id.*

65.     Defendants thus marketed the Wakaya enterprise by falsely touting Gilmour as the financial backer of, partner and as directly involved in promoting Smith's Wakaya and Wakaya's products.  Defendants have thus falsely marketed Wakaya upon Gilmour's reputation.  Those efforts were designed to lend credibility to Smith's Wakaya venture by falsely representing that Gilmour was a partner in and financial backer of Smith's Wakaya.

66.     In reality, Defendant Smith is the sole founder and owner of the Wakaya Perfection direct-selling network, a startup business that purchased the Wakaya Perfection brand from Gilmour in or about October, 2015.

67.     Gilmour is neither a partner in nor an owner of Wakaya Perfection LLC, despite Defendants' advertisements to the contrary.

68.     Upon information and belief, Wakaya at one time had the exclusive rights to use the "Wakaya" name and sell Gilmour's Wakaya products. Upon information and belief, in or approximately January 2017, Wakaya lost the exclusive right to sell Gilmour's Wakaya Products and use the "Wakaya" name because Wakaya failed to purchase sufficient Products under its licensing agreement with Gilmour.  Gilmour's company now sells Wakaya products, including Wakaya Ginger and Turmeric through the Home Shopping Network[4] and Amazon.com through the merchant names "Wakaya Perfection Group" and "Wakaya Perfection Limited."

69.     Wakaya's statements concerning Gilmour's involvement in Wakaya, representing Gilmour to be a business partner of Smith in Wakaya, and

---

[4] *See* https://www.hsn.com/shop/wakaya-perfection/11972 (last accessed Mar. 29, 2017).

representing Gilmour to be financially backing Wakaya, are false and tended to deceive or actually have deceived prospective Wakaya distributors who are induced by those representations to pay to become Wakaya distributors and buy Wakaya products.

70.   Wakaya and its agents' advertising claims concerning Gilmour's involvement and Wakaya and its agents' false income statements are material to consumers' purchasing of Wakaya's products and to prospective recruits entering Wakaya.

71.   Wakaya and its agents have made false and misleading claims concerning Gilmour through internet webcasts, social media, publications, and telephone conference calls, causing those statements to enter interstate commerce.

72.   Youngevity has suffered injury as a result of Wakaya's false claims concerning David Gilmour because Youngevity distributors, or potential distributors, have joined Wakaya instead of Youngevity and because consumers have purchased Wakaya products instead of Youngevity products thinking that the Wakaya and Wakaya products are backed by Gilmour.

**C. Statements About Youngevity's Finances (Against Wakaya, Smith, Graham, Barb Pitcock and Dave Pitcock)**

73.   Defendants Wakaya, Dave Pitcock, Barb Pitcock, Graham, and Smith, and all others acting in concert with them (to be determined in discovery), have maliciously and unlawfully promoted Wakaya through false and misleading claims about Youngevity.

74.   To lure business opportunities away from Youngevity, Defendants have falsely claimed that Youngevity has financial troubles:

- Beginning in or about January 2016, Defendant Smith told Youngevity distributors, including Kurt Venekamp, that Youngevity was struggling financially and was going to go out of business.

- Upon information and belief, in or about August 2015, Defendant Smith told potential Youngevity product supplier David Smith of the Great American Clay Company that Youngevity was struggling financially and was going to go out of business.

- In or about June 2016, Wakaya, through its agents Barb Pitcock and Defendant Graham, told individuals, including Youngevity distributors, that Youngevity was going out of business.  *See* Exh. 5 (e-mail documenting Graham's and Pitcock's statements).

- In April 2016, Wakaya, through its agents Barb Pitcock, Willie Martin, and Aaron Martin encouraged Youngevity distributors to join Wakaya by stating that Youngevity was going under, borrowing money, and bouncing checks.  Upon information and belief, they made similar statements to other distributors during that period in an effort to pull business from Youngevity into Wakaya.

- In a March 22, 2016 Facebook Post published by a Facebook account attributable to Wakaya agents, to wit, the "Dave and Barb Pitcock with Wakaya" account, the Pitcocks as Wakaya representatives claimed that Youngevity "desperately need[s] money."  *See* Exh. 6 (Facebook post).

- In or about November 2016, defendant Graham, a Wakaya agent, told two top level Youngevity distributors that Youngevity was purportedly borrowing money to support its coffee division because Youngevity was bouncing checks.

- In March 2016, Wakaya, through its agent Kurt Venekamp, promoted Wakaya and encouraged Youngevity distributors to join Wakaya by stating that Youngevity was going out of business, was broke, and would not be in operation much longer.  *See* Exh. 7 (e-mail documenting Venekamp's statements).

- In February 2016, defendant Dave Pitcock, a Wakaya agent, sent an e-mail to top Youngevity distributor Scott Fardulis encouraging Mr. Fardulis to join Wakaya.  In that e-mail, defendant Pitcock implied that Youngevity was going out of business.  *See* Exh. 8 (e-mail).

65.    In sum, to induce Youngevity distributors and employees to join Wakaya, Wakaya Perfection LLC, Dave Pitcock, Graham and Smith, and all others found through discovery to be acting in concert with them, falsely represented Youngevity to be a financially bereft, failing organization.

75.    In fact, Youngevity maintains excellent ratings with the Dunn & Bradstreet corporate credit monitoring organization—ratings far superior to Wakaya's ratings.  Youngevity's sales and profits have grown consistently over the past decade.   As a publicly traded corporation, Youngevity most recently posted sales revenues over $156 million.  By most metrics, Youngevity is a healthy and stable corporation with substantially better revenues, profits, and stability than Wakaya.

76.    Wakaya, Dave Pitcock, Barb Pitcock, Graham, Smith and their agents have made false statements of fact concerning Youngevity's financial status when promoting and marketing Wakaya.

77.    Wakaya's, Dave Pitcock's, Barb Pitcock's, Graham's and Smith's false statements concerning Youngevity's financial status were likely to deceive and did deceive the intended audience.

78.    Wakaya's, Dave Pitcock's, Barb Pitcock's, Graham's and Smith's statements concerning Youngevity's finances are material in that they have caused Youngevity distributors, or potential distributors, to leave Youngevity, violate Youngevity distributor agreements, and/or stop actively promoting and selling Youngevity products out of the false concern (created by Wakaya) that Youngevity is insolvent.

79.     Wakaya, Dave Pitcock, Graham, Smith, and their agents have made false and misleading claims concerning Youngevity's finances through internet webcasts and telephone conference calls, causing those statements to enter interstate commerce.

80.     Youngevity has suffered injury as a result of Wakaya's, Dave Pitcock's, Barb Pitcock's, Graham's, and Smith's false statements concerning Youngevity's finances.  Youngevity distributors have left Youngevity or reduced their sales and promotion activity for Youngevity because of those statements and because potential new Youngevity distributors have been dissuaded from so becoming as a result of those statements.  Additionally, Youngevity has suffered injury in harm to its reputation and goodwill as a result of Wakaya's false statement concerning Youngevity's finances.

**D. False Origin Statements About Wakaya Products (Against Wakaya and Smith)**

81.     Defendants Wakaya and Smith, and all others acting in concert (to be determined through discovery) with them, have advertised products based on claims that those products originate in the Fijian islands.

82.     Wakaya's marketing is based on the claim that their products are sourced from Wakaya Island in Fiji.  Smith, in his capacity as Wakaya's owner, personally participated in Wakaya's acts as alleged herein.  Smith reviews and approves all of Wakaya's official labels, advertisements, YouTube videos, catalogs, and other promotional materials and/or consents to the issuance and use of all of Wakaya's labels, advertisements, package inserts, and other promotional materials.  In the alternative, Smith is personally liable for the acts of Wakaya as alleged herein because he knew or should have known that Wakaya was committing the illegal acts alleged herein, and he facilitated or permitted those acts.

83.     Through the name "Wakaya Perfection," Wakaya implicitly claims that all of its products are sourced from Wakaya Island.

84.     Wakaya Perfection's Official Facebook.com page promotes Wakaya by claiming that all its products:  (a) "are hand-cultivated on the pristine island of Wakaya"; (b)  that "Wakaya Island's virgin volcanic soil is the birthplace of Wakaya Perfections life-enhancing products"; and (c) that Wakaya's "pure, virgin volcanic soil and thoughtful, hand-cultivation are what sets Wakaya Perfection products apart."[5]  That page further states that "Wakaya Island possesses a rich and pure virgin volcanic soil that contains amplified nutrients and vitamins.  As the volcanic rock naturally breaks down it releases rich vitamins and nutrients into the soil, creating a perfect recipe in which to cultivate Wakaya Perfection products."[6]

85.     Wakaya's official YouTube.com channel claims that Wakaya's "uniquely organic products are hand-cultivated on the pristine island of Wakaya …"  *See* Exh. 9 (YouTube page).

86.     In a promotional video aired, upon information and belief, on August 27, 2016, live on periscope.tv and other social mediums, defendant Smith claimed that Wakaya receives raw ingredients "from the island," thereby implying that all of Wakaya's raw ingredients are from Wakaya Island.[7]  In that video, Smith claims that Wakaya's raw clay is from "the island," again implying that the Wakaya Calcium Bentonite Clay is sourced from Wakaya Island.[8]

87.     In a March 26, 2016, Facebook post, Smith claimed that "Wakaya Perfection offers a line of incredible products made from exclusive ingredients grown on the origin island of Wakaya."  *See* Exh. 10 (Facebook Post).

---

[5] *See* https://www.facebook.com/pg/wakayap/about/ (last accessed Apr. 17, 2017).

[6] *Id.*

[7] Youngevity maintains a copy of this video, and will provide it upon request.

[8] *Id.*

88.     In Wakaya's 2016 catalog, Wakaya repeatedly claimed that their products are from the island of Wakaya.  *See* Exh. 11 (Catalog).

89.     Wakaya's promotional videos posted by the official Wakaya YouTube channel, "Wakaya Perfection," repeatedly claim, expressly or by implication, that Wakaya products are sourced from the island of Wakaya.[9]

90.     In or about February, 2017, Wakaya began marketing a new product line it refers to as "BulaFIT."  The BulaFIT product line includes, among other items, the Wakaya BulaFIT KetoFUEL Meal Replacement Shake and the Wakaya BulaFIT Burn Capsules (collectively the "BulaFIT Products").   Like its other products, Wakaya claims, either expressly or by implication, that its BulaFIT products originate from and/or are sourced from Wakaya Island. *See* Exh. 12 (Wakaya BulaFIT Warrior Fitness Program); Exh. 13 (Homebusinessmag.com Article); Exh. 14 (Wakaya BulaFIT Facebook Page).

91.     Reasonable consumers exposed to Wakaya's marketing interpret Wakaya's marketing to mean that all of Wakaya's products are sourced from Wakaya Island.

92.     Smith has approved and encouraged Wakaya's marketing to focus on the claim that all of Wakaya's products originate in Wakaya Island.

93.     In truth and in fact, many of Wakaya's products do not originate in the Fijian islands and are not sourced from Wakaya Island.  The Bula Bottles are produced in Idaho.  The Bula Caps are manufactured in Utah.  The Essential Oils are manufactured in Kansas.  The Wakaya Pop! Popcorn is sourced from California.  Wakaya Calcium Bentonite Clay is sourced from Texas.  Upon information and belief, the Wakaya BulaFIT Products contain ingredients sourced

---

[9] *See* https://www.youtube.com/user/wakayaperfection/videos (last accessed Mar. 31, 2017);
https://www.youtube.com/watch?v=OaFekSb13gE (last accessed Mar. 31, 2017);
https://www.youtube.com/watch?v=_sUVfsnk1Dk (last accessed Mar. 31, 2017);
https://www.youtube.com/watch?v=RNpBuuowEpA (last accessed Mar. 17, 2017).

from locations other than the Fijian Islands or Wakaya Island.  Upon information and belief, even some of Wakaya's turmeric and ginger products contain ingredients not sourced from Wakaya Island.

94.     The statements concerning the origin of Wakaya's products are likely to deceive and did deceive Wakaya distributors and customers and potential distributors and customers into believing that Wakaya products are all sourced from Wakaya Island.

95.     Wakaya's misleading claims are material and are likely to influence the willingness of the audience to become Wakaya distributors by purchasing that business opportunity.

96.     As documented in the above examples, Wakaya's false "origin" claims are a substantial selling point for Wakaya in promotional materials and videos wherein Wakaya directly sells the benefits of Wakaya-sourced ingredients. Moreover, Wakaya sells products at a substantial premium over comparable products in the market (e.g., ginger, turmeric, bentonite clay), based on the promotional concept that Wakaya-sourced products are superior due to Wakaya Island's special features, for example, by claiming that Wakaya's "pure, virgin volcanic soil and thoughtful, hand-cultivation are what sets Wakaya Perfection products apart."[10] *See* Exh. 15 (Non-Wakaya product listings).

97.     Wakaya and Smith caused their false statements to enter interstate commerce by publishing those statements on the internet and in interstate conference calls.

98.     Youngevity is or is likely to be injured as a result of the Defendants' false statements because Youngevity employees, distributors, and customers have left Youngevity or reduced their sales or purchases and promotion activity for Youngevity because of those statements, and because potential new Youngevity

---

[10] *See* https://www.facebook.com/pg/wakayap/about/?ref=page_internal (last accessed Apr. 19, 2017).

distributors and customers have been dissuaded from so becoming as a result of those statements.

### E. Sale of Unsafe, Adulterated, or Deleterious Products (Against Wakaya and Smith Only)

99.     Defendant Wakaya, and all others acting in concert (to be determined through discovery) with Wakaya, markets and sells a line of products known as "pure Calcium Bentonite Clay."

100.    The "pure Calcium Bentonite Clay" products include the Calcium Bentonite Clay Powder (referred to herein as the "Clay Product").

101.    Wakaya recommends that consumers ingest 1 teaspoon of Calcium Bentonite Clay with 2 ounces of water. *See* Exh. 16 (Wakaya Powdered Clay Label).

102.    Wakaya claims that its Clay Product has "AMAZING health benefits!" Wakaya does not include any warnings against use of the Clay Product by children or warning of risk of injury due to elevated arsenic and lead.

103.    Wakaya recommends oral consumption of the Clay Product multiple times daily, for continued use over prolonged periods of time.

104.    Wakaya claims that its Clay Product provides the following health benefits:

   a.  Used on the Skin to Heal Eczema, Dermatitis & Psoriasis;

   b.  Used in the Bath as a Soaking Liquid to Remove Toxins;

   c.  Allows Cells to Receive More Oxygen;

   d.  Alkalizes the Body;

   e.  Boosts Probiotics;

   f.  Relieves Digestive Problems (Constipation, IBS, Nausea, etc.);

   g.   Boosts Immunity by Killing Harmful Bacteria and Viruses;

   h.  Improves the Health of Teeth and Gums; and

   i.  Purifies Water.

*See* Exh. 17 (Facebook Post).

105.   Wakaya claims that its Clay Product has "powerful detoxifying benefits."

106.   Wakaya claims that its Clay Product aids nutrient absorption, weight loss, and overall good health.  In corporate-sponsored presentations, Wakaya has advertised its Clay Product as effective for treatment of "serious health problems."[11]

107.   In fact, Wakaya's Clay Product contains lead at dose levels high enough that when taken daily over extended periods pose a significant risk of serious health consequences, including damage to the central nervous system, kidneys, and immune system, not least of which are neurological disorders, lead encephalopathy, tremors, hallucinations, paralysis, coma, and even death.

108.   Instead of detoxifying and conveying health benefits, Wakaya's Clay Product poisons those who consume it, posing a significant risk of serious health consequences.

109.   The FDA recently warned consumers not to ingest bentonite clay products similar to Wakaya's Clay Products,[12] explaining that "laboratory analysis of the [clay] product found elevated lead levels" and that "[e]xposure to lead can cause serious damage to the central nervous system, the kidneys, and the immune system."

110.   Consumers ingesting just the Wakaya Calcium Bentonite Clay Powder in accordance with Wakaya's instructions on that product's label will consume between approximately 102.5–205 µg of lead per day—that amount is 50–100% of the average adult's total daily exposure to lead in the United States.

---

[11] *See, e.g.,* http://wakayaleaders.podbean.com/e/calcium-bentonite-clay-product-call/ (last visited Mar. 31, 2017).

[12] *See* http://www.fda.gov/Drugs/DrugSafety/ucm483838.htm (last visited Mar. 31, 2017).

Wakaya recommends that consumers ingest the clay product by mixing 1 teaspoon of the clay in 2 ounces of water between 2 and 4 times daily to form a beverage. To illustrate the excessive dosing here, the EPA sets an upper limit of lead in drinking water at 15 µg/L (exceeding that value violates federal law) [40 C.F.R. § 141.80(c)].  According to testing sponsored by Youngevity and conducted by independent reputable laboratory, Wakaya's recommended dosage of Bentonite Clay is equivalent to at least 102.5 µg of lead (2 teaspoons of the clay powder) in 2 ounces of water.  That dosage yields a concentration of approximately 845 µg/L, or more than 5,500% higher than the EPA's upper tolerable level.  40 C.F.R. § 141.80(c).

111.   The USDA, through the National Academic's Press Dietary Reference Intakes, recommends that adult women consume 2.7 liters of water per day.[13] Adult women following that recommendation consume up to 40.5 µg of lead per day from water so long as the water they drink does not exceed EPA's upper limit of lead in drinking water.  According to testing sponsored by Youngevity and conducted by an independent reputable laboratory, if individuals consume 4 teaspoons of the Wakaya Calcium Bentonite Clay Powder, in accordance with Wakaya's instructions on that product's label, they will then be consuming 205 µg of lead per day, or more than 500% of the lead they would consume from drinking water, greatly exceeding the EPA's upper limit of lead in drinking water.

112.   Wakaya's statements concerning its Clay Product outlined above are false and misleading because the Clay Product contains toxic levels of lead, often in excess of state and federal standards when used as directed, making them injurious to the health of all users.

113.   Wakaya has made no effort to warn consumers, including children, of

---

[13] *See* https://fnic.nal.usda.gov/sites/fnic.nal.usda.gov/files/uploads/DRIEssentialGuideNutReq.pdf (last accessed Mar. 9, 2017).

the risks posed by its Clay Product.

114.   Wakaya's statements about its Clay Product have a tendency to deceive and have deceived consumers into mistakenly believing that Wakaya's Clay Products are healthy and beneficial to human health when they are in fact unhealthy and a risk to human health.

115.   In addition, Wakaya claims that its ginger products are "pure" and safe for consumption.

116.   In its catalog, Wakaya claims that their products contain "only the purest, freshest ingredients because what you eat matters.  Our unique 100% Organic products are cultivated with care and with no chemicals, pesticides, or preservatives." *See* Exh. 11 (Catalog), at p. 6. Wakaya similarly claims that its ginger is a "pristine organic microfood[] that can enrich and support the body in a myriad of ways." *Id.* at p. 9.

117.   On its official Facebook page, Wakaya claims that its products are "pure,"  "cultivated solely for their purity and multi-faceted rejuvenating properties that enhance the quality of our lives," are "the purest form in the world," and that Wakaya's "goal is to provide the purest, most powerful wellness products on earth."[14]

118.   Wakaya's product description for its Organic Pink Fijian Ginger capsules claim that it contains "no chemicals, no pesticides, no preservatives, and no additives."  *See* Exh. 18 (Product descriptions).

119.   Taken together, Wakaya's advertising and promotion for its ginger product, either expressly or through implication, claims that its ginger products are safe for human consumption and free from excess bacteria.

120.   In reality, Wakaya's ginger contains 1,400,000 colony forming units

---

[14] *See* https://www.facebook.com/pg/wakayap/about/ (last accessed Mar. 31, 2017).

per gram (CFU/g).  That level of bacteria indicates safety concerns with Wakaya's ginger products, and substantially raises the risk for consumption.  Moreover, it renders Wakaya's claim that its product is free from excess bacteria false and deceptive.  On information and belief, the elevated plate counts evidence likely sanitation issues or product contamination due to the likely presence of harmful bacteria.

121.   Wakaya's statements about its Ginger have a tendency to deceive and have deceived consumers into mistakenly believing that Wakaya's Ginger is healthy and beneficial to human health when it in fact exhibits elevated bacterial counts.

122.   On or about February 9, 2017, Wakaya began marketing and selling a product it calls "BulaFIT BURN! Capsules ('the Capsules')."

123.   Wakaya markets the Capsules as a "[a] potent combination of herbs and extracts that help you manage appetite/cravings while providing sustained energy and heightened focus throughout your day."  *See* Exh. 19 (Wakaya Blog Post); Exh. 12 (Wakaya's BulaFit Warrior Fitness Program); Exh. 20 (Wakaya's Product Description for the Capsules).

124.   Wakaya and its agents have also claimed in promotional videos and telephone calls that the Capsules do not contain any stimulants.

125.   Consumers interpret Wakaya's claim that the Capsules are "[a] potent combination of herbs and extracts" to mean that the Capsules do not contain any stimulants, and contain only herbs and extracts.  Consumers relied on Wakaya's claim that the Capsules do not contain any stimulants when purchasing the Capsules.

126.   Consumers relied on Wakaya's claim that the Capsules contain only "herbs and extracts" when purchasing the Capsules.

127.   In reality, the Capsules contain substantial amounts of Octodrine HCl. *See* Exh. 21 (Label for the Capsules).  Octodrine HCl is an artificial stimulant and

not an herb or extract.  The stimulant DMAA was recently banned by the FDA.
Octodrine, also known as DMHA, is very similar to DMAA, a known
amphetamine derivative.

128.   Upon information and belief, Octodrine HCl can be dangerous and
cause injury.  Indeed, consumers of the Wakaya Capsules have suffered headaches,
nausea, and other side effects after consuming the product.

129.   On March 21, 2017, Wakaya began marketing and selling the
Capsules under a new formulation.  *See* Exh. 22 (Wakaya Blog Post).  Under the
new formulation, the Capsules are now sold in half dose capsules.  Upon
information and belief, Wakaya lowered the amount of Octodrine in the
reformulated Capsules and reformulated the Capsules to half doses because
Wakaya became aware of consumer complaints of adverse events.

130.   Wakaya's statements about the Capsules have a tendency to deceive
and have deceived consumers into mistakenly believing that the Capsules are
stimulant free, safe, and contain only herbs and extracts when in fact they contain
Octodrine HCl, a harmful stimulant.

131.   Wakaya's false and misleading statements concerning its Clay
Product, the Capsules, and Ginger are material in that they have caused consumers
to purchase and use the Clay Product, the Capsules, and Ginger and have also
caused Youngevity distributors, or potential Youngevity distributors, to become
Wakaya distributors and unwittingly sell the unsafe Capsules, Ginger and Clay
Product believing them to be safe.  The Wakaya Clay Product and Ginger are
specifically marketed and sold as "detox" or "detoxification" products despite
having substantially elevated levels of lead and arsenic that are toxic and excess
levels of bacteria.  The "detox" claims are therefore false and misleading.  Wakaya
specifically claims that Capsules will make consumers "provide a feeling of
balance within the body" and a "sense of well-being" when in reality the Capsules
cause headaches, nausea, and other harmful side effects.

132.   Youngevity has been harmed and continues to be harmed by Wakaya's false and misleading statements concerning Wakaya's Clay Product, Capsules, and Ginger.  Youngevity would have earned more sales for its own competing health products but for Wakaya's false and misleading statements concerning its Clay Product, Capsules, and Ginger.  Further, Youngevity is harmed by Wakaya's statements concerning its Clay Product, Capsules, and Ginger because those statements have caused Youngevity distributors or potential distributors to become Wakaya distributors.

**F.  Unlawful Pyramid Scheme (Against Wakaya Only)**

133.   Defendant Wakaya, and all others found through discovery to have acted in concert with Wakaya, drives its compensation plan heavily through sign-up bonuses designed to compensate the acquisition of downline members in a marketing "matrix," as opposed to direct consumer sales.  Wakaya pays "bonuses" based on the enrollment of new members.  Wakaya's agents have explained that members must "join the program at $499."

134.   The Wakaya product "Packs" are sold at exorbitant cost, and Wakaya encourages new members to purchase those packs for at least $499 per order.  New members must purchase those packs at $499 per month to remain eligible for profits within the system.  Those goods are sold at considerable markup, indicating little value attributed to the goods themselves—meaning that the purported value actually comes exclusively through the business opportunity.

135.   Before Wakaya Perfection began its direct-marketing business in 2016, a package of three Wakaya Beauty and Wellness products (e.g., Ginger Body Soak (16oz), Ginger Body Scrub (15oz), and Organic Pink Fijian Ginger (5.8oz)) sold online through Costco for $49.00.  Those products are currently available through eBay.com for as little as $38.00.  *See* Exh. 23 (eBay page).  Those same three products now cost $187.90 through the Wakaya Perfection direct-selling network, which actually represents a discount at the "preferred

customer" rates displayed online:  $38.25 for Pink Ginger Body Scrub 18oz; $84.40 for Pink Fijian Ginger Body Soak (16.9oz); and $65.25 for Organic Pink Fijian Ginger Powder (6.7oz).

136.   That significant price markup is necessary to support the significant "bonuses" and "commissions" promised to distributors participating in the direct-selling business.

137.   Wakaya's price markup is inherently problematic because Wakaya does not maintain a closed distribution network.  Retail consumers are thus able to purchase the Wakaya products from online retailers (e.g., Amazon.com) for substantially less money than through the Wakaya program.

138.   Wakaya's compensation plan pays bonuses for recruitment of new enrollees, including so-called qualifying, coding, or other bonuses linked exclusively to recruitment of new Wakaya distributors, *not* product sales or customer acquisition.  Wakaya compensation is thus largely tied to recruiting new members rather than product sales.

139.   Wakaya enrollment bonuses are tied to the number of members Wakaya participants can enroll.  Wakaya pledges to pay distributors $100 per enrollee in the system, and that bonus is not contingent on product sales.  It promises "matrix bonuses" that also compensate upline members solely for the recruitment of new participants without regard to product sales.  The system encourages reps to recruit new members rather than sell product.

140.   The Wakaya promotional campaign emphasizes luxury lifestyles, large financial gains, cruises, and other trappings of wealth (*see also supra*, at ¶¶ 35–53):

    A.  Wakaya, through its agent Barb Pitcock, a high ranking Wakaya
        Ambassador, claimed in a March, 2016 marketing telephone call with
        potential Wakaya ambassadors that Wakaya Ambassadors can earn
        $100,000 per month in commissions from Wakaya.

B.   Wakaya, through its agent Defendant Vaughn, in a March, 2016 live video presentation to Wakaya Ambassadors and potential Wakaya ambassadors claimed that they could become "1% wealthy," that they can earn more than $80,000 per month and retire from that residual income, and that they can earn a yearly income in only one month.

C.   In a YouTube.com video published on July 17, 2016, Wakaya, through its agent Defendant Pitcock claimed, that individuals can earn a "ton of money" by becoming Wakaya ambassadors.[15]

D.   On March 19, 2016, Wakaya, through its agent and Facebook account "Healthy Connections with Wakaya Woman," disseminated a Facebook post quoting Wakaya's agent Defendant Pitcock claiming that Wakaya Ambassadors can earn enough income from Wakaya to alter "future generations lifestyle and income." *See* Exh. 24 (Facebook post).

E.   Throughout 2016, Wakaya, through its agents including Thomas A. Stefanile, Bernadette Trafton, Yaa Kenyatta, Susan Luelf, and the Facebook accounts "Winning With Wakaya Perfection" and "JB Empowerment Zone," promoted Wakaya events by claiming that individuals participating in Wakaya will be able to replace their living wages through money earned in Wakaya. *See* Exh. 25 (Facebook posts claiming that residual income through Wakaya can replace income).

F.   Beginning in November, 2016, Wakaya, through its agents, disseminated a graphic claiming that Wakaya Ambassadors can earn $10,000 per month. *See* Exh. 26.

G.   In a YouTube.Com video published on April 19, 2016, Wakaya, through its agents Defendant Vaughn, Maxandra Desrosiers, and Barb

---

[15] *See* https://www.youtube.com/watch?v=vNFFuxSpxyw&feature=share (last accessed Dec. 5, 2016).

Pitcock promised that "a year from now, many of us will be million dollar earners."[16]

H. In a YouTube.com video published on March 23, 2016 by the official Wakaya YouTube.com channel, Wakaya encouraged product sales and memberships by informing individuals that they could be "million dollar earners."[17]

141.    In reality, none but a few top corporate participants will be eligible for the promised riches, if at all.  The false promise of luxury and wealth absent commercial substance and the need to appeal to outside "customers" indicates that Wakaya is primarily a pyramid scheme without regard to product sales.

142.    The Wakaya venture's primary (if not exclusive) source of revenue and income is sourced from *within* the Wakaya organization, meaning the only individuals purchasing product are those involved in the business opportunity itself rather than outside customers.  Wakaya has no significant independent source of income.  The reinvestment of income from downline members is thus essential for the promised payment of upline bonuses and commissions.

143.    Wakaya compels new distributors or enrollees to purchase goods monthly in an effort to "qualify" accounts for earnings (e.g., commissions and bonuses), including the Paradise Starter Packs (at $500).  It also compels new enrollees to accept a monthly auto-ship (i.e., a continuity plan where credit cards are charged automatically) at a cost of $150 per month.  *See* Exh. 27 (Wakaya Ambassador Application).

144.    New enrollees are considered "qualified" only if they also pay the $500 "starter pack" fee.  Although products ship along with the $500 fee, the "starter pack" is designed as an initial fee for new enrollees, which funds help to

---

[16] *See, e.g.,* https://www.youtube.com/watch?v=4dW5-yCgJRE (last visited Dec. 20, 2016).

[17] https://youtu.be/qpVPTIKiVmw (last visited Dec. 5, 2016).

pay "bonuses" promised to upline distributors.  The Wakaya scheme therefore reaps profits almost exclusively based on new acquisition of enrollees and not from product sales, a hallmark of unlawful pyramid schemes.[18]

145.   Wakaya offers a product line consisting of luxury beauty and cosmetic products (e.g., body scrubs and facial products), along with a small number of nutrition or "wellness" products at exorbitant prices.  Those products are unlikely to generate substantial residual income streams, particularly from Wakaya's flagship offerings that are, essentially, culinary spices commonly available at retail like Ginger and Turmeric powder.  Wakaya sells Turmeric Powder for $65.25 (7.5oz), Pink Ginger for $65.25 (6.7oz), and Kosher Sea Salt for $39.35 (12oz).  Moreover, at those elevated prices, individuals looking to replace living wages through the Wakaya system are unlikely to find any value in Wakaya's compulsory product purchases.

146.   Wakaya's promotional events, marketing, videos, and literature focus largely on the business opportunity and growth of "downline" distributors.  Wakaya's promotional content provides no guidance, instructions, or encouragement related to product sales outside of the organization to legitimate customers.

147.   Wakaya participants and agents have admitted that the system is a

---

[18] Wakaya's compensation plan does allow distributors to qualify through personal retail sales in excess of $1,000 over a three month window.  Distributors must be "qualified" before they can earn commissions and bonuses within the Wakaya business engine.  However, those distributors would otherwise "qualify" through one purchase of the $499 Paradise Starter Pack.  Thus, Wakaya made the most expedient and affordable method for qualifying an account the purchase of a Starter Pack by those distributors within Wakaya's organization.  Moreover, those sponsoring participants benefit most directly and efficiently by having their enrollees purchase the Paradise Starter Pack, making the sponsors' interests primarily geared towards that qualification process as they introduce prospects into the Wakaya system.  Again, the Wakaya system is designed almost exclusively to drive recruitment—*NOT* product sales—a hallmark of unlawful pyramid schemes.

pyramid.  *See* Exh. 28 (Ashley Duncan Facebook Post).

148.    Indeed, because Wakaya's direct-selling network supplies Wakaya products at a considerable premium over market rate, few legitimate "customers" would be expected outside of the Wakaya business plan.

149.    Wakaya's business plan promotes false and misleading earnings and opportunity claims, because the "residual" income promised by the Company is mathematically impossible to achieve for all but a few top-level distributors with high placements in the corporation.

150.    Indeed, Wakaya, despite its claims of success, maintains extremely poor ratings with Dun & Bradstreet.  *See* Exh. 3 (D&B Report).

151.    Wakaya's method of advertisement as a pyramid scheme has the tendency to deceive and does deceive the advertising audience into believing they can earn sustainable income by only encouraging others to join Wakaya without selling any actual product.

152.    Most Wakaya participants will spend more money to participate in Wakaya than they will earn through their involvement with the company, and the majority of Wakaya representatives will not make the substantial incomes promised.

153.     Those Wakaya advertising claims concerning the business opportunity are therefore false and misleading.  The average Wakaya participant will not experience significant financial gains through the Wakaya startup venture.

154.    The Federal Trade Commission has determined that similar business structures that share elements of the Wakaya business methodology are unlawful pyramid schemes, in part, based on similar fact presented herein in this Complaint.

155.    Unlawful pyramid schemes, by definition, materially mislead consumers.  New recruits, distributors, and participants are encouraged to participate in the scheme without critical disclosures or warnings related to the risk of monetary loss.

156.   Wakaya has misrepresented the true nature of its business opportunity. Defendants cannot reasonably expect that the Wakaya venture will be as lucrative as advertised.

157.   Wakaya has embraced the false and misleading nature of its pyramid scheme.  It has encouraged blind enrollment in the Wakaya "matrix" and targeted vulnerable recruits looking for quick profit and wealth.  At public Wakaya events and on corporate webinars, several Wakaya agents have described the desired enrollment process as "ignorance on fire."

158.   One Wakaya recruiter described the recruitment process as a means to keep prospective recruits ignorant of key business aspects:

> We don't want people to know everything.  We want people – even Andre [Vaughn], when we were at the [Wakaya Prelaunch] event this weekend, Andre was like 'I know like 15% of everything that's, you know, where this company is concerned.' He said 'I'm ignorance on fire right now.'  And that's what we want.  We don't want to have a bunch of experts running around thinking that they need to tell everybody everything about anything because then your prospects are going to think that they need to know and do the same thing."[19]

159.   Another recruiter separately explained that she had enrolled individuals without even having the name of the Wakaya company:

> [T]alk about ignorance on fire, the first person I signed up on this was my rep Dave.  And [in] our phone conversation … I had forgotten to ask what the name of the company was.  So here I am signing Dave up and he's like, 'what's the name?'  I said 'do you want to know the name of the company?'  He said 'no I don't care.'  And I said 'that's good [because] I forgot to ask.'  I had no idea.  But you know what, I was so excited that it didn't matter.

---

[19]*See, e.g.,* https://www.youtube.com/watch?v=2SpzlBlaxjA&feature=youtu.be (last accessed Mar. 31, 2017).

Does it really matter what the name is?  No.[20]

160.   Wakaya's and its agents' statements concerning Wakaya have been made through internet webcasts and in phone calls, thereby causing them to enter interstate commerce.

161.   Youngevity suffers direct and proximate injury stemming from the false and misleading Wakaya advertising and business model.  Wakaya solicits Youngevity distributors to become Wakaya distributors through that advertising and model and to devote time to Wakaya distributor recruitment that would otherwise be spent selling and promoting Youngevity's products.

## G. Curcumin Content in Wakaya Turmeric (Against Wakaya and Smith Only)

162.   Wakaya markets and sells various products containing turmeric, including "Organic Fijian Turmeric," "Organic Fijian Turmeric Capsules," "Organic Fijian Turmeric Tea," and "Organic Fijian Turmeric Powder" (collectively the "Turmeric Products").  *See* Exh. 29 (Wakaya Product Descriptions).

163.   Wakaya markets the Tumeric Products, in part, by claiming that Wakaya's turmeric contains five times as much curcumin compared to the typical turmeric available in the market.[21]  Wakaya's Product description for its turmeric expressly states that "[i]t contains nearly 6% curcumin compared to less than 1% for more traditional turmeric."  *See* Exh 29 (Product Description).

164.   Wakaya's claims that its Turmeric Products contain 6% curcumin and contain five times more curcumin than typical turmeric products available in the market are false.  According to testing conducted on Wakaya's Turmeric Powder,

---

[20] *Id.*

[21] *See* https://www.youtube.com/user/wakayaperfection (last accessed Mar. 29, 2017); https://www.youtube.com/watch?v=X6WNcCstjVQ (last accessed Mar. 29, 2017).

Wakaya's turmeric contains only approximately 4.02% curcumin.  Upon information and belief, most turmeric available in the marketplace also contains approximately 4% curcumin.

165.   Wakaya's statements concerning the curcumin content of its Turmeric Products are false and tend to deceive or actually deceive prospective Wakaya distributors and customers who are induced by those representations to pay to become Wakaya distributors and buy Wakaya turmeric products.

166.   Wakaya's and its agents' advertising claims concerning the curcumin content in the Turmeric Products are material to consumers' decisions to purchase Wakaya's Turmeric Products and to prospective recruits entering Wakaya.

167.   Wakaya and its agents have made false and misleading claims concerning the curcumin content in the Turmeric Products through internet webcasts and telephone conference calls, causing those statements to enter interstate commerce.

168.   Youngevity has suffered injury as a result of Wakaya's false claims concerning the curcumin content in the Turmeric Products because Youngevity distributors, or potential distributors, have joined Wakaya instead of Youngevity and because consumers have purchased Wakaya products instead of Youngevity products thinking that the Wakaya products contain superior amounts of curcumin.

## H. Weight Loss Claims (Against Wakaya, Smith, Casperson, Vaughn, Barb Pitcock, Dave Pitcock, Gardner, Graham, and Andreoli)

169.   In or about February, 2017, Wakaya introduced a Weight Loss program referred to as "BulaFIT."  The BulaFIT program encourages consumers to consume the BulaFIT products, eat a ketogenic diet, and engage in less than 10 minutes of exercise per day.

170.   On or about February 2, 2017, defendants and Wakaya, through its employees and agents, began a marketing campaign claiming that BulaFIT products cause substantial weight loss for all users.  Wakaya, through flyers,

promotional webcasts, YouTube promotional videos, Blog posts, and social media, falsely claims, either expressly or by implication, that 100% or the vast majority of consumers participating in the BulaFIT program will lose substantial amounts of weight in a limited period of time.

171.   Wakaya has also used testimonialists to claim either expressly or by implication that 100% or the vast majority of consumers participating in the BulaFIT program lose substantial amounts of weight in a limited period of time. Wakaya's testimonialists claim that they have lost substantial amounts of weight in short periods of time on the BulaFIT program.   Through those testimonialists, Wakaya, and the testimonialists themselves, disseminate the claim that consumers will obtain similar results if they participate in the BulaFIT Program.

172.   Wakaya's testimonialists include defendants Casperson, Gardner, Andreoli, Barb Pitcock, Graham, and Smith.  Those Defendants promote their alleged weight loss through social media, promotional videos, and at in-person Wakaya events.

173.   Wakaya and its executives, including Andreoli and Todd Smith, have personally participated in Wakaya's weight loss claims by, among other actions, endorsing claims made by Wakaya's agents on Facebook and through other promotional avenues.  *See* Exh. 30 (Facebook posts).

174.   On February 23, 2017, Wakaya, through its own Facebook account, disseminated an advertisement on Facebook claiming, *inter alia*, that "Over 350 pounds are missing from our BulaFIT Warriors!"  *See* Exh. 31 (Wakaya Facebook Post).  Wakaya's ambassadors interpret that advertisement to mean that "100% of the people trying the Keto Shake and Burn capsules have lost weight!"  *See* Exh. 32 (Ella Hinkle Jones Facebook Post).

175.   Through February 28, 2017, Wakaya employees and/or agents, including Blake Graham and Barb Pitcock continued to post testimonials—absent any disclaimer—claiming that people taking the Wakaya BulaFIT products lost

substantial amounts of weight in limited periods of time.  Defendant Todd Smith "liked" one of the most egregious of these posts, wherein Barb Pitcock claimed that "[a]bout 28 lbs in 29 days is a common testimony…Everyone I've shared [BulaFIT] with has lost a pound a day.  We're batting 100%...."  Smith and Wakaya were therefore aware and endorsed the weight loss claims made by Pitcock and others.

176.   On February 28, 2017, the Parties in this action participated in the Early Neutral Evaluation ("ENE") and Case Management Conference ("CMC").

177.   Immediately after February 28, 2017, some Wakaya employees and/or agents began adding a disclaimer to some advertisements containing weight loss claims.  The purported disclaimer is insufficient to cure the false and misleading claims contained within those specific advertisements themselves, and insufficient to cure the false and misleading claims aggressively promoted by Wakaya prior to the ENE and CMC.

178.   Nevertheless, Wakaya continues to make false and misleading weight loss claims relating to the BulaFIT program without any disclaimers.  Throughout March 2017, Wakaya created and disseminated various flyers promoting Wakaya events, wherein Wakaya included false and misleading "before" and "after" pictures and claimed that the BulaFIT program "creat[es] unbelievable results!"

179.   Some Wakaya agents and/or employees continue to make false and misleading claims concerning the efficacy of the BulaFIT program without any disclaimers.  *See, e.g.*, Exh. 33 (Barb Pitcock Facebook Posts).

180.   Through the use of advertisements and testimonialists, Wakaya falsely claims, either expressly or by implication, that 100% or the vast majority of consumers participating in the BulaFIT program lose substantial amounts of weight in a limited period of time.

181.   The Federal Trade Commission ("FTC"), in an effort to make it easier to spot false weight loss representations published a guide entitled "Gut Check: A

Reference Guide for Media on Spotting False Weight Claims."[22]  FTC therein explains that testimonials often convey to consumers that they will achieve results similar result to the testimonialists.[23]  Therefore, to be lawful, all testimonials must either "be typical of what other consumers can expect to achieve or the ad must clearly and conspicuously disclose what the typical results are."[24]  Further, "endorsements from people who say they lost more than 15 pounds overall – should be accompanied by a disclosure of how much weight consumers typically can expect to lose…."[25]

182.   FTC additionally identifies seven claims which can never be true. Among those claims FTC identifies which cannot be true, are that a product "causes substantial weight loss no matter what or how much the consumer eats," "safely enables consumers to lose more than three pounds per week for more than four weeks," and "causes substantial weight loss for all users."[26]

183.   Through the claims identified above and others, Wakaya and its executives, agents, and employees have claimed, either expressly or by implication, that the BulaFIT system and the BulaFIT Products cause substantial weight loss regardless of how much the consumer eats, safely enables consumers to lose more than three pounds per week for more than four weeks, and/or causes substantial weight loss for all users.  Wakaya's testimonials convey the claim, either expressly or by implication, that consumers can expect to lose more than three pounds per week for more than four weeks and that they can the BulaFIT program causes substantial weight loss for all users.

---

[22] See https://www.ftc.gov/tips-advice/business-center/guidance/gut-check-reference-guide-media-spotting-false-weight-loss#claims (Mar. 30, 2017).
23 Id.
[24] Id.
[25] Id.
[26] Id.

184.   Wakaya's claims that all or a substantial majority of consumers participating in the BulaFIT program will lose substantial amounts of weight are false.  According to the Federal Trade Commission, those claims can never be true,[27] and further, Wakaya lacks substantiation to prove the truthfulness of those claims.

185.   Wakaya's and its agents' advertising claims concerning the amounts of weight consumers will lose if they participate in the BulaFIT program are material to consumers' decisions to purchase Wakaya's BulaFIT Products and to prospective recruits entering Wakaya.

186.   Wakaya and its agents have made false and misleading claims concerning the BulaFIT Program and BulaFIT Products through, *inter alia*, internet webcasts and telephone conference calls, causing those statements to enter interstate commerce.

187.   Youngevity has suffered injury as a result of Wakaya's false claims concerning theBulaFIT Program and BulaFIT Products because Youngevity distributors, or potential distributors, have joined Wakaya instead of Youngevity and because consumers have purchased Wakaya products instead of Youngevity products thinking that the Wakaya BulaFIT Products cause more weight loss than Youngevity's competing products.

[27] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT TWO

### UNFAIR COMPETITION
### Cal. Bus. & Prof. Code § 17200
### (Wakaya)

188.   California Business and Professions Code § 17200 *et seq*. (the "UCL") borrows violations from other statutes and laws and makes them unlawful to engage in as a business practice.

### A. Unlawful Endless Chain Scheme

189.   Cal. Penal Code § 327 ("Section 327") prohibits a person from willfully contriving, preparing, setting up, or operating an organization which "gives compensation to some person when that compensation is given by the organization to the person for the chance to receive compensation for introducing one or more additional persons into participation in the scheme, or, for the chance to receive compensation when a person introduced by the participant introduces a new participant." *People v. Frederick*, 48 Cal. Rptr. 3d 585, 598 (Cal. Ct. App. 2006).

190.   Even if Wakaya's distributors make "retail sales, [those sales] do not legalize the pyramid marketing scheme which violates Penal Code section 327… the question is whether the focus of [Wakaya]—rather than the product sales themselves—was the recruitment of more members into the scheme." *People v. Sweeney*, 175 Cal. Rptr. 3d 31, 37–38 (Cal. Ct. App. 2014).

191.   Wakaya is an unlawful endless chain scheme as defined by Section 327.  Wakaya gives compensation to individuals who enroll other individuals into Wakaya.  The primary focus of Wakaya is the recruitment of more members into the scheme. *See supra* at ¶¶ 133–61.

192.   Defendants willfully contrived, prepared, set up, and operated Wakaya in violation of Section 327.

193.   As a result of Defendants' wrongful conduct, Youngevity has suffered and will continue to suffer damages and injuries according to proof at trial.

## B. Unlawful Sale of Misbranded and Adulterated Foods or Dietary Supplements

194.   Wakaya sells a Bentonite Clay Product, BulaFIT Burn Capsules, and Wakaya Ginger as natural and safe detoxifying agents; they are not; they contains toxic levels of lead, dangerous stimulants, unsafe levels of arsenic, or excess levels of bacteria.  *See supra* at ¶¶ 99–132.

195.   Wakaya recommends in corporate materials and advertising (including social media) that consumers ingest its Clay Product as a detoxifying agent, and claims that its ginger is "pure," when, in fact, those products impart toxic levels of lead, unsafe levels of arsenic, and excess levels of bacteria to the body.  *See supra* at ¶¶ 99–132.

196.   Wakaya's promotional materials advertise the Clay Product for use with "detoxification and weight loss," *see supra* at ¶¶ 99–132, and claims that its ginger has "healing properties."  *See* Exh. 18 (Wakaya Description for Organic Pink Fijian Ginger).

197.   Wakaya's promotional materials advertise that the BulaFIT Capsules promote weight loss, manage appetites and cravings, provide energy, and increase focus.  *See* Exh. 20 (BulaFIT Burn Capsules Description).

198.   Wakaya therefore advertises an intended use of the Clay Product, Capsules, and Ginger as dietary supplements regulable under state and federal laws.  *See* 17 Cal. Code Regs. § 10200 (defining "dietary supplement").

199.   As a dietary supplements, Wakaya's Clay Product, Capsules, and Ginger are adulterated and misbranded and, thus, unlawful for sale.  *See, e.g.,* Cal. Health & Safety Code §§ 110100, 110665, 110670, 110673, 110675, 110710, 110720.

200.   Wakaya's Clay Product and Ginger are marketed without required labels or labeling sufficient to inform consumers of the contents contained within the product.  Federal and state laws require proper disclosures of Supplement Facts for all dietary supplements marketed to California consumers.  *See* Cal. Health & Safety Code §§ 110100, 110665 (Nutrition labeling not in conformity with federal requirements), 110670 (Nutrition content or health claims not in conformity with federal requirements), 110675 (packaged food; labeling requirements), 110710 (definition and standard of identity; failure to include on label or otherwise conform), 110720 (common or usual name if no standard of identity exists; failure of label to state).

201.   Wakaya's Clay Product and Ginger, intended to be digested orally, are "foods" or "dietary supplements" under California's Sherman Laws.  Cal. Health & Safety Code § 109935.

202.   Foods and dietary supplements are adulterated if they contain any poisonous or deleterious substance that may render the product injurious to health.  Cal. Health & Safety Code § 110545.

203.   As described above, Wakaya's Clay Product contains unsafe levels or arsenic and amounts of lead which render it injurious to those who consume it and Wakaya's Ginger contains excess amounts of bacteria.  *See supra* at ¶¶ 99–132.  Wakaya's Capsules contains a dangerous stimulant, Octodrine HCl.  Wakaya's Clay Product is and Ginger are therefore misbranded under Cal. Health & Safety Code § 110545.

204.   It is unlawful under California's Sherman Laws "to manufacture, sell, deliver, hold, or offer for sale any food that is adulterated."  Cal. Health & Safety Code § 110620.

205.   Wakaya sells, delivers, holds, and offers for sale the Clay Product, Capsules, and Ginger.

206.   Wakaya violates the California Health and Safety Code by selling, delivering, holding, and offering for sale the Clay Product, Capsules, and Ginger.

207.   Wakaya's violations of the California Health and Safety Code constitute "unlawful" conduct under the California Unfair Competition Law.  Cal. Health & Safety Code § 17200 *et seq*.

208.   As a direct competitor with Wakaya, Youngevity suffers economic injury as a result of Wakaya's promotions and sales in violation of the California food and drug code sections.  Wakaya's use of unlawful labeling and claim language provides an unfair and unlawful market advantage.  Moreover, in light of Defendants use of web sites that trade upon the name of Youngevity and name and likeness of Dr. Wallach, Defendants convey the impression that Youngevity endorses or supports Wakaya's products, including its toxic clay and bacteria laden Ginger, thereby irreparably injuring the good will of Youngevity and the reputation of Dr. Wallach.

209.   Youngevity has lost business, or is likely to lose business, to the extent Youngevity distributors and consumers at large buy Wakaya's Clay Products, Capsules, and Ginger rather than Youngevity's competing health products.

**COUNT THREE**
**INTENTIONAL INTERFERENCE WITH PROSPECTIVE**
**ECONOMIC ADVANTAGE**
**(All Defendants)**

210.   Youngevity alleges the tort of Intentional Interference with Prospective Economic Advantage as follows:

**A. Todd Smith, Blake Graham, and Wakaya's Tortious Interference with the Great American Clay Company**

211.   For over a year before July 2015, Youngevity distributor Mia Magistro had an economic relationship with the Great American Clay Company,

owned and operated by David Smith.  A GAC product purchaser and associate of David Smith, Youngevity distributor Magistro sought to arrange for Youngevity to purchase and sell GAC products.  GAC coordinated with Magistro to contact Youngevity for the purpose of negotiating the purchase of GAC products and/or GAC itself.  A distributor in Todd Smith's downline, Magistro followed Youngevity protocol by asking her upline Smith to inquire whether Youngevity management would consider entering into a contract with GAC for sale of GAC products.

212.   When Youngevity distributor Magistro informed Defendant Todd Smith of GAC's interest in contracting with Youngevity, Smith, and shortly thereafter Graham and Wakaya, knew that GAC wished to contract with Youngevity.

213.   Defendants Smith, Graham, and Wakaya, acted intentionally to divert the GAC business opportunity intended for Youngevity to Wakaya, while posing in negotiations of the deal as contracting agents for Youngevity.

214.   Wakaya, Smith, and Graham did divert the GAC product purchasing agreement intended for Youngevity to Wakaya, entering into an exclusive purchase and sale agreement with GAC for Wakaya sale of GAC products.

215.   Youngevity suffered economic harm through the loss of the GAC business opportunity, combined with Wakaya's competitive market advantage gleaned from the GAC contract.

216.   In or about July, 2015, a distributor in Todd Smith's Youngevity "downline," Mia Magistro, introduced Todd Smith to David Smith, the owner of GAC based in Austin, Texas (hereinafter "GAC").[28]  *See* Decl. of Mia Magistro, attached as Exh. 34 at ¶ 7.

---

[28]David Smith and Todd Smith are unrelated and have no familial connections.

217.   Youngevity Downline distributors work under their "upline" distributors, who are generally the individuals responsible for enrolling, training and guiding downline distributors in the Youngevity business.

218.   GAC expressed interest in forming an economic relationship with Youngevity that would have Youngevity sell GAC's products.  *Id.* at ¶¶ 5–7, 9, 11–12.  GAC also indicated its willingness to work with Dr. Joel Wallach on a book publishing project related to Youngevity's business.  *Id.* at ¶ 11.

219.   On August 25, 2015, Todd Smith, Blake Graham, David Smith, Lynn Jenkins (a part owner of GAC), and Mia Magistro met at TNT's offices in Pleasant Grove, Utah.  *Id.* at ¶ 9.

220.   At that meeting, Graham and Smith became aware that GAC wanted to establish an economic relationship with Youngevity and Dr. Wallach.

221.   Magistro identified Todd Smith as a Youngevity distributor in her upline who had direct access to Youngevity management and Youngevity CEO Steve Wallach, and Todd Smith met with GAC as a representative of Youngevity. *Id.*  GAC thought that it was meeting Youngevity representatives who would negotiate a GAC product purchase agreement on Youngevity's behalf.

222.   At the time, however, and undisclosed to Youngevity CEO Steve Wallach, to GAC, or to Magistro, Todd Smith and Blake Graham were operating in their own self-interest with an intent to divert the GAC purchase agreement intended for Youngevity to their competing Wakaya venture, which venture had not then been publicly disclosed and was unknown to the Plaintiffs or to Magistro.

223.   Smith and Graham therefore abused their apparent authority to act on Youngevity's behalf to secure an opportunity for Wakaya with GAC.

224.   Todd Smith and Blake Graham thereby diverted a business opportunity intended for Youngevity to Wakaya, never disclosing to Youngevity CEO Steve Wallach the interest of GAC in selling its products through Youngevity.

225.   Todd Smith led GAC owner David Smith to understand that he, Todd Smith—and Smith alone—was the point of contact for Youngevity in negotiation of the GAC contract.  That representation was false.  The only person with authority to negotiate the GAC contract was Youngevity CEO Steve Wallach or those expressly authorized so to do by him for the benefit of Youngevity.

226.   GAC had been scheduled to meet with Dr. Joel D. Wallach, the founder of Youngevity and the father of Youngevity CEO Steve Wallach, in November of 2015 in North Carolina.  *Id.* at ¶ 14.

227.   Todd Smith told GAC to cancel the meeting with Wallach, stating falsely that he (Todd Smith) was already working on the account and had been given Youngevity's authorization to develop new products himself.  *Id.* at ¶¶ 15–16.  Those representations were false.

228.   Todd Smith had no authority from Youngevity to determine whether Youngevity would contract with GAC.  Youngevity was unaware that Todd Smith was meeting with GAC.

229.   Todd Smith asked GAC not to disclose the reasons he gave David Smith for cancelling GAC's meeting with Dr. Wallach and asked David Smith to keep all communications between Todd Smith and David Smith confidential.  *Id.* at ¶¶ 12, 18.

230.   Until approximately mid-December, 2015, Todd Smith continued his negotiations with GAC for the development and formulation of four GAC products for sale exclusively by Wakaya all the while still purporting to do so on Youngevity's behalf.  *Id.* at ¶¶ 19–20.

231.   Todd Smith then prepared a contract for GAC which named as contracting parties not Youngevity and GAC, but Wakaya and GAC.  That led GAC's owner to engage in email correspondence expressing confusion as to why Wakaya and not Youngevity was listed as the named contracting party.  Given further assurances by Todd Smith, GAC then contracted with Wakaya to prepare

its four clay products developed at Todd Smith's request for exclusive sale by Wakaya.

232.    At no point did Todd Smith inform Youngevity or Dr. Joel D. Wallach that GAC had been seeking to contract with Youngevity or that Smith had canceled the previously scheduled meeting between GAC's owner and Youngevity's Dr. Wallach.  *See* Decl. of Steve Wallach, attached as Exh. 35 at ¶ 12; Decl. of Joel D. Wallach, attached as Exh. 36 at ¶ 10.

233.    The actions of Todd Smith and Blake Graham on behalf of Wakaya disrupted the prospective economic relationship between GAC and Youngevity.

234.    GAC now provides products exclusively for sale through Wakaya. The Wakaya-GAC products include nutritional supplements or products that now compete directly with Youngevity's nutritional products.

235.    Wakaya's agents have described the GAC bentonite clay product as a safe, unique and exclusive product that can only be sourced from the GAC mines and only purchased through Wakaya.

236.    Had Youngevity been aware of the opportunity to contract with GAC, Youngevity would have evaluated that business opportunity seriously, negotiating with GAC for the testing, acquisition, manufacture, and sale of the Great American Clay products through Youngevity for commercial and non-ingestible uses, or into negotiations to purchase the Great American Clay Company itself.  *See* Exh. 35 (Decl. of Steve Wallach) at ¶ 12.  To the extent the GAC products contain unsafe levels of lead and arsenic, Youngevity would have determined how best to remove those harmful metals from GAC products through further processing to permit alternative, safe commercial and non-ingestible uses for the GAC clay in accordance with applicable federal and state laws.

237.    The actions outlined above therefore caused Youngevity to suffer economic harm because, but for Smith's, Graham's, and Wakaya's interference with GAC and Youngevity's relationship, GAC would likely be producing

products for sale through Youngevity and at Youngevity's direction and all profits to Wakaya from the sale of GAC products would instead flow to Youngevity.

238.   Had Dr. Wallach known about the potential opportunities with David Smith and Great American Clay, he would have been interested in pursuing those opportunities.  *See* Exh. 36 (Decl. of Joel D. Wallach) at ¶ 11.  Dr. Wallach would have been interested in pursuing the opportunity to learn more about the Great American Clay products, in investigating the potential for safe commercial and public uses of GAC products, in pursuing the opportunity to co-author a book, in pursuing the opportunity for establishing an arrangement to promote Great American Clay through media appearances, and in pursuing the opportunity to create a viable commercial relationship between Youngevity and Great American Clay for the commercial or public sale of GAC products.  *Id.*  The actions outlined above therefore caused Dr. Wallach to suffer economic harm.

239.   There was an economic relationship between Plaintiffs and GAC because GAC contacted Youngevity distributor Mia Magistro who invited GAC to contract with Youngevity, and GAC intended to contract with Youngevity.

240.   Defendants Smith, Graham, and Wakaya were aware that GAC intended to enter into an economic relationship with Youngevity and posed as agents authorized by Youngevity to consummate a deal on Youngevity's behalf with GAC but then diverted the deal to Wakaya.

241.   Defendants Smith, Graham, and Wakaya took intentional acts to interfere in the economic relationship between GAC and Plaintiffs because they mislead and lied to David Smith of GAC and misrepresented their authority in Youngevity.

242.   Defendants Smith, Graham, and Wakaya actually interrupted Plaintiffs' relationship with GAC because, as a result of Defendants' actions, GAC and Plaintiffs were never able to profit from their economic relationship.

243.   Plaintiffs suffered economic harm resulting from the acts of defendants Smith, Graham, and Wakaya because they were not able to secure a product purchase and sales contract with GAC.

**B. All Defendants' Tortious Interference with Youngevity's Distributor Relationships**

244.   Youngevity alleges tortious interference with prospective contractual relations against all named defendants as follows.

245.   While still employed by or serving as Youngevity distributors, Defendants encouraged other high ranking Youngevity distributors and Youngevity employees to work for, or enroll as distributors in, Wakaya and further recruit to Wakaya other Youngevity distributors with the aim of depleting Youngevity's entire distributor force while those so recruiting simultaneously continued to receive distributor commission payments from Youngevity.

246.   Defendants advised and encouraged those they induced to breach their Youngevity distributor agreements to maintain secrecy about their involvement with Wakaya until after public announcement of the company by Todd Smith.

247.   Defendants induced married couples and business partners to breach their Youngevity distributor agreements through nominal and false conveyances of Youngevity distributorships from one spouse or business partner to another. Defendants misleadingly informed married couples who were both Youngevity distributors, and business partners who were both Youngevity distributors, that they could keep their full Youngevity distributor commissions if those couples and partners engaged in what Defendants called "the split."  "The split" involved the conveyance of nominal and false representations to Youngevity that a spouse or a business partner had transferred his or her Youngevity distributorship to the other spouse or the other business partner, thereby enabling the transferor to become a Wakaya distributor yet in fact retain access to the full economic benefit of commissions previously received by the couple or the partnership from

Youngevity, and retain full access to Youngevity business materials and distributors.  In fact, Defendants encouraged use of this act of legerdemain and misrepresentation to induce Youngevity distributors to breach their Youngevity contracts which forbid such transfers without prior Youngevity evaluation and consent, which prior evaluation and consent was never given in any case, and which forbid Youngevity distributors while serving as Youngevity distributors from aiding in the recruitment of other Youngevity distributors into competing MLM's.

248.   Graham has admitted that individuals employed and under his management of then-Youngevity distributor and defendant TNT (who were also Youngevity distributors) were invited by Graham to consider becoming Wakaya distributors while retaining their Youngevity distributor positions, thereby inducing breach of their contracts with Youngevity.  Those so employed who became Wakaya distributors assisted in inducing other Youngevity distributors to breach their contracts with Youngevity.

249.   Wakaya has thus relied on Youngevity distributors to serve and promote Youngevity competitor Wakaya and thereby breach their distributor agreements with Youngevity for the economic benefit of Wakaya.  Wakaya's conduct has been to the economic benefit of Wakaya and the corresponding economic loss of Youngevity.

250.   Defendants made their statements to Youngevity distributors solely for Defendants' own financial gain, and as a promotional tool to lure Youngevity business into Wakaya.

251.   In October 2015, while under contract with Youngevity and while serving as Youngevity's President, Andreoli contacted specific Youngevity distributors and employees and invited them to become distributors or employees of Wakaya, and further recruit other Youngevity distributors to do the same. Andreoli made additional contacts with other Youngevity distributors in November

2015 to induce those distributors to breach their Youngevity distributor agreements by simultaneously becoming Wakaya distributors or employees and further recruit other Youngevity distributors to do the same.

252.   In reliance on their prominent positions as leading distributors in Youngevity, Defendants Dave Pitcock, Patti Gardner, Barb Pitcock, Vaughn, Graham, and Todd Smith, while still Youngevity distributors, encouraged or solicited other Youngevity distributors to breach their distributor agreements with Youngevity by simultaneously recruiting other Youngevity distributors to do the same.  Those subsequent acts of cross-recruiting at the Defendants behest were in violation of Youngevity's distributor agreement.  For their personal and pecuniary gain, the Defendants thus encouraged, aided, and abetted the disruption of Youngevity's business and relationships with Youngevity's distributors.

253.   In January 2015, Vaughn, Dave Pitcock, Barb Pitcock, Andreoli, Graham, and Todd Smith participated in meetings with Youngevity distributors wherein they falsely represented that Youngevity had made bad business decisions against their advice with resulting financial losses that would imperil Youngevity, encouraging those Youngevity distributors to fear remaining in Youngevity. Andreoli took those actions while serving as President of Youngevity.  That conduct misled Youngevity distributors into violating their distributor agreements with Youngevity by enrolling in the competing Wakaya as distributors and actively soliciting other Youngevity distributors to do the same.  Defendants' statements about Youngevity were false and motivated by Defendants' need to secure new business for the nascent Wakaya venture.

254.   Defendants Vaughn, Dave Pitcock, Barb Pitcock, Graham, and Smith also used internet webcasts and telephone conference calls to interfere with Youngevity's economic relationships with its distributors.  In those webcasts and telephone calls, defendants Vaughn, the Pitcocks, Graham, and Smith made false or misleading statements of fact about Wakaya's business operations, and, either

implicitly or explicitly, about Youngevity's business operations, including false representations that Youngevity was in financial distress. Defendants Vaughn, the Pitcocks, Graham, and Smith made those statements during promotional presentations for Wakaya, which were intended solely to generate commercial gains for Defendants.

255.  On February 22, 2016, defendant Graham without prior authorization from Youngevity sent an email and text letter to all Youngevity distributors using Youngevity's confidential distributor list. In that email Graham, then still a top level Youngevity distributor and co-owner of TNT, falsely conveyed the impression that Youngevity acquiesced in Smith's formation of a competing company (which was then engaged in cross-recruitment of Youngevity distributors) and wished Smith success in that new venture. *See* Exh. 37 (Graham e-mail).

256.  The statements made by Graham, Dave Pitcock, Barb Pitcock, Vaughn, and Smith in their webcasts, emails, and conference calls, were made solely to further Defendants' pecuniary interests, whereby they would receive from Wakaya commissions upon causing other Youngevity distributors simultaneously to become Wakaya distributors and thereafter induce and further recruit other Youngevity distributors to likewise breach their Youngevity distributor agreements by simultaneously becoming Wakaya distributors and so on.

257.  Defendants Cloward and Gardner acted tortiously by using Youngevity's confidential distributor lists and information to interfere with Youngevity's economic relationships. During the course of their employment and/or association with Youngevity, each of the Defendants came into possession of Youngevity confidential distributor lists. They have each used those lists to assist Wakaya to interfere with Youngevity's relationship with its distributors by variously falsely alleging that Youngevity is in financial extremis and falsely alleging Youngevity is engaged in unlawful conduct; by inducing Youngevity

distributors to believe that if they simultaneously become Wakaya distributors they will earn from Wakaya tens of thousands or hundreds of thousands of dollars in commissions each month; and by inducing Youngevity distributors to believe that if they engage in "the split" they will be able to retain their full Youngevity commissions while simultaneously profiting from distributorships in Wakaya.

258.   As a direct result of the Defendants' tortious interference with Youngevity's relationships with its distributors, Youngevity has suffered a loss in its distributor sales force and in sales revenues.

259.   Many of Wakaya's initial participants and endorsers were Youngevity distributors or former Youngevity distributors recruited by Todd Smith or at Todd Smith's request, evidencing Wakaya's concerted effort to procure Youngevity business.

260.   As of April 22, 2016, approximately 125 of Wakaya's 268 participants (about 46.6%) are Ambassadors[29] who are current or former Youngevity distributors.  *See* Exh. 35 (Decl. of Steve Wallach), at ¶ 11.

261.   As of April 22, 2016, approximately 77 of Wakaya's 125 "Founder Qualified" Wakaya ambassadors (about 61%) are current or former Youngevity distributors.  *Id.*

262.   As of December 7, 2016, almost all of the individuals who are administrators on the Facebook.com page entitled "Wakaya Leaders" are former Youngevity distributors, employees, or officers.  *See* Exh. 38 (Wakaya Leaders Facebook Page).

263.   Wakaya has launched "challenges" for its participants, asking them to target and secure Youngevity distributors for Wakaya.

264.   All Defendants were aware that Youngevity maintains an economic relationship with its distributors because all Defendants were former distributors,

---

[29]Wakaya refers to its distributors as "ambassadors."

employees, or executives of Youngevity themselves.

265.   All Defendants took intentional actions to disrupt the economic relationships between Youngevity and their distributors because they contacted Youngevity distributors and encouraged them simultaneously to join Wakaya and to urge other Youngevity distributors simultaneously to join Wakaya.

266.   Defendants interfered with Youngevity's distributor relations through improper means, to wit, by encouraging or soliciting those distributors to breach Youngevity's distributor agreement.

267.   All Defendants are primarily engaged in the business of selling goods and services through Wakaya.

268.   Youngevity's economic relationship with many of its distributors was disrupted because many Youngevity distributors did in fact lessen or halt their promotion and sales of Youngevity products while simultaneously mounting efforts to promote and sell the competing Wakaya products, thus causing Youngevity to experience a loss in sales revenues and in active distributors for its products.

**COUNT FOUR**
**BREACH OF CONTRACT**
**(Defendants Andreoli and Dave Pitcock)**

269.   Defendants Andreoli and Dave Pitcock entered into valid contacts with Youngevity.  *See* Andreoli Employment Contract, attached as Exh. 39; Pitcock Consulting Agreement, attached as Exh. 40.

270.   Youngevity has performed its obligations required under those contracts.  Youngevity therefore alleges the following facts and legal allegations.

**A. Defendant Andreoli Breached His Contract with Youngevity**

271.   In August 13, 2011, as part of the sale of Andreoli's company, FDI, to Youngevity, Andreoli and Youngevity entered into an Employment Agreement

which included non-circumvent and non-disclosure clauses.  *See* Exh. 39 (Andreoli Employment Agreement).  That agreement contains the following relevant terms:

- Andreoli must "devote his full working time, attention, and energy to [Youngevity …] and shall not … be engaged in any other business activity if pursued for gain, profit, or other pecuniary advantage without [Youngevity's] prior written consent …."  *Id.* at § 7.

- Andreoli cannot disclose any confidential information, including customer information, to any third party.  *Id.* at § 9(a)

- Andreoli cannot use any of Youngevity's trade secrets to compete with Youngevity.  *Id.* at § 9(b).

- Andreoli was required to promptly disclose any new discoveries or improvements that he developed to Youngevity.  *Id* .at §10.

272.   Youngevity entered that Agreement as part of its acquisition of Andreoli's holdings.

273.   Also as part of Youngevity's acquisition of Andreoli's FDI's holdings, Andreoli entered into an Amended and Restated and Restated Equity Purchase Agreement.  *See* Exh. 41 (Executed Agreement).  As memorialized in that Agreement, as a condition precedent to Youngevity acquiring Andreoli's FDI assets, Andreoli had to deliver to Youngevity an executed Non-Competition Agreement.  *Id.* at § 1.5(c)(ii).  That Non-Competition Agreement contained, among other clauses, a non-competition clause forbidding Andreoli from being involved with a competing company for six months after ending his relationship with Youngevity.  *See* Exh. 42 (Non-Competition Agreement), at § 2(c).

274.   Despite Youngevity successfully acquiring FDI's assets, Andreoli never provided Youngevity with an executed Non-Competition Agreement. Nevertheless, the parties proceeded on the understanding that the six month non-competition clause as set forth in the Non-Competition Agreement was incorporated into the Amended and Restated Equity Purchase Agreement and

Employment Agreement.  Indeed, on November 3, 2015, as part of his resignation, Andreoli wrote to Youngevity that he "will honor the six month non-compete as set forth in the 'Amended and Restated Equity Purchase Agreement' and the 'Employment Agreement.'"  *See* Exh.43 (e-mail).  Furthermore, Andreoli accepted the benefits of the Non-Competition Agreement, i.e., Youngevity's purchase of his FDI Assets, and so he is bound by the Non-Employment Agreement even though he never signed it.

275.   Andreoli was made President of Youngevity after Youngevity's acquisition of FDI.  The contractual clauses were designed, in part, to ensure that Youngevity received the ongoing value and goodwill of FDI.

276.   Andreoli breached his contract with Youngevity because he participated in, and helped facilitate, the directly competing Wakaya network marketing venture while serving as President of Youngevity and while under contractual obligations to refrain from such participation, facilitation, and competition against Youngevity.  Andreoli's contractual agreements with Youngevity expressly precluded and prohibited his involvement with other network marketing companies while also employed with Youngevity and for six months thereafter.

277.   Andreoli, while serving as Youngevity's President in August 2015, acted to encourage widespread dissention from Youngevity during key distributor meetings and on occasional visits to other Youngevity offices.  He worked against Youngevity in favor of Wakaya while holding a top level corporate position within Youngevity.

278.   Upon information and belief, beginning in August, 2015 Andreoli, again while under contract with Youngevity and while serving as Youngevity's President, solicited Youngevity distributors and employees in an effort to induce them to join Wakaya while simultaneously serving as Youngevity distributors and employees.  Andreoli hosted Wakaya corporate events at the New Hampshire

offices wherein Youngevity distributors and employees invited to attend were simultaneously solicited to become Wakaya distributors and employees.

279.    Andreoli secretly became an official Wakaya Perfection employee, executive, and/or partner no later than January, 2016.  Youngevity made severance payments to Andreoli which Andreoli was not entitled to because of his employment with Wakaya.

280.    Moreover, Andreoli breached his Employment Contract with Youngevity by attempting to purchase Xocai, a competing Multi-Level Marketing Company in early 2015.

281.    Andreoli's conduct described herein this Count violated his contractual obligations to Youngevity while still employed with Youngevity.

282.    Youngevity has suffered and continues to suffer damage as a result of Andreoli's breach of his contract with Youngevity because that breach resulted in lost Youngevity employees, including, Randolph, Casperson, Barney, Cloward, and Gardner and lost revenues to the competing venture he helped create and promote, Wakaya.

### B. Defendant Dave Pitcock Breached His Contract with Youngevity

283.    Defendant Dave Pitcock was the owner of Livinity, Inc.

284.    On or about July 10, 2012, Dave Pitcock sold Livinity, Inc.'s assets to Youngevity.  As part of that transaction, Livinity and Youngevity entered into a Consulting Agreement with valid non-disclosure and non-circumvent clauses, wherein Dave Pitcock agreed to serve as a Consultant for Youngevity.  *See* Exh. 40 (Pitcock Consulting Agreement).

285.    Dave Pitcock was the alter-ego of Livinity.  Dave Pitcock and Livinity maintained a unity of interest such that that the separate personalities of Dave Pitcock and Livinity did not exist when Dave Pitcock signed the contract selling Livinity's assets to Youngevity.  Dave Pitcock comingled his funds and assets with

Livinity's funds and assets, and failed to segregate his personal funds from those of Livinity.  For example, in 2013, the Pitcocks directed Youngevity to submit all payments owed to their Livinity distributor account into their personal bank account—"Pitcock marketing Group – Dave and Barb Pitcock," even though Youngevity owed those payments only to the Livinity distributorship account.  *See* Exh. 44 (e-mail).  Dave Pitcock and his wife Barb Pitcock also used funds earned by Livinity for their personal benefit, including paying consumer bills.  Dave Pitcock, with his wife Barb Pitcock, founded Livinity, Inc. in 2006, listing their home address as the company's registered office and identifying defendant Dave Pitcock as the company's registered agent and incorporator.  *See* Exh. 45 (Livinity Articles of Incorporation).  From 2006 through 2011, Livinity, Inc. filed annual reports with the Kansas Secretary of State, each identifying the Pitcocks as the sole shareholders and officers for Livinity, Inc.  *See* Exh. 46 (Livinity Annual Reports).  Dave Pitcock himself believed he was personally bound by the Livinity Agreement.  Under the Livinity Agreement, Youngevity was required to pay the Pitcocks a bonus of ten percent of all net sales from Livinity downline distributors for the duration of the agreement.  Exh. 40, at § 3(b).  Believing that the agreement would expire in July 2015, Dave Pitcock e-mailed Youngevity on July 30, 2014, asking for an extension.  *See* Exh. 47 (e-mail).  Dave Pitcock represented that money paid by Youngevity under the Contract would be paid to him and Barb.  In addition, an inequitable result follows if Dave Pitcock is not personally bound by the Livinity Agreement.  If the Livinity Agreement is read to separate the Pitcocks from Livinity as a corporation, then the contractual terms that bind individuals will be nullified.  The Agreement would thus become illusory, with Youngevity having bargained for the Pitcocks' personal consideration (e.g., non-disparagement), and the Pitcocks now excused from their performance.

286.   Because Dave Pitcock was the alter ego of Livinity, Inc., he is personally bound by the Pitcock Consulting Agreement.

287.   The Pitcock Consulting Agreement prohibited Livinity and Dave Pitcock from disclosing any confidential information and from using confidential information, including business contacts, information regarding distributors/vendors/supplies and other business associates of Youngevity, for the purpose of circumventing Youngevity's business operations, specifically requiring Dave Pitcock to:

- maintain in strict confidence, and not use or disclose except pursuant to written instructions from [Youngevity], any Confidential Information (as defined below) of [Youngevity], for so long as the pertinent data or information remains Confidential;

- not use any of the Confidential Information and/or business contacts, information regarding distributors/vendors/suppliers and other business associates of [Youngevity], or other types of confidential and proprietary business information transmitted to [Dave Pitcock] by [Youngevity], for the purpose of circumventing [Youngevity's] business operations.

Exh. 40 at §§ 4(c)–(d).

288.   Furthermore, Livinity and Dave Pitcock were required, at all times, to refer to Youngevity in terms that further Youngevity's business objectives and not refer to Youngevity in a manner that damages Youngevity's position in the marketplace. *Id.* at § 6 (requiring Dave Pitcock to "refer to [Youngevity] and its operating units in terms that further its business objectives" and to "not refer to [Youngevity] or its operating units in a manner that damages [Youngevity's] position in the marketplace").

289.   Those contractual provisions were designed to ensure that Youngevity received full benefit of its bargain in acquiring Dave Pitcock's holdings in Livinity. Enabling Dave Pitcock to actively promote product or ventures against Youngevity would clearly devalue Youngevity's interest in Livinity and its remaining business.

290.   The Pitcock Consulting Agreement provides for extensive relief to Youngevity, including an "injunction, monetary damages, punitive damages, and

specific liquidated damages in the amount of the prior year's earnings for disclosure of Confidential Information and/or use of such information to solicit Youngevity's customers." *Id.* at § 4(e).

291. Dave Pitcock has violated his contract with Youngevity. On conference calls and/or internet webcasts, in meetings with Youngevity distributors, and in person, either implicitly or explicitly, he has referred to Youngevity in terms that do not further Youngevity's business objectives and instead disparage Youngevity, including personal attacks calling into question the fitness to serve and fiduciary integrity of Youngevity's CEO Steve Wallach and Youngevity's COO Michelle Wallach on a company cruise in January, 2015.

292. Youngevity has suffered and continues to suffer injuries as a result of Dave Pitcock's breach because his comments disparaging Youngevity and efforts to induce Youngevity distributors to violate their distributor agreements by becoming Wakaya distributors who solicit additional Youngevity distributors to likewise become Wakaya distributors, have harmed Youngevity's reputation and have caused Youngevity to suffer economic loss from lost Youngevity product sales diverted unlawfully to Wakaya.

## COUNT FIVE
## INTENTIONAL INTERFERENCE WITH CONTRACT/INDUCING BREACH OF CONTRACT

**(Defendants Wakaya, Patti Gardner, TNT, Smith, Graham, Dave Pitcock, Barb Pitcock, Andreoli, and Vaughn)**

293. Defendants Wakaya, TNT, Smith, Graham, Dave Pitcock, Barb Pitcock, Andreoli, Patti Gardner, and Vaughn have interfered with Youngevity contracts and have induced third parties to breach their contracts with Youngevity, as follows:

**A. Defendants' Wakaya, TNT, Smith, Graham, the Pitcocks, and Vaughn's International Interference with Youngevity's Contracts with Distributors**

294.    Youngevity hereby alleges the following facts with respect to Defendants Wakaya, TNT, Smith, Graham, Patti Gardner, the Pitcocks, and Vaughn.

295.    Youngevity's Policies and Procedures impose strict prohibitions against "cross-recruiting" as provided in Section E12 of the Youngevity Distributor Agreement:

> Distributors are strictly forbidden from Cross-Recruiting, and shall not sell, recruit, propose, or in any other way induce or attempt to induce any other Distributor to purchase any product or service, or to participate in any other income opportunity, investment, venture, or commit any other activity deemed, at the full discretion of the Company, as cross-recruiting.   This includes any such activities across any divisions of the Company, should any separate divisions with different compensation plans or hierarchy structures exist, unless, and as specifically stated otherwise.  The integrity of the hierarchy and the relationships therein is of paramount importance to every Distributor as well as to the Company.   Any Distributor violating this provision may be subject to immediate termination for cause, forfeiting any and all commissions due him or her.

*See* Exh. 35, at Attach. 2 (Youngevity's Policies and Procedures).

296.    Youngevity maintains valid and enforceable distributor agreements containing this provision with all of its distributors.  *See* Exh. 35 (Decl. of Steve Wallach), at ¶ 5.

297.    Defendants Wakaya, TNT, Smith, Gardner, Graham, Dave Pitcock, Barb Pitcock, and Vaughn are all aware of the foregoing provision not only because Smith (who owns Wakaya) and Graham (who owns TNT) were themselves Youngevity distributors bound by the contract but also because each urged or aided in enforcement of this very same provision against other Youngevity distributors who violated the provision.

298.   The intentional actions of Defendants Smith, Gardner, Wakaya, TNT, Graham, Vaughn, and the Pitcocks, described above in Paragraphs 244–68  were intended to induce Youngevity distributors to breach their Youngevity contracts by inducing them to cross-recruit for Wakaya while still serving as Youngevity distributors.

299.   Defendants encouraged other Youngevity distributors to "cross-recruit" within the Youngevity business, conduct that would violate the Youngevity agreements and render those cross-recruiting defendants in breach and subject to termination by Youngevity.

300.   The intentional acts of Defendants Smith, Wakaya, Gardner, TNT, Graham, Vaughn, and the Pitcocks, described above in Paragraphs 244–68, did cause Youngevity distributors to cross-recruit other Youngevity distributors to become Wakaya distributors, in violation of Youngevity's distributor agreement.

301.   Youngevity suffered economic losses from lost sales revenues as a direct result of defendants Smith, Wakaya, TNT, Gardner, Graham, Vaughn, and the Pitcocks inducing those distributors to breach their distributor agreements with Youngevity by simultaneously cross-recruiting Youngevity distributors to become Wakaya ambassadors.

302.   But for Defendants inducement of Youngevity distributors to breach their distributor agreements, those distributors would have sold more Youngevity product and devoted more time to promotion and sales of Youngevity products.

303.   Defendants Smith, Wakaya, TNT, Graham, Gardner, Vaughn, Barb Pitcock, and Dave Pitcock's interference was wrongful beyond the fact of the interference itself.  Defendant Dave Pitcock violated Section 4 of his Livinity Sales Contract with Youngevity, Exh. 40 (Pitcock Consulting Agreement), at ¶ 4, by inducing distributors to breach their agreements with Youngevity, *see supra* at ¶¶ 244–56.  Defendants Wakaya, Vaughn, Gardner, Dave Pitcock, Barb Pitcock, Graham, Andreoli, and Smith made false statements of fact concerning Youngevity

to induce distributors to violate their agreements with Youngevity, *see supra* at ¶¶ 32–187.  Defendants TNT, Graham and Smith infringed Youngevity's trademark while inducing Youngevity distributors to violate their agreements with Youngevity, *see infra* at ¶¶ 312–322.  Defendants TNT, Graham and Smith misappropriated Dr. Wallach's name and likeness while inducing Youngevity distributors to violate their agreements with Youngevity, *see infra* at ¶¶ 317–59.  Defendant Gardner misappropriated Youngevity's trade secrets while inducing Youngevity distributors to violate their agreements with Youngevity, *see supra* at ¶ 257.

## COUNT SIX
### MISAPPROPRIATION OF TRADE SECRETS
### (Cal. Civ. Code § 3426)
### (Defendants Wakaya, Andreoli, Dave Pitcock, Gardner, Casperson, and Cloward)

304.   Youngevity holds trade secrets in the form of confidential and proprietary customer and distributor lists and confidential and proprietary intellectual property related to Youngevity marketing, marketing strategy, and business know-how.

305.   Defendants Andreoli, Dave Pitcock, Gardner, Casperson, Cloward, and Wakaya (through those individual defendants) acquired Youngevity's trade secrets, including confidential and proprietary customer and distributor lists, by virtue of their positions as employees of Youngevity.

306.   Defendants Gardner, Casperson, and Cloward also acquired Youngevity's confidential and proprietary intellectual property used for marketing Youngevity products by virtue of their positions as employees of Youngevity.

307.   Defendants Andreoli, Dave Pitcock, Gardner, Casperson, and Cloward were under specific contractual obligations not to use Youngevity's trade secret information to harm Youngevity or to benefit Youngevity competitors.  *See*

Exh. 48 (Gardner, Casperson, and Cloward contracts); Exh. 39 (Andreoli Contract); Exh. 40 (Pitcock contract).

308.  Defendants Andreoli, Pitcock, Gardner, Casperson, Cloward, and Wakaya misappropriated Youngevity's trade secrets, including distributor and customer lists, and Youngevity marketing and business information removed by or at the direction of Andreoli, Pitcock, Gardner, Casperson, and Cloward from Youngevity computers to benefit Wakaya at the expense of Youngevity.

309.  Defendants Andreoli, Pitcock, Gardner, Casperson, and Cloward used Youngevity's trade secrets through improper means because those defendants were under a contractual obligation not to use those trade secrets to harm Youngevity and/or to benefit Youngevity's competitor, Wakaya.

310.  The proprietary information, including customer and distributor lists, is, and at all relevant times has been, the subject of Youngevity's reasonable efforts under the circumstances to maintain their use exclusively by Youngevity and its top level distributors.  Youngevity has taken reasonable measures to prevent the unauthorized disclosure or use of its proprietary customer and distributor lists by limiting access to the whole list to only specific officers, distributors, and employees who have a need to know.

311.  Defendants Andreoli, Pitcock, Casperson, Gardner, and Cloward misappropriated Youngevity's trade secrets by, among other things, retaining and/or using Youngevity's distributor and customer information, and confidential Youngevity work product, for the purpose of soliciting, directing or advising Youngevity's customers and distributors to switch their business away from Youngevity and to Wakaya's competing business.

312.  Defendants Cloward, Casperson, and Gardner also misappropriated Youngevity's trade secrets by using Youngevity's proprietary intellectual property to create marketing material for Wakaya.  They refused to return complete laptops that held valuable and confidential Youngevity information.

313.   Wakaya's distribution of promotional content and its prompt connection and enrollment of Youngevity distributors evidences the use of Youngevity's confidential and proprietary information by Wakaya and Defendants. The majority of Wakaya founders and ambassadors are sourced from Youngevity's ranks.

314.   As a direct and proximate result of Defendants Andreoli, Dave Pitcock, Casperson, Gardner, and Cloward misappropriating Youngevity trade secrets, Youngevity has suffered and will continue to suffer economic injuries. Furthermore, Defendants have been unjustly enriched by their misappropriation and use of Youngevity's trade secrets and confidential information.

315.   Defendants' conduct was done and continues to be done willfully and maliciously.  Youngevity is therefore entitled to exemplary damages pursuant to Civil Code section 3426.3, subdivision (c), and reasonable attorneys' fees pursuant to Civil Code section 3426.4.

316.   Defendants agreed and conspired to misappropriate Youngevity's trade secrets and confidential information to recruit Youngevity distributors into Wakaya and to promote Wakaya using Youngevity's trade secrets.  That misappropriation caused Youngevity damage in lost product sales.

## COUNT SEVEN
### MISAPPROPRIATION OF NAME AND LIKENESS
### (Cal. Civ. Code § 3344)
### (Defendants TNT and Graham)

317.   Dr. Wallach is a celebrity within the field of nutrition and in the direct-sales, network-marketing field.  He is a frequent speaker or lecturer on nutritional science and medicine.

318.   There is substantial value in selling and promoting nutritional supplements and similar products through use of Dr. Wallach's name and likeness.

319.   Dr. Wallach has granted Youngevity an exclusive license to trade on

his name and likeness.  Exh. 36 (Decl. of Joel D. Wallach) at ¶ 6.

320.   Defendants TNT, Graham and Smith and any others acting in concert with them as discovery may reveal (collectively "TNT" under this cause of action) were previously Youngevity authorized distributors.

321.   TNT, while an authorized Youngevity distributor, traded on Dr. Wallach's name and likeness for decades without objection from Youngevity.

322.   While an authorized Youngevity distributor, TNT created the websites www.wallachonline.com and www.yteamtools.com and the phone number 1-800-WALLACH.  Exh. 35 (Decl. of Steve Wallach), at ¶¶ 6–7.  TNT also created and owns www.myyoungevity.com which automatically redirects to www.wallachonline.com.  Through those websites and that phone number, TNT sold Youngevity approved products along with tools designed for Youngevity distributors.  Distributors could purchase those business "tools" to help promote their own downlines within the Youngevity system.

323.   While TNT was an authorized Youngevity distributor, it enjoyed a bundle of rights Youngevity provides to its authorized distributors.  Those rights include, *inter alia*, the right to enroll other distributors in Youngevity downlines, order Youngevity products, and sell those products under the Youngevity mark and Wallach name and likeness.  Exh. 35, at Attach. 2 (Youngevity's Policies and Procedures) at §§ F1, H1; *Id.* at 31 at § E1, 41 at §§ I9(c)–(e), (j).

324.   Under the Distributor Agreement that Youngevity executes with all distributors, Youngevity expressly reserves the right in its sole discretion to revoke consent to the use of its logos, slogans, and trademark "without notice or reason and solely at the discretion of Youngevity."  *See* Exh. 35, at Attach. 2 (Youngevity's Policies and Procedures) at § I 9(c), 46 at § J 10(c).  That authority is necessary to protect the Youngevity brand and maintain a compliant direct-selling business and state and federal laws.

325.   While Youngevity never affirmatively authorized TNT to make commercial use of Dr. Wallach's name or likeness or Youngevity's mark, Exh. 35 (Decl. of Steve Wallach, at ¶ 7) TNT enjoyed an implied license to trade on Dr. Wallach's name and likeness while TNT remained an authorized Youngevity distributor.

326.   So long as TNT served as a Youngevity distributor, TNT had the right to order and sell Youngevity products; implicit in that right is the right to use Dr. Wallach's name and likeness, but solely in the capacity as a Youngevity distributor and in accordance with Youngevity's distributor agreement and Youngevity policies and procedures.

327.   TNT's implied license to trade on Dr. Wallach's name and likeness ended with the notice of termination of the distributorships memorialized in Youngevity's March 21, 2016 letter to TNT wherein Youngevity stated that TNT "may not continue" to sell or distribute items bearing Dr. Wallach's name and likeness and prohibited TNT "from making any further use of web sites or web addresses that purport to be those of, or make commercial use of the names of, Dr. Joel D. Wallach, Youngevity, or any Youngevity product, material, or service." Exh. 35, at Attach. 4 (Demand Letter).

328.   Youngevity suspended TNT and Graham's distributor accounts in March 2016 after learning that those Defendants had actively promoted, aided, and abetted the formation of Wakaya as a competing business.  Youngevity discovered that TNT, Graham, and Smith had exploited their relationships within Youngevity to aid and abet the Wakaya venture, which would have violated the operative Youngevity agreements.

329.   Despite that March 21, 2016 letter, TNT continued to knowingly use Dr. Joel Wallach's name, likeness, and identity without his or Youngevity's permission and for its own commercial benefit.

330.   Despite Youngevity's revocation of the TNT Youngevity distributorship and demand that TNT no longer make commercial use of the Youngevity mark and Dr. Wallach's name and likeness, TNT sent postcards bearing Dr. Wallach's name and likeness with Youngevity's mark to Youngevity distributors. *See* Decl. of Richard Renton, attached as Exh. 49 at ¶ 5, at Attach. 1. Those postcards encouraged Youngevity distributors to purchase Youngevity product from TNT by calling 1-800-WALLACH or visiting Wallachonline.com. *Id.* at Attach. 1.

331.   Despite Youngevity's revocation of his Youngevity distributorship and demand that he no longer make commercial sue of the Youngevity mark and Dr. Wallach's name and likeness, Defendant Graham hosted a "Youngevity" distributor meeting in Salt Lake City, Utah, wherein he sold newly published "YTeam Tools" to distributors, which purport to aid in the sale of Youngevity products, and from which TNT exclusively profits. *See* Decl. of Leia Anderson, attached as Exh. 50 at ¶ 6.

332.   Those new tools are not authorized by Youngevity but contain Dr. Wallach's name and likeness, specifically his image and a short biography. *See id.* at Exh. B. Both tools are copyrighted "2016 yteamtools.com" which evidences TNT's recent republication of Dr. Wallach's name and likeness and Youngevity's mark this very year. *Id.* at ¶¶ 6–7.

333.   Youngevity requires all such "tools" to have corporate approval—a necessary measure to prevent unauthorized advertising claims and business methods that could violate law or damage Youngevity's business.

334.   TNT and Graham, as recently as July 13, 2016, held events for Wakaya ambassadors at TNT headquarters, despite continuing to profit from the website www.wallachonline.com and the phone number 1-800-WALLACH. *See* Exh. 51 (Blake Graham Facebook Post).

335. TNT has gained a commercial benefit and advantage by using Dr. Wallach's name, likeness, and identity in commerce.

336. Despite Plaintiffs' demands for immediate cessation of the unauthorized use, TNT only ceased using Dr. Wallach's mark, brand, and likeness on websites www.wallachonline.com and www.yteamtools.com, and through the phone number 1-800-Wallach, after December 8, 2016, in accordance with this Court's December 1, 2016 Order. *See* Dkt. 57.

337. TNT's misappropriation of Dr. Wallach's name and likeness caused Youngevity and Dr. Wallach irreparable harm.

338. Youngevity and Dr. Wallach are injured by the unlawful and improper misappropriation and use of Dr. Wallach's name, likeness, and identity. TNT has used the websites and the other promotional material containing Dr. Wallach's name and likeness to divert Youngevity consumer traffic away from Youngevity.

339. Youngevity and Dr. Wallach had lost their control over Dr. Wallach's online identity. The unauthorized TNT website "Wallachonline.com" is the first site returned in most online searches for content related to Dr. Joel Wallach. The website was based on Dr. Wallach's image and likeness.

340. TNT had used Dr. Wallach's name and likeness to mislead consumers when selling products. Consumers who have purchased purportedly "Youngevity" product from www.wallachonline.com have in fact received mislabeled Youngevity "product," with the product label bearing Japanese language. *See* Additional Declaration of Joel D. Wallach, attached as Exh. 41 at ¶¶ 5–7. TNT's use of Dr. Wallach's name and likeness to sell products held out by TNT to be Youngevity products when in fact those products are not Youngevity approved products harm Dr. Wallach's reputation.

341. TNT similarly uses Dr. Wallach's name and likeness to attract Youngevity distributors to events held out by TNT to promote Youngevity, but are in fact events to promote Wakaya and unauthorized TNT products.

342.   On March 30, 2016, Jonny Steele, a Youngevity Distributor and cousin of defendant Todd Smith, sent an e-mail to Steve Wallach, Youngevity's Chief Executive Officer. *See* Steele e-mail, attached as Exh. 53.  That e-mail explained how and why TNT's control over Wallachonline.com and Yteamtools.com cause Youngevity and its distributors irreparable harm.  Steele explained that "[i]f Todd [Smith] and Blake [Graham] continue to operate wallachonline and yteamtools, they will have the potential to negatively affect our downline and our livelihood." *Id.*  "The damage [to Youngevity distributors] can be devastating and long term, even if they continue to operate for only a couple more weeks let alone for the next few months or years." *Id.*

343.   TNT's misappropriation of Dr. Wallach's name benefitted TNT and Wakaya because it used Dr. Wallach's valuable reputation to entice others to join Wakaya as distributors and/or purchase Wakaya and TNT products and goods. The website relied on Dr. Wallach's image and likeness to generate traffic online. That site then placed Defendants TNT and Wakaya in direct contact with Youngevity distributors, potential distributors, or potential customers.  Wakaya thus profits from lead generation through Dr. Wallach's image.  TNT's website was designed to appear as Youngevity-authorized content.

344.   TNT lacks consent to trade on Dr. Wallach's name and likeness because Plaintiffs revoked that consent in March 2016.

345.   Plaintiffs are harmed by TNT's misappropriation of Dr. Wallach's name and likeness because they lose business opportunities that would otherwise flow from the websites and phone number herein identified directly to Youngevity. But for TNT's misappropriation of Dr. Wallach's name and likeness, Youngevity customers would have purchased Youngevity product not from TNT but from authorized Youngevity distributors.  The purchase of products and unauthorized "tools" from an unauthorized individual or entity not within the Youngevity system causes direct loss to those authorized distributors, and threatens to undermine

Youngevity's closed distribution network—which closed-system is an integral element in a direct-sales business like Youngevity.   Plaintiffs suffer harm to their reputations and goodwill resulting from consumers being misled to believe that Plaintiffs endorse or condone toxic Wakaya products, including the Clay Product.

346.   Dr. Wallach is further harmed by TNT's misappropriation of his name and likeness because his privacy interests, including the right to limit use of commercial trading on his name, likeness and identity outweigh any public interest served by the Defendants' improper use of Dr. Wallach's name, likeness, and identity.

347.   TNT agreed and conspired to misappropriate Dr. Wallach's name and likeness by continuing to profit from his name and likeness through 1-800-WALLACH, yteamtools.com, and wallachonline.com.  That conspiracy to misappropriate caused Youngevity and Dr. Wallach damage in diversion of sales, profit, internet traffic, and consumer contact information that should have gone to Youngevity and authorized Youngevity distributors.

## COUNT EIGHT
## LANHAM ACT TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114
### (Defendants TNT and Graham)

348.   Youngevity owns a valid trademark through the United States Patent and Trademark Office in the mark "Youngevity."  *See* Exh. 35, at Attach. 1 (Trademark).

349.   Defendants TNT, Graham, Smith, and any others acting in concert with them as discovery may reveal (collectively "TNT" under this cause of action) owned the websites www.yteamtools.com and www.wallachonline.com.

350.   Until March of 2016, TNT was an authorized Youngevity distributor. While an authorized Youngevity distributor, TNT maintained, among other rights, an implied right to sell Youngevity goods and trade on Youngevity's mark.

351.   In March 2016, Youngevity terminated TNT's distributorships and revoked any implied right to trade on Youngevity's mark.  Nevertheless, on those websites and through other promotional material, TNT continued to use the mark "Youngevity" to sell and promote unauthorized products, including Wakaya products.

352.   TNT sold products through www.myyoungevity.com, www.wallachonline.com.  TNT also sells product through www.yteamtools.com. TNT used the Youngevity mark on those websites and in its products sold on those websites to imply falsely to consumers and Youngevity distributors that TNT is an authorized Youngevity distributor and that the products it sells bearing the Youngevity mark are Youngevity approved products.

353.   In fact, TNT is not an authorized Youngevity distributor and Youngevity does not approve all of the products TNT sells to consumers and Youngevity distributors.

354.   TNT sold unauthorized and misbranded Youngevity "goods" on www.wallachonline.com.  When consumers believe they are purchasing legitimate Youngevity products from www.wallachonline.com, TNT in fact sends them unapproved Youngevity products with a Japanese label.  *See* Exh. 52 (Additional Decl. of Joel D. Wallach), at ¶¶ 5–7.

355.   Youngevity does not object to TNT's use of the Youngevity mark only to the extent TNT sells Youngevity products which TNT purchased from Youngevity while still acting as an authorized Youngevity distributor.

356.   Defendant Blake Graham, Todd Smith, and TNT also use the Youngevity mark to attract Youngevity distributors to what Graham, Smith and TNT advertise to be Youngevity events but at which those Defendants engage in a bait and switch whereby they solicit Youngevity distributors in attendance to buy Wakaya products and become Wakaya distributors.

357.   Defendant Smith used the e-mail address "todd@myyoungevity.com" to conduct business for the benefit of Wakaya, including using that e-mail address to discuss Wakaya's products and marketing.

358.   TNT's use of the Youngevity mark is likely to, and does, confuse consumers into believing falsely that TNT is an authorized Youngevity distributor and that Youngevity approves of the sale of Wakaya products and the enrollment of Youngevity distributors in Wakaya.

359.   TNT's illegal use of the Youngevity mark has harmed Youngevity, including harm to Youngevity's reputation and in diluting the value of the Youngevity mark, in an amount to be proven at trial.  Youngevity also suffers harm to its reputation and goodwill resulting from consumers being misled to believe that Youngevity endorses or condones toxic Wakaya products, including the Clay Product.

## COUNT NINE
### Breach of Fiduciary Duty
### (Defendant Andreoli)

360.   Defendant Andreoli served as President of Youngevity from October, 2011 through November, 2015.

361.   As President of Youngevity, Andreoli owed fiduciary duties to Youngevity.  Andreoli's duties as Youngevity President included notifying Youngevity's CEO and obtaining authorization from him before force qualifying any individuals or entities.  Those duties also obligated Andreoli to take actions that served the interests of Youngevity over competing ventures.  Those duties also required Andreoli to exercise reasonable care and to maintain his loyalty to Youngevity.

362.   Andreoli in his capacity as President of Youngevity authorized in excess of a dozen "forced qualifications" or automatic rank advancements to be bestowed upon individuals and entities who did not earn those advancements

through increased product sales volumes, as required by Youngevity rules.  The effect of those forced qualifications was to cause the company to pay those individuals and entities higher than justified commissions, bonuses, and car bonuses.

363.   Through those forced qualifications, Andreoli breached his fiduciary duty to Youngevity and caused Youngevity funds to be converted for the unjust enrichment of those friends and family members he wished to financially benefit without the prior knowledge or advanced approval of Youngevity's CEO Steve Wallach.

364.   Andreoli further breached his fiduciary duties to Youngevity by encouraging widespread dissent within Youngevity

365.   Upon information and belief, Andreoli became involved with Wakaya in or about August, 2015, while still serving as Youngevity's President.  Beginning in or about August, 2015, he encouraged Youngevity employees, executives, and distributors to leave Youngevity for Wakaya.

366.   Andreoli also breached his fiduciary duties to Youngevity by charging Youngevity above fair market value to rent the property he owns in New Hampshire.

367.   Moreover, Andreoli breach his fiduciary duties to Youngevity in early 2015 by attempting to purchase Xocai, a competing Multi-Level Marketing Company and failing to inform Youngevity of his attempt to purchase Xocai.

368.   In addition, while Andreoli was Youngevity's President, Andreoli allowed another business to operate out of Youngevity's New Hampshire offices, iCheer Brands, LLC d/b/a iCheer Cookies.

369.   Andreoli additionally breached his fiduciary duties to Youngevity by failing to deduct any of his vacation time while serving as Youngevity's President, and encouraging others to do the same.

370.   Andreoli's breach of his fiduciary duties to Youngevity proximately caused Youngevity damages, including paying individuals and entities higher than justified commissions and bonuses, making unjustified severance, vacation, and distributor payments, paying more than fair market value for its New Hampshire office, and causing the loss of Youngevity executives, employees, and distributors.

## COUNT TEN
### Breach of Duty of Loyalty
### (Gardner, Randolph, Casperson, Cloward)

371.   Defendants Gardner, Randolph, and Casperson were each employed by Youngevity in executive and managerial positions.  Gardner was Youngevity's Vice President of Sales.  Casperson was Youngevity's Vice President of Distributor Relations.  Cloward was Youngevity's Vice President of Marketing. Randolph was Youngevity's Executive Vice President.

372.   Gardner and Randolph were employed by Youngevity until December 31, 2015.  Casperson and Cloward were employed by Youngevity until November 7, 2015.

373.   While being employed by Youngevity, Gardner, Cloward, Randolph, and Casperson each became employed by Wakaya.  Gardner, Randolph, Cloward, and Casperson each became employed by Wakaya no later than November 4, 2015.  Upon information and belief, Gardner, Cloward, Randolph, and Casperson each became employed by Wakaya significantly earlier than November 4, 2015. Gardner and Casperson are now Vice Presidents at Wakaya.  Randolph is now Wakaya's Executive Vice President.  Cloward is now Wakaya's Vice President of Marketing

374.   While being employed by Youngevity, Gardner, Randolph, Cloward, and Casperson each took actions contrary to Youngevity's best interests, thereby breaching their duties of loyalty to Youngevity, their employer.  They each spent time working for Wakaya while being paid for that time by Youngevity.  During

that time, they neglected their employment duties to Youngevity in favor of working for Wakaya. They each used Youngevity equipment, including computers, to benefit Wakaya, while still working for Youngevity. They benefitted Wakaya while working out of Youngevity offices. They each used Youngevity's trade secrets, including customer and distributor lists and marketing materials, to harm Youngevity and benefit Wakaya. They each contacted Youngevity distributors or employees and enticed those distributors or employees to join Wakaya.

375.   Youngevity has been harmed by Gardner's, Cloward's, Randolph's, and Casperson's breach of their duty of loyalty to Youngevity. Youngevity paid them salary for time they spent working to further Wakaya's interests. They used Youngevity equipment and office space to work for and benefit Wakaya. They used Youngevity trade secrets to attract Youngevity customers and distributors to Wakaya.

### **PRAYER FOR RELIEF:**

WHEREFORE, Plaintiffs pray for judgment in its favor and against Defendants and requests that this Court:

A.      Award Plaintiffs exemplary or punitive damages under Cal. Civ. Code § 3294, 15 U.S.C. § 1117, and other applicable laws and statutes for Defendants' conduct undertaken with intent to injure Plaintiffs, or with a willful and conscious disregard of Plaintiffs' rights. This is an exceptional case that involves a Company's top officers, employees, and distributors conspiring together, while employed at Youngevity, to create a business in direct competition with Youngevity. An award of punitive damages sufficient to deter and prevent that misconduct in future is appropriate in this case.

B.      Issue against Defendants a permanent injunction enjoining the Defendants, their officers, shareholders, agents, servants, employees, attorneys, successors and assigns, subsidiaries, affiliated companies or entities, all those in

privity with same, and all those in active concert or participation who receive actual notice of the judgment: (1) from using any of Youngevity's proprietary and confidential information in any manner not expressly authorized by Youngevity; (2) from profiting from any of their illegal activities, including profits made from Wakaya employees and/or distributors who were employed by and/or distributors for Youngevity; (3) from inducing Youngevity distributors and employees to breach their contracts with Youngevity; (4) from operating an unlawful pyramid scheme; (5) from making any further commercial use of the name and likeness of Joel D. Wallach, BS, DVM, ND, including, but not limited to, making commercial use of the name and likeness of Joel D. Wallach, BS, DVM, ND through the websites wallachonline.com and yteamtools.com, and through the phone number 1-800-WALLACH; and (6) from making any further commercial use of the mark "Youngevity," including, but not limited to, making commercial use of the name "Youngevity" through the websites wallachonline.com and yteamtools.com.

C.     Order the Defendants to file with this Court a compliance plan under oath describing the method and manner in which Defendants intend to comply with the injunction(s), including a description of any new operating procedures and policies, to be filed within 30 days after service of an injunction;

D.     Order the Defendants to specifically perform contractual provisions binding on Defendants Smith, Andreoli, and Dave Pitcock that require those Defendants to return all proprietary and confidential information to Youngevity;

E.     Award Plaintiffs all costs and reasonable attorney fees and expenses incurred by Plaintiffs in connection with this action;

F.     Award Plaintiffs all of Defendants' profits and income since October, 2015;

G.     Award Plaintiffs recompense for all damages suffered by Plaintiffs as a result of Defendants' unlawful acts;

H.     Award Plaintiff Youngevity all damages allowed under the contracts

and agreements between Youngevity and defendants Andreoli and Dave Pitcock;

I.     Award Plaintiff Youngevity all Wakaya sales receipts and proceeds from the sale of GAC products exclusively licensed to Wakaya;

J.     Award Plaintiffs all damages necessary to remedy the injuries to their reputations and goodwill resulting from Defendants' misrepresentation to consumers that Plaintiff endorses or condones the sale of injurious product, to wit, the Clay Product.

K.     Compel an accounting of all Defendants' profits, revenues, accounts, and proceeds received or obtained, directly or indirectly, since the date Wakaya was founded.

L.     Award Plaintiffs pre-judgment and post-judgment interest on the above damage awards;

M.     Adjudge all Defendants jointly and severally liable, as the law allows, under each cause of action asserted by Youngevity and for all damages awarded against any Defendant;

N.     Grant such other and further relief as this Court deems just.

1

2   DATED: November 6, 2017

3                                          Respectfully submitted,

4

5                                          YOUNGEVITY INTERNATIONAL,
                                           CORP. AND DR. JOEL D. WALLACH,
6

7                              By:      _/s/ Eric J. Awerbuch_____
8                                       Eric J. Awerbuch
9                                       EAwerbuch@emord.com
                                        *Attorney for Plaintiffs*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28