UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

YOUNGEVITY INTERNATIONAL
CORP., et al.,

                               Plaintiffs,

v.

TODD SMITH, et al.,

                               Defendants.

Wakaya Perfection, LLC, et al.,

                    Counter Claimants,

v.

Youngevity International Corp.

                    Counter Defendants.

Case No.: 16-cv-704-BTM-JLB

**ORDER DENYING AND GRANTING IN PART COUNTERCLAIM DEFENDANTS' ANTI-SLAPP MOTION TO STRIKE AND MOTION TO DISMISS [ECF No. 90]**

     On March 9, 2017, Plaintiffs and Counterclaim Defendants Youngevity International Corp. ("Youngevity"), Dr. Joel D. Wallach, Steve Wallach, Michelle Wallack, and Dave Briskie (collectively "Counterclaim Defendants") filed a special motion to strike pursuant to California Code of Civil Procedure § 425.16 and/or dismiss the Counterclaim ("CC") filed by Wakaya Perfection, LLC ("Wakaya"), Todd Smith,

Total Nutrition Inc ("TNT"), Blake Graham, Andre Vaughn, Dave Pitcock, and Barb Pitcock (collectively "Counterclaimants"). (Countercl. Defs.' Mot. to Strike, ECF No. 90.)

## I. BACKGROUND

On February 23, 2017, Counterclaimants filed a First Amended Answer and Counterclaim ("CC") against Counterclaim Defendants alleging the following causes of action: (1) Declaratory Judgment against Youngevity; (2) breach of contract against Youngevity; (3) breach of the covenant of good faith and fair dealing against Youngevity; (4) conversion against Youngevity; (5) tortious interference with existing economic relations against Youngevity; (6) tortious interference with existing economic relations against Youngevity; (7) tortious interference with prospective economic advantage against Youngevity; (8) tortious interference with prospective economic advantage against Youngevity, Briskie, and Steve Wallach; (9) Defamation against Youngevity, Dr. Wallach, Michelle Wallach, and Steve Wallach; (10) False Light against Youngevity, Dr. Wallach, and Michelle Wallach; (11) Business Disparagement against Youngevity; (12) Unfair Competition, Cal. Bus. & Prof. Code § 17200 et seq. against all Counterclaim Defendants; and (13) Fraud/Negligent Misrepresentation against Youngevity and Briskie. (ECF No. 83.)

## II. DISCUSSION

**A. California Code of Civil Procedure § 425.16, Anti-SLAPP Motion**

California Code of Civil Procedure § 425.16, the Anti-Strategic Lawsuits Against Public Participation[1] ("Anti-SLAPP") law, provides in relevant part:

> (b)(1) A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court

---

[1] SLAPP stands for "Strategic Lawsuits Against Public Participation."

determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

(2) In making its determination, the court shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

Courts apply a two-part test to determine whether an action is subject to an anti-SLAPP special motion to strike. *Navellier v. Sletten*, 29 Cal.4th 82, 85, 88 (2002). First, the defendant must establish that "the challenged cause of action is one arising from protected activity." *Id.* at 88. Once a defendant makes a threshold showing that the act in question is protected, the burden shifts to the plaintiff. To resist the special motion to strike, the plaintiff must establish "a probability of prevailing on the claim." *Navellier*, 29 Cal.4th at 88. In federal court, "the claim should be dismissed if the plaintiffs presents an insufficient legal basis for it, or if, on the basis of the facts shown by the plaintiff, 'no reasonable jury could find for the plaintiff.'" *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013) (citing *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001)). For a "mixed cause of action," a court may rule on a plaintiff's specific allegations of protected activity "rather than reward artful pleading by ignoring such claims if they are mixed with assertions of unprotected activity." *Baral v. Schnitt*, 1 Cal.5th 376, 393 (2016).

Counterclaim Defendants move to strike counterclaims six, seven, nine, ten, eleven, and part of twelve, arguing that the conduct on which they are based constitutes protected activity because it directly relates to litigation activity and is absolutely privileged under California Civil Code section 47. Counterclaimants, on the other hand, argue that the alleged false defamatory statements are exempt from the anti-SLAPP statute because they constitute commercial speech. The Court addresses each of these arguments below.

### 1. "Arising From" Requirement

First, Counterclaim Defendants must demonstrate that the challenged causes of

action "'aris[e] from' protected activity in which the defendant has engaged." *Park v. Bd. of Trs. of Cal. State Univ.*, 2 Cal.5th 1057, 1061 (2017) (quoting Cal. Civ. Proc. Code § 425.16(b)).  The anti-SLAPP statute defines protected activity as:

> (1) any written or oral statement or writing made before a legislative, executive, or judicial proceeding, or any other official proceeding authorized by law, (2) any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law, (3) any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public interest, or (4) any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest.

Cal. Civ. Proc. Code § 425.16(e).

"A claim arises from protected activity when that activity *underlies* or *forms the basis* for the claim." *Park*, 2 Cal.5th at 1062 (emphasis added).  Courts ruling on anti-SLAPP motions must determine "what the defendant's activity is that gives rise to his or her asserted liability—and whether that activity constitutes protected speech or petitioning." *Id.* at 1063 (citations omitted).  The mere fact that an action was triggered by protected activity does not mean that it "arose from that activity for the purposes of the anti-SLAPP statute." *Id.* at 1063; *see City of Cotati v. Cashman*, 29 Cal.4th 69, 78 (2002) ("[A] claim filed in response to, or in retaliation for, threatened or actual litigation is not subject to the anti-SLAPP statute simply because it may be viewed as an oppressive litigation tactic.").  Thus, the only means by which a defendant can meet its burden under the anti-SLAPP statute is by demonstrating "that *the defendant's conduct by which plaintiff claims to have been injured* falls within one of the four categories described in [Cal. Civ. Proc. Code § 425.16(e)]." *Parks*, 2 Cal.5th at 1063.

Counterclaimants' sixth, seventh, ninth, tenth, eleventh, and in part, twelfth causes of action all appear to depend, in part, on the following speech and conduct: (1) allegations contained within the Verified Complaint; (2) Youngevity's press release

4

announcing the initiation of this action, which was sent to a trade publication; (3) republication of the Verified Complaint to nonparticipating third parties including Rick Ansen; (4) Dr. Wallach's oral statements to Youngevity distributors about Smith, Graham, and the Pitcocks; (5) Michelle Wallach's fabricated emails accusing Barb Pitcock of cross-recruiting; and (6) Steve Wallach's email to Youngevity distributors. (CC ¶¶ 88–128.)  The Court discusses each below to determine whether any of these activities constitute protected speech or petitioning under the anti-SLAPP statute.  *See Park*, 2 Cal.5th at 1063.  The Court finds that the first three types of statements are protected under the anti-SLAPP statute.

First, the allegations contained within the Verified Complaint constitute protected speech because they are statements made before a judicial proceeding.  *See* Cal. Civ. Proc. Code § 425.16(e)(1); *see also Navellier*, 29 Cal.4th at 90 ("A claim for relief filed in a federal district court indisputably is a 'statement or writing made before a . . . judicial proceeding.'").  Second, the press release that Youngevity forwarded to a trade publication, businessforhome.org ("BFH"), constitutes protected speech because it is a statement made "in connection" with this action. *See Fremont Reorg. Corp. v. Faigin*, 198 Cal. App. 4th 1153, 1167 (2011) ("A statement is 'in connection with' an issue under consideration by a court in a judicial proceeding . . . if it relates to a substantive issue in the proceeding and is directed to a person having some interest in the proceeding.").  The Court finds that it was directed at people with "some interest in the proceeding," as Youngevity is a publicly traded corporation and the press release was sent to a trade publication and read by individuals in the multi-level marketing community.

Finally, the republication of the Verified Complaint to non-participating third parties, including Rick Ansen, is also protected under the anti-SLAPP statute as a statement made "in connection" with this action and directed at someone with some interest in the matter.

Counterclaim Defendants have thus met their burden as to step one.  As to the

remaining statements, the Court agrees with Counterclaimants that they constitute commercial speech and are thus exempt from the anti-SLAPP statute.

### 2. Commercial Speech Exemption

Counterclaimants argue that the statements underlying the causes of action are commercial speech not protected within the anti-SLAPP statute.

California Civil Procedure Code § 425.17 lays out numerous exemptions from the anti-SLAPP statute, including the commercial speech exemption. Cal. Civ. Proc. Code § 425.17(c). The commercial speech exemption applies when:

> (1) the cause of action is against a person primarily engaged in the business of selling or leasing goods or services; (2) the cause of action arises from a statement or conduct by that person consisting of representations of fact about that person's or a business competitor's business operations, goods, or services; (3) the statement or conduct was made either for the purpose of obtaining approval for, promoting or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services; and (4) the intended audience for the statement or conduct meets the definition set forth in section 425.17(c)(2).

*Simpson Strong-Tie Co., Inc. v. Gore*, 49 Cal. 4th 12, 30 (2010).

Here, Counterclaimants allege three types of speech that fall within the commercial speech exemption. First, they allege that Dr. Wallach made several defamatory oral statements to Youngevity distributors accusing Smith and Graham of stealing Youngevity's distributors, money, and property, and the Pitcocks of "raiding" multi-level marketing companies. Second, they allege that Michelle Wallach fabricated emails accusing Barb Pitcock of cross-recruiting. Though the Counterclaim is less specific as to who these emails were directed to, a reasonable inference from the pleadings reveals that they were directed to Youngevity distributors, as it is alleged that they "were intended to discredit Barb and damage her reputation both within Youngevity and in the larger direct marketing community." (CC ¶ 51.) Finally, Counterclaimants allege that Steve Wallach's email to the Youngevity network of distributors accusing Smith, Wakaya, and

distributor Counterclaimants of "engaging in theft, misappropriation of confidential information, and breaching various provisions of the Youngevity Policies and Procedures" is exempt from the anti-SLAPP statute. (CC ¶ 98.) The Court relies on the four *Simpson* factors in concluding that these statements constitute commercial speech.

First, the causes of action grounded in these statements, counts seven, nine, ten, and eleven in particular, are all against Youngevity and its top officers. They all qualify as "persons primarily engaged in the business of selling or leasing goods or services." *Simpson*, 49 Cal. 4th at 30. Youngevity and its officers are in the business of selling Youngevity products. (Pl.s' Fourth Amended Complaint ("FAC"), ECF No. 269, ¶ 2–11.)

Second, the counterclaims arise out of statements of fact about Wakaya, its founder and employees, and operations. Counterclaim Defendants argue that these statements cannot constitute commercial speech because they concern individual characters and actions and not business operations, goods, or services . . . ." (Countercl. Def.s' Reply, ECF No. 112, 3.) However, both Youngevity and Wakaya's business models depend on the distribution of its consumer products through independent direct-sellers known as "distributors" who serve as the companies' agents. The representations of fact the Wallachs made about Wakaya being established as a result of cross-recruiting or Smith's alleged misappropriation of Youngevity's property, all constitute representations of fact about "a business competitor's business operations, goods, or services." *See id.* at 30.

Third, and arguably the most disputed factor, is whether the statements at issue were "made either for the purpose of obtaining approval for, promoting or securing sales or leases of, or commercial transactions in, the person's goods or services or in the course of delivering the person's goods or services . . . ." *Simpson*, 49 Cal.4th at 30. The Court finds that these statements were made for the purposes of promoting or securing the sale of Youngevity's goods. As already discussed, Youngevity's business and profitability depends on the preservation of its distributors and their respective "uplines" and "downlines." (FAC ¶ 5.) As Youngevity pleads, "[t]he integrity of the Youngevity

genealogies is essential to Youngevity's business model." (Id.)  The clearest example is perhaps Steve Wallach's email to Youngevity distributors.  It begins by addressing it to "All Our Loyal Distributors and Friends."  (CC, Ex. C.)  The email then dedicates the next three pages to, on the one hand, accusing Counterclaimants of violating Youngevity's company rules and poaching downlines, and on the other, reassuring those loyal distributors that Youngevity is committed to protecting their business and livelihoods.  The email states in relevant part:

> Those loyal to Youngevity, who faithfully uphold the company's rules, may rest assured that the company will protect their interests from those whose acts of betrayal would otherwise steal their downlines.  Those disloyal to Youngevity, who recruit the company's distributors to competing companies, should be aware that the company will enforce its rules and end their distributorships, causing their commissions to be forfeited permanently.

(Id.)

Though perhaps not a conventional sale presentation, it is reasonable to infer that the Wallachs made these statements in an effort to preserve their downlines and business. *See E.D.C. Techs. V. Seidel*, 225 F. Supp. 3d 1058, 1066 (N.D. Cal. 2016) (finding commercial speech where the "emails were undoubtedly written to 'reassure customers' and 'to dispel confusion.'"); *see also Weiland Sliding Doors & Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp.2d 1033, 1039 (S.D. Cal. 2011) (finding that plaintiff's oral statement to defendant's potential customers constituted commercial speech where it communicated that they could be sued if they purchased defendant's products).

Lastly, the Court finds that the intended audience, Youngevity distributors, were "an actual or potential buyer[s] or customer[s], or . . . person[s] likely to repeat the statement to, or otherwise influence an actual potential buyer or customer."  *Simpson*, 49 Cal.4th at 30.

The Court therefore concludes that counterclaims seven, nine, ten, and eleven based on Dr. Wallach's oral statements, Michelle Wallach's email, and Steve Wallach's email are exempt from anti-SLAPP procedure under the commercial speech exemption.

### 3. Counterclaimants' Probability of Prevailing on the Merits

Having determined what alleged speech and conduct is protected under the anti-SLAPP statute, the Court next turns to Counterclaimants' probability of prevailing on the merits. As the Supreme Court of California has held, a plaintiff cannot defeat an anti-SLAPP motion by merely establishing a probability of prevailing on *any part* of a pleaded cause of action. *Baral*, 1 Cal.5th at 392. Instead, "the plaintiff must make the requisite showing as to each challenged claim that is based on allegations of protected activity." *Id.* Though how a plaintiff meets this standard varies with every case, "when the defendant seeks to strike particular claims supported by allegations of protected activity that appear alongside other claims within a single cause of action, the motion cannot be defeated by showing a likelihood of success on the claims arising from unprotected activity." *Id.* Because some of the counterclaims are based on both protected and unprotected activity, the Court for the purposes of this analysis focuses on the sufficiency of the claims arising from protected activity. Counterclaim Defendants argue that Counterclaimants cannot prevail on their claims because they are barred by California's litigation and fair reporting privileges under California Civil Code section 47.

### i.     *Application of California Privilege Law*

It is worth noting at the outset that Counterclaimants dispute the application of California's privileges, arguing that federal common law controls here. Federal Rule of Evidence 501 states that "in a civil case, state law governs privileges regarding a claim or defense for which state law supplies the rule of decision." Fed. R. Evid. 501. Pursuant to Federal Rule of 501, assertion of privileges in federal question cases are governed by federal law, while state privilege law applies to purely state claims brought under diversity jurisdiction. *Id.* Counterclaimants argue that because this is a federal question action, federal common law of privileges should govern these claims.

The Court holds that Federal Rule of Evidence 501 does not preclude application of Civil Code section 47 because section 47 is not an *evidentiary privilege*. Rule 501

applies to *evidentiary privileges*. *See Doles v. Milonas*, 889 F.2d 885, 889 n.6 (9th Cir. 1989) ("F.R. Evid. 501 provides that questions of *evidentiary privileges* in federal cases are governed by federal common law."). Though California Civil Code section 47 refers to "privileges," its effect is to provide immunity from tort liability based on certain protected conduct or speech. *See Kimes v. Stone*, 84 F.3d 1121, 1127 (9th Cir. 1996) (refusing to apply Cal. Civ. Code § 47(b) to a plaintiff's § 1983 claim because state laws that immunize government conduct are preempted); *Scheider v. Cnty of Sacramento*, No. S-12-2457-KJM, 2013 WL 6623873, at *6–7 (E.D. Cal. Dec. 16, 2013) ("Although short-hand reference to Civil Code §47(b) denominates it as a privilege, its effect is to limit liability or provide immunity from suits if its requirements are met.").

Counterclaimants also argue that even if federal common law does not control here, California law does not apply to their counterclaims because in cases of federal question jurisdiction, federal common law applies to choice of law determinations. However, the Court exercises federal question and supplemental jurisdiction. The Court applies California's choice of law rules because in federal question actions that involve supplemental jurisdiction over state law claims, courts apply the choice of law rules of the forum state. *Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1080 (9th Cir. 2009). California follows a three-step analysis in determining the correct choice of law:

> First, we determine whether the two concerned states have different laws. Second, we consider whether each state has an interest in having its law applied to this case. Finally, if the laws are different and each state has an interest in having its own law applied, we apply the law of the state whose interests would be more impaired if its policy were subordinated to the policy of the other state.

*Id.* (citing *Havlicek v. Coast-to-Coast Analytical Servs.*, 39 Cal. App. 4th 1844, 1851 (1995).

Here, Counterclaimants have not established which foreign law should apply, how those laws may differ from California's, or whether those states have an interest in having their own laws applied to this case. Because California has a paramount interest

in the freedom of speech uttered by its citizens within its territory, the Court applies California's privilege law.

### ii. Count Six

In count six, Wakaya alleges that Youngevity tortuously interfered with contracts it maintained with Rick Ansen and LiveWell by republishing its defamatory allegations and thereby convincing them to terminate their contracts. Youngevity argues Wakaya cannot succeed on this claim because the republication of the Verified Complaint is absolutely protected speech under California's litigation privilege.

The litigation privilege, California Civil Code § 47(b)(2), provides an absolute defense to defamation and all other torts except malicious prosecution. *Silberg v. Anderson*, 50 Cal.3d 205, 212 (1990). The privilege "applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." *Id.*

The privilege exists "to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *Id.* at 213 (citations omitted). Notably, the privilege "applies to any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." *Id.* at 212.

Additionally, the requisite "connection or logical relation" between the communication and the litigation must be a "functional connection." *Rothman v. Jackson*, 49 Cal.App.4th 1134, 1146 (1996). The communication, whether it takes the form of a court document, a letter from an attorney, or a public statement, "must function as a necessary or useful step in the litigation process and must serve its purposes." *Id.* Thus, the party asserting the privilege must do more than show that the statement's content is related to the subject of the litigation. *Id.*

Moreover, the "objects of litigation" prong is limited to legally cognizable ends

and does not include a general "desire to be vindicated in the eyes of the world." *Id.* at 1147–48. Accordingly, "the litigation privilege should not be extended to 'litigating in the press'" because it does not advance the purpose of the privilege—uninhibited access to the courts—and it damages the justice system by poisoning jury pools and bringing the bench and bar into disrepute. *Id.* at 1149 (denying application of the litigation privilege to attorney's statement made at a press conference accusing opposing counsel of engaging in extortion); *see also Susan A. v. County of Sonoma*, 2 Cal.App.4th 88, 92, 95-96 (1991) (denying application of the litigation privilege to psychologist's disclosure of his impressions of his patient to a reporter).

The Court finds that the litigation privilege does not apply to the republication of the Verified Complaint to non-participating third parties. Here, the Counterclaim alleges that Youngevity republished its defamatory allegations to Rick Ansen. Though out-of-court statements may fall within the protections of the litigation privilege, here, there is no indication that the republication to a non-participating party functioned as a necessary step in the litigation process. As such, the litigation privilege does not apply to the republication of the Verified Complaint to non-participating third parties. The Court, therefore, turns to Wakaya's probability of prevailing.

Youngevity challenges this claim, arguing that Wakaya has failed to plead an independent wrong. However, Wakaya does not need to plead an independent wrong because it appears to be moving against Youngevity for its alleged tortious interference with contracts it had with Rick Ansen and LiveWell. The Supreme Court of California has made it clear that intentionally interfering with an existing contract is a "wrong in of itself." *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1158 (2003) (internal citations omitted). As such, unlike the tort of intentional interference with a prospective economic advantage, which requires pleading an independently wrongful act, the tort of intentional interference with an existing contract does not. *Id.* Accordingly, Wakaya has adequately pled Youngevity's tortious interference with existing contracts. *See Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal.4th 26, 27 (1998). Moreover,

to the extent that Wakaya is intending to plead a tortious interference with prospective economic advantage, because the republication of defamatory statements is not protected by any privilege, it constitutes an independently wrongful act. Therefore, Youngevity's anti-SLAPP motion to strike is **DENIED** as to count 6.

### iii. *Count Seven*

Count seven depends, in part, on statements made within the Verified Complaint, the press release, and the republication of the Verified Complaint to non-participating third parties.

To the extent the cause of action depends on the actual statements made within the Verified Complaint, there is no dispute that they are protected under the litigation privilege. Thus, Counterclaimants could not prevail on these allegations and the Court **GRANTS** Counterclaim Defendants' anti-SLAPP motion to strike any allegations regarding the statements directly made within the Verified Complaint.

As to the press release, Youngevity argues that Counterclaimants cannot prevail because the press release is protected under California's litigation privilege and fair reporting privilege. The Court finds that the press release is not protected by the litigation privilege because immunity should not be extended to "litigation in the press." *See Rothman*, 49 Cal.App.4th at 49; *see also GetFugu, Inc. v. Patton Boggs, LLP*, 220 Cal. App.4th 141, 154 (2013) ("Dissemination of these publications to a segment of the population as large as the 'investment community' is essentially the same as disclosure to the general public. If anyone with an interest in the outcome of the litigation is a person to whom a privileged communication could be made, *Silberg* and *Rothman* would be eviscerated."). As to the fair reporting privilege, the Court finds that there is a factual dispute that controls whether the privilege applies. The fair reporting privilege provides a defense for "a fair and true report in, or a communication to, a public journal, of (A) a judicial, (B) legislative, or (C) other public official proceeding, or (D) of anything said in the course thereof, or (E) of a verified charge or complaint made by any person to a public official, upon which complaint a warrant has been issued." Cal. Civil Code §

47(d)(1). A newspaper and its website are "'public journal[s]' within the meaning of this statute." *Carver v. Bonds*, 135 Cal.App.4th 328, 351 (2005) (citing *Colt v. Freedom Communications, Inc.*, 109 Cal.App.4th 1551, 1555, 58 (2003)). On October 18, 2017, Counterclaimants filed a motion for leave to file a sur-reply brief. (ECF No. 238). In its papers, Counterclaimants allege that discovery has revealed that the trade publication Youngevity forwarded its press release to, BFH, is not a "public journal" within the meaning of section 47(d). Counterclaimants argue that because "Youngevity and BFH formed an ongoing contractual relationship to promote Youngevity shortly before Wallach sent the Verified Complaint to BFH," BFH cannot constitute a "public journal." (Id. at 2.) Because this is a factual dispute that requires additional briefing and in light of forthcoming motions for summary judgment, the Court **DENIES** without prejudice Counterclaim Defendant's anti-SLAPP motion as to the press release. The Court grants leave to raise the issue in a motion for summary judgment.

Finally, as discussed above, the republication of the Verified Complaint to non-participating parties is not protected by the litigation privilege. Thus, the Court turns to Counterclaimants' probability of success.

To adequately state a claim for intentional interference with prospective economic advantage, a plaintiff must plead: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of that relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *Korea Supply Co.*, 29 Cal.4th at 1153. To recover, a plaintiff must also plead that the "defendant's conduct was 'wrongful' by some legal measure other than the fact of interference itself." *Id.* (citing *Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 393 (1995). As to the intent element, a plaintiff need only allege that the defendant "knew that the interference was certain or substantially certain to occur as a result of its action." *Id.* at 1154.

Here, Counterclaimants allege that "Youngevity and its agents have engaged in a concerted campaign to smear and defame Wakaya . . . ." (CC ¶ 197.) Defamation is an independently wrongful act. Therefore, Youngevity's anti-SLAPP motion to strike is **DENIED** as to the allegations of republishing the Verified Complaint to non-participating parties.

### iv.    Counts Nine and Ten

Similar to count seven, counts nine and ten for defamation and false light are based on statements made within the Verified Complaint, the press release, and the republication of the Verified Complaint among other things. As discussed above, only the statements directly contained within the Verified Complaint are protected by California's litigation privilege. As such, to the extent these causes of action depend on those allegations, Counterclaim Defendants' anti-SLAPP motion to strike is **GRANTED**. In regards to the press release, for the same reasons stated above, the anti-SLAPP motion is **DENIED** without prejudice as to those allegations.

Finally, as to allegations concerning the republication of the Verified Complaint, the Court turns to Counterclaimants' probability of success

Because when pleaded together, a false light claim and defamation claim stand or fall together, the Court analyzes the sufficiency of these claims jointly. *See Eisenberg v. Alameda Newspapers, Inc.*, 74 Cal. App.4th 1359, 1385 n.13 (1999) ("When a false light claim is coupled with a defamation claim, the false light claim is essentially superfluous, and stands or falls on whether it meets the same requirements as the defamation cause of action.").

Defamation "involves (1) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage." *Taus v. Loftus*, 40 Cal.4th 683, 720 (2007).

An action for false light invasion of privacy exists when defendant "gives publicity to a matter concerning another that places the other before the public in a false light . . . if (a) the false light in which the other was placed would be highly offensive to a reasonable

person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." Restatement Second of Torts § 652E; *see also Hill v. National Collegiate Athletic Assn.*, 7 Cal.4th 1, 24 (1994) ("California common law has generally followed Prosser's classification of privacy interests as embodied in the Restatement."); *Fellows v. National Enquirer, Inc.*, 42 Cal.3d 234, 238-39 (1986) (recognizing the false light tort in California and noting that the publication at issue need not be defamatory, but often will be).

Here, the Counterclaimants have sufficiently alleged their claims and the Court cannot find as a matter of law that Counterclaimants could not succeed on their merits. Therefore, the anti-SLAPP motion is **DENIED** as to the allegations concerning the republication of the Verified Complaint to non-participating parties.

### v. Count Eleven

Count eleven is a cause of action for business disparagement. To the extent this claim is based on allegations concerning statements directly made within the Verified Complaint, the anti-SLAPP motion is **GRANTED** and the allegations must be stricken. With regard to the press release, for reasons already stated, the anti-SLAPP motion is **DENIED** without prejudice.

Lastly, with reference to the allegations that Youngevity republished the Verified Complaint to non-participating parties, Wakaya is unable to show a probability of success because it has failed to plead special damages. *See Choose Energy, Inc. v. API*, 87 F. Supp. 3d 1218, 1225 (N.D. Cal. 2015) ("If Plaintiffs cannot plead a plausible cause of action under the Fed. R. Civ. P. 12(b)(6) standard, then Plaintiffs as a matter of law cannot meet the probability of success on the merits standard under C.C.P. § 425.16." (internal citations omitted)).

Under California law, commercial disparagement or trade libel "is defined as an intentional disparagement of the quality of property, which results in pecuniary damage to plaintiff . . . . Injurious falsehood, or disparagement, then, may consist of the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to

his business in general . . . ." *Nichols v. Great Am. Ins. Cos.*, 169 Cal. App.3d 766, 773 (1985) (internal citations omitted). A cause of action for trade libel requires pleading and showing special damages in the form of pecuniary loss. *Leonardini v. Shell Oil, Co.*, 216 Cal. App.3d 547, 572 (1989). Additionally, under Federal Rule of Civil Procedure 9(g) a plaintiff must state special damages with specificity. A plaintiff must "identify particular customers and transactions of which it was deprived as a result of the libel." *Mann v. Quality Old Time Service, Inc.*, 120 Cal. App.4th 90, 109 (2004). Wakaya contends that it has specifically pled special damages, in particular as to the loss of its valuable business relationship with LiveWell. While the claim does incorporate by reference all 223 paragraphs that precede it, the Court finds that this is insufficient to satisfy the heightened pleading standard set forth under Rule 9(g). Moreover, the claim complains of "economic losses due to decreased sales and distributors who were deterred from associating with Wakaya." (CC ¶ 226.) This too is insufficient to satisfy the heightened pleading standard. Therefore, Youngevity's anti-SLAPP motion is **GRANTED** as to Count 11.

### vi.     Count Twelve

For the reasons already articulated above, to the extent the twelfth cause of action under California's Unfair Competition laws is premised on statements made directly within the Verified Complaint, the anti-SLAPP motion is **GRANTED** and the allegations must be stricken. As to the press release, the motion is **DENIED** without prejudice. Finally, because the allegations concerning the republications of the Verified Complaint survive in relation to the other claims, they survive as to this claim and the motion is **DENIED**.

//

//

//

## B. Arbitration[2]

The Federal Arbitration Act ("FAA") permits "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration [to] petition any United States district court . . . for an order directing that . . . arbitration proceed in the manner provided for in [the arbitration] agreement. 9 U.S.C. § 4. "By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original). Thus, arbitration agreements "must be enforced, absent a ground for revocation of the contractual agreement." *Id.* A court's role is limited to "determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1119 (9th Cir. 2008) (citing *Chiron Corp. v. Ortho Diagnostic Sys.*, 207 F.3d 1126, 1130 (9th Cir. 2000)).

Youngevity moves to dismiss counterclaims one through five in favor of arbitration. Underlying these counterclaims is the Distributor Agreement entered between Youngevity and former distributor Counterclaimants. Each Distributor Agreement contains an arbitration provision that states:

> In the event of *a* dispute with the Company, Distributor and the Company agree to participate in mediation in an earnest attempt to resolve the dispute prior to submitting it to binding arbitration pursuant to the Commercial Arbitration Rules then in effect of the American Arbitration Association, provided, however, that injunctive relief sought by the Company against any party shall be excluded from this clause. Such Arbitration shall occur in San Diego, California. Louisiana Distributors, however, may arbitration in New Orleans, Louisiana.

---

[2] Counterclaim Defendants also move to dismiss numerous counterclaims because they were first filed in the District of Utah. Because that court recently dismissed the complaint, this argument is now moot. (*See ECF No.* 274, Ex. 1.)

(CC, Ex. A, § J9.)

Counterclaimants argue that Youngevity cannot now compel arbitration because the request is procedurally improper and alternatively, Youngevity has waived its right to compel arbitration. The Court discusses each argument below.

### 1. Notice

First, Counterclaimants argue that Youngevity's motion to compel arbitration should be denied because it is procedurally improper as it did not comply with the FAA's notice requirements. Under section 4 of the FAA, a "party aggrieved" by another's failure to arbitrate can petition the district court "for an order directing that such arbitration proceed in the manner provided for in such agreement. Five days' notice in writing of such application shall be served upon the party in default." 9 U.S.C. § 4.

Here, Counterclaimants argue that Youngevity has failed to initiate arbitration or serve a proper demand for arbitration in writing. However, in filing this motion and allowing Counterclaimants more than five days to respond to the request for arbitration before the motion's hearing date, May 5, 2017, Youngevity has complied with the procedures outlined by the FAA. *See Bridgeport Mgmt. v. Lake Mathews Mineral Props.*, No. 14-cv-00070-JST, 2014 U.S. Dist. LEXIS 29813, at *6 (N.D. Cal. March 6, 2014) ("[T]he function of the FAA's five-day notice provision is to prevent courts from issuing an order compelling arbitration without first affording the respondent five days' notice of the hearing."); *see also Roque v. Applied Materials, Inc.*, No. 03-cv-1564-ST, 2004 U.S. Dist. LEXIS 10477, at *11 (D. Or. Feb. 20, 2004) ("[T]he five day notice period in § 4 of the FAA requires the party opposing arbitration to be given five days' notice before a hearing is held regarding the application for arbitration. It does not require that the party be given give days' notice from the date the application is made.").

### 2. Waiver

Alternatively, Counterclaimants argue that Youngevity has waived its right to arbitrate by initiating this action and actively litigating for more than 18 months.

In the Ninth Circuit, "[t]he party arguing waiver of arbitration bears a heavy burden of proof." *Britton v. Co-op Banking Group*, 916 F.2d 1405, 1412 (9th Cir. 1990) (internal citations omitted). To carry this burden, the opposing party must show that the other party (1) had knowledge of the right to compel arbitration; (2) acted inconsistently with that right; and (3) resulting prejudice. *Id.* Here, there is no dispute that Youngevity had knowledge of its right to compel arbitration. As such, the Court will focus on the second and third elements.

Counterclaimants argue that Youngevity has acted inconsistently with the right to compel arbitration by initiating this litigation. Youngevity, on the other hand, argues that its initiation of this action does not constitute waiver because its causes of action are not covered by the arbitration provision, as they do not require any construction of the Distributor Agreement. However, the language of the arbitration provision is quite broad. Rather than limit arbitrable claims to just those arising under the Distributor Agreement, it instead calls for arbitration "[i]n the event of *a* dispute with [Youngevity] . . . ." (CC, Ex. A, § J9) (emphasis added). Unlike arbitration clauses that are limited to claims "arising hereunder" or "arising under the Agreement," the arbitration provision at issue here is not narrowly written. *See Mediterranean Enters. V. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) ("We have no difficulty finding that 'arising hereunder' is intended to cover a much narrower scope of the disputes, *i.e.*, only those relating to the interpretation and performance of the contract itself."). On its face, it appears to call for arbitration in the event of any dispute with Youngevity. While not all of Youngevity's causes of action fall within the scope of the arbitration clause, certainly those claims that rest on the alleged wrongful conduct of Counterclaimants within their capacity as Youngevity distributors would constitute arbitrable claims.

The more difficult question then becomes whether in filing these arbitrable claims did Youngevity act inconsistent with its right to arbitrate Counterclaimants' causes of action. Courts deciding whether a plaintiff who brings suit on potentially arbitrable claims waives his right to arbitrate a defendant's counterclaims have generally only found

waiver where the legal and factual issues in the original claims and counterclaims are the same. *See* Gidatex, S.r.L. v. Campaniello Imports, Ltd., 13 F. Supp. 2d 420, 427–28 (S.D. N.Y. 1998) ("[A] plaintiff asserting an arbitrable claim in federal court waives his right to demand arbitration of an adversary's counterclaims only if the parties' claims present the 'same legal and factual issues.'" (citing *Doctor's Assocs. V. Distajo*, 107 F.3d 126, 133 (2d. Cir. 1997)); *see also MicroStrategy, Inc. v. Lauricia*, 268 F.3d 244, 250 (4th Cir. 2001) (finding no waiver where defendant's previous claims were "distinct, both factually and legally" from plaintiff's current claims); *RISO, Inc. v. Witt Co.*, 13-cv-02064, 2014 U.S. Dist. LEXIS 9297, at *23 (D. Or. July 9, 2014) (finding no waiver where prior claims were related to violations of federal anti-trust laws and current claims concerned fraudulent conduct). Underlying many of Youngevity's claims and the counterclaims at issue is whether former distributor Counterclaimants engaged in cross-recruiting. With respect to both parties' claims, a trier of fact will have to ultimately resolve whether former distributor Counterclaimants engaged in cross-recruiting and therefore unlawfully interfered with Youngevity's business relationships or whether they did not and Youngevity wrongfully terminated their distributorships. Accordingly, by filing this action Youngevity acted inconsistent with its right to compel arbitration.

Finally, the Court finds that Counterclaimants have met their burden of establishing prejudice. *See Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016) ("[I]n order to establish prejudice, the plaintiffs must show that, as a result of the defendants having delayed seeking arbitration, they have incurred costs they would not otherwise have incurred . . . or that the defendants have received an advantage from litigating in federal court that they would not have received in arbitration."). As Counterclaimants note, Youngevity has been litigating both its own claims and the counterclaims for more than 18 months, engaging in extensive discovery and petitioning the Court for a wide range of remedies. Undoubtedly, Youngevity has benefited from discovery that it would not otherwise have had automatic access to in arbitration. Thus, the Court finds that Youngevity has waived its right to arbitrate the first five counterclaims. As such, its

motion to dismiss is **DENIED** on this ground.

## C. Motion to Dismiss

Counterclaim Defendants move dismiss counterclaims one, four, five, eight, eleven, and thirteen under Federal Rule of Civil Procedure 12(b)(6) [3].  The Court addresses each cause of action below.

### 1. Count One—Declaratory Judgment

Youngevity contends that the counterclaim for declaratory judgment is moot and a request for an impermissible advisory opinion.  A court may only enter declaratory judgment if there is an actual controversy between the parties.  *See* 28 U.S.C. § 2201; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240 (1937).  Thus, a district court has no jurisdiction where there is no actual controversy.  *Id.*

While Youngevity submits that it no longer disputes the application of California law and admits that its policies and procedures allow individuals to be both Youngevity and Wakaya distributors, its own pleadings create controversy.  As Counterclaimants highlight, Youngevity grounds its own tortious interference claim on allegedly inviting Youngevity distributors "to consider becoming Wakaya distributors while retaining their Youngevity distributor positions . . . ."  (FAC ¶ 248.)  Whether Counterclaimants did in fact induce breaches of contract therefore turns on the interpretation of these policies and procedures.  Therefore, at least as to this issue a controversy still exists.  As such, Youngevity's motion to dismiss the first counterclaim is **DENIED**.

### 2. Count Four—Conversion

Youngevity moves the Court to dismiss Counterclaimants' fourth claim for conversion, arguing that they have insufficiently identified a specific, identifiable sum of money.

---

[3] Counterclaim Defendants also make 12(b)(6) arguments for counts six, seven, nine and ten.  However, because the Court has already determined above that these claims have been sufficiently pled at least as to the "protected activity," the Court need not address the sufficiency of the merits as to the "unprotected activity" allegations at this time.  The issues may be raised in a motion for summary judgment.

Under California law, "[c]onversion is the wrongful exercise of dominion over the property of another." *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 601 (9th Cir. 2010). To establish conversion, a plaintiff must demonstrate: "(1) [his or her] ownership or right to possession of the property at the time of the conversion; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages." *Id.* "Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved . . . ." *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLC*, 150 Cal. App.4th 384, 395 (2007). However, it is unnecessary that "each coin or bill be earmarked." *Fischer v. Machado*, 50 Cal. App.4th 1069, 1072 (1996). At the pleading stage in federal court, it is only necessary for a plaintiff to allege an amount of money that is "capable of identification," rather than specifically identify the sum that would be required to prove the claim in a motion for summary judgment. *Natomas Gardens Inv. Group v. Sinadinos*, 710 F. Supp.2d 1008, 1019–20 (E.D. Cal. 2010). Here, Counterclaimants have alleged that Youngevity wrongfully terminated distributor Counterclaimants and has withheld their commission checks. Counterclaimants have, therefore, sufficiently pled an amount of money that is capable of identification. Thus, Youngevity's motion to dismiss this claim is **DENIED**.

### 3. Count Five—Tortious Interference with Existing Economic Relations

As to count five, Youngevity argues that to the extent Counterclaimants wish to plead tortious interference with contractual relations, the Court should dismiss the claim because a party to the contract cannot be liable for interfering with its own contract. To the extent that this is the harm Counterclaimants seek to redress, the Court agrees. *See Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal.4th 503, 521 (1994) ("One contracting party owes no general tort duty to another not to interfere with performance of the contract; its duty is simply to perform the contract according to its terms. The tort duty not to interfere with the contract falls only on strangers—interlopers who have no legitimate interest in the scope or course of the contract' performance.").

However, Counterclaimants contend that Youngevity is misconstruing the claim because they instead seek to recover for the alleged interference with the economic relationships they had established with distributors in their downlines. While the tort is generally known as intentional interference with prospective contractual relationships or economic advantage, courts have sometimes referred to it as "interference with economic relations." *See Della Penna v. Toyota Motor Sales, U.S.A., Inc.*, 11 Cal.4th 376, 381, n.2 (1995). At its core the tort seeks to protect economic relationships short of contractual that contain a probable future economic benefit. *See Korea Supply Co.*, 29 Cal.4th at 1153. Nevertheless, the claim fails because it sounds in contract, not tort.

The Court in *JRS Products, Inc. v. Matsushita Electric Corp. of America*, 115 Cal. App.4th 168, 179 (2004), addressed this exact issue—"whether damages can be recovered for interference with prospective economic advantage by one contracting party against another based on conduct that would otherwise constitute a breach of the parties' contract." The court answered in the negative grounding its reasoning in the principle that "a party to a contract cannot recover damages in tort for breach of contract." *Id.* In evaluating these claims, the proper question for courts to determine is "whether the essence of the claim is fundamentally based on conduct that sounds in contract or in tort." *Id.* at 181. Here, the Court finds that "the essential nature of the conduct sounds in contract," as the principal conduct Counterclaimants complain of is Youngevity wrongfully terminating their distributorships. *See id.* at 182. Youngevity's motion to dismiss this claim is, therefore, **GRANTED**.

### 4. Count Eight—Tortious Interference with Prospective Economic Advantage

Counterclaim Defendants move to dismiss count eight for tortious interference with prospective economic advantage, arguing that Counterclaimants have failed to plead a wrongful act independent of the interference itself. Counterclaimants, on the other hand, argue that Briskie and Steve Wallach's misrepresentation to the prospective buyer of Graham and TNT's media assets was independently wrongful. The Counterclaim alleges that Briskie and Steve Wallach, without having a legal right to do so, "informed

the buyer that they would not approve of the sale if any proceeds from the sale would flow to either Graham or Smith." (CC ¶ 204.) This alleged misrepresentation to the prospective buyer constitutes an independently wrongful act. In its reply, Counterclaim Defendants argues that Steve Wallach's and Briskie's representation to a potential purchaser is not independently wrongful because "the Court already held that TNT cannot make commercial use of those assets without Youngevity's consent . . . ." (Countercl. Def.s' Reply, 10.) Counterclaim Defendants mischaracterize the Court's holding. First, a Court's ruling in an order granting preliminary injunction is not a final determination of rights. Second, the Court never held that TNT cannot make a sale without Youngevity's consent[4]. As such, Counterclaim Defendants' motion to dismiss this claim is **DENIED**.

### 5. Count Eleven—Business Disparagement

Because in evaluating the anti-SLAPP motion above the Court only focused on the sufficiency of the claim in regard to allegations based on "protected activity," the Court here looks to the sufficiency of the claim as it relates to "unprotected activity," such as trade libel based on Dr. Wallach's statements about Smith and Graham and Steve Wallach's email. Nevertheless, the Court **GRANTS** Youngevity's motion to dismiss this claim because it insufficiently alleges special damages under Rule 9(g). However, the Court grants Wakaya leave to amend its pleadings so as to comply with the heightened pleading standards.

### 6. Count Thirteen—Fraud/Negligent Misrepresentation

Lastly, Counterclaim Defendants move to dismiss the counterclaim for fraudulent and negligent misrepresentation.

---

[4] "If Defendants notify any purchaser of this litigation and receive written assurances from the purchaser that its operation of the Assets would be lawful, then equity would require allowing such a sale. Therefore, any sale and/or transfer that conforms with this order is not prohibited by the Injunction. Any non-complaint sale will be grounds for contempt." (Ct. Order, ECF No. 53.)

To state a claim for fraudulent misrepresentation, a plaintiff must allege: (1) a misrepresentation; (2) knowledge of falsity; (3) intent to defraud or induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal.4th 631, 368 (1996). Federal Rule of Civil Procedure 9(b) requires that these facts be alleged with particularity. Fed. R. Civ. Proc. 9(b). "The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." *Charnay v. Cobert*, 145 Cal. App.4th 170, 184 (2006).

Counterclaim Defendants argue that Counterclaimants fail to plead intent and reliance. As to intent, Counterclaimants allege that "Smith specifically verified with Briskie and Steve Wallach that Youngevity had obtained the required regulatory approvals to distribute its product in Mexico." (CC ¶ 57.) They further allege that Smith informed Briskie and Steve Wallach of his intentions to begin establishing Youngevity distributorships in Mexico and that at no point did they correct his "express understanding that Youngevity had completed all of the requirements to conduct business in Mexico." (Id. at ¶¶ 58–59.) Counterclaimants allege that Briskie intended for Smith and other Youngevity distributors to rely on his statements. (Id. at ¶ 243.) As to the reliance element, Counterclaimants allege that the misrepresentation was reasonably relied upon given Briskie's position as Chief Financial Officer of Youngevity and the officer in charge of international expansion. (Id. at ¶ 244.) Construing the facts in the light most favorable to Counterclaimants, the Court finds that both intent and reliance are adequately pled. Accordingly, Counterclaim Defendants' motion to dismiss this claim is

### III. CONCLUSION

For the reasons discussed above, Counterclaim Defendants' anti-SLAPP motion is **GRANTED in part and DENIED in part**. To the extent claims six, seven, and nine through twelve are based on allegations concerning statements directly made within the

Verified Complaint, the motion is **GRANTED** and those allegations are ordered to be stricken.  The anti-SLAPP motion is also granted as to count eleven, which must also be stricken from the Counterclaim.

Counterclaim Defendant's 12(b)(6) motion to dismiss is **GRANTED** as to counts five and eleven and **DENIED** as the remaining causes of action.  Counterclaimants are granted leave to amend counts five and eleven.  Counterclaimants must file an amended counterclaim within 14 days of the entry of this order.  Finally, Counterclaimants' motion to file a sur-reply brief (ECF No. 238) is **DENIED** but the Court has considered the motion herein.

**IT IS SO ORDERED**.

Dated: December 13, 2017

_Barry Ted Moskowitz_
_____
Barry Ted Moskowitz, Chief Judge
United States District Court