UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Youngevity International, et al.,<br><br>                              Plaintiffs,<br><br>v.<br><br>Todd Smith, et al.,<br><br>                    Defendants. | Case No.:  16-CV-704-BTM-JLB<br><br>**ORDER**<br>**(1) DENYING IN PART AND GRANTING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFFS' FIRST CAUSE OF ACTION**<br>**(2) DENYING PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF JOSHUA PLANT**<br>**(3) DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AS TO SUBPART G OF PLAINTIFFS' FIRST CAUSE OF ACTION**<br><br>**[ECF Nos. 300, 559]** |

Before the Court is a motion for summary judgment by Wakaya Perfection, LLC, et al. ("Defendants" or "the Wakaya parties" or "Wakaya") as to the first cause of action in the Fourth Amended Complaint (ECF No. 269 ("FAC")) for false advertising under the Lanham Act.  (ECF No. 300 ("Defs.' MSJ I").) Youngevity International, et al. ("Plaintiffs" or "the Youngevity parties" or

"Youngevity") move for summary judgment as to subpart G of the first cause of action ("FAC I.G") for false advertising under the Lanham Act with respect to the curcumin content in Wakaya turmeric and also move to exclude the testimony of Defendants' rebuttal expert, Dr. Joshua Plant.  (ECF No. 559 ("Pls.' MSJ I.G & Mot. Excl.").)  For the reasons discussed below, the Court denies in part and grants in part Defendants' motion for summary judgment, denies Plaintiffs' motion to exclude the testimony of Dr. Plant, and denies Plaintiffs' motion for summary judgment.

## **STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323.

On cross motions for summary judgment, a court "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."  *ACLU v. City of Las Vegas*, 466 F.3d 784, 790–91 (9th Cir. 2006) (internal citations omitted).  The burdens faced by the opposing parties vary with the burden of proof they will face at trial.  When the moving party bears the burden of proof at trial, "'his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'"  *Indep. Cellular Tel., Inc. v. Daniels & Assocs.*, 863 F. Supp. 1009, 1113 (N.D. Cal. 1994) (quoting Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–488 (1984)).  By contrast,

when the moving party does not bear the burden of proof at trial, "the [moving party] need only point to the insufficiency of the [nonmoving party's] evidence to shift the burden to the [nonmoving party] to raise genuine issues of fact as to each claim by substantial evidence. *Id.* If the nonmoving party then fails to raise a genuine issue of fact, the court should grant summary judgment in favor of the moving party. *Id.*

The court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## DISCUSSION

In its first cause of action, Youngevity alleges false advertising claims under the Lanham Act in eight subparts, A through H. (See ECF No. 269 ("Fourth Amended Complaint" or "FAC"), 9-40.) Wakaya moves for summary judgment as to the entirety of Youngevity's first cause of action. (Defs.' MSJ I.) Youngevity moves for summary judgment as to subpart G and also moves to exclude the testimony of Defendants' rebuttal expert, Dr. Joshua Plant. (Pls.' MSJ I.G & Mot. Excl.)

## I. Liability Under § 43(a) of the Lanham Act

Under § 43(a) of the Lanham Act, codified as 15 U.S.C. § 1125(a), false advertising is a distinct basis for liability. *See Lexmark Int'l, Inc., v. Static Control Components, Inc.*, 572 U.S. 118, 122 (2014). The Act creates a cause of action imposing civil liability on:

> [a]ny person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false

or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

*POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 107-08 (2014) (quoting 15 U.S.C. § 1125(a)(1)(B)).

In the Ninth Circuit, there are five elements to a false advertising claim:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product;
(2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience;
(3) the deception is material, in that it is likely to influence the purchasing decision;
(4) the defendant caused its false statement to enter interstate commerce; and
(5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1110 (9th Cir. 2012) (citing 15 U.S.C. § 1125(a)(1)(B)); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997)).  Defendants claim that Plaintiffs cannot establish a genuine dispute of material fact as to elements one, two, three, and five, but concede that there is no dispute with respect to the fourth element.

To constitute commercial advertising or a promotion, a statement of fact must be:

(1) commercial speech; (2) by the defendant who is in commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services. While the representations need not be made in a "classic advertising campaign," but may consist instead of more informal types of "promotion," the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.

*Newcal Indus., Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1054 (9th Cir. 2008) (citing *Coastal Abstract Serv., Inc., First American Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999)).

To demonstrate falsity, "a plaintiff may show that the statement was literally false, either on its face or by necessary implication, or that the statement was literally true but likely to mislead or confuse consumers." *Southland Sod Farms*, 108 F.3d at 1139. Because the evaluation of whether an advertising claim is literally false requires analyzing the claim "in its full context," a claim may be "literally false by necessary implication." *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993) (holding that a company made a literally false claim even when its assertion of superiority over its competitors was done implicitly)). Moreover, "[e]ven if an advertisement is not literally false, relief is available under § 43(a) of the Lanham Act if it can be shown that the advertisement has misled, confused, or deceived the consuming public." *Id.* at 1140.

When a claim is literally false, a plaintiff need not provide evidence on whether the claim was deceptive or material. *See Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 497 (5th Cir. 2000) ("[W]hen the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers [because] [i]n such a circumstance, the court will assume that the statements actually misled consumers."); *Logan v. Burgers Ozark Cty. Cured Hams Inc.*, 263 F.3d 447, 462 (5th Cir. 2001) (holding that when a plaintiff established that defendant made literally false statements, arguments that those statements "did not mislead [] customers and that the advertising did not affect their purchasing decision [were] inconsequential"); *American Home Prods. Corp. v. Johnson & Johnson*, 577 F.2d 160, 165 (2d Cir. 1978) ("Deceptive advertising or merchandising statements may be judged in various ways. If a statement is actually false, relief can be

granted on the court's own findings without reference to the reaction of the buyer or consumer of the product.").

While materiality in false advertising claims is "typically proven through consumer surveys, nothing in the Lanham Act, nor under [9th Circuit] precedents, requires a plaintiff to use such surveys." *Skydive Arizona, Inc*, 673 F.3d at 1110-11 (holding that a declaration may support a finding of materiality).

When determining damages under the Lanham Act, the court, "'*in its discretion,*' may award '(1) defendant's profits, (2) *any damages* sustained by the plaintiff, and (3) the costs of the action'" for a a violation under section 43(a). *Id.* at 1111-12 (quoting 15 U.S.C. § 1117(a)) (emphasis in original). The district court assesses "any damages sustained by the plaintiff in the same manner as in tort damages: the reasonably foreseeable harms caused by the wrong." *Id.* at 1112 (internal quotations omitted) (citing *DSPT Int'l, Inc. v. Nahum,* 624 F.3d 1213, 1222 (9th Cir. 2010)).

"[B]ecause of the possibility that a competitor may suffer future injury, as well as the additional rationale underlying section 43(a)—consumer protection—a competitor need not prove injury when suing to enjoin conduct that violates section 43(a)." *Harper House, Inc. v. Thomas Nelson, Inc.*, 889 F.2d 197, 210 (9th Cir. 1989). Moreover, "an inability to show actual damages does not alone preclude a recovery under section 1117." *Southland Sod Farms*, 108 F.3d at 1146 (internal quotations omitted) (citing *Lindy Pen Co. v. Bic Pen Corp.,* 982 F.2d 1400, 1411 (9th Cir. 1993)). In the Ninth Circuit, "the preferred approach allows the district court in its discretion to fashion relief, including monetary relief, based on the totality of the circumstances." *Id.*

Finally, the Ninth Circuit emphasizes that § 1117 "confers a wide scope of discretion upon the district judge in fashioning a remedy." *Skydive Arizona, Inc*, 673 F.3d at 1110-11 (internal quotations omitted) (quoting *Maier Brewing Co. v. Fleischmann Distilling Corp.,* 390 F.2d 117, 121 (9th Cir. 1968)). "Section

16-CV-704-BTM-JLB

1117 demands neither empirical quantification nor expert testimony to support a
monetary award of actual damages; many sources can provide the requisite
information upon which a reasonable jury may calculate damages." *Id.* at 1113.

## II. Wakaya's Arguments in Support of Summary Judgment

As a threshold matter, before analyzing the various statements that
Youngevity alleges are actionable as false advertising under § 43(a), the Court
considers several arguments that Defendants raise as reasons to grant its motion
for summary judgment with respect to most or all of the subparts within Plaintiffs'
first cause of action.

### A. Injury

Defendants argue that summary judgment should be granted because
Plaintiffs have not established "either the fact or amount of damages attributable
to the conduct alleged in Count I." (Defs.' MSJ I, 8:10:11.) But, as stated above,
"an inability to show actual damages does not alone preclude a recovery
under section 1117 [of the Lanham Act]." *Southland Sod Farms*, 108 F.3d at
1146. In addition, to the extent that Plaintiff seeks injunctive relief based on its
first cause of action, (see FAC 77:16-79:16), granting summary judgment
because Plaintiffs have not sufficiently established damages is not appropriate.
*See Harper House, Inc.*, 889 F.2d at 210.

Moreover, Plaintiffs provide several sources of evidence upon which a
reasonable jury could calculate damages for violations under § 43(a) of the
Lanham Act. *See Skydive Arizona, Inc*, 673 F.3d at 1113. A declaration by
Youngevity CEO Steve Wallach demonstrates that Youngevity's sales decreased
during the time period in which Defendants began allegedly engaging in false
advertising. (ECF No. 376 ("Pls.' Opp'n"), 8:25-26 (citing ECF No. 340-1).)
Plaintiffs' expert, Mr. Bergmark, links Youngevity's missed revenue projections
with corresponding sales earned by former Youngevity distributors who went to
work for Wakaya. (Id. at 8:19-23 (citing ECF No. 318-3, p. 55-57) ("I understand

that at least the primary source of Wakaya's revenues were the result of sales generated by Defendants in this matter who had previously worked with Youngevity.").) Thus, the Court determines that the issue of damages is more appropriately reserved for a jury.

**B. Vicarious Liability**

Defendants also argue that a statement made by a Wakaya distributor (also known as "Wakaya Ambassador") may not be a basis for holding Wakaya liable under § 43(a). "It is well established that traditional vicarious liability rules ordinarily make principals or employers vicariously liable for acts of their agents or employees in the scope of their authority or employment." *Operation Tech., Inc. v. Cyme Int'l T & D Inc.*, 2016 WL 6246806, at *4 (C.D. Cal. Mar. 31, 2016) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 756 (1998) (quotation omitted). The question for the Court to resolve is whether there is sufficient evidence for a jury to find that the Wakaya Ambassadors are agents of Wakaya for purposes of Lanham Act liability. *See id.* The Court concludes that there is.

First, "[w]hether or not a principal holds out the purported agent as an agent by calling them such does not determine the scope of the relationship." *Id.* (citing Restatement (Third) of Agency § 1.02 (2006)). Thus, the fact that Wakaya Ambassadors are classified as independent contractors within Wakaya Policies and Procedures is not sufficient to establish the absence of a genuine issue of material fact as to whether the Ambassadors are agents of Wakaya. (See Defs.' MSJ I, 2:19-3:1.)

Second, Defendants only argue that the Wakaya Ambassadors do not speak on behalf of Wakaya or any other individual. However, Defendants do not challenge that the Ambassadors engaged in the allegedly false advertising for the purpose of attracting distributors and increasing sales. The Wakaya Ambassadors who relied on the allegedly false advertising to carry out their objective of increasing the number of Wakaya distributors were acting squarely

8

within their roles as representatives of Wakaya. Moreover, Plaintiffs assert that Wakaya exercises control over the Ambassadors by reserving the right to terminate their accounts for unapproved conduct. (See Pls.' Opp'n, 10:2-4 (citing ECF No. 340-2, p. 42-43).) Thus, when construing the facts in the light most favorable to Plaintiffs, the Court cannot say that there is no dispute of material fact as to whether the Wakaya Ambassadors who made the alleged false claims were acting as agents of Wakaya within the scope of their authority granted by Wakaya.

## C. Remedies Under § 43(a) Are Available to a Private Party

Wakaya argues that Youngevity is attempting to "use the Lanham Act to create a private right of action" under federal administrative regulations.[1] (Defs.' MSJ I, § III.) However, Defendants fail to establish that any federal statute or regulation would bar Plaintiffs' false advertising claims. The U.S. Supreme Court has held that in particular, the Food, Drug, and Cosmetic Act (FDCA) does not preclude a private party from bringing a Lanham Act claim challenging advertisements of products that are also regulated by the FDCA. *See generally POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102 (2014). In *POM Wonderful*, the Supreme Court explained:

> When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other" and that "[a]lthough both [the Lanham Act and the FDCA] touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition while the FDCA protects public health and safety.

*Id.* at 115. Thus, even if there is overlap in the claims that Plaintiffs assert in the

---

[1] Defendants specifically refer to "FTC and FDA Acts" but do not provide citations to any statutes or regulations. (Defs.' MSJ I, § III.) The Court assumes Defendants are referring to the Federal Trade Commission Act and the Food, Drug, and Cosmetic Act (FDCA).

first cause of action and any hypothetical FDCA violations committed by Defendants, Plaintiff may nonetheless proceed in protecting its commercial interests under the Lanham Act.

Defendants assert that Plaintiff fails to prove that claims made by Defendants are false or misleading, and at most, provides evidence that claims "lack substantiation" which "coopt[s] . . . the standard adopted by the Federal Trade Commission in [an attempt] to shoehorn a private right of action under the FTC and FDA Acts into a Lanham Act claim." (Defs.' MSJ I, 3:25-27.) If Plaintiff is unable to establish a genuine issue of material fact as to whether Defendants made false or misleading claims, then the Court would agree that summary judgment would be appropriate, but only because demonstrating falsity is a critical element of a § 43(a) claim and not because Plaintiffs have premised any private right of action under federal regulatory statutes.

**III. Claims of False Advertisements Within Plaintiff's First Cause of Action**

**A. Re Income Claims Against Wakaya, Andreoli, Barb Pitcock, Dave Pitcock, and Vaughn**

Plaintiff asserts that Defendants falsely advertised the potential income of a typical Wakaya distributor. (See FAC I.A.)

As to Defendants Barb and Dave Pitcock, Youngevity alleges that several statements are actionable. (Pls.' Opp'n, § II.A.) In a Wakaya promotional video, Dave Pitcock claimed that Wakaya Ambassadors can earn "$6,200 bucks residually in the next three to six months." (Id. at Ex. B, 67:20-68:14.) In a widely distributed email, the Pitcocks wrote that "[w]e plan to build several leaders to 10K a month in the next 6 months." (Id. at Ex. C, p. 37.) The Pitcocks also wrote promotional emails with the following claims: "You can be making thousands of dollars a month in residual income in a very rapid fashion!!!"; "[Wakaya] quadrupled the bonuses on the top two levels and we now have a huge goal to get everyone to $1000 a month residual fast!" (Id. at Ex. D, p. 39-40

16-CV-704-BTM-JLB

(capitalization omitted).)

As to Defendant Andre Vaughn, Plaintiff presents similar statements. In a company presentation, Vaughn claimed that

> when—you get a thousand people joining [Wakaya] a day, that's $85,000 in a day. If you wanna do it in a week, that's $85,000 in a week. If you wanna do it in a month, it's $85,000 in a month. If you wanna do it in 90 days, it's $85,000 in 90 days. The moral of the story is what? $85,000. $85,000."

(Id. at Ex. F, 94:23-96:5.) When played the audio of Vaughn making this statement during the deposition of Defendant Todd Smith (Wakaya's owner), Smith observed that the statement is "inaccurate" because "it claims that Wakaya Perfection pays income for the joining of new people, for new people joining the organization." (Id. at Ex. F, 96:17-97:12.) Smith also testified during his deposition that he could not recall any distributor in Wakaya ever making $85,000 in a month and that Vaughn himself does not make $8,500 in a week based on his work as a Wakaya distributor. (Id. at Ex. F, 97:13-17.) Plaintiff presents further evidence that Vaughn repeatedly asserted that Wakaya Ambassadors could earn a million dollars in their first year. (Id. at Ex. G, 79:13-80:19.)

As to Defendant Wakaya, in addition to the statements made by the Pitcocks and Vaughn, Youngevity presents allegedly false statements made by Defendant Smith. On a promotional call, Smith stated, "I'm telling you right now you're going to earn a lot of money. . . . [T]he amount of money you're going to earn in this program . . . right now you won't even be able to imagine. They're almost incalculable." (Id. at Ex. F, 103:13-105:4.)

Plaintiff also alleges that other Wakaya distributors likewise made false statements as to the income they were making as Ambassadors. For example, one distributor claimed he was making up to $1700 in one day. (Id. at Ex. J.) This same Ambassador testified that, in fact, he made less than $550 in any

16-CV-704-BTM-JLB

single month.  (Ex. K, 90:13-92:9.)  Another distributor discussed in a video posted to social media "how easy it is to get to 10k a month."  (Id. at Ex. L.) Plaintiff further establishes with the expert report of David Stewart that in reality, about 1% of Wakaya's active associates earn $1000 per month in commissions and less than 3% even earn $500 per month.  (Id. at Ex. A, p. 27.)  Based on these statements, the Court holds that Youngevity raises a genuine issue of material fact as to whether Defendants Wakaya, Barb Pitcock, Dave Pitcock, and Vaughn falsely advertised the potential income a distributor could earn by becoming a Wakaya Ambassador.

### 1. The Income Claims Advertise Commercial Activities

Defendants argue that the income claims are not actionable because they are not related to products or services.  Nonetheless, the income claims fall within the category of "commercial activities."  The Tenth Circuit has explained:

> It is [] apparent, in the context of the Act's broad purpose of proscribing unfair competition and the 1988 amendment of § 43(a), that Congress did not intend to narrowly limit the term "commercial activities," but rather intended to encompass those activities which do not solely involve the provision of services or the production of goods.

*Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1271-73 (10th Cir. 2000) (holding that § 43(a) encompasses false claims about the plaintiff's use of its profits); *see also Condit v. Star Editorial, Inc.*, 259 F. Supp. 2d 1046, 1052 (E.D. Cal. 2003) (citing Senate Report No. 100-515, which notes that § 43(a) applies to "'acts or practices which occur in [or] affect commerce'" and that § 43(a) expands the types of unfair competition covered by the Lanham Act).  Attracting distributors is at the core of Defendants' business model and is a practice with a substantial impact affecting commerce.  Plaintiff has presented evidence that the Defendants falsely advertised the amount of income a Wakaya distributor would make as a way to advance in a competitive market.  Thus, the income claims are actionable under § 43(a).

### 2. Materiality

Defendants claim that Plaintiff fails to raise a dispute as to whether any false income claims are in fact material. However, the Court holds that the income claims listed above and others like it are literally false, either on their face or by necessary implication, *see Southland Sod Farms*, 108 F.3d at 1139, and so assumes that the income claims misled potential Wakaya distributors, *see Pizza Hut, Inc.*, 227 F.3d at 497. The claims are specific, conclusive assertions that a Wakaya distributor will make at least the income that in reality, only 1% of distributors make. Even Defendant Smith's statement, while not stating a particular dollar value, implies that earning a large amount of income as a Wakaya distributor is an inevitability. (See Pls.' Opp'n, Ex. F, 103:13-105:4 (referencing the "incalculable" amounts of money distributors "*are going to earn* in this program") (emphasis added).) Moreover, because the claims are highly specific and present the likelihood of earning unrealistic amounts of money as a foregone conclusion when becoming a Wakaya distributor, the income claims are far outside the scope of mere puffery or opinion. *See Southland Sod Farms*, 108 F.3d at 1145 (describing puffery as claims that are "vague or highly subjective" while claims of a "specific or absolute" nature are actionable).

Additionally, Wakaya argues that Youngevity has not presented facts that any customer ever saw the alleged statements about the earning potential of Wayaka Ambassadors. However, this is not relevant to Plaintiff's Lanham Act claim. Under § 43(a) of the Lanham Act, inquiries of falsity and materiality are made with respect to *consumers* or a target *audience*. *See Skydive Arizona, Inc.*, 673 F.3d at 1110; *Southland Sod Farms*, 108 F.3d at 1139. Here, the target audience is anyone who might be convinced to become a Wakaya Ambassador based on claims of earning potential above a certain threshold. Likewise, "purchasing decision" in this context means whether a consumer who saw Wakaya's advertising then chose to become an Ambassador. Thus, whether

customers purchasing Wakaya products saw the income claims is not a relevant issue.

Therefore, as to Defendants Wakaya, Barb Pitcock, Dave Pitcock, and Vaughn, the Court denies Defendants' motion for summary judgment as to I.A. However, having found no evidence of false advertising by Andreoli, the Court grants the motion as to Defendant Andreoli.

**B. Re David Gilmour's Involvement Against Wakaya**

Plaintiffs alleges that Wakaya has produced false advertising with respect to the role of David Gilmour. Youngevity alleges that Mr. Gilmour is not the founder of Wakaya Perfection LLC, contrary to a pattern of Wakaya advertising. (See FAC I.B.)

Wakaya and its Ambassadors have referred to Mr. Gilmour as the founder, owner, and CEO of Wakaya. For example, in an email from Wakaya Ambassador Andre Vaughn providing advertising resources and material for other Ambassadors to use in their own work as distributors, Vaughn provides the following sample language: "Wakaya is a new wellness network marketing company founded by billionaire David Gilmour the founder of Fiji water a billion dollar bottled water company." (See Pl.'s Opp'n, Ex. O (quoted as appears).) Other Ambassadors have referred to Mr. Gilmour as "the owner of Wakaya Perfection." (See ECF No. 371-1, Ex. A, Appx. F.) At least one other Ambassador identified Mr. Gilmour as Wakaya Perfections's "CEO." (Id. ("I hear this all the time I wish I was one of the first people to hear about an opportunity just starting, you can right here, right now with Wakaya Perfection! And our CEO is a Billionaire! His name is Mr David Gilmo…ur. . . .") (quoted as appears).)

There is evidence that these claims are false. For example, during a deposition of Wakaya's owner, Todd Smith, on July 25, 2017, the following exchange took place:

Q: All right. Fine. Now, now, as I understand it, you founded Wakaya

Perfection, LLC, the LLC that we just looked at; is that right?

A: Yes.

Q: David Gilmour didn't found Wakaya Perfection, LLC?

A: No, he did not.

(Defs.' MSJ I, Ex. 7, 51:9-15.)  In another deposition taken on September 18, 2017 of Wakaya Perfection LLC, in which Todd Smith was again questioned, Youngevity's counsel asked whether David Gilmour is an owner of Wakaya Perfection, LLC.  (Pls.' Opp'n, Ex. I, 68:10-11.)  Mr. Smith replied, "He is not." (Id. at 68:12.)  Finally, David Roth, an agent of Mr. Gilmour, testified during his deposition on October 24, 2017 that Mr. Gilmour has no ownership interest in Wayaka Perfection, LLC, nor is he an officer of the company.  (Pls.' Opp'n, Ex. N, 62:11-17.)  Roth also testified that Mr. Gilmour is not a lender or financial guarantor of Wakaya Perfection, LLC.  (Id. at 62:21-63:17.)

However, in contrast with this testimony, Defendants persist in claiming that Mr. Gilmour founded Wakaya Perfection.  In Wakaya's September 18, 2017 deposition, Todd Smith explained Mr. Gilmour's role in the following way:

> He is our founder and so he is present at our large corporate events, he speaks from the stage, signs books, takes pictures, kisses babies. You know, all that kind of stuff that a founder of a company would do. He continues to invest in the island and actually into expansion on the other island on the agricultural side to guarantee us the ability to grow and have ample supply as well as expand into other ingredients.  So when you say is he a financial supporter, on the supply side he's a [sic] incredible financial supporter, but he does not own or invest in Wakaya Perfection, LLC.

(Pls.' Opp'n, Ex. I, 68:13-69:6.)  Moreover, Wakaya asserts in its motion: "Indeed, the undisputed evidence is that Gilmour founded Wakaya Perfection, remains involved with the production of Wakaya products, and continues to consider himself a partner to Wakaya."  (Defs.' MSJ I, 6:8-10.)

Thus, there are two issues with respect to Mr. Gilmour's involvement in

16-CV-704-BTM-JLB

Wakaya Perfection, LLC. The first is whether Mr. Gilmour is an owner or the CEO of Wakaya Perfection, LLC. Based on the deposition testimony cited above, it is clear that Mr. Gilmour is neither. Any statement by Wakaya that referred to Mr. Gilmour as an owner or CEO of Wakaya Perfection is literally false. Because Youngevity provides evidence that Wakaya made such statements, it need not also provide evidence on whether those claims were also deceptive or material.

The second issue revolves around the use of the word "founder." This is where Youngevity and Wakaya are talking past each other. It seems that Youngevity is using the word to connote one who formally or legally founds a company, while Wakaya uses the word more colloquially or symbolically to refer to one who acts as a kind of figurehead of a venture or project. With respect to statements that Mr. Gilmour "founded" Wakaya Perfection, LLC or was a "founder" of the company, it may be that these claims are also false. At the very least, with the expert report of David Stewart, Youngevity has provided some evidence that the claims, whether literally true or not, are likely to mislead or confuse consumers. (See Pls.' Opp'n, Ex. A, 21-22.)

Because Wakaya has failed to establish that there is no genuine issue of material fact with respect to claims about David Gilmour's involvement in Wakaya, the Court denies Defendants' motion for summary judgment as to subpart B of the first cause of action.

## C. Re Youngevity's Finances Against Wakaya, Smith, Barb Pitcock, Dave Pitcock, and Graham

Youngevity alleges that Wakaya and its Ambassadors promoted false advertisements about the status of Youngevity's finances. (See FAC I.C.) However, Youngevity has failed to provide evidence that raises a genuine dispute of material fact as to this claim.

In its opposition to Wakaya's motion, Youngevity asserts, "To entice

16-CV-704-BTM-JLB

[Youngevity distributors] to leave [Youngevity] for [Wakaya], [Wakaya] and its [a]gents Pitcocks, Graham, and Smith spread rumors that [Youngevity] was financially bereft and going out of business." (Pls.' Opp'n, § II.C.)

In support of this allegation, Youngevity first cites to an email about the branding of a Wakaya product that includes no mention of Youngevity or its finances. (See Pls.' Opp'n, Ex. T.)

Youngevity next cites to another email that is a personal correspondence between Dave Pitcock and Scott Fardulis. (FAC, Ex. 8.) The email discusses Mr. Pitcock's "decision to move along," presumably from Youngevity, but does not explicitly make any claim regarding Youngevity's finances. (Id.) This email also does not constitute commercial advertising or promotion. *See Newcal Indus., Inc.*, 513 F.3d at 1054. It is personal, rather than commercial, in nature. *Id.* The email is an expression of an individual's experiences and personal decisions written to a close associate or friend, rather than a promotion to "influenc[e] [the recipient] to buy defendant's goods or services." *Id.* Moreover, the email is not advertising because, as a single communication to one other person, it was not "disseminated sufficiently to the relevant purchasing public." *See id.*; *American Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1078 (N.D. Ill. 1993) ("To permit a single private correspondence to constitute either [advertising or promotion] for purposes of § 43(a)(2) liability would render their use superfluous and would sweep within the ambit of the Act any disparaging comment made in the context of a commercial transaction."); *cf. Mobius Mgmt Sys., Inc., v. Fourth Dimension Software, Inc.*, 808 F. Supp. 1005, 1020-21 (S.D.N.Y. 1994) (holding that when "the true relevant purchasing public consisted solely" of one potential customer, a single promotion to an individual purchaser could constitute commercial advertising under the Lanham Act).

Youngevity also cites to two other emails. (See FAC, Exs. 5, 7.) The authors of these emails themselves do not make any negative statements about

Youngevity's finances but rather discuss disparaging communication that the authors allegedly heard about or were on the receiving end of. One of the emails reports that "a young man" "had an hour long conversation with Barb Pitcock and Blake Graham and they have him convinced that Youngevity is going out of business." (FAC, Ex. 5.) The other email appears to be a communication by two Youngevity distributors, John and JoAnne Johnson, in which they describe an interaction with Kurt Venekamp. (FAC, Ex. 7.) The email reports that Mr. Venekamp "stated that Youngevity was going broke, and would not be around much longer." (Id.) However, these emails also fail to demonstrate sufficient dissemination. *See Newcal Indus., Inc.*, 513 F.3d at 1054; *see also Walker & Zanger, Inc. v. Paragon Indus. Inc.*, 549 F. Supp. 2d 1168, 1182 (N.D. Cal., 2007) (internal quotations and citations omitted) (holding on summary judgment that "[a] handful of statements to customers does not trigger protection from the Lanham Act unless the potential purchasers in the market are relatively limited in number"). Because three potential purchasers do not account for Wakaya's "relevant purchasing public," the two alleged conversations discussed in these emails are not sufficient dissemination. *See Newcal Indus., Inc.*, 513 F.3d at 1054. At most, these emails show, as Youngevity articulates, that "rumors" were spread but do not provide evidence of actual advertising or promotion with respect to Youngevity's finances.

Youngevity also cites to a social media post by "Dave and Barb Pitcock with Wakaya." (See FAC, Exs. 6.) The post certainly disparages Youngevity; however, it does not falsely advertise Youngevity's financial status. The post describes issues the Pitcocks claim they experienced with Youngevity and attempts to explain Youngevity's alleged behavior by stating, "*perhaps* [Youngevity] desperately need[s] money." (Id. (emphasis added).) While the post does operate to promote Wakaya, it is personal in nature as griping by disgruntled former employees and does not amount to an advertisement about

Youngevity's finances.

Finally, Youngevity provides the declaration of Michelle Wimberley, a former distributor of both Youngevity and Wakaya. (See ECF No. 607-1 ("Decl. Michelle Wimberley").) Ms. Wimberley declares that, "[A]fter I joined Wakaya, Barb Pitcock told me in approximately June 2016 on the telephone that Youngevity was struggling financially and would go out of business." (Id. at 2.) However, by this point, Ms. Wimberley recounts that she had already ended her involvement with Youngevity and became a Wakaya distributor. (Id.) Thus, there is no indication that Ms. Pitcock's statement, even if false, was a commercial advertisement promoting Wakaya to the detriment of Youngevity.

Thus, the evidence that Youngevity provides is insufficient to raise a genuine dispute of material fact as to whether Wakaya falsely advertised that Youngevity was experiencing financial trouble. The Court therefore grants Defendants' motion for summary judgment as to subpart C of the first cause of action.

## D. Re False Origin Statements About Wakaya Products Against Wakaya and Smith

Youngevity alleges that Wakaya produced false advertising with respect to the origin of its products. (See FAC I.D.) During Wakaya's September 18, 2017 deposition, counsel for Youngevity presented Todd Smith with the following description of Wakaya Perfection taken from Wakaya's YouTube page:

> Wakaya Perfection is a suite of wellness products by David H. Gilmour, the founder of Fiji water. The uniquely organic products are hand cultivated on the pristine island of Wakaya and made of 100 percent certified organic ginger powder and Dilo oil.

(Pls.' Opp'n, Ex. I, 197:25-198:15.) Mr. Smith testified that while this description was accurate when it was first written, it became "untrue" or "not fully accurate" after Wakaya Perfection, LLC acquired the YouTube page and introduced products that included ingredients not sourced from the island of Wakaya. (Id. at

198:16-199:23.)  This evidence sufficiently establishes a genuine issue of material fact as to whether Wakaya promoted literally false advertisements with respect to the origin and source of its products.  Based on this evidence, the Court denies Defendants' motion for summary judgment as to subpart D of the first cause of action.

## E. Re Sale of Unsafe, Adulterated, or Deleterious Products Against Wakaya and Smith

Youngevity alleges that Wakaya promoted false advertising with respect to the safety and health benefits of its products.  (See FAC I.D.)  Wakaya advertises that its products provide a variety of health benefits.  For example, in promotional materials for Wakaya's calcium bentonite mineral clay ("clay"), Wakaya claims that its clay product has "well known benefits."  (Pls.' Opp'n, Ex. W.)  Wakaya touts that the clay "may remove toxins from the body," and is "known" to "neutralize and balance acidic conditions," "relieve digestion," and "boost the immune system," among other benefits.  (Id.)

Youngevity argues that these claims, among others, are false.  Youngevity presents the expert report of Dr. Philip Michael Bolger, a board-certified toxicologist, who reviewed and analyzed test results of Wakaya products.  (See generally ECF No. 306-3 ("Bolger Expert Rep.").)  Dr. Bolger reports that "[t]here is no scientific evidence that would support any therapeutic effects or claims of the consumption of bentonite clays."  (Id at 19.)  The report also opines that the clay may pose a health hazard:

> Any such claims [of therapeutic effects] are not only without any clinical or scientific merit, but may very well pose a potential human health hazard and risk.  A good example is the inappropriate use of chelating agents to "remove" or "detoxify" the body of elemental contaminants. . . . Although chelating agents can be beneficial in cases of serious elemental metal poisoning, use of unapproved chelating agents is dangerous and pose a serious risk to human health.

16-CV-704-BTM-JLB

(Id. at 19.)  Additionally, the report warns that those who consume the clay may be exposed to unsafe levels of lead and arsenic.  (Id. at 17-18.)

With this report, Youngevity sufficiently raises a dispute of material fact as to whether Wakaya promoted false advertisements with respect to the health benefits of its products.  Thus, the Court denies Defendants' motion for summary judgment as to subpart E of the first cause of action.

## F. Re Unlawful Pyramid Scheme Against Wakaya

In subpart F of the first cause of action, Youngevity alleges that Wakaya Perfection, LLC is a pyramid scheme.  (FAC I.F.)  Youngevity supports this claim with evidence that Wakaya falsely advertised the amount of income a potential distributor could make by becoming a Wakaya Ambassador.  These claims were discussed above in Part III.A, where the Court held that the evidence Youngevity has provided sufficiently raises a dispute of material fact as to whether Wakaya is liable under the § 43(a) of the Lanham Act for making these claims.  Whether the income claims also establish a dispute of material fact as to whether Wakaya is an unlawful pyramid scheme, however, is not an inquiry covered by the Lanham Act.

"[T]he operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes."  *Webster v. Omnitrition Intern., Inc.*, 79 F.3d 776, 781 (9th Cir. 1996).  A pyramid scheme is "characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."  *Id.* (emphasis in original) (internal citation omitted).

The income claims do not sufficiently raise a dispute as to whether Wakaya is a pyramid scheme, because the evidence presented does not demonstrate that the "rewards" or income that Wakaya Ambassadors receive are unrelated to the sale of Wakaya products.  Thus, Youngevity fails to establish a genuine

16-CV-704-BTM-JLB

dispute of material fact as to whether Wakaya is liable under the Lanham Act for being a pyramid scheme. Thus, the Court grants Defendants' motion for summary judgment as to subpart F of the first cause of action.

**G. Re Curcumin Content in Wakaya Turmeric Against Wakaya and Smith**

Youngevity alleges that Wakaya falsely advertised the percentage of curcumin in its turmeric products, as compared to typical turmeric in the market. (See FAC I.G.)

For example, Wakaya has advertised that its turmeric product, Wakaya Organic Fijian Turmeric ("turmeric"), contains six times more curcumin (5.96%) that traditional turmeric (0.92%). (ECF No. 311-3 ("Glade Expert Rep."), 27-28; ECF No. 559-3, Ex. A ("Rucker Expert Rep."), 5.) However, Youngevity presents expert reports demonstrating that these claims are false. (See Glade Expert Rep., 27-28, 35; see also Rucker Expert Rep., 20-23.) Youngevity expert Dr. Michael John Glade reports that "independent analyses of the Wakaya Organic Fijian Turmeric dietary supplement found that it contained 2.45% curcumin." (Glade Expert Rep., 27-28, 35.) Youngevity expert Dr. Richard P. Rucker, after conducting comparative testing of Wakaya's turmeric and five other turmeric products on the market, determined that Wakaya's turmeric contains about 3.10% curcumin. (Rucker Expert Rep., 20-23.)

Based on this evidence, Youngevity raises a triable issue of fact as to whether Wakaya has promoted false advertising with respect to the percentage of curcumin in its turmeric products. Therefore, the Court denies Defendants' motion for summary judgment as to subpart G of Yougevity's first cause of action.

**H. Re Weight Loss Claims Against Wakaya, Smith, Andreoli, Barb Pitcock, Dave Pitcock, Vaughn, Graham, Casperson, Gardner**

Youngevity alleges that Wakaya promoted false advertising with respect to Wakaya's weight loss program, "BulaFIT." (See FAC I.H.) However, Youngevity

has failed to provide evidence that raises a genuine dispute of material fact as to this claim.

In its opposition to Wakaya's motion, Youngevity asserts, "To promote BulaFIT, [those within the Wakaya network] claimed that 100% of BulaFIT users *would lose* substantial amounts of weight in weeks or months . . . ." (Pls.' Opp'n, § II.D (emphasis added).) However, while the evidence includes testimonials of weight loss during specific periods of time, no promotions or advertising presented by Youngevity promise that users *would* or *will* lose weight. (See Pls.' Opp'n, Ex. CC; FAC, Ex. 30.) For example, one social media post promoting BulaFIT states, "So far 100% of People have lost weight on our #Keto #BulaFIT Program." (Pls.' Opp'n, Ex. CC, p. 280.) Another social media post explicitly states that the program does not guarantee weight loss: "While we can't say that 100% of the people will get results, so far we do have 20 out of 20 that have lost weight." (Id. at p. 282.)

Youngevity has not provided evidence that the specific claims made about any individual's experience using Wakaya's weight loss program are literally false or literally true but likely to mislead consumers. *Southland Sod Farms*, 108 F.3d at 1139. Youngevity only presents the expert report of Dr. Samuel N. Grief, who opines that the 100% success rate in achieving weight loss put forth by the Wakaya Ambassadors who used BulaFit is "unrealistic, unsubstantiated, and very misleading." (ECF No. 312-3 ("Grief Expert Rep."), 8.) Thus, Dr. Grief does not refute that the weight loss claims are literally true. Dr. Grief continues:

> Rapid weight loss is achievable with almost any diet, commercial or medically supervised, as mentioned earlier above. Maintenance is the key to success. To re-iterate: No evidence of successful long-term weight loss maintenance is asserted or put forward on Wakaya's website or in the testimonials.

(Id.) Plaintiffs, however, must establish falsity, not simply that the weight loss claims are unrealistic or unsubstantiated. *Southland Sod Farms*, 108 F.3d at

16-CV-704-BTM-JLB

1139.

Dr. Grief opines that the weight loss claims are "misleading," because Wakaya's website and testimonials do not make any assertions as to weight loss maintenance. However, promotions with respect to weight loss maintenance are not at issue. The BulaFIT advertising only claims that its users lost weight. Claims about weight loss are not inherently misleading just because they fail to include data about weight loss maintenance. Moreover, even if weight loss maintenance were at issue, Youngevity fails to provide evidence that those who used BulaFIT were unable to maintain their weight loss.

Because Youngevity fails to raise a dispute of material fact with respect to Wakaya's promotions of the BulaFIT program, the Court grants Defendants' motion as to subpart H of the first cause of action.

## IV. Youngevity's Motion to Exclude Testimony of Dr. Plant

Federal Rule of Evidence 702 permits expert testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Under Rule 702, expert testimony must be both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999). The trial court must act as a "gatekeeper" to exclude expert testimony that does not meet Rule 702's reliability standards. *Kumho Tire*, 526 U.S. at 147-48.

With respect to relevance, there must be a "valid scientific connection to the pertinent inquiry" in order for Rule 702's "helpfulness" standard to be met. *Daubert*, 509 U.S. at 592. As for reliability, the Court must make a preliminary

16-CV-704-BTM-JLB

assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can be applied to the facts in issue. *Id.* at 592-93. In *Daubert*, the Supreme Court listed several factors that may be pertinent in assessing reliability: (1) whether the scientific theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Id.* at 593-94. The inquiry under Rule 702 is a "flexible" one, and the district court has "the discretionary authority . . . to determine reliability in light of the particular facts and circumstances of the particular case." *Kumho Tire*, 526 U.S. at 158. Accordingly, the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Id.* at 150.

Importantly, the focus of the court's gatekeeping inquiry "must be solely on principles and methodology, not the conclusions that they generate." *Daubert*, 509 U.S. at 595. "When an expert meets the threshold established by Rule 702 . . . the expert may testify and the jury decides how much weight to give that testimony." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

Plaintiffs seek to exclude the testimony of Dr. Joshua Plant, who Defendants retained to rebut the arguments and claims made by one of Plaintiff's experts, Dr. Richard Rucker, with respect to the curcumin content in Wakaya turmeric. (See ECF No. 569-1, Ex. B ("Plant Expert Rep.").) Youngevity challenges the expert opinion offered by Dr. Plant on three grounds: (1) Dr. Plant is not an expert in turmeric or curcumin, (2) Dr. Plant has a "disqualifying conflict of interest" as an owner of Pharmatech, a Wakaya manufacturer, and (3) Dr. Plant did not conduct independent testing and does not challenge the validity of Dr. Rucker's expert report. (See Pls.' MSJ I.G & Mot. Excl., § IV.)

Youngevity challenges Dr. Plant's expertise in large part by raising issues as to his deposition testimony. (See Pls.' MSJ I.G & Mot. Excl., § IV, Ex. C.) Even when taking Youngevity's characterization of Dr. Plant's deposition testimony as accurate, Youngevity's challenges are insufficient to warrant exclusion. First, Dr. Plant need not be an expert in turmeric or curcumin specifically for his opinion to be relevant to or relied on by the trier of fact. His education and credentials in biomedical science and experience studying and testing supplementation efficacy and functionality qualify him to testify and offer a rebuttal to Dr. Rucker's opinion with regard to curcumin content in turmeric supplements. *See United States v. Thompson*, No. 05-50801, 2007 WL 2044725, at \*2 (9th Cir. July 16, 2007) (citing *Kumho Tire*, 526 U.S. at 147) ("Federal Rule of Evidence 702 merely requires some form of specialized knowledge . . . .").

Second, whether Dr. Plant has a conflict of interest goes to the weight and credibility of Dr. Plant's testimony, rather than its admissibility. *See United States v. Abonce-Barrera*, 257 F.3d 959, 965 (9th Cir. 2001) (applying to expert testimony the general principle that evidence of bias goes toward credibility of a witness, not his competence to testify).

Third, the fact that Dr. Plant did not conduct his own testing also goes to the weight and credibility of his testimony, not its admissibility. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) (internal quotation omitted) ("The relative weakness or strength of the factual underpinnings of the expert's opinion goes to weight and credibility, rather than admissibility.") Moreover, while Dr. Plant may not challenge the validity of Dr. Rucker's expert report, Dr. Plant's opinion is helpful in that it refines and contextualizes

//

//

//

Dr. Rucker's opinion. *See Kumho Tire*, 526 U.S. at 147; *Abonce-Barrera*, 257 F.3d at 965. For example, Dr. Plant testified during his deposition that Dr. Rucker's results may be an underestimation of the curcumin content in the samples he tested. (Pls.' MSJ I.G & Mot. Excl., Ex. C 94:6-24, 95:17-23.)

Therefore, Plaintiffs' motion to exclude the testimony of Dr. Joshua Plant is denied.

The Court limits its ruling to the consideration of the expert evidence on this and any other pending motion for summary judgment. If the expert is to actually be called as a witness at trial, a party may use one of its allotted motions *in limine* to seek an evidentiary hearing seeking to exclude the expert's testimony.

### V. Youngevity's Motion for Summary Judgment as to Subpart G

Youngevity moves for summary judgment as to subpart G of the first cause of action. Youngevity alleges in subpart G that Wakaya has violated § 43(a) of the Lanham Act by falsely advertising the amount of curcumin in Wakaya's turmeric product. (See FAC I.G.)

Wakaya has advertised that its turmeric "contains nearly 6% curcumin compared to less than 1% for more traditional turmeric." (Pl.'s MSJ I.G & Mot. Excl., Ex. A, 5.) Wakaya has also claimed that its turmeric has "a whopping five times more curcumin, the therapeutic agent in turmeric, above all conventional turmeric powders." (Id. at Ex. C, 160:12-15.)

Youngevity argues that these statements are literally false, either on their face or by necessary implication, because the only quantitative data to support these claims are test results by Microbac Laboratories ("the Microbac test results") that compare Wakaya's turmeric with one other brand of curcumin. Todd Smith, Wakaya's owner, confirms that Wakaya marketed its turmeric product based on these test results:

Prior to launching Wakaya Perfection as a direct selling company in 2016, I was provided test results from Wakaya Perfection LP that

16-CV-704-BTM-JLB

> were conducted by Microbac Laboratories in 2014. The test results showed that Wakaya's turmeric from Wakaya Island in Fiji contained 5.96% curcumin and that another brand of curcumin from a local store was tested under the same methodology, showing that it contained 0.92% curcumin.

(ECF No. 569-1, Ex. A ("Todd Smith Decl."), ¶ 2.)

Youngevity also presents the expert report of Dr. Richard Rucker, who tested Wakaya turmeric against five other turmeric products on the market. (See Pl.'s. MSJ I.G & Mot. Excl., Ex. A.) Dr. Rucker opines that Wakaya turmeric contains 3.10% curcumin. (Id. at 20.) The other five products tested contain percentages of curcumin ranging from 1.72% to 3.92%. (Id.)

Wakaya's rebuttal expert, Dr. Plant, opines that because levels of organic compounds naturally vary in spices, test results of the percentage of certain compounds in products will also vary. (See ECF No. 569-1, Ex. B ("Plant Expert Rep."), 4.) Consequently, Dr. Plant opines that Dr. Rucker's reporting on the curcumin content in Wakaya's turmeric is not definitive, nor does it show that the Microbac test results are false. Based on Dr. Plant's report and testimony, Wakaya argues that at most, Youngevity establishes evidence that Wakaya's advertising with respect to its curcumin content is unsubstantiated.

There is no dispute that Wakaya's promotions of its turmeric product lack support. However, when viewing all inferences drawn from the underlying facts in the light most favorable to Wakaya, the evidence provided is insufficient to establish that there is no genuine dispute of material fact as to whether the promotions are false. Thus, the Court denies Youngevity's motion for summary judgment as to subpart G of the first cause of action.

//
//
//
//

## **CONCLUSION**

For the reasons discussed above, the Court **denies in part and grants in part** Defendants' motion for summary judgment (ECF No. 300).

The Court **denies** the motion as to the following subparts of the first cause of action: B, D, E, G.  The Court also **denies** the motion as to subpart A against Defendants Wakaya, Barb Pitcock, Dave Pitcock, and Andre Vaughn.

The Court **grants** the motion as the following subparts of the first cause of action: C, F, H.  The Court also **grants** the motion as to subpart A against Defendant Bill Andreoli.

The Court **denies** Plaintiffs' motion to exclude the testimony of Defendants' rebuttal witness, Dr. Joshua Plant (ECF No. 559.)  The Court **denies** Youngevity's motion for summary judgment as to subpart G of its first cause of action (ECF No. 559).

**IT IS SO ORDERED**.

Dated: July 5, 2019

_____
Honorable Barry Ted Moskowitz
United States District Judge

16-CV-704-BTM-JLB