# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Youngevity International, et al.,<br><br>                Plaintiffs,<br><br>v.<br><br>Todd Smith, et al.,<br><br>                Defendants. | Case No.: 16-cv-704-BTM-JLB<br><br>**ORDER DENYING COUNTERCLAIM DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AS TO COUNTERCLAIM PLAINTIFFS' THIRTEENTH COUNTERCLAIM FOR RELIEF**<br><br>**[ECF NO. 439]** |

Before the Court is a motion for summary judgment by Counterclaim Defendants Youngevity International ("Youngevity") and Dave Briskie (collectively, "Counterclaim Defendants") against Counterclaim Plaintiffs Todd Smith, *et al.* ("Counterclaim Plaintiffs") as to the thirteenth counterclaim in the Second Amended Counterclaim (ECF No. 404 ("SACC")) for fraudulent and negligent misrepresentation. (ECF No. 439.) For the reasons discussed below, the Court denies Counterclaim Defendants' motion.

## **STANDARD**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil

Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 323.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to demonstrate that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 314. The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256. Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting FED. R. CIV. P. 56(e)).

The Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## DISCUSSION

Under California law, the elements of a claim for fraud are: "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, *i.e.*, to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies, Inc.*, 30 Cal. 4th 167, 173 (Cal. 2003) (quoting *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (Cal. 1996).) A claim of negligent misrepresentation requires a similar showing, except that it "does not require scienter or intent to defraud." *Small*, 30 Cal. 4th at 173-74 (citing *Gagne v. Bertran*, 43 Cal. 2d 481, 487–488 (Cal. 1954)); *Los Angeles Unified Sch. Dist. v. Great Am. Ins. Co.*, 49 Cal. 4th 739, 750 n.5 (Cal. 2010) ("[T]ort law recognizes a claim for negligent misrepresentation, which allows recovery in the absence of scienter or intent to defraud . . . ." (citations omitted)); *but see Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal. App. 4th 226, 243 (Cal. Ct. App. 2007) ("The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." (citing *Shamsian v. Atlantic Richfield Co.* 107 Cal. App. 4th 967, 983 (Cal. Ct. App. 2003))). Rather, negligent misrepresentation requires "only the assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." *Conroy v. Regents of Univ. of California*, 45 Cal. 4th 1244, 1255 (Cal. 2009) (citing *Small*, 30 Cal. 4th at 173-74); *Charnay v. Cobert*, 145 Cal. App. 4th 170, 184 (Cal. Ct. App. 2006) ("In a claim for negligent misrepresentation, the plaintiff need not [show] the defendant made an

intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." (citing *Bily v. Arthur Young & Co.*, 3 Cal. 4th 370, 407–08 (Cal. 1992))).

In their claim for fraud and/or negligent misrepresentation, Counterclaim Plaintiffs assert that Todd Smith relied to his financial detriment upon false or misleading statements made by Youngevity's leadership as to Youngevity's readiness to conduct business in Mexico. (SACC ¶¶ 269-275.) In support thereof, Smith declares that he attended "Youngevity's Leadership Summit" in late September 2014, including "several different presentations concerning Youngevity opening for business in Mexico." (ECF No. 473-1, Ex. 1 ("Smith Decl."), ¶ 4.) During one such presentation, Youngevity's then-CFO and Director of International Development, Briskie, announced that "Youngevity was ready to operate in Mexico, . . . had a Mexico office, a warehouse, staff, . . . [and] was prepared to enter Mexico through the front door, meaning that Dr. [Joel] Wallach's 90-for-life message could be taken to Mexico." (*Id.* ¶ 5.) Youngevity's CEO, Steve Wallach, stood behind Briskie and nodded with approval during such announcements. (*Id.*) During that same presentation and while Briskie and Steve Wallach were still on stage, Youngevity's Director of Latin America, Susan Azocar, announced that "Youngevity [was] opening Mexico in just one week on October 1, 2014" and that "all [were] welcome to visit Mexico and help spread Dr. Wallach's message." (*Id.* ¶ 6.) Further, Smith "witnessed numerous distributors from Mexico being recognized [at the Leadership Summit] as top sales producers" and these distributors "spoke about Dr. Wallach's products and the health benefits they observed from themselves and others buying and consuming Youngevity dietary supplements in Mexico." (*Id.* ¶ 9.) Smith sought confirmation of such announcements "individually with both [Steve] Wallach and Briskie on two separate occasions at the Leadership Summit, inquiring whether what [Smith] heard was accurate and whether [he] could begin establishing distributorships and

selling product in Mexico." (*Id.* ¶ 7.) After Smith informed Briskie and Steve Wallach of his intent to begin establishing distributorships in Mexico, Steve Wallach told Smith that "Mexico [was] good to go" and Briskie told Smith that "all the necessary requirements had been satisfied and that we were good to go in Mexico now." (*Id.*)

Based on the foregoing statements of Briskie and Steve Wallach, Smith decided to "pursue establishing distributorships to sell Youngevity's 90-for-life dietary supplements in Mexico." (*Id.* ¶ 10.) In reliance on the statements, Smith "made arrangements to hold three separate meetings in Mexico in January 2015 with Dr. Wallach" and incurred various expenses – in an amount no less than $10,000 – in connection therewith. (*Id.*) Nevertheless, approximately two days before Smith was to travel to Mexico for such meetings, Briskie told Smith for the first time that "Youngevity actually had not received approval from the Mexican government to sell Youngevity's supplement products in Mexico and . . . that [Smith] could not hold meetings in Mexico with Dr. Wallach to sell Youngevity's products." (*Id.* ¶ 11.) Given that "Dr. Wallach and others were already in Mexico and the events were going forward," however, Smith nonetheless travelled to Mexico and held the meetings – rebranding them as "pre-marketing meetings" – but was "precluded from signing up distributors or selling the products that [he] purchased for the events." (*Id.* ¶ 13.).

In their present motion, Counterclaim Defendants argue that, whether construed as a claim for fraud or negligent misrepresentation, Counterclaim Plaintiffs have failed to properly support each and every element of such claims. As to the first element (misrepresentation), Counterclaim Defendant denies that any of the aforementioned statements were made and that, even if they were, they were "substantially true statements" in September 2014 because Youngevity "was open for business and legally able to sell cosmetics and jewelry [in Mexico], just not dietary supplements." (ECF No. 439-1, at 4.) As to whether the statements

were made, Smith has clearly raised a triable issue of fact. (*See* Smith Decl. ¶¶ 5-7, 9.) Further, construing all inferences in the light most favorable to the non-moving parties, a reasonable factfinder could conclude that, given the context in which they were made, the import of Briskie and Steve Wallach's comments were not limited to Youngevity's authorization to sell cosmetics and jewelry in Mexico, but rather included – or were primarily directed at – Youngevity's authorization to sell dietary supplements in Mexico. This is particularly true given that "[t]he theme of the announcements at the Leadership Summit regarding Youngevity's international expansion focused on marketing Dr. Wallach's 90-for-life products [*i.e.*, dietary supplements] in new countries" with little to no "focus or attention given to selling cosmetics or jewelry in Mexico" and over 99% of Smith's sales involved the sale of dietary supplements. (*Id.* ¶ 8.)

As to the second element (knowledge/disregard for falsity), Counterclaim Defendants similarly argue that any statements by Briskie and Steve Wallach were "substantially true" given that Youngevity was "open for business" in Mexico as of September 2014. (ECF No. 439-1, at 4.) However, a reasonable factfinder could conclude that such statements were not limited in their scope to solely being open for *any* business, but rather *all* Youngevity business – including the marketing and sale of Youngevity's dietary supplements. Moreover, a reasonable factfinder could, after drawing the aforementioned conclusion, conclude on the evidence of record that Briskie and Steve Wallach knew their aforementioned statements were materially false – or at least lacked reasonable grounds to believe them to be true – at the time they were made. (*See* ECF No. 439-2 ("S. Wallach Decl."), ¶ 8 ("I [*i.e.*, Steve Wallach] also did not verify with Todd Smith on the day of that event [*i.e.*, the Leadership Summit] that Youngevity had obtained the required regulatory approvals to distribute its products in Mexico because we had not yet obtained product approvals from Mexico for dietary supplements."); ECF No. 439-4, at 24-26 ("Q: Do you [*i.e.*, Briskie] remember saying that you had products in Mexico at

1 that time? A: We might have had a 3PL operating shipping product potentially.
2 We were getting products approved so we were in the approval process. So it is
3 possible that some products were approved by then. . . . Q: What do you recall
4 about the conversation between you and [Smith]? A: I think it was via email that
5 we weren't ready to go into Mexico just yet. There's one thing about these foreign
6 markets, you've got distributors that are marketing products down there, but our
7 company officially being open across the product line. I didn't think we were ready
8 yet for that. You know, we have a lot of products, some are easier to get registered
9 than others, and the more complicated product would be the ones like Dr. Wallach
10 would probably talk about. So I thought it was a little bit early as I recall. . . . Q:
11 Okay. So prior – what I want to know is if you recall having a conversation with
12 [Smith] and shortly after the convention, after the announcement was made at the
13 convention concerning Mexico, if you recall having a conversation with [Smith]
14 where he confirmed that everything was ready to go, and if he went down, there
15 things would be ready. Do you recall that conversation? A: I mean, I remember
16 conversations that we were going to open in Mexico and would be opening an
17 office there and would be staffing that office and had hired a country manager. I
18 remember all that type of conversation. But in terms of the specifics, I mean, why
19 would I discourage someone going down there with Dr. Wallach if we were 100
20 percent ready to go.")

21 As to the third element (intent to induce reliance), Counterclaim Defendants
22 argue that Counterclaim Plaintiffs have failed to introduce any evidence that
23 Youngevity's leadership intended Smith to rely on their statements. Yet, a
24 reasonable factfinder could infer that Briskie and Steve Wallach intended to induce
25 reliance on their statements given Smith's declaration that they both confirmed
26 Mexico was "good to go" – and Briskie claimed "the necessary requirements had
27 been satisfied" – in response to Smith's inquiries as to whether he could begin
28 efforts to establish distribution channels in Mexico. *See Gagne v. Bertran*, 43 Cal.

2d 481, 488 (Cal. 1954) ("Defendant's intent to induce plaintiffs to alter their position can be inferred from the fact that he made the representations with knowledge that plaintiffs would act in reliance on them." (citations omitted)).

As to the fourth element (reasonable reliance), Counterclaim Defendants argue that it would have been unreasonable for Smith to rely upon the statements at issue "without himself seeking requisite [Mexican] government approvals or confirming that [Youngevity] had obtained such approvals applicable to him specifically." (ECF No. 439-1, at 5.) Notably, Counterclaim Defendants cite no evidence or authority for their assertion that Smith was required to obtain "separate approvals" for "imports, marketing and sale by [Smith] rather than by [Youngevity] corporate." (*Id.*) And while it is true that the Court must consider Smith's knowledge and experience in determining whether his reliance was justifiable, *Gray v. Don Miller & Associates, Inc.,* 35 Cal. 3d 498, 503 (Cal. 1984), Counterclaim Defendants have failed to sufficiently develop the record so as to support their argument that Smith's purported prior failures in introducing Youngevity's products into Australia and New Zealand[1] made it objectively unreasonable to rely upon statements from Youngevity's leadership that all regulatory requirements for marketing and sale in Mexico had been satisfied. Because the Court cannot conclude that Smith's reliance was objectively

---

[1] (*See* S. Wallach Decl. ¶ 11 ("I personally became aware that Todd Smith had attempted to promote Youngevity in international markets previously, including New Zealand and Australia. In each of these instances, Todd Smith failed at introducing Youngevity to those countries. Specifically, the Australian Office of Fair Trading of the NSW Consumer Protection Agency took issue with claims Smith made regarding Youngevity products. Smith thereafter resigned his position as Director of Australian Longevity Pty Ltd. Smith then left Australia and returned to Utah, forcing Youngevity to resolve issues with the Australian Office of Fair Trading before Youngevity could reintroduce product to Australia with required regulatory approvals.").)

unreasonable based upon the evidence of record, the determination of reasonableness is left to the factfinder. *See City Sols., Inc. v. Clear Channel Commc'ns*, 365 F.3d 835, 840 (9th Cir. 2004) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact." (quoting *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (Cal. 1995))).

Finally, as to the fifth element (damages), Counterclaim Defendants argue that Smith suffered no resulting damages because, even assuming Smith incurred nonrefundable expenses in organizing the January 2015 meetings in Mexico, "those meetings, in fact, occurred" and thus Smith "has no provable damages by preparing for and attending those meetings. (ECF No. 493, at 4-5.) Further, Counterclaim Defendants argue that even if Smith was "precluded from signing up distributors or selling" Youngevity's products at such meetings, those losses are akin to lost profits and therefore unrecoverable via a claim of fraud or negligent misrepresentation. (*Id.* at 5.) While the Court agrees that lost profits cannot satisfy the damages element of this claim because they are unrecoverable "benefit-of-the-bargain" losses, any nonrefundable amounts expended by Smith in organizing such meetings may be recovered as "out-of-pocket" expenditures. *See Kenly v. Ukegawa*, 16 Cal. App. 4th 49, 54 (Cal. Ct. App. 1993) ("[A] defrauded party may recoup his out-of-pocket losses and expenditures in reliance on the fraud, but he may not recover benefit-of-the-bargain damages (*i.e.*, damages placing him in the economic position he would have occupied had the representation been true), at least where the recovery is not premised on a specific property actually acquired by the defrauded party." (citing *Gray,* 35 Cal. 3d at 504)); *see also Alliance Mortg. Co.,* 10 Cal. 4th at 1240 ("The out-of-pocket measure of damages is directed to restoring the plaintiff to the financial position enjoyed by him prior to the fraudulent transaction, and thus awards the difference in actual value at the time of the transaction between what the plaintiff gave and what he received." (internal

quotations and citations omitted)). Because a reasonable factfinder could conclude that Smith would not have organized the meetings and incurred the attendant expenses thereof in the absence of the statements at issue (*see* Smith Decl. ¶ 10), such expenses would be recoverable from Counterclaim Defendants. *See, e.g., Kenly*, 16 Cal. App. 4th at 55 ("If the "wrong" [*i.e.*, misrepresentation] had not been done, Kenly presumably would not have borrowed funds to purchase the note; if he incurred damages from that transaction, he is entitled to be made whole.").

Because the Court concludes that the record can support each and every element of the Counterclaim Plaintiffs' claim for fraud and/or negligent misrepresentation and genuine issues of material fact remain in connection therewith, summary judgment is inappropriate on this claim.

## **CONCLUSION**

For the foregoing reasons, the Court **DENIES** Counterclaim Defendants' motion for summary judgment as to Counterclaim Plaintiffs' thirteenth claim for fraudulent and negligent misrepresentation (ECF No. 439).

**IT IS SO ORDERED.**

Dated: July 18, 2019

_____
Honorable Barry Ted Moskowitz
United States District Judge